**STARK & STARK, P.C.**
A Professional Corporation
Joseph H. Lemkin, Esq.
100 American Metro Boulevard
Hamilton, NJ 08619-2319
(609) 791-7022
*Attorneys for Drexel Distributors*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In Re:<br><br>ProPhase Diagnostics NJ, Inc., et al.,<br><br>    Debtors. | Chapter 11<br><br>Case No. 25-19833 (CMG)<br><br>jointly administered<br><br>**Hearing Date: February 10, 2026** |

**JOINDER TO UNITED STATES TRUSTEE'S MOTION**
**TO DISMISS OR CONVERT PURSUANT TO 11 U.S.C. § 1112(B)**

**PRELIMINARY STATMENT**

Drexel Distributors, Inc. d/b/a EZ Test NY   ("Drexel"), a creditor of ProPhase Diagnostics, Inc and   ProPhase Diagnostics NY, Inc. ("Prophase"), respectfully submits this joinder (the "Joinder") to the Motion filed by the United States Trustee (the "UST") to dismiss or convert the above-captioned Chapter 11 cases pursuant to 11 U.S.C. § 1112(b) (the "Motion"), and specifically to support the alternative relief of conversion of the cases to Chapter 7.

1. Drexel fully agrees with the UST's position that ProPhase Diagnostics NJ, Inc. ("ProPhase NJ"), ProPhase Diagnostics NY, Inc., and ProPhase Diagnostics, Inc. (   all three entities referenced together as "Debtors") breached their statutory and fiduciary obligations by not filing Monthly Operating Reports ("MORs") for the months of September 2025, October,

2025, and November 2025, and that their wholesale failure to comply with their obligations establishes cause under §1112(b). However, as explained below, given the Debtors' fraudulent conduct and failure of their parent company, Prophase Labs, Inc. ("ProPhase Labs"), to treat its subsidiaries as independent, among other things, there is a need for appointment of a Chapter 7 trustee which in this case would ensure:

- o An independent investigation into inter-company transactions between the Debtors and their parent entity;

- o A review of potential fraudulent transfers, preferential transfers, and insider transactions;

- o An examination of any improper diversion or upstreaming of funds; and

- o The orderly collection of estate assets, including potentially significant receivables owed by third parties, including insurance carriers, to ProPhase and potentially the other Debtors. [1]

2. Only through conversion can creditors be assured that assets will be preserved, investigated, and administered for their collective benefits.

3. Conversion is therefore plainly in the best interests of the creditors and Debtors' estates, and Drexel therefore urges this Court to convert the cases to Chapter 7 rather than dismiss them.

## **FACTS**

4. Drexel was and is a limited services laboratory licensed by the New York State Department of Health to operate various COVID-19 collection and/or testing sites in New York. *See* Certification of Bedis Zormati ("Zormati Cert") ¶ 3 attached hereto as **Exhibit "A".**

5. During the COVID-19 pandemic, Drexel collected patient specimens for independent laboratories to perform polymerase chain reaction ("PCR") testing and, later, also performed

---

[1] ProPhase Diagnostics, Inc. is a wholly owned subsidiary of ProPhase Labs. ProPhase Diagnostics NY, Inc. and ProPhase Diagnostics NJ, Inc. are wholly owned by ProPhase Diagnostics, Inc. Drexel signed a written agreement with ProPhase Diagnostics, Inc. For clarity, we will refer to ProPhase Diagnostics, Inc. and ProPhase Diagnostics NY, Inc. together collectively as "ProPhase" throughout the rest of the pleading.

rapid antigen ("Antigen") testing for individuals seeking rapid COVID-19 diagnoses. *See* Zormati Cert ¶ 4.

6.  Beginning in or about May 2021, Drexel began utilizing ProPhase as one of several CLIA-certified laboratories for PCR testing on specimens that Drexel collected. *See* Zormati Cert ¶ 5.

7.  Thereafter, in or about October 2021, Drexel also began utilizing ProPhase as one of several CLIA-certified laboratories that Drexel used for billing and reporting services for Antigen tests that Drexel administered to patients who needed rapid test results in the field. *See* Zormati Cert ¶ 6.

8.  On March 7, 2022, Drexel and ProPhase entered into a written agreement that more formally memorialized the prior agreements of the parties. Specifically, the parties agreed to certain payment schedules and dollar amounts for Drexel's collection of PCR specimens to be tested by ProPhase, and for ProPhase's reporting of Antigen results. At the time, ProPhase was reimbursed for all costs of collection, testing, and treatment through a government program run by the Health Resources and Services Administration (the "HRSA Program"). *See* Zormati Cert ¶ 7.

9.  Shortly thereafter, on March 22, 2022, the government advised that it was no longer going to accept claims under the HRSA program.[2] Accordingly, Prophase reached out to Drexel (among other specimen collection partners) by email and stated that, although Prophase was unsure whether HRSA would reinstate funding, Prophase would assume the risk of continued testing at no cost to its collection partners if those collection partners agreed that they would

---

[2] Notwithstanding the announcement, upon information and belief, HRSA permitted laboratories (including Prophase) to submit claims for reimbursement for collection, testing, and/or treatment of COVID-19 up to and including March 30, 2022.

only be paid for those patients for whom Prophase got reimbursed (whether through HRSA or insurance). *See* Zormati Cert ¶ 8.

10. Thereafter, Drexel continued to perform substantial collection (PCR) and testing (Antigen) services, but ProPhase did not pay Drexel for *any* services rendered after the end of HRSA. *See* Zormati Cert ¶ 9.

11. Prophase asserted that there were little to no insurance reimbursements to pay Drexel but failed and/or refused to provide *any* independent empirical data to prove that claim despite repeated requests that it do so. Accordingly, Drexel was left to conclude that Prophase was, in fact, reimbursed by insurance and that Prophase owed Drexel the full amount for all PCR collection and testing on all invoices. *See* Zormati Cert ¶ 10.

12. Additionally, even though HRSA ended on March 22, 2022, the COVID-19 Public Health Emergency ("PHE") continued in the United States and did not officially end until May 11, 2023. Upon information and belief, ProPhase billed collection fees to other payers, particularly Medicare, Medicaid, and private insurers, but retained that revenue without remitting it to Drexel even though Drexel performed the collections. Indeed, ProPhase misrepresented to Drexel that claims were denied based on the testing portion, while still collecting the collection fees that should have been paid to Drexel. *See* Zormati Cert ¶ 11.

13. As a result, Drexel commenced an action in the Supreme Court of New York, New York County *Drexel Distribution Inc., Drexel Distribution Inc. d/b/a EZ Test NY v. Prophase Diagnostics, Inc.*( Index No. 654503/2022) ("State Court Action") alleging that ProPhase failed to pay certain invoices for PCR testing and Antigen testing. The Second Amended Complaint alleged causes of action for breach of contract, unjust enrichment, and quantum

4919-1871-4506, v. 3

merit, respectively seeking total damages of $1,654,222.00 plus attorney's fees. *See* Zormati Cert ¶ 12.

14. During the course of the State Court case, Drexel demanded but was never provided with independent support for ProPhase's claims that there were little to no insurance reimbursements to pay Drexel. However, Drexel's independent investigation revealed that ProPhase had, in fact, received reimbursements that should have been paid over to Drexel under the HRSA program but were not (a fraud on the government) and/or that ProPhase resubmitted claims years later with modified information (a fraud on insurance). *See* Zormati Cert ¶ 13.

15. On September 10, 2025, Drexel obtained partial summary judgment on its claims in the State Court Action, but only for certain invoices that remained unpaid prior to the end of the HRSA program, and the remaining claims for non-payment (both pre- and post-HRSA) were denied and/or were not part of the motion to begin with. The total partial award was in the principal sum of $127,235.00 plus statutory interest from May 29, 2022, with the remaining claims reserved for trial. *See* Zormati Cert ¶ 14.

16. On September 22, 2025, the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11, United States Code. the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey. [ ECF Doc. No. 1].

17. Since the filing, the Debtors have acted as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

18. On October 31, 2025, a Notice of Appearance was filed by this office on behalf of Drexel in this matter. [ECF Doc. No.: 36].

19. On November 30, 2025, an Amended Proof of Claim was filed setting forth the basis of Drexel's claim against Debtors in this matter. The amount set forth was no less than $1,754,088.00 plus cost, fees, disbursements, and pre- and post-judgment interest as alleged in the State Court Action. [Claim Register No. 32].

20. On January 6, 2026 Drexel served a Rule 2004 Subpoena on ProPhase. Documents were to be produced by January 30, 2026. *See* a true and correct copy of Rule 2004 Subpoena with Schedule A ("Rule 2004 Subpoena") attached hereto as **Exhibit "B"**.

21. On January 15, 2026, the UST filed the Motion asserting that cause exists to either dismiss or in the alternative convert the case due to the Debtors' failure to file monthly operating reports since the inception of these cases, including the months of September 2025, October 2025, and November 2025. [ECF Doc. No.: 59].

22. Drexel agrees with the assertions made in the Motion, but requests conversion of this case to Chapter 7 for the reasons set forth below.

## LEGAL ARGUMENT

### I.     Cause Exists for Dismissal or Conversion pursuant to 11 U.S.C. § 1112(b).

23. Pursuant to 11 U.S.C. § 1112(b)(4)(f) of the Bankruptcy Code, upon request of a party in interest, the court shall convert a Chapter 11 case to a case under Chapter 7 or dismiss the case, whichever is in the best interests of creditors and the estate, if cause is established.

24. As set forth in the Motion, cause exists under 11 U.S.C. § 1112(b)(4) due to the Debtors' repeated failure to file any MORs and their failure to meaningfully participate in the Chapter 11 process since its inception in September 2025.

4919-1871-4506, v. 3

25. The Debtors have not proposed a plan and have no ongoing operating business to be reorganized. The Debtors ceased providing COVID-19 diagnostic testing in May 2025. *See* Zormati Cert ¶ 27.

26. In addition to the cause established by the UST in the Motion, cause exists for conversion based on the Debtors' misconduct prior to and during the pendency of this bankruptcy case.

27. Indeed, ProPhase is a wholly owned subsidiary of ProPhase Labs. The Debtors and ProPhase Labs share the same principals and officers. ProPhase operated out of the same location as ProPhase Labs. Moreover, ProPhase Labs, not ProPhase, often received and paid Drexel's invoices. Specifically, Drexel received ACH payments directly from ProPhase Labs for invoice payments related to COVID-19 testing services performed for ProPhase, followed later by payments from ProPhase for the same invoicing stream. *See* Zormati Cert ¶¶ 16 and 17.

28. ProPhase Labs has disclosed substantial intercompany balances, including approximately $27.7 million in payables involving ProPhase, evidencing financial entanglement between the parent company and the Debtor subsidiary. *See* Zormati Cert ¶ 16.

29. Pro-Phase Labs has publicly stated that proceeds generated through the Debtors' diagnostics-related collections (including through the use of a collection agency known as Crown Medical Collections, purportedly working on behalf of the Debtors ***without Court approval***) are expected to fund parent-level initiatives and other business-lines, to the detriment of Debtors' creditors, further reflecting an abuse of the bankruptcy process and a total lack of independent subsidiary operations. *See* Zormati Cert ¶ 17.

30. On December 19, 2025, ProPhase Labs announced that it entered into a Memorandum of Understanding with a foreign entity that contemplates the sale of controlling interests in

ProPhase Labs.  This is particularly significant.  This potential "reverse merger" raises a concrete risk that funds will go to insiders and that the value economically derived from the Debtors' prior operations and assets could be diverted and upstreamed beyond creditor reach to the non-debtor parent company.  *See* Zormati Cert  ¶ 26.

31. Through the Debtors' failure to meaningfully participate in this case, as well as their fraud on the government and/or insurers through collections and their failure and/or refusal to pay ProPhase's creditors, and their efforts to upstream estate assets to the detriment of their creditors, the Debtors have demonstrated a complete inability and unwillingness to perform the duties of a debtor-in-possession, instead frustrating the purpose of these bankruptcy cases.[3]

## II.    Dismissal Would Prejudice Creditors and Reward the Debtors' Misconduct

32. Once a party establishes cause, a court must examine whether dismissal or conversion of a case to case under Chapter 7 is in the best interests of the creditors and the estate.  *In re Elmwood Ventures LLC*, No. 25-10932 (MG), 2025 Bankr. LEXIS 2244, at *6 (Bankr. S.D.N.Y. Sep. 10, 2025).

33. Courts have examined multiple factors when determining which action is in the best interest of creditors and the estate.  *Id*. The Bankruptcy Code identifies ten such factors:  (1) Whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal.  **(2) Whether there would be a loss of**

---

[3] Moreover, the United States, the State of New Jersey, and the State of New York are plaintiffs in a qui tam Complaint filed in the U.S. District Court for the Eastern District of New York ( 23-cv-06478-EK-MMH) alleging violations of the Federal and State False Claims Acts arising from the submissions of claims for reimbursement to government payors for COVID-19 laboratory testing to which Debtors were not entitled.  The United States, the State of New Jersey, and the State of New York have agreed to extend the deadline by which they can challenge the dischargeability of their claims under § 523(c) of the Bankruptcy Code until the government date, which is March 23, 2026. [ECF. Doc. No. 64].  Seemingly, based on the same misconduct, the United States of America, New York State and the State of New Jersey, filed a Complaint to Determine if  Debt is Non-Dischargeable pursuant to 11 U.S.C. § 1141 (d)(6) (Adv. Proc. No. 25-02526) ( the "Adversary Proceeding").  A true and correct copy of the Complaint commencing the Adversary Proceeding is attached hereto as **Exhibit "C".**

**rights granted in the case if it were dismissed rather than converted**, (3) Whether the debtor would simply file a further case upon dismissal, **(4) The ability of the trustee in a Chapter 7 case to reach assets for the benefit of creditors**, (5) In assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise, (6) Whether any remaining issues would be better resolved outside of the bankruptcy forum, (7) Whether the estate consists of a "single asset," **(8) Whether the debtor had engaged in misconduct and whether creditors are in need of a Chapter 7 case to protect their interests**, (9) Whether a plan has been confirmed and whether any property remains in the estate to be administered, and (10) Whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns. *Id.* (emphasis added).

34. Although dismissal is one of the remedies available under §1112(b), Drexel respectfully submits that dismissal would materially prejudice creditors and effectively reward the Debtors' misconduct.

35. Drexel has substantial concerns regarding the relationship between the Debtors, their insiders, and their non-debtor parent entity, including the potential for improper upstreaming of funds, dissipation of assets, and self-dealing once the protections of the Bankruptcy Code are lifted. *See* Zormati Cert ¶ 18.

36. As mentioned, there is a centralized laboratory location between ProPhase Labs and ProPhase[4]. ProPhase Labs publicly identified 711 Stewart Avenue, Suite 200, Garden City, NY 11530 ("711 Stewart Avenue") as a principal operational location – the same address as ProPhase NY. In addition, marketing materials, laboratory documentation, and COVID-19

test reports identify this address as a CILA- certified laboratory site.  *See* Zormati Cert ¶ 21-23.

37. Jason Karkus, known to be ProPhase's Chief Operating Officer/Senior Vice President of Business Development, has made various statements and communications reflecting centralized control of the laboratory activities.  *See* Zormati Cert ¶ 24.

38. Ted Karkus, known to be the CEO of ProPhase Labs, has also made statements reflecting centralized strategic and financial control over subsidiary operations.  *See* Zormati Cert ¶ 25.

39. Given the Debtors' failure to provide transparency during the pendency of these cases thus far, dismissal would eliminate the only forum in which such conduct can be examined and would permit the Debtors and their insiders to place assets beyond the reach of creditors.

**III.    Conversion to Chapter 7 is in the Best Interests of Creditors and the Estate.**

40. The Debtors have failed to propose a plan and have failed to comply with the most basic statutory reporting obligations.  The absence of MORs deprives creditors and the Court of visibility into cash balances, receivables, intercompany transactions, and post-petition activity.

41. There is no viable operating business to re-organize, no prospect of confirmation, and no justification for allowing the Debtors' to regain unfettered control of their assets outside of bankruptcy.

42. Under Chapter 7, a trustee would be appointed to oversee the liquidation of the Debtors' non-exempt assets and the distribution of proceeds to creditors in accordance with the Bankruptcy Code.

43.    Conversion to Chapter 7 is in the best interests of creditors and the estate because:

      ○ A Chapter 7 trustee can investigate and liquidate the Debtors' assets in an orderly and efficient manner.

      ○ Conversion will ensure equitable distribution of the Debtors assets to creditors.

      ○ Dismissal would leave creditors without recourse and potentially result in a race to the courthouse, undermining the Bankruptcy Code's goal of equitable treatment of creditors.

**IV. Conversion Aligns with the Purpose and Intent of 11 U.S.C. §1112(b)**

44. The intent of 11 U.S.C. § 1112(b) is to protect creditors, not to provide a tactical exit strategy for debtors who have ignored their obligations under the Bankruptcy Code.

45. In this case, the Debtors' have abandoned the Chapter 11 process and appear poised to exploit dismissal to shield assets and avoid scrutiny.  In order to avoid this injustice, conversion is the only remedy consistent with the statute's purpose of protection of the creditors.

### <u>CONCLUSION</u>

    **WHEREFORE**, for the above reasons, Drexel respectfully requests that the Court grant the UST's Motion to Dismiss or Convert and grant Drexel's Joinder to convert the above-captioned Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code, together with such other and further relief as is just, necessary, or appropriate.

                Respectfully submitted,

Dated: January 30, 2026           STARK & STARK
                             A Professional Corporation

                            By:/s/ *Joseph H. Lemkin*
                             JOSEPH H. LEMKIN, ESQ.
                             100 American Metro Blvd.
                             Hamilton, NJ 08619
                             (609) 791-7922 (direct)
                             (609) 896-9060 (main)
                             (609) 895-7395 (facsimile)

4919-1871-4506, v. 3

# *EXHIBIT A*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| In Re:<br><br>ProPhase Diagnostics NJ, Inc., et al.,<br><br>      Debtors. | Chapter 11<br><br>Case No. 25-19833 (CMG);<br><br>jointly administered |
|---|---|

**CERTIFICATION OF BEDIS ZORMATI IN SUPPORT OF JOINDER
FOR DISMISSAL OR CHAPTER 7 CONVERSION PURSUANT TO 11 U.S.C. § 1112(b)**

I, Bedis Zormati, being of full age and duly sworn according to law, hereby certify as follows:

1. I am the Principal of Drexel Distribution, Inc. d/b/a EZ Test NY ("Drexel"), a creditor of ProPhase Diagnostics, Inc. and Prophase Diagnostics NY, Inc. ("ProPhase") in the above-captioned Chapter 11 cases.[1]  I am authorized to submit this certification on behalf of Drexel. I have personal knowledge of the facts set forth herein, or such facts are based on my review of the file and relevant documents in this matter such as ProPhase Labs, Inc.'s ("ProPhase Labs") public filings.  I am fully competent to make this certification and I believe the facts asserted here to be true and correct.

2. I submit this certification in support of the United States Trustee's Motion to Dismiss or Convert these cases under 11 U.S.C. § 1112(b). This certification is in support of conversion from Chapter 11 to Chapter 7 under the United States Bankruptcy Code, rather than dismissal of the case.  Only by conversion will the interests of creditors, including Drexel, be protected.

---

[1] ProPhase Diagnostics, Inc. is a wholly owned subsidiary of ProPhase Labs, Inc. ProPhase Diagnostics NY, Inc. and ProPhase Diagnostics NJ, Inc. are wholly owned by ProPhase Diagnostics, Inc. Drexel signed a written agreement with ProPhase Diagnostics, Inc. For clarity, we will refer to ProPhase Diagnostics, Inc. and ProPhase Diagnostics NY, Inc. together collectively as "ProPhase" throughout the rest of the certification.

**Drexel and ProPhase**

3.  Drexel was and is a limited services laboratory licensed by the New York State Department of Health to operate various COVID-19 collection and/or testing sites in New York.

4.  During the COVID-19 pandemic, Drexel collected patient specimens for independent laboratories to perform polymerase chain reaction ("PCR") testing and, later, also performed rapid antigen ("Antigen") testing for individuals seeking rapid COVID-19 diagnoses.

5.  Beginning in or about May 2021, Drexel began utilizing ProPhase as one of several CLIA-certified laboratories for PCR testing on specimens that Drexel collected.

6.  Thereafter, in or about October 2021, Drexel also began utilizing ProPhase as one of several CLIA-certified laboratories that Drexel used for billing and reporting services for Antigen tests that Drexel administered to patients who needed rapid test results in the field.

7.  On March 7, 2022, Drexel and ProPhase entered into a written agreement that more formally memorialized the prior agreements of the parties. *See* a true and correct copy of the March 7, 2022 agreement attached hereto as **Exhibit "A"**. Specifically, the parties agreed to certain payment schedules and dollar amounts for Drexel's collection of PCR specimens to be tested by ProPhase, and for ProPhase's reporting of Antigen results. At the time, ProPhase was reimbursed for all costs of collection, testing, and treatment through a government program run by the Health Resources and Services Administration (the "HRSA Program").

8.  Shortly thereafter, on March 22, 2022, the government advised that it was no longer going to accept claims under the HRSA program.[2]   Accordingly, ProPhase reached out to Drexel

---

[2] Notwithstanding the announcement, upon information and belief, HRSA permitted laboratories (including Prophase) to submit claims for reimbursement for collection, testing, and/or treatment of COVID-19 up to and including March 30, 2022.

4939-0143-7324, v. 2

(among other specimen collection partners) by email and stated that, although ProPhase was unsure whether HRSA would reinstate funding, ProPhase would assume the risk of continued testing at no cost to its collection partners if those collection partners agreed that they would only be paid for those patients for whom ProPhase got reimbursed (whether through HRSA or insurance). In response, Drexel advised it would collect specimens at the risk of not getting paid for a two-week period and would then reevaluate the business model.

9. Thereafter, Drexel continued to perform substantial collection (PCR) and testing (Antigen) services, but ProPhase did not pay Drexel for *any* services rendered after the end of HRSA.

10. Prophase asserted that there were little to no insurance reimbursements to pay Drexel but failed and/or refused to provide *any* independent empirical data to prove that claim despite repeated requests that it do so.  Accordingly, Drexel was left to conclude that ProPhase was, in fact, reimbursed by insurance and that ProPhase owed Drexel the full amount for all PCR collection and testing on all invoices.

11. Additionally, even though HRSA ended on March 22, 2022, the COVID-19 Public Health Emergency ("PHE") continued in the United States and did not officially end until May 11, 2023.   Upon information and belief, ProPhase billed collection fees to other payers, particularly Medicare, Medicaid, and private insurers, but retained that revenue without remitting it to Drexel even though Drexel performed the collections. Indeed, ProPhase misrepresented to Drexel that claims were denied based on the testing portion, while still collecting the collection fees that should have been paid to Drexel.

12. As a result, Drexel commenced an action in the Supreme Court of New York, New York County *Drexel Distribution Inc., Drexel Distribution Inc. d/b/a EZ Test NY v. Prophase Diagnostics, Inc.*( Index No. 654503/2022) ("State Court Action") alleging that ProPhase

failed to pay certain invoices for PCR testing and Antigen testing. The Second Amended Complaint alleged causes of action for breach of contract, unjust enrichment, and quantum merit, respectively seeking total damages of $1,654,222.00 plus attorney's fees.

13. During the course of the State Court case, Drexel demanded but was never provided with independent support for ProPhase's claims that there were little to no insurance reimbursements to pay Drexel. However, Drexel's independent investigation revealed that ProPhase had, in fact, received reimbursements that should have been paid over to Drexel under the HRSA program but were not (a fraud on the government) and/or that ProPhase resubmitted claims years later with modified information (a fraud on insurance).

14. On September 10, 2025, Drexel obtained partial summary judgment on its claims in the State Court Action, but only for certain invoices that remained unpaid prior to the end of the HRSA program, and the remaining claims for non-payment (both pre- and post-HRSA) were denied and/or were not part of the motion to begin with. The total partial award was in the principal sum of $127,235.00 plus statutory interest from May 29, 2022, with the remaining claims reserved for trial.

**Conversion is Warranted**

15. Based on the information available, conversion to Chapter 7 is in the best interest of creditors because, in addition to the reasons set forth by the United States Trustee, dismissal would prejudice creditors by allowing the Debtors to avoid their obligations. There are serious concerns regarding operational control, intercompany dealings, and centralized laboratory operations between the Debtors[3] and ProPhase Labs.

---

[3] All three entities, ProPhase Diagnostics NJ, Inc., ProPhase Diagnostics NY, Inc. and ProPhase Diagnostics, Inc. are referenced collectively as "Debtors" pursuant to the voluntary petition filed on September 22, 2025 in United States Bankruptcy Court for the District of New Jersey.

16. Public SEC filings evidence that ProPhase is a wholly owned subsidiary of ProPhase Labs and that enterprise level decisions are centralized at the parent level. ProPhase Labs has further disclosed substantial intercompany balances, including approximately $27.7 million in payables involving ProPhase, evidencing financial entanglement rather than arm's length separation of these entities. *See* True and correct copies of: (i) ProPhase Labs, Inc. 8K Annual Reports SEC filings March 31, 2025; (ii) ProPhase Labs, Inc. 10K Annual Reports 10Q SEC filings March 25, 2025; (iii) ProPhase Labs, Inc. 10K Annual Reports 10Q SEC filings; and (iv) ProPhase Labs, Inc. SEC Filings September 30, 2025 (collectively, the "SEC filings") are attached hereto as **Exhibit "B".**

17. ProPhase Labs has publicly stated that proceeds generated through diagnostics-related collections (including collections obtained through a company hired to collect receivables owed to Drexel by ProPhase, known as Crown Medical Collections) are expected to fund parent-level initiatives and other business lines, reflecting centralized treasury and capital allocation decisions rather than independent subsidiary operations. *See* SEC filings attached as **Exhibit "B".**

18. There is a substantial risk of asset diversion if the Debtors' cases are dismissed. Given the Debtors' fraud and complete lack of transparency to date, dismissal would create a substantial risk that receivables, litigation proceeds, or other value attributable to the Debtors' could be upstreamed, transferred, or otherwise placed beyond the reach of creditors, including to non-debtor affiliates or insiders.

## The Intertwining of ProPhase with ProPhase Labs

4939-0143-7324, v. 2

19. From March 2021 through at least August 2022, all invoices issued by Drexel for COVID-19 testing-related services were issued to ProPhase Labs, **NOT** to ProPhase. *See e.g.*, a true and correct copy of an invoice dated May 31, 2022 attached hereto as **Exhibit "C".**

20. Drexel received ACH payments directly from ProPhase Labs for invoice payments related to COVID-19 testing services, followed later by payments from ProPhase for the same invoicing stream. Bank records reflect payments including, among others:

      a. Payments from ProPhase Labs in August-October 2021

      b. Subsequent payments from ProPhase in February 2022.

*See* a true and correct copy of Bank Statements and ACH transaction excerpts attached hereto as **Exhibit "D".**

21. ProPhase Labs shares the same offices as ProPhase. That is, ProPhase Labs has publicly identified 711 Stewart Avenue, Suite 200, Garden City, NY 11530 ("711 Stewart Avenue") as a principal operational location. Marketing materials, laboratory documentation, and COVID-19 test reports identify this address as a CILA-certified laboratory site and a location where COVID-19 diagnostic testing and sample analysis were performed. *See* a true and correct copy of COVID-19 Laboratory Test Reports attached hereto as **Exhibit "E";** *see also* ProPhase Labs' Marketing Materials and Fact Sheet attached hereto as **Exhibit "F".**

22. Based on my personal observations from approximately March 2021 through August 2022, pursuant to Drexel's agreements with ProPhase, I observed that testing supplies were distributed from the 711 Stewart Avenue location, collected specimens were delivered to that location, and the location functioned as an active diagnostic laboratory housing lab equipment and personnel engaged in COVID-19 testing operations.

23. The facility marketing materials and floor plan identify 711 Stewart Avenue as a laboratory/medical space with lab build-out, backup generators, dedicated lab infrastructure,

and ProPhase branded occupancy, which further supports that the 711 Stewart Avenue address housed operations during the relevant period. *See* a true and correct copy of Facility Materials and Floor Plan attached hereto as **Exhibit "G"**.

24. During the same period of time, Jason Karkus, known to me to be the Chief Operating Officer/Senior Vice President of Business Development for ProPhase Labs, made statements and communications reflecting centralized control of the laboratory activities, including :

    a. Written communications confirming weekly and daily testing volumes, supply fulfillment, and ramp-up expectations;

    b. Statements indicating the laboratory's ability to increase processing capacity from approximately 5,000 tests per day to 10,000 tests per day, contingent on operational performance; and

    c. Instructions relating to specimen collection quality, accessioning, and turnaround issued at the company-level rather than by an independent subsidiary.

25. In a Q3 2025 investor conference call, Ted Karkus, known to me to be the CEO of ProPhase Labs, made statements reflecting centralized strategic and financial control over subsidiary operations. He stated, among other things:

    a. The laboratory entities were "purposefully bankrupted;"

    b. COVID era revenues were used to invest at the company level; and

    c. Crown Medical Collections' recoveries were expected to generate future proceeds for ProPhase Labs;

*See* Renmark Q3 2025 Investor Conference Call Transcript Excerpts attached hereto as **Exhibit "H"**.

26. On December 19, 2025, ProPhase Labs announced a non-bid Memorandum of Understanding ("MOU") contemplating the sale of a controlling interest in ProPhase Labs to a foreign entity, which further raises the concrete risk that value economically derived from

the Debtors' operations and assets could be diverted beyond creditors reach to the non-debtor parent company, ProPhase Labs, and its insiders.    *See* a true and correct copy of the document advising of the contemplated sale  attached hereto as **"Exhibit I".**

27. The Debtors have not proposed a plan and have no ongoing operating business to be reorganized.  The Debtors ceased providing COVID-19 diagnostic testing in May 2025.

28. I respectfully request that the Court grant the United States Trustee's Motion and this Joinder pursuant to 11 U.S.C. §1112 (b) and convert these cases to ones under Chapter 7.  Dismissal would reward the Debtors' wholesale failure to comply with their fiduciary and statutory obligations under the Bankruptcy Code and would eliminate the only forum capable of investigating and preserving estate value for the benefit of creditors.

29. I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.


Dated: January 30, 2026


/s/ *Bedis Zormati*

Bedis Zormati
Principal of Drexel Distribution, Inc. d/b/a EZ Test NY

4939-0143-7324, v. 2

# *EXHIBIT B*



Joseph H. Lemkin
DIRECT
(609) 791-7022
DIRECT FAX NUMBER
(609) 895-7395
E-MAIL
jlemkin@stark-stark.com

January 6, 2026

Thaddeus R. Maciag, Esq.
Maciag Law, LLC
475 Wall Street
Princeton, NJ 08540

> **Re:    Pro-Phase Diagnostics, Inc.**
> **Case No. 25-19833 (CMG)**

Dear Mr. Maciag:

Stark & Stark, PC is counsel to Creditor/Interest Party, Drexel Distribution, Inc. and Drexel Distribution, Inc., dba EZ Test NY in the above referenced matter.  Enclosed for service, please find the following:

1.  Subpoena for Rule 2004 Examination with Schedule "A".

Kindly take note that the examination is scheduled to take place at our offices on January 30, 2026 at 10:00 a.m.

Please call me directly at (609) 791-7022 if you have any questions.

Very truly yours,

STARK & STARK
A Professional Corporation

By:_____*/s/ Joseph H. Lemkin*_____
        JOSEPH H. LEMKIN, ESQUIRE
JHL/elr
Enclosure

# UNITED STATES BANKRUPTCY COURT

_____ District of _New Jersey

In re Prophase Diagnostics, NJ, et al.,

              Debtor

Case No. 25-19833-CMG
Jointly Administered
Chapter 11

## SUBPOENA FOR RULE 2004 EXAMINATION

To:  ProPhase Diagnostics, Inc.,

*(Name of person to whom the subpoena is directed)*

☒ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at an examination under Rule 2004, Federal Rules of Bankruptcy Procedure.  A copy of the court order authorizing the examination is attached.

| PLACE: Stark & Stark, PC, 100 Amerian Metro Boulevard, Hamilton, NJ 08619 | DATE AND TIME<br>January 30, 2026<br>@ 10:00 a.m. |
| --- | --- |

The examination will be recorded by this method:  N/A

☐X *Production:* You, or your representatives, must also bring with you to the examination the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

      The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  January 6, 2026

              CLERK OF COURT

                              OR

_____      /s/ Joseph H. Lemkin
*Signature of Clerk or Deputy Clerk*        *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)* Drexel Distribution, Inc. and Drexel Distribution, Inc. d/b/a EZ TEST NY, who issues or requests this subpoena, are: Joseph H. Lemkin, Esq., Stark & Stark, P.C., 100 American Metro Boulevard, Hamilton, NJ 08619, (609)791-7022

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

B2540 (Form 2540 – Subpoena for Rule 2004 Examination) (Page 2)

## PROOF OF SERVICE
**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*:

on *(date)*                    .

☐ I served the subpoena by delivering a copy to the named person as follows:

on *(date)* _____                    ; or

☐ I returned the subpoena unexecuted because: _____


Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of  $              _____ .

 My fees are $              for travel and $              for services, for a total of $              .


        I declare under penalty of perjury that this information is true and correct.

Date:

*Server's signature*


*Printed name and title*


*Server's address*


Additional information concerning attempted service, etc.:

B2540 (Form 2540 – Subpoena for Rule 2004 Examination) (Page 3)

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:

(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*

*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*

*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*

*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

# Schedule A

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

## DEFINITIONS AND INSTRUCTIONS

1.      As used herein, "documents" means all writings of any kind, including the originals and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, including without limitations, correspondence, memoranda, notes, diaries, statistics, letters, telegrams, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, prospectuses, certificates, drawings, plans, interoffice and intra-office communications or offers, notations in any form made of conversations, telephone calls, meetings or other communications; bulletins, printed matter (including newspapers, magazines and other publications and articles and clippings therefrom), press releases, computer printouts, teletypes, telecopies, invoices, ledgers, worksheets (and all drafts, alterations, modifications, changes and amendments of any of the foregoing), graphic or aural records or representations of any kind (including without limitation photographs, charts, graphs and microfiche, microfilm, videotape or film recordings) and electronic, mechanical or electrical records or representations of any kind (including without limitation tapes, cassettes, discs, recordings), or transcriptions thereof.

2.      The term "all documents" means every document, as defined in paragraph 1, above which can be located, discovered or obtained by reasonably diligent efforts, including without limitation all documents possessed by:

(a)      you or your counsel;

(b)      any other person or entity from whom you can obtain such documents by request or which you have a legal right to bring within your possession by demand.

3.      If any document requested herein was at one time in existence, but has been lost, discarded or destroyed, identify in writing each document and provide the following information:

(a)      the date or approximate date it was lost, discarded or destroyed;

(b)      the circumstances and manner in which it was lost, discarded or destroyed;

(c)      the reason or reasons for disposing of the document (if discarded or destroyed);

(d)      the identity of all persons authorizing or having knowledge of the circumstances surrounding the disposal of the document;

(e)      the identity of the person(s) who lost, discarded or destroyed the document; and

(f)      the identity of all persons having knowledge of the contents thereof.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

4.      If any request for documents is deemed to call for the production of privileged or work product materials and such privilege or work product is asserted, provide the following information:

(a)      the reason for withholding the document;

(b)      a statement of the basis for the claim of privilege, work product or other ground of nondisclosure; and

(c)      a brief description of the document, including:

(i)      the date of the document;

(ii)      number of pages, attachments and appendices;

(iii)      the names of its author, authors or preparers and an identification by employment and title of each such person;

(iv)      the name of each person who was sent, was shown, or was blind-copied or carbon-copied the document, together with an identification of each such person;

(v)      the present custodian; and

(vi)      the subject matter of the document, and in the case of any document relating or referring to a meeting or conversation, identification of such meeting or conversation.

5.      Whenever identification of any person is requested herein, for each such person, separately state:

(a)      name;

(b)      current business address and telephone number;

(c)      current residential address and telephone number;

(d)      employer; and

(e)      occupation.

6.      Whenever identification of any document is requested herein, for each such document, separately state:

(a)      the title of the document or description of the document;

(b)      the date of the document;

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

(c)    if the document is a letter, memorandum, or other form of correspondence, state the names and the address of the addressee of the document; and

(d)    identify, in the manner described above, each person having custody or control of the original and all copies of the document.

*In lieu of compliance with instructions 3(a)-3(d), supra, you may attach a duplicate copy of each such document to your answers to these Interrogatories, marking such copies with a number of the interrogatory answer to which it corresponds.

7.    As used herein, the term "person" or "persons" shall mean any individual, partnership, joint venture, corporation, group, association, governmental entity or governmental agency. The term shall also encompass any and all agents, servants and employees of the above entities.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

<u>SCHEDULE OF ITEMS TO BE PRODUCED</u>

1. **All documents relating to explanation of benefits from public insurers (Medicaid and Medicare) and private insurance carriers for patients whose specimens were collected and/or tested by Drexel for Prophase Diagnostics, Inc.("Prophase"). This includes, but is not limited to:**

   a. Reimbursement determinations
   b. Denials
   c. Payment details

2. **Federal and Pandemic Related Reimbursement Programs: All documents relating to reimbursement information under HRSA, the COVID 19 Public Health Emergency (PHE), and applicable billing codes.**

   **This includes, but is not limited to:**

   a. Documents evidencing Prophase's application for reimbursement under the COVID 19 PHE program or the HRSA Uninsured Program for specimen collections performed by Drexel.

3. **Billing Codes – Expanded and Complete Coverage: All documents relating to claims submitted, resubmitted, paid, denied, adjusted, reversed, or written off under any of the following Current Procedural Terminology ("CPT") or Healthcare Common procedure Coding System ("HCPCS") codes, whether billed alone or in combination:**

   -G2023
   -G2024
   -U0001
   -U0002
   -U0003
   -U0004
   -U0005
   -87635
   -87426
   -99000 / 99001
   -Any modifiers applied to the foregoing codes

**This includes, without limitation:**

   o Dates of service
   o Dates of submission and resubmission

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

-5-

- o Amounts billed and reimbursed
- o Corresponding EOBs

**4. Compliance With U0005 Turnaround Requirement**

All documents evidencing compliance with the following reimbursement rule:

> *Effective for dates of service on or after January 1, 2021, providers may bill U0005 in addition to U0003 or U0004 only if results were returned within two calendar days from the date and time of specimen collection.*

**This includes, without limitation:**

- o Claims submitted under this provision
- o Time stamped laboratory result records
- o All reimbursements received

**5. Rebilling, Resubmission, and Date-of-Service Changes**

All documents sufficient to identify:

- o Claims originally denied and later resubmitted;
- o Claims resubmitted with altered dates of service;
- o Original submission data versus revised submission data;
- o Audit trails, metadata, or billing-platform logs (including Xifin or any clearinghouse) showing edits, overrides, or corrections;
- o Claims reflecting dates of service occurring after July 2022.

**6. Specimen Collection Fee – $23.46 Allocation**

All documents relating to the billing, receipt, accounting, allocation, and retention of the $23.46 specimen collection fee, including but not limited to fees billed under HCPCS codes G2023 and G2024, including without limitation:

- o Identification of the entity that performed specimen collection for each claim;
- o Documents showing receipt of the collection fee by Prophase;
- o Records of any remittance or failure to remit such fees to Drexel;
- o Internal policies or agreements governing entitlement to the collection fee

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

-6-

7. **Source-of-Payment Reconciliation**

Documents setting forth a detailed, claim-by-claim breakdown of all payments received for COVID-19 related services, categorized by source, including without limitation:

- Private insurance
- Medicare
- Medicaid
- PHE-related reimbursement
- HRSA Uninsured Program
- Provider Relief Fund (PRF)

8. **Third-Party Collection Agency**

**All documents, records, agreements, invoices, or communications relating to Prophase's efforts to collect outstanding or uncollected funds through third-party agencies, including but not limited to:**

- Crown Medical Collections
- Any other collection agencies

 **Including:**

- Claims submitted for collection
- Amounts sought
- Amounts collected
- Corresponding EOBs or denials

9. **Internal Accounting and Banking Records**

All internal accounting records sufficient to trace reimbursement funds, including without limitation:

- General ledgers
- Sub ledgers
- Deposit records
- Reconciliation reports
- Internal spreadsheets tracking denied vs. paid claims

10. **Billing Platforms and Vendors**

All agreements, communications, and audit logs from billing platforms or vendors (including Xifin), including without limitation:

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

- Claim submission histories
- User access logs
- Date-change permissions
- Batch resubmission records

**11. Regulatory Orders**

All Documents relating to the New Jersey Department of Health's order directing Prophase to cease COVID-19 testing on or about March 31, 2021.

**Business Interests**

12. As to any business in which you have held an interest within the past four years (other than a passive shareholder interest in a publicly traded company)("Related Entity"), produce the following documents:

   a. From January 1, 2018 to the present, provide copies of the federal and state tax returns filed by any Related Entity.

   b. All financial statements prepared by Related Entity or on behalf of Related Entity from January 1, 2019 to the present. For the period starting January 1, 2019 to the present, produce copies of all checking account statements; accounts receivable ledgers or journals, general ledgers, brokerage accounts, contracts, intangibles or any other property in which Related Entity, has, or had, an interest.

   c. A complete copy of all financial records of Related Entity for the time period of January 1, 2019 to the present, including but not limited to, all contracts, ledgers, journals, inventory lists, asset lists, title to vehicles and other financial records.

   d. A complete copy of all organizational and operational documents of Related Entity, including, without limitation any LLC operating agreements or bylaws, together with any amendments or supplements thereto, including any an information regarding members of Related Entity and Related Entity's capital structure.

   e. Documents relating or referring to monies due to Related Entity on any loans or other obligations or accounts receivable.

   f. List of all assets owned by Related Entity from January 1, 2019 to the present, including titles to any real property or any vehicles.

   g. Copies of any litigation to which Related Entity is presently a party or as to which judgment has been entered either against or in favor of Related Entity, from January 1, 2019 to the present.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

-8-

h.  All insurance policies or annuities where Related Entity is the owners or income beneficiaries.

i.  All documents evidencing Related Entity's interest in any business, corporation, partnership, and/or limited liability company from January 1, 2019 to the present.

j.  Any and all documents evidencing any source of income Related Entity has received from January 1, 2019 to the present.

k.  Any and all documents evidencing any bank account(s) held by Related Entity, or in which Related Entity holds or held an interest, from January 1, 2019 to the present.

l.  Any and all documents relating or referring to Related Entity's principal place of business from January 1, 2019 to the present.

m.  Any and all documents relating to any bonds posted for the benefit of Related Entity from January 1, 2019 to the present.

n.  Any and all documents relating or referring to any transfers of real or personal property made by Related Entity from January 1, 2019 to the present.

o.  Any and all documents sufficient to identify Related Entity's current officers, directors, and/or any other person(s) authorized to direct or manage the affairs of Related Entity.

**Property Interests:**

13. As to any property in which you have held an interest within the past four years, produce the following documents:

a.  All deeds and other documents reflecting your ownership or leasehold interest in homes, apartment buildings, condominiums, cooperatives, unimproved real estate (including vacant land and farmland), chattel mortgages, real estate mortgages, oil or gas wells, mineral rights and subsurface rights within the past eight years. This request includes, but is not limited to any oil and gas rights that you or any business in which you have held an interest (hereinafter "Related Entity") have or had, including, but not limited to any rights in the name of Accordo Limited Partnership.

b.  All deeds, certificates and other documents reflecting your ownership interest in any personal property, tangible or intangible, within the past eight years.

c.  All documents reflecting your ownership interest in notes, stocks, bonds, defense bonds, mutual funds, treasury bills, corporate income funds, and other securities and money market instruments for the past four years.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

-9-

d.  All documents reflecting your ownership in a seat on any stock, commodities or other exchange within the past four years.

e.  All documents reflecting any patents, copyrights, inventions or other intellectual property, any interest in which you have owned or controlled, and all documents reflecting any conveyances of them, within the past four years.

f.  All documents reflecting your legal or equitable interest in the assets, corpus or earnings of a trust including any such interest held as a trustee, personal representative, guardian or curator, within the past four years.

g.  As to any trust of which you are a beneficiary, all trust agreements and any amendments, all trust tax returns, trust bank statements, trust check registers, any correspondence or other written communications between you and any trustee of the trust, and all trust accountings, within the past four years.

h.  All documents reflecting that any property which you hold or have held for another person or entity within the past four years in fact belongs to the other entity or person and not to you.

i.  All documents regarding or relating to any cryptocurrency holdings that you or any Related Entity, within the past four years (e.g., Bit Stop), have or had, including, but not limited to, documents evidencing and identifying any wallet numbers and the amount of cryptocurrency in each wallet.

j.  All documents regarding or relating to the account names and transaction histories of any and all cash transmittal applications in your name or in the name of any Related Entity within the past four years, including, but not limited to Venmo, Cash App, Zelle, Google Pay, Apple Pay, or any other similar application.

**Insider Transfers:**

14. All documents relating to transfers of more than $500.00 to "insiders" as that term is deinded under 11 U.S.C. § 101(31) of the Bankruptcy Code.

STARK & STARK
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
MAILING ADDRESS
PO BOX 5315
PRINCETON, NJ 08543

# *EXHIBIT C*

**WEBBER MCGILL LLC**
Douglas J. McGill, Esq.
100 E. Hanover Avenue, Suite 104
Cedar Knolls, New Jersey 07927
Tel: (973) 739-9559
Fax: (973) 739-9575
dmcgill@webbermcgill.com

NIALL P. McCARTHY (*pro hac vice app. forthcoming*)
GRACE Y. PARK (*pro hac vice app. forthcoming*)
KEVIN J. BOUTIN (*pro hac vice app. forthcoming*)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Tel: (650) 697-6000
Fax: (650) 697-0577
nmccarthy@cpmlegal.com
gpark@cpmlegal.com
kboutin@cpmlegal.com
*Attorneys for Plaintiffs*

|  |  |  |
|---|---|---|
| In re: | : | Case No. 25-19833 (CMG) |
|  | : | Chapter 11 |
| ProPhase Diagnostics, NJ, *et al.*,[1] | : |  |
|  | : | Hon. Christine M. Gravelle |
| Debtors-in-Possession. | : | (Jointly Adminstered) |
| -------------------------------------------------------- | : |  |
|  | : |  |
| United States of America, New York State and the State of New Jersey, *ex rel*, PPFB, LLC, | : | Adv. Pro. No.  25- |
|  | : |  |
| Plaintiffs, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| ProPhase Diagnostics, NJ, Inc., ProPhase Diagnostics, NY, Inc. and ProPhase Diagnostics, Inc., | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

### COMPLAINT TO DETERMINE DEBT IS NON-DISCHARGEABLE PURSUANT TO 11 U.S.C. § 1141(d)(6)

---

[1] ProPhase Diagnostics, Inc., No. 25-19833 (CMG); ProPhase Diagnostics, NY, Inc., No. 25-19834 (CMG); ProPhase Diagnostics, Inc., No. 25-19836 (CMG)

<u>**TABLE OF CONTENTS**</u>

<u>**Page(s)**</u>

I.    SUMMARY OF THE CASE ................................................................................. 1

II.   JURISDICTION AND VENUE ......................................................................... 2

III.  PROCEDURAL BACKGROUND ...................................................................... 3

IV.   PARTIES ....................................................................................................... 3

V.    ALLEGATIONS .............................................................................................. 9

      A.    ProPhase's Fraudulent COVID Diagnostic Testing Operations ........................... 9

      B.    Damages Exposure ........................................................................... 25

      C.    ProPhase's Knowledge and/or Reckless Disregard ........................... 28

VI.   COUNTS ...................................................................................................... 34

      COUNT 1
      DETERMINATION OF NON-DISCHARGEABILITY UNDER
      11 U.S.C. § 1141(d)(6) ................................................................... 34

VII.  PRAYER FOR RELIEF .................................................................................. 36

Plaintiff PPFB, LLC ("PPFB") files this Complaint against Debtor-in-Possession ProPhase Diagnostics, NJ, Inc., under 11 U.S.C. § 1141(d)(6), and alleges as follows:

## I.   <u>SUMMARY OF THE CASE</u>

1.   This action arises from a scheme carried out by ProPhase Labs, Inc. ("ProPhase Labs") and its wholly-owned subsidiaries, ProPhase Diagnostics, Inc., ProPhase Diagnostics NJ, Inc., and ProPhase Diagnostics NY, Inc. ("ProPhase Diagnostics Entities"),[2] to defraud the United States, New York, and New Jersey in connection with HRSA, Medicare, and Medicaid reimbursement payments in violation of the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*; the New York False Claims Act, New York State Fin. Law § 189, *et seq.*; and the New Jersey False Claims Act, N.J. Stat. § 2A:32C-3.

2.   During the height of the COVID-19 ("COVID") pandemic, the New Jersey Department of Health ("NJ DOH") ordered ProPhase to "cease COVID testing immediately" after a March 31, 2021, on-site inspection found that "deficient practices of [ProPhase's] laboratory pose immediate jeopardy to patient health and safety" that "has already caused, is causing, or is likely to cause, at any time, serious injury or harm, or death, to individuals served by the laboratory or to the health and safety of the general public" in violation of the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), 42 U.S.C. § 263a; 42 C.F.R. § 493, *et seq*.

3.   When ProPhase's COO told Ted Karkus, CEO of ProPhase Labs and the ProPhase Diagnostics Entities, that COVID testing had to stop, Karkus responded: ***"We are not shutting down for anyone."*** Months later, when ProPhase's COO again urged Karkus to cease testing and disclose NJ DOH's order to ProPhase Labs' investors, Karkus exploded and said that ProPhase

---

[2] Unless otherwise noted, "ProPhase" refers to ProPhase Labs and the ProPhase Diagnostics Entities.

would continue COVID testing at its New Jersey and New York labs, and would "march on" and operate like "business as usual."

4.      ProPhase concealed their continued COVID-testing against the NJ DOH order in multiple ways. First, Karkus directed ProPhase to fraudulently use another lab's CLIA number to conceal where the testing was actually taking place.

5.      Karkus further directed ProPhase to conceal its continued COVID testing by reconfiguring the New Jersey laboratory so that COVID testing took place at night behind a wall. During one unannounced inspection by NJ DOH, ProPhase showed the inspector a shut-down machine to give the false impression that COVID testing had ceased—a move Karkus later described as "brilliant."

6.      ProPhase Labs and the ProPhase Diagnostics Entities are alter egos of one another.

7.      As Karkus explained at the November 19, 2025 earnings call with ProPhase Labs' shareholders, Karkus explained, "[w]e [ProPhase Labs] bankrupted the lab subs [the ProPhase Diagnostics Entities]." Karkus further explained that "[i]t made sense to bankrupt them" because "the COVID Lab subs . . . aren't really doing anything now anyway." "[W]hen significant cash comes in from the Crown Medical Initiative [bankrupting the ProPhase Diagnostics Entities], we [ProPhase Labs] could use that cash."

## II.    <u>JURISDICTION AND VENUE</u>

8.      Under 28 U.S.C. § 1334(b), this Court has subject matter jurisdiction over this proceeding, which is referred here under 28 U.S.C. § 157(a).

9.      This is a core proceeding under 28 U.S.C. § 157(b)(2). If any portion of this proceeding is not a core proceeding or a bankruptcy judge does not have constitutional authority

to enter final judgments in this proceeding, PPFB does not consent to entry of a final judgment by this Court.

10.     This Court is the proper venue for this adversary proceeding under 28 U.S.C. § 1409.

## III.  PROCEDURAL BACKGROUND

11.     On January 27, 2023, PPFB filed a *qui tam* lawsuit against ProPhase Labs and others in the District Court for the Eastern District of New York, Case No. CV 23-0627 (E.D.N.Y.). ("EDNY Action"). That case remains pending.

12.     On December 1, 2025, PPFB timely filed proofs of claim against each of the ProPhase Diagnostics Entities.

13.     Concurrently with the filing of this Complaint against the ProPhase Diagnostics Entities, PPFB has filed a First Amended Complaint in the EDNY Action. The allegations in the adversary proceeding in this action and the allegations in the EDNY Action are substantially similar.

14.     The facts illustrating the ProPhase Diagnostics Entities' fraud and the non-dischargeability of PPFB's claims are set forth below.

## IV.  PARTIES

15.     ProPhase Diagnostics NJ, Inc. ("ProPhase Diagnostics NJ") is a New York corporation with its principal place of business at 42 Throckmorton Ln., Old Bridge, NJ 08857.

16.     ProPhase Diagnostics NY, Inc. ("ProPhase Diagnostics NY") is a New York corporation with its principal place of business at 626 RXR Plaza, Uniondale, NY 11556.

17.     ProPhase Diagnostics, Inc. ("ProPhase Diagnostics") is a Delaware corporation with its principal place of business at 626 RXR Plaza, Uniondale, NY 11556.

18.     ProPhase Diagnostics is a wholly owned subsidiary of ProPhase Labs. ProPhase Diagnostics NY and ProPhase Diagnostics NJ are wholly owned subsidiaries of ProPhase Diagnostics.

19.     As detailed below, ProPhase Diagnostics, ProPhase Diagnostics NY, and ProPhase Diagnostics NJ are each an alter ego of ProPhase Labs. ProPhase Labs exerted dominion and control over each of ProPhase Diagnostics, ProPhase Diagnostics NY, and ProPhase Diagnostics NJ. There is such a unity of interest and ownership between each of ProPhase Labs, its wholly-owned subsidiary ProPhase Diagnostics, and its indirectly wholly-owned subsidiaries ProPhase Diagnostics NY and ProPhase Diagnostics NJ, that the separate personalities of the entities do not exist and the entities operate as a single economic entity. If the acts of each of these entities were treated as those of the individual corporation alone, an inequitable, unjust, and unfair result would follow.

20.     ***Identity of Ownership.*** ProPhase Diagnostics is a wholly owned subsidiary of ProPhase Labs. ProPhase Diagnostics NY and ProPhase Diagnostics NJ are wholly owned by ProPhase Diagnostics.[3]

21.     ***Commonality of Officers and Directors.*** Ted Karkus is the Chief Executive Officer of ProPhase Labs, ProPhase Diagnostics, ProPhase Diagnostics NY, and ProPhase Diagnostics NJ.

22.     Jason Karkus is President of ProPhase Diagnostics, ProPhase Diagnostics NY, and ProPhase Diagnostics NJ. Jason Karkus is listed among ProPhase Labs' "Management Team" on

---

[3] ProPhase's October 21, 2025 SEC Form S-1 states: "Our wholly-owned subsidiary, ProPhase Diagnostics, Inc., and two indirectly wholly-owned subsidiaries, ProPhase Diagnostics NY, Inc. and ProPhase Diagnostics NJ, Inc., ceased providing COVID-19 diagnostic testing in May 2025."

4

its website. During a November 19, 2025 earnings call with ProPhase Labs' shareholders, Karkus

stated that Jason Karkus "built the COVID testing business into a multi-$100 million business."

23.     Robert Morse served as CFO for ProPhase Labs, ProPhase Diagnostics, ProPhase

Diagnostics NY, and ProPhase Diagnostics NJ.

24.     Monica Brady likewise served as CFO for ProPhase Labs, ProPhase Diagnostics,

ProPhase Diagnostics NY, and ProPhase Diagnostics NJ.

25.     Derek DeStefano serves as Director for ProPhase Diagnostics, ProPhase

Diagnostics NY, and ProPhase Diagnostics NJ.

26.     Lance Bisesar serves as Controller for ProPhase Labs, ProPhase Diagnostics NY,

and ProPhase Diagnostics NJ. He was also in possession of the books of account and records for

ProPhase Diagnostics, ProPhase Diagnostics NY and ProPhase Diagnostics NJ as of

approximately September 2025.

27.     ProPhase Diagnostics, ProPhase Diagnostics NY, and ProPhase Diagnostics NJ

each have engaged the same CPAs to prepare financial statements: Morison Cogen CPAs, LLP

and Fuci & Associates PS, CPAs.

28.     **_Same Offices_**. ProPhase Labs, ProPhase Diagnostics, and ProPhase Diagnostics

NY each list their principal place of business as 626 RXR Plaza, 6th Floor, Uniondale, NY 11556.

29.     **_Siphoning Corporate Funds_**. ProPhase Diagnostics, ProPhase Diagnostics NY,

and ProPhase Diagnostics NJ each improperly siphoned corporate funds, including by paying

Jason Karkus a salary in the year preceding their bankruptcy petitions.

30.     **_Inadequate Capitalization / Insolvency_**. ProPhase Labs' alter egos ProPhase

Diagnostics, ProPhase Diagnostics NY, and ProPhase Diagnostics NJ were not adequately

capitalized for their undertakings and became insolvent. On or about September 22, 2025, each of these entities filed Chapter 11 petitions for bankruptcy (jointly administered).

31.    ___**Lack of Corporate Formalities / Façade for Dominant Shareholder.**___ During a November 19, 2025 earnings call with ProPhase Labs' shareholders, Karkus, CEO of each of these entities, described how ProPhase Labs completely dominates ProPhase Diagnostics, ProPhase Diagnostics NY, and ProPhase Diagnostics NJ. Karkus explained: "We [ProPhase Labs] bankrupted the lab subs [ProPhase Diagnostics, ProPhase Diagnostics NY, and ProPhase Diagnostics NJ]." Karkus further explained that "[i]t made sense to bankrupt them" because "the COVID Lab subs . . . aren't really doing anything now anyway." He elaborated that "[w]e did not anticipate it would take that long to bankrupt the labs sub and get going. Now we've done it. We crossed that hurdle."

32.    Karkus described the effect of the bankruptcies of ProPhase Diagnostics, ProPhase Diagnostics NY, and ProPhase Diagnostics NJ as "an accounting item." He explained: "When we bankrupted the lab subs, the accounting for those lab subs changed. The assets and liabilities, the timing changed between what's current and what's non-current. It created this ridiculous amount of negative working capital. Obviously, it's ridiculous. We're not losing tens of millions of dollars. That was an accounting. It's a balance sheet item. It's not affecting us in real terms. It's just accounting terms for bankrupting a sub."

33.    ___**Domination and Control.**___ During the same call, Karkus made clear that ProPhase Labs directed and controlled ProPhase Diagnostics, ProPhase Diagnostics NY, and ProPhase Diagnostics NJ's activities with respect to COVID testing. He stated that "we [ProPhase Labs] built out [its COVID testing] businesses thinking that money was going to continue to flow." Karkus also made a point "to give Jason Karkus a tremendous amount of credit for building the

6

COVID-19 testing business." Previously, on a May 20, 2025 earnings call, Karkus described the
events that "led us [ProPhase Labs] to have the capital to get us [ProPhase Labs] into COVID-19
testing."

34.     ***Intermingling of Corporate Funds***. During the November 19, 2025 earnings call,
seeking to reassure ProPhase Labs' shareholders about the company's financial health, Karkus
explained that ProPhase Labs had engaged a third party, Crown Medical Collections ("Crown
Medical"), to recover purportedly unpaid claims for COVID testing performed by ProPhase
Diagnostics, ProPhase Diagnostics NY, or ProPhase Diagnostics NJ. Karkus regarded any
revenues to ProPhase Diagnostics, ProPhase Diagnostics NY, or ProPhase Diagnostics NJ as
directly benefiting ProPhase Labs. For example, Karkus stated to shareholders:

a.      "These are COVID tests where we submitted to the insurance companies.
They paid us, but they underpaid us."

b.      "[Crown Medical] absolutely believe[s] we're going to collect at least $50
million net."

c.      "They have been working on this all year for free for us. They would not be
doing it if we were not going to collect a lot of money. That is Crown. When
you look at it from the perspective of I am trying to figure out strategically
what to do with our company, I see all this cash coming in."

d.      "If Crown Medical [revenue regarding unpaid COVID claims] starts to kick
in, if [ProPhase Labs'] stock's anywhere near these prices, I'll buy back
stock [in ProPhase Labs] and take it up dramatically higher than where it is
now."

e.      "As I mentioned, though, if significant cash comes in, when significant cash

comes in from the Crown Medical Initiative, we [ProPhase Labs] could use that cash."

f.    "The Crown Medical $20 million is going to come in, and I'm going to buy back half the shares outstanding in the company [ProPhase Labs]."

g.    "Whatever we do right now, once Crown Medical comes in, even if [ProPhase Labs] hypothetically issued shares, my goal would be to buy back all the shares. If the stock price is anywhere near stock price, I'll buy back. I wouldn't be afraid to buy back 10 or 20 or 30 or 50% of the shares outstanding in the entire company [ProPhase Labs]. I really do think that way. If our [ProPhase Labs] stock's undervalued and the cash is coming in, that all gets fixed as the cash comes in."

h.    "[Y]ou just have to be patient until cash flow starts coming in from Crown Medical Initiative, or we partner on our B-Smart esophageal cancer test, or we do a strategic initiative, an M&A type transaction, whether that's a reverse merger or similar, that brings out the value in our company. Any of those things would drive our stock price significantly higher, in my opinion."

35.    ProPhase Labs' domination and control of ProPhase Diagnostics NJ, and ProPhase Diagnostics NY has resulted in fraud and wrongdoing against the United States, New York, and New Jersey, as alleged in detail herein.

36.    ***Knowing Ratification.*** As alleged above, ProPhase Labs knowingly ratified the activities and operations of ProPhase Diagnostics, ProPhase Diagnostics NY, and ProPhase Diagnostics NJ. For example, ProPhase Labs directed and controlled the COVID testing conducted

by ProPhase Diagnostics, ProPhase Diagnostics NY, and/or ProPhase Diagnostics NJ, as detailed below.

## V.    **ALLEGATIONS**

### A.    **ProPhase's Fraudulent COVID Diagnostic Testing Operations**

37.    ***March 7, 2020 – New York Executive Order 202.10.*** Centers for Medicare & Medicaid Services ("CMS") regulates all laboratory testing (except research) performed on humans in the United States through the Clinical Laboratory Improvement Amendments (CLIA). On March 7, 2020, New York State issued Executive Order 202.10 in response to the unfolding COVID pandemic, which permitted clinical laboratories holding a CLIA accredited license outside New York State to perform COVID testing within the state.

38.    ***October 2020 – New Jersey Lab Acquisition.*** Before October 2020, ProPhase Labs principally sold over-the-counter supplements.

39.    On October 9, 2020, ProPhase Labs formed its wholly-owned subsidiary, ProPhase Diagnostics. On October 23, 2020, ProPhase completed the acquisition of Confucius Plaza Medical Laboratory ("CPM"), for approximately $2.5 million. CPM was the owner of a 4,000 square foot CLIA accredited laboratory in Old Bridge, New Jersey.

40.    As a result of the acquisition, ProPhase entered into a new business line, diagnostic services, specifically including COVID-19 and (RPP) molecular tests. March 31, 2021 SEC Form 10K. ProPhase claimed that, as a result of the Confucius acquisition, ProPhase was now "validated for COVID-19 testing for both swabs and saliva." ProPhase Labs Completes Acquisition of CLIA Accredited Lab and Provides Corporate Update, November 2, 2020, *available at* https://ir.ProPhaselabs.com/news-events/press-releases/detail/5/ProPhase-labs-completes-acquisition-of-clia-accredited-lab.

41.    ProPhase initially set a goal of processing 1,000 COVID tests per day by December 31, 2020. In early December, ProPhase increased this goal to 1,500 COVID tests per day with a pre-tax net profit of at least $30 per test processed. ProPhase Labs Exceeding Initial Goals as Covid-19 Lab Testing Business Ramps up, February 1, 2021, *available at* https://ir.ProPhaselabs.com/news-events/press-releases/detail/112/ProPhase-labs-exceeding-initial-goals-as-covid-19-lab.

42.    Months after the sale, ProPhase's CFO told ProPhase's COO in person that the CPM acquisition was rushed within 30 days with minimal due diligence completed.

43.    ___*October 2020 to November 2020 – ProPhase hires ProPhase's COO*___. The ProPhase COO was contacted by a recruiter inquiring about his interest in working for ProPhase as its COO. The ProPhase COO interviewed with Karkus approximately three times over Zoom/telephone, met with Karkus and his son Jason (who also works for ProPhase) at Rockville Center Diner, and interviewed with most of ProPhase's board members over Zoom or telephone. After five to seven days of interviews, Karkus gave an oral job offer to the ProPhase COO.

44.    During the interview process, Karkus told the ProPhase COO that the New Jersey lab was "turn-key" ready. Karkus told the ProPhase COO that ProPhase retained former CPM employees and retained CPM's former owner as a consultant to ensure a smooth transition. The ProPhase COO accepted the offer and began working for ProPhase on November 9, 2020.

45.    ___*November 2020 – the ProPhase COO learns the New Jersey lab was not "turn-key" ready*___. On November 9, 2020, the ProPhase COO entered the New Jersey lab for the first time and immediately understood that the lab was far from "turn-key" ready. Equipment had not been properly calibrated. The physical layout needed redesign given the small size and peculiar dimensions of the space. Two or three weeks into the job, the ProPhase COO learned that ProPhase

10

did not file basic paperwork, including notifying NJ DOH of CPM's new ownership and new lab director.

46.     On multiple occasions, the ProPhase COO asked Karkus why the New Jersey lab was not ready for COVID testing, particularly since CPM's former owner had been retained as a consultant to ensure a smooth transfer of operations. In response, Karkus blamed the ProPhase COO for the deficiencies in the New Jersey lab and stressed to the ProPhase COO that COVID testing had to begin by the end of November 2020 to pay for the ProPhase COO's salary and to actualize the company's investor forecasts that COVID testing would begin by that time.

47.     The ProPhase COO hired former colleagues, including Sergio Miralles, to prepare the New Jersey lab for COVID testing, which included testing calibration and validation, rearranging the physical layout of the facility, and completing necessary transfer paperwork. ProPhase, however, later learned that it failed to file for its New Jersey CLIS[4] license by January 2021. COVID testing began at the New Jersey lab in late November 2020.

48.     Throughout November 2020, the ProPhase COO was at the New Jersey lab on a nearly daily basis. Over that time period, the ProPhase COO also trained Karkus's son, Jason, who had no prior experience in the healthcare field, let alone laboratories.

49.     Karkus visited the New Jersey lab on the ProPhase COO's first day, November 9, 2020, and shortly after Thanksgiving. The ProPhase COO does not recall Karkus visiting the New Jersey lab before or after these two November dates.

50.     ***November 2020 – ProPhase enters into unlawful referral arrangements for COVID testing.*** Anxious that its entry into the new COVID testing business would not succeed, Karkus, on behalf of ProPhase, entered into a November 2020 agreement with Docs Health,

---

[4] In New Jersey, the terms "CLIA" and "CLIS" are used interchangeably.

located at 6097 Easton Rd, Pipersville, Pennsylvania, 18947, which had just secured a contract for COVID testing with the State of Texas. In exchange for a steady stream of patients from Docs Health's Texas contract, ProPhase agreed to pay Docs Health a packaging and handling fee of $35 per COVID specimen—rather than the rate of $23.46 established under the CARES Act—a 50% increase over fair market value. Docs Health also demanded, and ProPhase agreed to pay ClaimCare Medical Billing Services of Irving, Texas ("ClaimCare"), 8% per COVID claim paid, which is twice the typical 4% rate for simple and less complicated reimbursement claims, such as COVID testing.

51.     Karkus was advised that ProPhase should not pay more than fair market value for any service to be compliant with the anti-kickback laws, but Karkus ignored this warning. ProPhase agreed to pay $35 per specimen and submit these particular COVID claims submissions to ClaimCare despite the fact that ProPhase uses an outside billing company, Committ Services ("Committ"), for its other COVID reimbursement claims at a 4% rate. On belief, Docs Health has financial interest in ClaimCare.

52.     ***December 2020 to January 2021 – Lease and build out of New York lab.*** On December 8, 2020, ProPhase began leasing 711 Stewart Avenue, Garden City, New York, which would eventually serve as ProPhase's second laboratory. Beginning in December 2020, the ProPhase COO, along with other employees, began the build-out and paperwork to submit an application for the New York lab's standalone CLIA accreditation.

53.     In January 2021, ProPhase Entities submitted its application for standalone CLIA accreditation of its New York lab.

54.     On March 31, 2021, ProPhase stated to the public: "We offer both nasal swab testing and saliva testing, and are a preferred lab for Spectrum Solutions, the manufacturer and

supplier of the first FDA EUA (Emergency Use Authorization) authorized saliva collection kit

used for COVID-19 testing. We currently operate two lab facilities including, (i) our facility

located in Old Bridge, New Jersey, acquired in October 2020, with a capacity to process up to

10,000 COVID-19 tests per day, and (ii) our facility located in Garden City, New York, which

opened in January 2021, and commenced operations in January 2021, with a capacity to process

up to 50,000 COVID-19 tests per day." March 31, 2021 SEC Form 10K.

55.    Also on March 31, 2021, ProPhase highlighted the risks of its new COVID testing

operations, including: "our ability to maintain our status as an authorized laboratory to perform

COVID-19 and other diagnostic testing and related services and to respond to any changes in

regulatory requirements," and "the period of time for which we are able to serve as an authorized

laboratory offering COVID-19 testing under various Emergency Use Authorizations." March 31,

2021 SEC Form 10K.

56.    ***March 31, 2021 – NJ DOH's inspection and order of New Jersey lab.*** 42 C.F.R.

§ 493.1812 provides: If a laboratory's deficiencies pose immediate jeopardy, the following rules

apply:

(a)    CMS requires the laboratory to take immediate action to remove the
jeopardy and may impose one or more alternative sanctions to help bring
the laboratory into compliance.

(b)    If the findings of a revisit indicate that a laboratory has not eliminated the
jeopardy, CMS suspends or limits the laboratory's CLIA certificate no
earlier than 5 days after the date of notice of suspension or limitation. CMS
may later revoke the certificate.

(c)    In addition, if CMS has reason to believe that the continuation of any
activity by any laboratory (either the entire laboratory operation or any
specialty or subspecialty of testing) would constitute a significant hazard to
the public health, CMS may bring suit and seek a temporary injunction or
restraining order against continuation of that activity by the laboratory,
regardless of the type of CLIA certificate the laboratory has and of whether
it is State-exempt.

13

57.     As set forth in more detail below, after receiving a notice from NJ DOH regarding "immediate jeopardy to patient health and safety" at its New Jersey lab, ProPhase did not "remove the jeopardy" identified. Rather ProPhase continued COVID testing using unvalidated methods that posed harm to human health. Moreover, ProPhase fraudulently created the impression that it had "eliminated the jeopardy," *i.e.*, ceased COVID testing using unvalidated methods. ProPhase concealed the fact that it continued COVID testing using unvalidated methods to avoid CMS suspension, enforcement, injunction, and/or revocation of its CLIA certificate.

58.     On March 31, 2021, NJ DOH conducted its onsite inspection of the New Jersey lab, pursuant to 42 U.S.C. § 263a, 42 C.F.R. § 493, *et seq.* Indeed, NJ DOH took the rare step of summarizing its reasons in writing about why it ordered the New Jersey lab to immediately cease COVID testing. In its April 9, 2021, letter, NJ DOH emphasized the "IMMEDIATE JEOPARDY" the conditions at ProPhase's laboratory presented. *See* **Exhibit 1**. NJ DOH explained that the "deficient practices of [ProPhase's] laboratory pose immediate jeopardy to patient health and safety" that "has already caused, is causing, or is likely to cause, at any time, serious injury or harm, or death, to individuals served by the laboratory or to the health and safety of the general public." *See id.*

59.     During the inspection, the Laboratory Director was not onsite, not available by electronic mail, and not available by telephone. The New Jersey certification paperwork was contradictory on the most basic matters, including the identity of the Laboratory Director. ProPhase failed to renew its state level CLIS license for 2021. Additionally, ProPhase never received a New Jersey state or CLIA License to perform COVID testing for saliva specimens, despite the fact that 81,271 saliva specimens had been tested from December 11, 2020, to March

20, 2021, and failed to report these qualitative Molecular SARS-COV-2 (COVID 19) PCR tests accurately from April 8, 2020, to the date of the March 31, 2021, survey.

60.    NJ DOH's reasons for the immediate cease-and-desist order can be divided into four categories: (1) inaccurate test results; (2) absence of Laboratory Director; (3) substandard conditions at the laboratory; and (4) lack of licensing.

61.    <u>Inaccurate Test Results</u>. "[T]he laboratory failed to report qualitative Molecular SARS-COV-2 (COVID 19) PCR tests results accurately from 4/8/20 to the date of the survey."

      a.     "The Laboratory Director failed to ensure a Quality Assurance (QA) program was accurately established to assure quality of laboratory services for Molecular SARS-COV-2 RT PCR tests provided from 4/8/20 to the date of the survey," which posed "immediate jeopardy to patient health and safety."

      b.     Specifically, "[t]he QA procedure did not include review of:" (i) "Positivity rate monitoring for contamination"; (ii) "False positive and negative results in reference to patients history"; (iii) "Rejected samples"; (iv) "Daily Quality Control (QC) and extraction QC"; and (v) "Requisitions received."

"The [Laboratory Supervisor] confirmed on 3/30/20 at 2:45 pm that a QA program was not accurately established."

62.    <u>Absence of Laboratory Director</u>. In the cover letter to its findings, NJ DOH provided that a primary reason for the "immediate jeopardy" notice was violation of CLIA regulation 42 C.F.R. § 493.1441 (D6076): "The laboratory must have a director who meets the qualification requirements of § 493.1443 of this subpart and provides overall management and direction in accordance with § 493.1445 of this subpart."

63.     NJ DOH found that ProPhase's Laboratory Director, Shahrokh Momtahen, M.D., did not provide "overall management and direction" of the New Jersey laboratory for all of the "Condition level" and other deficiencies listed on the survey report. Indeed, he was not onsite and not accessible by telephonic or electronic means.

64.     Worse, over the course of the onsite interview, the onsite ProPhase staff disputed that Dr. Momtahen was the Laboratory Director. NJ DOH noted that on December 16, 2020—after the CPM acquisition—ProPhase requested a change of Laboratory Director to Dr. Momtahen. NJ DOH processed that change the same day. Regardless, on the day of the onsite March 31, 2021, survey, ProPhase's Laboratory Supervisor and other employees stated that another individual was the Laboratory Director—not Dr. Momtahen.

65.     <u>Substandard Conditions at the Laboratory</u>. In addition to inaccurate test results and the lack of a Laboratory Director, the actual conditions that NJ DOH observed during the onsite review were woefully deficient. These numerous conditions are summarized below:

66.     *The laboratory did not adequately validate test results*. "There was no documented evidence validation was performed for:"

      c.    "Saliva tests. The laboratory performed 81,278 saliva tests from 10/20/20 to 3/31/21."

      d.    "The stability of the specimen. Room temperature, Refrigerated and Frozen."

      e.     "The expiration date of reagents, working solutions, and controls."

      f.    "Time and temperature of the thermocyclers."

      g.    "Quality control."

      h.    "There was no documented evidence found on site at the day of the survey.

. . to show the validation was done in the laboratory or by laboratory staff."

67.     *The laboratory did not minimize potential contamination*. "Observation of the work area revealed that the laboratory did not have a closed system to prevent contamination of Molecular tests." "Patient specimens and reagents were received, prepared, extracted and amplified in the same work space," despite the fact such testing "must include separate areas for specimen preparation, amplification and product detection, and, as applicable, reagent preparation."

68.     *The laboratory test report was not in compliance*. For example, "[a] review of 20 Test Results revealed 20 out of 20 did not have a specimen source." "The laboratory performed non FDA cleared tests and there was no statement stating 'This test has not been FDA cleared or approved. This test has not been authorized by the FDA under an Emergency Use Authorization.'" "The laboratory failed to provide all of the manufacturer reporting disclaimers as required in their package insert."

69.     *The laboratory did not adequately maintain records of COVID test processes and results*. "[T]he laboratory failed to retain Performance Specification records for the QuantStudio 12K Flex analyzer used to perform SARS-COV-2 (COVID 19) PCR tests from 4/8/20 to the date of the survey," and specifically found that "[t]he[re] were no work records, raw data or instrument print outs on site to confirm the data in four separate validations found on site."

70.     *The laboratory lacked systems to assess employee competency*.

i.      The Laboratory Supervisor "failed to follow written procedures to perform a Competency Assessment on the Technical Supervisor, General Supervisor and twelve testing personnel from April 8, 2020, to the date of [the] survey."

j.      "the laboratory failed to follow the Procedure Manual for Molecular tests

from 4/8/20 to the date of the survey." Indeed, the Program Manual stated under the "ProPhase Covid-19 Real Time (RT-PCR) Assay Manual: 'Assay tests nasopharyngeal swab, nasopharyngeal apirate, and bromchial lavage specimens," and "Page 27 of the [Program Manual] Section 21.0 States: 'other specimen types have not been evaluated and **should not be tested with this assay**.'" (Emphasis added.) The "other specimen type" is saliva.

71. *The laboratory did not compare test results*. "There was no documented evidence the laboratory performed comparison studies between . . . four analyzers . . . during the validation or prior to patient testing."

72. *The laboratory did not correct post-analysis results*. The laboratory failed to follow established written policies and procedures to monitor, assess, and correct problems in postanalytic systems, 42 C.F.R. 493.1291, including:

k. "Collection time and received time was 12:00 am but the laboratory was not open at 12:00 am."

l. "One sample received from Texas was collected at 4:49 pm, received at 8:14 pm, and resulted at 11:42 pm on 3/10/21. Timing is not possible."

73. "The Laboratory Director failed to provide overall management and direction to the laboratory to ensure that laboratory testing is performed satisfactorily for Molecular SARS-COV-2 RT PCR tests and in compliance with the CLIA regulations from 4/8/20 to the date of the survey."

74. *Lack of Licensing*. Finally, in violation of 42 C.F.R. § 492.1101(c), ProPhase was not in compliance with applicable federal, state, and local laboratory requirements. "Based on an in-office review of the laboratory's requirements for a NJ State License, the laboratory failed to

18

renew their New Jersey State Clinical Laboratory License ('CLIS') for 2021." A ProPhase employee, moreover, confirmed that the CLIS license was not renewed.

75.     Worse, despite the fact that ProPhase touted that it offered "both nasal swab testing and saliva testing, and are a preferred lab for Spectrum Solutions, the manufacturer and supplier of the first FDA EUA (Emergency Use Authorization) authorized saliva collection kit used for COVID-19 testing," *supra*, the Laboratory Director "failed to be in compliance with the State of New Jersey requirements to get approval from the state before performing samples for SARS-COV-2 (COVID 19) PCR saliva tests." "The laboratory performed 81,278 saliva tests from 1211/20 to 3/20/21" at a time when "the laboratory did not have a CLIS license for saliva tests."

76.     The ProPhase COO was at ProPhase's New York office when the inspection began. While at the New York office, the ProPhase COO received a call from New Jersey Laboratory Supervisor about NJ DOH inspector Melanie Rinaldi's findings. While the inspection was ongoing, the ProPhase COO directed certain employees to leave ProPhase's New York offices to its New Jersey lab to assist the Laboratory Supervisor.

77.     Over the course of NJ DOH's investigation, the ProPhase COO spoke with Rinaldi two or three times over the telephone. During the last telephone call, Rinaldi told the ProPhase COO that the New Jersey lab must stop testing immediately and highlighted the deficiencies found during the inspection. The ProPhase COO asked Rinaldi for her telephone number and email address. Rinaldi stated that she would provide a letter highlighting the deficiencies observed during the inspection, which culminated in the April 9, 2021, letter attached as **Exhibit 1**.

78.     While the April 9, 2021, order cited the unavailability of the Lab Director as a key deficiency resulting in the order, the ProPhase COO's telephonic and subsequent discussions regarding ProPhase's corrective actions indicate that the critical deficiency was the New Jersey

19

lab's failure to provide an accurate validation study for its COVID saliva testing.[5] The ProPhase

COO eventually learned that CPM's former lab director prepared the company's initial, deficient

validation study, which he later sold to other labs. That plagiarism was easy to detect, since the

former lab director inadvertently submitted a draft of the validation report to NJ DOH with telltale

typos and other editing errors. CPM's former lab director also sold the same draft to the defrauding

labs with the same typos and errors. The ProPhase COO terminated CPM's former lab director's

employment in writing shortly after learning of his plagiarism.

79.    ***March 31, 2021 – Karkus' reaction to the order***. When his telephone call with

Rinaldi ended, the ProPhase COO immediately walked over to Karkus's office and told him about

the NJ DOH order. Karkus' initial response was "Oh shit." When the ProPhase COO told Karkus

that COVID testing had to cease immediately, Karkus responded: "We are not shutting down for

anyone." Karkus explained that the company had to continue its COVID testing to "bring revenue

up" and accordingly directed the ProPhase COO to "do what you have to do."

80.    In the days and months after March 31, 2021, the ProPhase COO advised Karkus

to: (1) cease COVID testing at the New Jersey and New York labs, and (2) disclose to ProPhase's

investors that NJ DOH had issued an order to cease its unvalidated COVID testing. Each and every

time, Karkus refused. Each discussion took place orally. The ProPhase COO eventually stopped

advising Karkus on these matters in approximately May 2021. Around this time, Karkus isolated

the ProPhase COO from ProPhase's regular business operations, including by cutting off his access

to ProPhase's computer network.

---

[5]  In other words, ProPhase falsely stated that, by the Confucius acquisition, ProPhase was now
"validated for COVID-19 testing for both swabs and saliva." ProPhase Labs Completes
Acquisition of CLIA Accredited Lab and Provides Corporate Update, November 2, 2020,
*available at* https://ir.ProPhaselabs.com/news-events/press-releases/detail/5/ProPhase-labs-
completes-acquisition-of-clia-accredited-lab.

81.     The ProPhase COO and CFO often commiserated privately about the order in either of their offices or by telephone. Once, the ProPhase COO and the ProPhase CFO, together, advised Karkus to cease testing and disclose the order to investors. In response, Karkus exploded and told the ProPhase COO and CFO that ProPhase would not disclose the order to investors, would continue COVID testing at its New Jersey and New York labs, and would "march on" and operate like "business as usual."

82.     ProPhase laid off numerous employees at the laboratories and retained only those employees that Karkus believed were loyal to him to continue COVID testing operations. As described further below, these operations mostly took place during evening hours in a back room of the New Jersey laboratory, and behind locked doors of the New York laboratory, neither of which could be seen from the outside.

83.     Karkus ordered all ProPhase employees to continue COVID testing at the laboratories, having disregarded internal written and verbal communications from the ProPhase COO and other ProPhase employees that such continued COVID testing should cease immediately.

84.     ***April 2021 to September 2021 – ProPhase surreptitiously continues COVID testing in its New Jersey and New York labs under a false CLIA number.*** In light of the March 31, 2021, NJ DOH order, ProPhase could not continue COVID testing at its New Jersey lab. Specifically, under 42 C.F.R. § 493.1812(a), ProPhase was required "to take immediate action to remove the jeopardy[.]" Further, because ProPhase no longer had an out-of-state CLIA accredited lab, it could no longer continue COVID testing at its New York lab pursuant to Executive Order 202.10. But as set forth below, ProPhase continued COVID testing using unvalidated methods that posed harm to human health. ProPhase created the impression that it had "eliminated the

21

jeopardy," *i.e.*, ceased COVID testing using unvalidated methods. Rather, ProPhase concealed the fact that it continued COVID testing using unvalidated methods to avoid CMS suspension, enforcement, injunction, and/or revocation of its CLIA certificate.

85.     Moreover, under CMS Medicare Claims Processing Manual Ch. 16, § 40.1—what is commonly referred to in the industry as the "Shell Lab provision" or the "70/30 Rule"— laboratories are required to perform in-house at least 70 percent of what is billed to Medicare, and refer or send out no more than 30 percent of what is billed to Medicare. If this rule is not met, the lab cannot seek reimbursement for tests sent to another lab. Because he initially believed that the stop order would be lifted within two to four weeks, the ProPhase COO negotiated a contract on behalf of ProPhase with P4 Diagnostix ("P4"), located at 25 Riverside Drive, Suite 10, Pine Brook, New Jersey 07058, to continue ProPhase's COVID testing at P4 while the stop order was in place. By approximately April 30, 2021, ProPhase stopped sending specimens to P4 because Karkus believed the profit margins of the P4 contract were too small.

86.     Instead, Karkus negotiated and signed a contract with Enigma Management Corp., dba Alliance Laboratories under which ProPhase paid Alliance $40,000 per month.[6] Initially, all ProPhase COVID specimens were sent to Alliance (rather than P4), but within a few weeks ProPhase surreptitiously resumed COVID testing at its own New Jersey and New York labs because beneficiaries complained about the long turnaround times. The low flat rate of $40,000 per month (in the midst of a pandemic) shows that the Alliance/ProPhase contract was a sham and ProPhase always intended to illegally bill using Alliance's unique NPI number while conducting COVID testing at its New Jersey and New York labs.

---

[6] On or about June 12, 2024, the owner of Alliance was criminally indicted for, among other alleged conduct, conducting unnecessary medical tests through Alliance and accepting kickbacks for patient referrals. *U.S. v. Abrazi*, 24-cr-393 (D.N.J.).

87.     Laboratories like ProPhase must submit claims to Medicare for reimbursement using CMS Form 1500. At line 23 of CMS Form 1500, each submission must identify the unique CLIA number where the laboratory services took place. Between approximately March 31, 2021, and September 30, 2021, ProPhase falsely used Alliance's unique CLIA number, 33D0985206, despite the fact that COVID testing actually took place at ProPhase's own New Jersey lab, CLIA number 33D0126129 or its New York lab (which was permitted to use CLIA number 33D0126129 while Executive Order 202.10 was in place).

88.     After NJ DOH issued the March 31, 2021 stop order, ProPhase continued its COVID testing at the New Jersey and New York labs at nighttime to avoid detection. At the New Jersey lab, COVID testing took place behind the wall depicted in **Exhibit 2**. At the New York lab, the ProPhase COO personally observed signs that COVID testing took place the night before when he began work each morning.

89.     Current or former ProPhase lab assistants are believed to have raised concerns with NJ DOH that the company did not cease its COVID testing. The Laboratory Supervisor told the ProPhase COO that NJ DOH conducted two or three surprise inspections to confirm that the "immediate jeopardy," *i.e.*, unvalidated COVID testing, ceased in accordance with the stop order. Each time the inspectors visited the site, employees told the inspectors that the arriving specimens were being processed and shipped to Alliance. On one occasion, The Laboratory Supervisor showed a NJ DOH inspector a shut-down machine to demonstrate that COVID testing had in fact ceased—a move that Karkus later described as "brilliant." Under 42 C.F.R. § 493.1812(c), "if CMS has reason to believe that the continuation of any activity by any laboratory (either the entire laboratory operation or any specialty or subspecialty of testing) would constitute a significant hazard to the public health, CMS may bring suit and seek a temporary injunction or restraining

order against continuation of that activity by the laboratory, regardless of the type of CLIA certificate the laboratory has and of whether it is State-exempt."

90.     ProPhase's CIO, Sergio Miralles, also took steps to conceal the fact that COVID testing continued to take place at the New Jersey and New York labs. First, multiple ProPhase employees told the ProPhase COO that Miralles scrubbed ProPhase's laboratory information system (LIS)to falsely show that COVID testing took place at Alliance instead of ProPhase's New Jersey and New York labs. Second, the ProPhase COO observed Karkus approve Miralles' proposal of purchasing device trackers on Amazon.com and directing a ProPhase employee to drive near the Alliance facility (which was near where she lived) with the tracker enabled. The employee did not load or deliver any specimens when the tracker was enabled. Rather, Miralles kept the records of the tracker on his computer in the event that NJ DOH or other governmental agencies sought evidence that specimens were in fact being delivered to Alliance (when in fact they were not). Such activities were carried out to give the false impression of compliance with 42 C.F.R. § 493.1812.

91.     As previously stated, because of the NJ DOH order, ProPhase could no longer continue COVID testing at its New York lab pursuant to Executive Order 202.10. In June 2021, Executive Order 202.10 expired, meaning that ProPhase's New York lab could no longer operate both because: (1) ProPhase no longer had an out-of-state accredited lab; and (2) Executive Order 2021.20 expired. While ProPhase submitted its application for a standalone New York lab in January 2021, the inspection for that application took place in June 2021, and the CLIA accreditation would not be issued until September 2021.

92.     Between July 2021 and September 2021, the ProPhase COO observed that COVID testing continued at the New Jersey and New York labs at night, despite the fact that the order had

not been lifted.

93.     The ProPhase COO believes that throughout the period from at least April 2021 through September 2021, ProPhase and/or its subsidiaries continued to submit claims to Medicare, Medicaid, and HRSA for reimbursement indicating at line 23 that COVID testing took place at Alliance. Additional information about the details of the claims submitted to Medicare, Medicaid, and HRSA is peculiarly within the knowledge of ProPhase and/or its affiliated entities.

94.     ***September 2021 – NJ DOH lifts the March 31, 2021 order.*** About the same time the ProPhase COO resigned from ProPhase: (1) NJ DOH lifted the March 31, 2021, order; and (2) New York State approved ProPhase's CLIA application for its New York lab.

95.     In its multiple reports to the SEC since March 31, 2021, ProPhase never disclosed to the public that the NJ DOH ordered ProPhase to cease its COVID testing pursuant to its CLIA license, as the negative impact to such a large segment of its business would result in a steep and precipitous stock price decline and corresponding shareholder lawsuits against ProPhase and other individuals, in light of the cascading troubles (lack of licensing, cease-and-desist order, and expiration of Executive Order 202.10) affecting a business segment, COVID testing, that affected at least 80% of ProPhase's revenue.

**B.     Damages Exposure**

96.     From approximately December 1, 2020, to September 30, 2021, ProPhase conducted COVID testing without renewing its New Jersey CLIS license.[7] Accordingly, when ProPhase began COVID testing at its New Jersey and New York facilities, any reimbursements

---

[7] Because ProPhase failed to renew its CLIS license, its CLIA license was also non-compliant, 42 C.F.R. § 493.1101(c), and could not be applied to any COVID testing operations in New York, pursuant to Executive Order 202.10.

for such testing from approximately 2021Q1 through 2021Q3 was fraudulent because "the laboratory failed to renew their CLIS license for 2021."

97.    Prior to building out its COVID testing laboratories, ProPhase's revenues and profits were dismal, as reflected in the table below. *See* applicable SEC Forms 10K and 10Q.

|  | Sept. 30, 2022 | Dec. 31, 2021 | Dec. 31, 2020 | Dec. 31, 2019 |
|---|---|---|---|---|
| **Net Sales** | $100,824 | $79,042 | $14,514 | $9,876 |
| **Costs of Sales** | $41,453 | $37,054 | $9,908 | $7,261 |
| **Gross Profit** | $59,371 | $41,988 | $4,606 | $2,615 |

*Chart in thousands*

98.    Indeed, ProPhase's entry into the COVID testing space has had blockbuster results. By November 15, 2022, ProPhase reported a market cap of $192 million, $101 million revenue for the first nine months of 2022, and profits of $60 million—a 12x profit increase compared to the entire 2020 calendar year. ProPhase was the best performing publicly traded laboratory stock in 2022, with a stock increase of 68%, as reported by Laboratory Economics, a leading industry publication. According to ProPhase, these spectacular results are exclusively due to its entry into the COVID testing space.

99.    ProPhase reported: "Revenue for the quarter ended March 31, 2021 totaled $15.3 million, an increase of 709%, or $13.4 million, from $1.9 million in the quarter ended March 31, 2020. The increase in sales was primarily driven by revenue of $12.7 million related to our new diagnostic services business and, to a lesser extent, an increase in third party customer orders from our contract manufacturing business." The "diagnostic services business" is ProPhase's COVID testing, amounting to 83% of ProPhase revenue ($12.7 million / $15.3 million). Loss of this revenue due to lack of appropriate CLIS and CLIA licensing would have been catastrophic for ProPhase.

100.    An alternative measure of damages exposure for 2021 Q1 is as follows: As stated in the NJ DOH's written report: "The laboratory performed 81,278 saliva tests from 12/1/20 to

26

3/20/21" and "17,223 tests using swabs in saline from 10/10/20 to 3/20/21" at a time when "the laboratory did not have a New Jersey State Clinical Laboratory License for saliva tests." Average out-of-network reimbursement for COVID testing is approximately $150 per test. Accordingly, (81,278 Saliva Tests + 17,223 Swabs in Saline) x $150 = $14,775,150 in fraudulently obtained reimbursement revenue.

101.    Compounding the lack of a New Jersey state CLIS license, at the conclusion of the March 31, 2021, survey, the NJ DOH ordered ProPhase to "cease COVID testing immediately," and that CLIA license was not provisionally reinstated until approximately September 31, 2021. Accordingly, reimbursements for any COVID testing for that six-month window was fraudulent in light of that "immediate jeopardy" notice (as well as the earlier failure to renew its CLIS license), which again affected both the New Jersey and New York laboratories.

102.    In ProPhase's August 31, 2021, SEC Form 8-K, ProPhase reported: "For the three months ended June 30, 2021, net revenue was $9.1 million compared to $3.6 million for the three months ended June 30, 2020. The Company experienced higher net revenue for the three months ended June 30, 2021, primarily as a result of an increase of $7.5 million related to its new diagnostic services business." COVID testing, therefore, amounted to 82% of ProPhase revenue ($7.5 million / $9.1 million).

103.    Further compounding the issues, *supra*, on June 24, 2021, New York Executive Order 202.10, which permitted clinical laboratories holding a CLIA license outside of New York to perform COVID testing within New York, expired. Accordingly, reimbursements for any COVID testing in 2021 Q3 was fraudulent because ProPhase had not resolved the NJ DOH order, and on top of all of that, Executive Order 202.10 expired on June 24, 2021.

104.    In ProPhase's November 12, 2021, SEC Form 8-K, ProPhase reported: "For the

three months ended September 30, 2021, net revenue was $9.5 million as compared to $3.8 million for the three months ended September 30, 2020. We recognized higher net revenue for the three months ended September 30, 2021 primarily as a result of an increase of $7.1 million in revenue related to our new diagnostic services business." COVID testing, therefore, amounted to 75% of ProPhase revenue ($7.1 million / $9.5 million).

105.    ProPhase has not separately reported COVID testing revenue from HRSA, Medicare, and Medicaid reimbursements from 2021 Q1 to 2021 Q3, but these figures are significant in light of publicly available data. For example, from December 2020, when ProPhase began COVID testing, until March 22, 2022, when HRSA funding stopped, HRSA paid $23,883,698 to ProPhase for COVID testing for uninsured beneficiaries. *See* Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration of the Uninsured *available at* https://data.cdc.gov/Administrative/Claims-Reimbursement-to-Health-Care-Providers-and-/rksx-33p3. Said another way, HRSA, alone, paid ProPhase $4.8 million on average per fiscal quarter, or approximately $14.4 million from 2021Q1 to 2021Q3.

106.    Based upon the foregoing and other reliable information, PPFB believes that ProPhase's fraudulently billed the United States, New York State, and the State of New Jersey for at least $25 million in COVID testing from approximately from approximately 2021Q1 through 2021Q3.

### C.    ProPhase's Knowledge and/or Reckless Disregard

107.    ProPhase and its personnel knew or recklessly disregarded that ProPhase engaged in fraudulent billing for COVID testing, including by continuing to perform COVID testing despite

the fact that (i) it never renewed its New Jersey CLIS license, (ii) it received an "immediate jeopardy" notice and was ordered to stop testing, and (iii) Executive Order 202.10 expired.

108.    The following entities and individuals were aware that ProPhase engaged in fraudulent billing for COVID testing, as alleged herein.

109.    ***ProPhase.*** In its eagerness to enter the COVID testing space, ProPhase and each member of its Board of Directors declined to conduct *any* due diligence, and recklessly disregarded the possibility that CPM's CLIS/CLIA certification status and the safety conditions at the New Jersey laboratory were subpar. CLIS/CLIA certification at a well-run laboratory was the most important asset ProPhase needed to enter into the new business segment of COVID testing. Yet ProPhase (and Karkus, who signed the deal), knew of or disregarded the possibility that CPM's CLIS/CLIA certification and safety conditions at the New Jersey laboratory were substandard and went ahead with the acquisition anyway.

110.    This was not a mere oversight by a naïve purchaser. ProPhase touts its sophistication in the healthcare space, and in its March 31, 2021, SEC Form 10K, ProPhase underscored the potential negative impact to its business if CLIA certification, and parallel state regulations, were in any way deficient. It stated:

> The performance of laboratory diagnostic testing is subject to extensive U.S. regulation, and many of these statutes and regulations have not been interpreted by the courts. CLIA extends federal oversight to virtually all physician practices performing clinical laboratory testing and to clinical laboratories operating in the United States by requiring that they be certified by the federal government or, in the case of clinical laboratories, by a federally approved accreditation agency. Standards for testing under CLIA are based on the complexity of the tests performed by the laboratory, with tests classified as "high complexity," "moderate complexity," or "waived." Laboratories performing high-complexity testing are required to meet more stringent requirements than moderate-complexity laboratories. **The sanction for failure to comply with CLIA requirements may be suspension, revocation or limitation of a laboratory's CLIA certificate, which is necessary to**

conduct business, as well as significant fines and/or criminal penalties. In addition, we are subject to regulation under state law.

State laws may require that laboratories and/or laboratory personnel meet certain qualifications, specify certain quality controls or require maintenance of certain records. **Applicable statutes and regulations could be interpreted or applied by a prosecutorial, regulatory or judicial authority in a manner that would adversely affect our business. Potential sanctions for violation of these statutes and regulations include significant fines and the suspension or loss of various licenses, certificates and authorizations, which could have a material adverse effect on our business**. In addition, compliance with future legislation could impose additional requirements on us, which may be costly.

(Emphasis added.)

111.    ProPhase also implemented internal controls for investigating allegations of fraud raised by whistleblowers, "Non-retaliation Policy for Employees who Report Actions which may be Violations of Law," but disregarded these processes.[8]

112.    **_Ted Karkus._** As alleged, *supra*, on March 31, 2021, the NJ DOH told ProPhase's Laboratory Supervisor and COO to "cease COVID testing immediately." Multiple current and former (laid off) ProPhase employees raised concerns to Karkus about the continuing COVID testing taking place at the New Jersey and New York laboratories and some even demanded to management that these actions immediately stop at the risk of governmental and regulatory action and public safety concerns. Despite the internal elevation of these concerns, Karkus ordered that employees continue COVID testing at both the New Jersey and New York facilities.

113.    The ProPhase COO advised Karkus that he risked both civil and criminal liability under the False Claims Act for failing to cease COVID testing at ProPhase's New Jersey and New York labs and under the securities laws for failing to disclose the March 31, 2021 order to

---

[8] ProPhase's knowledge and reckless disregard is likewise shown by the knowledge and actions of its personnel, as alleged in more detail below.

investors. Karkus responded that the "reward" of larger revenue and increasing stock prices outweighed the risk of False Claims Act or securities law liability. Karkus further told the ProPhase COO that he had apprised his personal attorney of the matter and "would resolve it" should governmental authorities become aware of his conduct.

114. ***Jason Karkus.*** As alleged, *supra*, Jason Karkus "helped develop two elite CLIA-certified labs" for ProPhase Diagnostics. On belief, Jason Karkus recklessly disregarded the lack of licensing, cease-and-desist order, and expiration of Executive Order 202.10. Instead, he followed his father's orders to continue COVID testing at the New Jersey and New York sites. For these efforts, Jason Karkus was promoted to EVP and Co-COO of ProPhase Diagnostics after the CLIA cease-and-desist order was provisionally lifted in approximately September 2021. *See ProPhase Labs Continues to Build Strong Leadership with Key Promotions and Additions to Management Team*, *available at* https://ir.ProPhaselabs.com/news-events/press-releases/detail/139/.

115. ***Sergio Miralles.*** As alleged, *supra*, Miralles is "responsible for ensuring a complete end-to-end technology solution that links its lab customers' patient data via interface to efficiently process and report results." On belief, Miralles disregarded the fact that ProPhase scrubbed patient files on a daily basis and followed Karkus's orders to continue COVID testing at the New Jersey and New York sites. Instead, Miralles continued to scrub patient data to conceal the fact that COVID testing continued at the New Jersey and New York sites. Further, Miralles' proposed purchasing device trackers on Amazon.com and directing a ProPhase employee to drive near the Alliance facility (which was near where she lived) with the tracker enabled. The employee did not load or deliver any specimens when the tracker was enabled. Rather, Miralles kept the records of the tracker on his computer in the event that NJ DOH or other governmental agencies sought

evidence that specimens were in fact being delivered to Alliance (when in fact they were not). For these efforts, Miralles was promoted to EVP and CIO of ProPhase Diagnostics after the CLIA cease-and-desist order was provisionally lifted in approximately September 2021. *See* ProPhase Labs Continues to Build Strong Leadership with Key Promotions and Additions to Management Team, *available at* https://ir.ProPhaselabs.com/news-events/press-releases/detail/139/.

116.    ***Alice Lioi.*** Lioi joined ProPhase in May 2021, and recklessly disregarded the fact that ProPhase Diagnostics lacked its state level CLIS licensing, was issued a "immediate jeopardy" notice with respect to its CLIA license, and Executive Order 202.10 would shortly expire. Lioi was aware that ProPhase continued COVID testing at both the New York and New Jersey lab locations. Lioi did not correct these deficiencies despite the fact that she "brings more than 18 years of progressive laboratory leadership experience in both clinical and research," including at ICON and Quest Diagnostics. Instead, she followed Karkus's orders to continue COVID testing at the New Jersey and New York sites. For these efforts, Lioi was promoted to EVP and Co-COO of ProPhase Diagnostics after the CLIA cease-and-desist order was provisionally lifted in approximately September 2021. *See* ProPhase Labs Continues to Build Strong Leadership with Key Promotions and Additions to Management Team, *available at* https://ir.ProPhaselabs.com/news-events/press-releases/detail/139/.

117.    ***Jason M. Barr.*** On belief, Barr, as head of the Compliance Committee ignored or disregarded any of the concerns elevated to him through the internal controls established for whistleblower complaints and failed to take appropriate action in accordance with the guidance set forth in the Non-retaliation Policy for Employees who Report Actions which may be Violations of Law and other ProPhase policies regarding whistleblowers. Among his responsibilities enumerated in the Whistleblower Policy were: "The Compliance Officer is responsible for

receiving, collecting, reviewing, processing and resolving concerns and reports by Associates and

others on the matters described above and other similar matters. Associates are encouraged to

discuss issues and concerns of the type covered by this Policy with their supervisor, who is in turn

responsible for informing the Compliance Officer of any concerns raised." Rather, Barr followed

Karkus's orders to continue COVID testing at the New Jersey and New York sites.

118.    ___Warren Hirsch & Louis Gleckel.___ On belief, Hirsch, Gleckel, and Barr, as members

of the Audit Committee, disregarded the proper accounting for the $40,000 per month payment

that is a clear and obvious violation of the FCA, Anti-Kickback Statute, parallel state law, and

other applicable federal and state statutes and regulations. As ProPhase acknowledged in its March

31, 2021, SEC Form 10K:

> The U.S. Anti-Kickback Statute prohibits knowingly providing
> anything of value in return for, or to induce the referral of, Medicare,
> Medicaid or other U.S. healthcare program business. **Violations can
> result in imprisonment, fines, penalties, and/or exclusion from
> participation in U.S. healthcare programs.** The OIG has published
> "safe harbor" regulations that specify certain arrangements that are
> protected from prosecution under the Anti-Kickback Statute if all
> conditions of the relevant safe harbor are met. Failure to fit within a
> safe harbor does not necessarily constitute a violation of the Anti-
> Kickback Statute; rather, the arrangement would be subject to scrutiny
> by regulators and prosecutors and would be evaluated on a case-by-
> case basis. Many states have their own Medicaid anti-kickback laws,
> and several states also have anti-kickback laws that apply to all payers
> (i.e., not just government healthcare programs).
>
> In addition to the Anti-Kickback Statute, in October 2018, the U.S.
> enacted the Eliminating Kickbacks in Recovery Act of 2018 (EKRA),
> as part of the Substance Use-Disorder Prevention that Promotes
> Opioid Recovery and Treatment for Patients and Communities Act
> (SUPPORT Act). EKRA is an all-payer anti-kickback law that makes
> it a criminal offense to pay any remuneration to induce referrals to, or
> in exchange for, patients using the services of a recovery home, a
> substance use clinical treatment facility, or laboratory. **Although it
> appears that EKRA was intended to reach patient brokering and
> similar arrangements to induce patronage of substance use
> recovery and treatment, the language in EKRA is broadly written.**

33

> As drafted, an EKRA prohibition on incentive compensation to sales employees is inconsistent with the federal anti-kickback statute and regulations, which permit payment of employee incentive compensation, a practice that is common in the industry. Significantly, EKRA permits the U.S. Department of Justice to issue regulations clarifying EKRA's exceptions or adding additional exceptions, but such regulations have not yet been issued. The Company is working through its trade association to address the scope of EKRA and is seeking clarification or correction.

(Emphasis added).[9]

119. ***Alliance.*** As alleged *supra*, ProPhase paid $40,000 per month to Alliance to use Alliance's CLIA number, 33D0985206, to fraudulently indicate that COVID testing took place at Alliance's laboratories, rather than at ProPhase's unlicensed and stop-ordered laboratories.

## VI.   COUNTS

## COUNT 1

## DETERMINATION OF NON-DISCHARGEABILITY UNDER 11 U.S.C. § 1141(d)(6)

120. PPFB incorporates by reference and realleges the above allegations.

121. 11 U.S.C. § 1141(d)(6) provides: "the confirmation of a plan does not discharge a debtor that is a corporation from any debt[:]" (a) "of a kind specified in paragraph (2)(A) or (2)(B) of section 523(a) that is owed to a domestic governmental unit."

122. 11 U.S.C. § 523(a)(2)(A) provides: "A discharge under section 727, 1141, 11921 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent

---

[9] ProPhase has also experienced significant turnover at its senior management levels, including three CFOs since August 2022: Monica Brady, Bill White, and Robert Morse. The timing of certain promotions and bonuses suggests that Karkus sought to compensate ProPhase employees in exchange for their concealing the company's wrongful conduct, including Sergio Miralles, who was promoted from CIO to EVP in December 2021.

obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

123.    PPFB, LLC's claims against ProPhase Diagnostics, NJ, Inc. are nondischargeable under 11 U.S.C. § 1141(d)(6) because the COVID reimbursements were obtained by false pretenses, false representations, or actual fraud.  Specifically, after ProPhase Diagnostics, NJ, Inc. was ordered to "cease COVID testing immediately" after the March 31, 2021, NJ DOH on-site inspection, ProPhase Diagnostics, NJ, Inc. concealed the fact that it continued COVID testing using unvalidated methods to avoid CMS suspension, enforcement, injunction, and/or revocation of its CLIA certificate.

124.    Among other things:

a.    Karkus directed ProPhase Diagnostics, NJ, Inc. to fraudulently use another labs' CLIA number to conceal where the testing was actually taking place.

b.    ProPhase Diagnostics, NJ, Inc. continued to conceal their COVID testing by reconfiguring the New Jersey laboratory so that COVID testing took place at night behind a wall.

c.    During one unannounced inspection by NJ DOH, ProPhase Diagnostics, NJ, Inc. showed the inspector a shut-down machine to give the false impression that COVID testing had ceased—a move Karkus later described as "brilliant."

125.    ProPhase Diagnostics, NJ, Inc. knew that the above actions, representations, and statements were false when they made them or they made them with reckless disregard of their truth.

126.    ProPhase Diagnostics, NJ, Inc. also made the above representations and statements and took the above actions with the intent to deceive and induce reliance.

127.    The recipients of these representations reasonably and justifiably relied upon ProPhase Diagnostics, NJ, Inc.'s representations and conduct.

128.    ProPhase Diagnostics, NJ, Inc.'s fraudulent activity damaged the United States, New Jersey, New York, and PPFB, in the amount of at least $75 million and attorneys' fees and costs. *See* Proofs of Claim No. 6.

129.    11 U.S.C. § 1141(d)(6) further provides: "the confirmation of a plan does not discharge a debtor that is a corporation from any debt[:]" "owed to a person as the result of an action filed under subchapter III of chapter 37 of title 31 or any similar State statute."

130.    PPFB, LLC's claims against ProPhase Diagnostics, NJ, Inc. are nondischargeable under 11 U.S.C. § 1141(d)(b) because the fraudulent acts alleged in this complaint are the basis of PPFB, LLC's claims under the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*; the New York False Claims Act, New York State Fin. Law § 189, *et seq.*; and the New Jersey False Claims Act, N.J. Stat. § 2A:32C-3.

131.    As set forth in ¶¶ 19-36 of this Complaint, ProPhase Labs, ProPhase Diagnostics, Inc., ProPhase Diagnostics NY, Inc., and ProPhase Diagnostics NJ, Inc. are alter egos of one another.

132.    As a result of the damages to the United States, New Jersey, New York, and PPFB, the claims against ProPhase Diagnostics, NJ, Inc. are not dischargeable under 11 U.S.C. § 1141(d)(6).

VII.    **PRAYER FOR RELIEF**

WHEREFORE, PPFB prays as follows:

a.    That the Court enter judgment in PPFB's favor on Count 1 of this Complaint;

b.      Find that PPFB's claims against ProPhase Diagnostics, NJ, Inc. are non-

dischargeable under 11 U.S.C. § 1141(d)(6);

c.      Grant any such further relief as the Court finds appropriate under the

circumstances.

Respectfully submitted,

Dated: December 19, 2025      By:    /s/ *Douglas J. McGill*          
DOUGLAS J. MCGILL
**WEBBER MCGILL, LLC**
100 E. Hanover Avenue, Suite 401
Cedar Knolls, New Jersey 07927
Telephone: (973) 739-9559
dmcgill@webbermcgill.com

NIALL P. McCARTHY (*pro hac vice app. forthcoming*)
GRACE Y. PARK (*pro hac vice app. forthcoming*)
KEVIN J. BOUTIN (*pro hac vice app. forthcoming*)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
nmccarthy@cpmlegal.com
gpark@cpmlegal.com
kboutin@cpmlegal.com

*Attorneys for Plaintiffs*

# Exhibit 1

**State of New Jersey**
**DEPARTMENT OF HEALTH**
PO BOX 361
TRENTON, N.J. 08625-0361

**www.nj.gov/health**

PHILIP D. MURPHY
*Governor*

SHEILA Y. OLIVER
*Lt. Governor*

JUDITH M. PERSICHILLI, RN, BSN, MA
*Commissioner*

**IMPORTANT NOTICE – ACTION NECESSARY**

**VIA FACSIMILE TO (732) 753-9998 AND FIRST CLASS MAIL.**
**(CONFIRMATION OFSUCCESSFUL TRANSMISSION OF FACSIMILE**
**CONSTITUTES PROOF OF RECEIPT)**

April 9, 2021

Shahrokh Momtahen, MD
PROPHASE DIAGNOSTIC LABORATORY
42 Throckmorton LN
Old Bridge, NJ 08857

**CLIA #33D0126129**

**RE: CONDITIONS OUT - IMMEDIATE JEOPARDY**

Dear Dr. Momtahen:

In order for a laboratory to perform testing under the Clinical Laboratory Improvement Amendments of 1988 (CLIA), Public Law 100-578, it must comply with all CLIA requirements. These requirements are found in section 353 of the Public Health Service Act (42 U.S.C. § 263a) and 42 Code of Federal Regulations, Part 493 (42 C.F.R. § 493). Federal regulations require onsite surveys to determine whether or not a laboratory is in compliance with the applicable regulations. Compliance with these regulations is a condition of certification for the CLIA program.
New Jersey Department of Health (State agency) conducted an initial, a routine recertification, a survey of your laboratory that was completed on **March 31, 2021**. As a result of the survey, it was determined that your facility is not in compliance with all of the Conditions required for certification in the CLIA program. In addition, it was determined that the deficient practices of your laboratory pose immediate jeopardy to patient health and safety. (Immediate jeopardy is defined by the CLIA regulations as a situation in which immediate corrective action is necessary because the laboratory's non-compliance with one or more Condition-level requirements has already caused, is causing, or is likely to cause, at any time, serious injury or harm, or death, to individuals served by the laboratory or to the health and safety of the general public.) Specifically, the following Conditions were not met:;

D6076 - 42 C.F.R. § 493.1441 Condition: Laboratories performing high complexity testing; laboratory director;

If you have questions regarding this letter, please contact me at 609-406-6832.

Sincerely,

Melanie Rinaldi, MT (ASCP)
CLIA Program Manager
Clinical Laboratory Evaluator 3

Enclosure: CMS-2567

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 33D0126129 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 03/31/2021 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| PROPHASE DIAGNOSTIC LABORATORY | 42 THROCKMORTON LN OLD BRIDGE, NJ 08857 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D3003 | **FACILITIES** CFR(s): 493.1101(a)(2)<br><br>The laboratory must be constructed, arranged, and maintained to ensure contamination of patient specimens, equipment, instruments, reagents, materials, and supplies is minimized. This STANDARD is not met as evidenced by: Based on surveyor observation of the work area where Molecular testing was performed and interview with the Laboratory Supervisor (LS), the laboratory failed to minimize contamination of patient specimens, equipment, reagents, and instrumentation for SARS-COV-2 (COVID 19) PCR tests from 4/8/20 to the date of the survey. The findings include:<br><br>1. Observation of the work area revealed the laboratory did not have a closed system to prevent contamination of Molecular tests.<br><br>2. The product was prepared and detected while moving between two work spaces using the same entrance and exit.<br><br>3. Patient specimens and reagents were received, prepared, extracted and amplified in the same work space.<br><br>4. The laboratory processed 1000 to 1500 Molecular SARS-COV-2 PCR tests per day.<br><br>5. The LS confirmed on 3/31/21 at 12:10 pm the laboratory was not arranged to minimize contamination. | D3003 | | |
| D3005 | **FACILITIES** CFR(s): 493.1101(a)(3)<br><br>Molecular amplification procedures that are not contained in closed systems have a | D3005 | | |

| LABORATORY DIRECTOR'S OR PROVIDER/SUPPLIER REPRESENTATIVE'S SIGNATURE | TITLE | (X6) DATE |
|---|---|---|

Any deficiency statement ending with an asterisk (*) denotes a deficiency which the institution may be excused from correcting providing it is determined that other safeguards provide sufficient protection to the patients. (See instructions.) Except for nursing homes, the findings stated above are disclosable 90 days following the date of survey whether or not a plan of correction is provided. For nursing homes, the above findings and plans of correction are disclosable 14 days following the date these documents are made available to the facility. If deficiencies are cited, an approved plan of correction is requisite to continued program participation.

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>33D0126129 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>03/31/2021 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| PROPHASE DIAGNOSTIC LABORATORY | 42 THROCKMORTON LN<br>OLD BRIDGE, NJ 08857 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D3005 | Continued From page 1<br>uni-directional workflow. This must include separate areas for specimen preparation, amplification and product detection, and, as applicable, reagent preparation.<br>This STANDARD is not met as evidenced by:<br>Based on surveyor observation of the area where Molecular amplification procedures were performed and interview with the Laboratory Supervisor (LS), the laboratory failed to have a unidirectional workflow for specimen preparation, reagent preparation, product detection and amplification from 4/8/20 to the date of the survey. The laboratory processed 1000 to 1500 Molecular SARS-COV-2 (COVID 19) PCR tests per day. The LS confirmed on 3/31/21 at 12:00 pm the laboratory did not have a unidirectional work flow. | D3005 | | |
| D3009 | FACILITIES<br>CFR(s): 493.1101(c)<br><br>The laboratory must be in compliance with applicable Federal, State, and local laboratory requirements.<br>This STANDARD is not met as evidenced by:<br>a. Based on an in-office review of the laboratory's requirements for a NJ State License, the laboratory failed to renew their New Jersey State Clinical Laboratory License for 2021. The Supervisor for the Clinical Laboratory Improvement Services (CLIS) confirmed on 3/30/21 that the laboratory did not renew its CLIS license for 2021.<br><br>b. Based on surveyor review of the NJ State license and interview with the state surveyor, the Laboratory Director failed to be in compliance with the State of New Jersey requirements to get approval from the state before performing patient | D3009 | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: ZF8L11          Facility ID: NJ22031261          If continuation sheet Page 2 of 14

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>33D0126129 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>03/31/2021 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>PROPHASE DIAGNOSTIC LABORATORY | STREET ADDRESS, CITY, STATE, ZIP CODE<br>42 THROCKMORTON LN<br>OLD BRIDGE, NJ 08857 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D3009 | Continued From page 2<br><br>samples for SARS-COV-2 (COVID 19) PCR saliva tests. The laboratory performed 81,278 saliva tests from 12/11/20 to 3/20/21. The Laboratory Supervisor confirmed on 3/31/21 at 12:00 pm the laboratory did not have a CLIS license for saliva tests. | D3009 | | |
| D3033 | RETENTION REQUIREMENTS<br>CFR(s): 493.1105(a)(3)(i)<br><br>In addition, the laboratory must retain records of test system performance specifications that the laboratory establishes or verifies under §493.1253 for the period of time the laboratory uses the test system but no less than 2 years.<br><br>This STANDARD is not met as evidenced by:<br>Based on lack of Performance Specification (PS) records and interview with the Laboratory Supervisor (LS), the laboratory failed to retain PS records for the QuantStudio 12K Flex analyzer used to perform SARS-COV-2 (COVID 19) PCR tests from 4/8/20 to the date of survey. The finding includes:<br><br>1. The were no work records, raw data or instrument print outs on site to confirm the data in four separate validations found on site.<br><br>2. The LS confirmed there were none of the above records for the validations performed. | D3033 | | |
| D5209<br><br>140H | PERSONNEL COMPETENCY ASSESSMENT POLICIES<br>CFR(s): 493.1235<br><br>As specified in the personnel requirements in subpart M, the laboratory must establish and follow written policies and procedures to assess | D5209 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:  33D0126129 | (X2) MULTIPLE CONSTRUCTION  A. BUILDING _____  B. WING _____ | (X3) DATE SURVEY COMPLETED  03/31/2021 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER

**PROPHASE DIAGNOSTIC LABORATORY**

STREET ADDRESS, CITY, STATE, ZIP CODE

**42 THROCKMORTON LN**
**OLD BRIDGE, NJ 08857**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5209 | Continued From page 3  employee and, if applicable, consultant competency.  This STANDARD  is not met as evidenced by:  Based on the lack of Competency Assessment (CA) records and interview with the Laboratory Supervisor (LS), the laboratory failed to  follow written procedures to perform a CA on the Technical Supervisor, General Supervisor and twelve Testing Personnel form 4/8/20 to the date of survey. The LS confirmed on 3/31/21 at 12:00 pm that the CA was not performed. | D5209 | | |
| D5401  140H | PROCEDURE MANUAL  CFR(s): 493.1251(a)  A written procedures manual for all tests, assays, and examinations performed by the laboratory must be available to, and followed by, laboratory personnel.  Textbooks may supplement but not replace the laboratory's written procedures for testing or examining specimens.  This STANDARD  is not met as evidenced by:  Based on surveyor review of the Procedure Manual (PM) and interview with the Laboratory Supervisor (LS), the laboratory failed to follow the PM for Molecular tests from 4/8/20 to the date of the survey. The findings include:  1. The PM stated under Prophase Covid-19 Real Time (RT-PCR) Assay Manual: "Assay tests nasopharyngeal swab, nasopharyngeal aspirate, and bronchial lavage specimens."  2. Page 27 of the PM Section 21.0 States: "other specimen types have not been evaluated and should not be tested with this assay.  3.  The laboratory performed 81,278 RT-PCR using saliva specimens. | D5401 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>33D0126129 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>03/31/2021 |
| --- | --- | --- | --- |

| NAME OF PROVIDER OR SUPPLIER<br><br>**PROPHASE DIAGNOSTIC LABORATORY** | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>**42 THROCKMORTON LN**<br>**OLD BRIDGE, NJ  08857** |
| --- | --- |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
| --- | --- | --- | --- | --- |
| D5401 | Continued From page 4 | D5401 | | |
| | 4. The TS confirmed 3/31/21 at 12:30 pm that the laboratory did not follow the PM. | | | |
| D5775<br><br>140H | COMPARISON OF TEST RESULTS<br>CFR(s): 493.1281(a)(c)<br><br>(a) If a laboratory performs the same test using different methodologies or instruments, or performs the same test at multiple testing sites, the laboratory must have a system that twice a year evaluates and defines the relationship between test results using the different methodologies, instruments, or testing sites.<br>(c) The laboratory must document all test result comparison activities.<br>This STANDARD  is not met as evidenced by:<br> Based on surveyor review of the Laboratory Records and interview with the Laboratory Supervisor (LS), the laboratory failed to perform comparison studies for the QuantStudio Flex 12K instruments in use from 4/8/20 to the date of the survey. The finding includes:<br><br>1. There was no documented evidence the laboratory performed comparison studies between the four analyzers stated above during the validation or prior to patient testing.<br><br>2. The LS confirmed on 3/31/21 at 11:00 am that the laboratory failed to perform comparison studies. | D5775 | | |
| D5805<br><br>140H | TEST REPORT<br>CFR(s): 493.1291(c)<br><br>The test report must indicate the following:<br>(c)(1) For positive patient identification, either the patient's name and identification number, or a unique patient identifier and identification number. | D5805 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>33D0126129 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>03/31/2021 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| PROPHASE DIAGNOSTIC LABORATORY | 42 THROCKMORTON LN<br>OLD BRIDGE, NJ 08857 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5805 | Continued From page 5<br><br>(c)(2) The name and address of the laboratory location where the test was performed.<br>(c)(3) The test report date.<br>(c)(4) The test performed.<br>(c)(5) Specimen source, when appropriate.<br>(c)(6) The test result and, if applicable, the units of measurement or interpretation, or both.<br>(c)(7) Any information regarding the condition and disposition of specimens that do not meet the laboratory's criteria for acceptability.<br>This STANDARD is not met as evidenced by:<br>Based on surveyor review of the Test Report (TR) and interview with the Laboratory Supervisor (LS), the laboratory failed to report qualitative Molecular SARS-COV-2 (COVID 19) PCR tests results accurately from 4/8/20 to the date of survey. The finding includes:<br><br>1. A review of 20 TR revealed 20 out of 20 did not have a specimen source.<br><br>2. The laboratory performed non Food and Drug Administration (FDA) cleared tests and there was no statement stating "This test has not been FDA cleared or approved. This test has not been authorized by the FDA under an Emergency Use Authorization (EUA).<br><br>3. The laboratory failed to provide all of the manufacturer reporting disclaimers as required in their package insert and the four disclaimers that the FDA lists in pathway D of the "FDA Policy for Diagnostic Tests for Coronavirus Disease-2019 during the Public Health Emergency" since all of the testing performed was a laboratory developed test (LDT).<br><br>4. The LS confirmed on 3/31/21 at 10:45 am that tests SARS-COV-2 (COVID 19) PCR were not | D5805 | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: ZF8L11          Facility ID: NJ22031261          If continuation sheet Page 6 of 14

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 33D0126129 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 03/31/2021 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| PROPHASE DIAGNOSTIC LABORATORY | 42 THROCKMORTON LN OLD BRIDGE, NJ 08857 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5805 | Continued From page 6 reported accurately. | D5805 | | |
| D5891 140H | POSTANALYTIC SYSTEMS QUALITY ASSESSMENT CFR(s): 493.1299(a) | D5891 | | |
| | The laboratory must establish and follow written policies and procedures for an ongoing mechanism to monitor, assess, and, when indicated, correct problems identified in the postanalytic systems specified in §493.1291. | | | |
| | This STANDARD is not met as evidenced by: Based on surveyor review of the Test Report (TR) and interview with the Laboratory Supervisor (LS) the laboratory failed to assess and correct problems on the TR for SARS-CoV-2 RT PCR tests results from 4/8/20 to the date of survey. The finding includes: | | | |
| | 1. The review of four FR revealed: a. Two of four : Collection time and received time was 12:00 am but the laboratory was not open at 12:00 am. b. One of four: No collection time was recorded c. One sample received from Texas was collected at 4:49 pm, received at 8:14 pm, and resulted at 11:42 pm on 3/10/21. Timing is not possible. d. Accession 686 stated: Testing location: P4 Clinical - 25 Riverside Drive, Pine Brook, NJ at bottom of the report but under Testing Methodology it stated " This sample was tested and interpreted at Prophase Diagnostic. | | | |
| | 2. Statement on TR said Prophase Diagnostics is "using nasopharyngeal swabs and nasal swabs" but omitted saline specimens. | | | |
| | 3. The Laboratory Director (LD) on the TR was | | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | | A. BUILDING _____ | | |
| | 33D0126129 | B. WING _____ | | 03/31/2021 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| PROPHASE DIAGNOSTIC LABORATORY | 42 THROCKMORTON LN |
| | OLD BRIDGE, NJ  08857 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D5891 | Continued From page 7<br>DR, not the LD listed in the CMS 116.<br><br>4. Disclaimer stated " This test has been authorized by the Clinical Laboratory Improvement Services (CLIS) of NJ State Licensure Review Program/PT Review Program and the laboratory must abide by all applicable regulations regarding testing under a FDA/EUA." but CLIS did not license them for saliva testing and the test did not receive an EUA at the time of the survey. It was a laboratory developed test.<br><br>5. The laboratory performed 81,278 SARS-CoV-2 RT PCR saliva tests and 17,223 tests using swabs in saline from 10/10/20 to 3/20/21.<br><br>6. The LS stated on 3/31/21 at 1:45 pm that the laboratory failed to assess and correct problems of the FR. | D5891 | | |
| D6076 | LABORATORY DIRECTOR<br>CFR(s): 493.1441<br><br>The laboratory must have a director who meets the qualification requirements of §493.1443 of this subpart and provides overall management and direction in accordance with §493.1445 of this subpart.<br><br>This CONDITION  is not met as evidenced by:<br> Based on an surveyors review of the laboratory's records, procedures, Quality Control (QC), Quality Assurance (QA), Performance Specifications (PS) and interviews with the Laboratory Supervisor (LS) the Laboratory Director (LD), the LD failed to provide overall management and direction to the laboratory to ensure that laboratory testing is performed satisfactorily for Molecular SARS-COV-2 RT PCR | D6076 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>33D0126129 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>03/31/2021 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER

**PROPHASE DIAGNOSTIC LABORATORY**

STREET ADDRESS, CITY, STATE, ZIP CODE

**42 THROCKMORTON LN**
**OLD BRIDGE, NJ 08857**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6076 | Continued From page 8<br><br>tests and in compliance with the CLIA regulations from 4/8/20 to the date of the survey.<br><br>1. The LD failed to ensure the laboratory was constructed, arranged, and maintained to ensure contamination of patient specimens, equipment, instruments, reagents, materials, and supplies is minimized. Cross Refer to D 3003<br><br>2. The LD failed to ensure Molecular amplification procedures that are not contained in closed systems have a uni-directional workflow. Cross Refer to D 3005.<br><br>3. The LD failed to be responsible for the overall operation and administration of the laboratory, to include assuring compliance with the applicable regulations and ensuring that all the duties of the Laboratory Director were performed on the date of the survey. Cross Refer to D 6079<br><br>4. The LD listed on the CMS 116 failed to be accessible by telephone or electronically. Cross Refer to D 6080<br><br>5. The LD failed to ensure PS were adequate to perform test. Cross Refer to D 6086.<br><br>6. The LD failed to ensure the laboratory established an accurate QA program. Cross Refer to D 6094.<br><br>7. The LD failed to ensure that prior to testing patients' specimens, all personnel have the appropriate education. Cross Refer to D 6102. | D6076 | | |
| D6079 | LABORATORY DIRECTOR RESPONSIBILITIES CFR(s): 493.1445(a)(b) | D6079 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | 33D0126129 | A. BUILDING _____<br>B. WING _____ | | 03/31/2021 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| PROPHASE DIAGNOSTIC LABORATORY | 42 THROCKMORTON LN<br>OLD BRIDGE, NJ 08857 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6079 | Continued From page 9<br><br>The laboratory director is responsible for the overall operation and administration of the laboratory, including the employment of personnel who are competent to perform test procedures, record and report test results promptly, accurately and proficiently, and for assuring compliance with the applicable regulations.<br>(a) The laboratory director, if qualified, may perform the duties of the technical supervisor, clinical consultant, general supervisor, and testing personnel, or delegate these responsibilities to personnel meeting the qualifications under 493.1447, 493.1453, 493.1459, and 493.1487 respectively.<br>(b) If the laboratory director reapportions performance of his or her responsibilities, he or she remains responsible for ensuring that all duties are properly performed.<br>This STANDARD is not met as evidenced by:<br>Based on the review of written policies and procedures, record review, surveyor interviews and observation, it was determined that the Laboratory Director (LD) failed to be responsible for the overall operation and administration of the laboratory, to include assuring compliance with the applicable regulations and ensuring that all the duties of the Laboratory Director were performed on the date of the survey. The findings include:<br><br>1. A CMS 116 was received from the laboratory requesting a LD change to SM, MD on 12/16/2020.<br><br>2. The change was made in the Aspen Data base on 12/16/2020.<br><br>3. The Laboratory Supervisor and staff on site the day of the survey stated the LD was DR, MD. | D6079 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 33D0126129 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 03/31/2021 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| PROPHASE DIAGNOSTIC LABORATORY | 42 THROCKMORTON LN OLD BRIDGE, NJ 08857 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6079 | Continued From page 10<br><br>4. The manuals listed below were on site the day of the survey:<br>a. Laboratory Policy Manual (LPM): Molecular Virology Version 1 Covid - 19 Assay Validation, LPM: Covid-19 Real Time (RT-PCR) Assay Manual both dated 11/20/2020, Final Reports and Laboratory PM were signed by DR, MD.<br>b. Prophase Diagnostic Covid -19 Validation 2020 approved by SM, MD.<br>c. Prophase Diagnostic Covid -19 Validation 2021, Molecular Version 1 approved by CB/AV, neither are listed on the CMS 209 or are employed at this Prophase NJ location.<br>d. Prophase Diagnostic Quality Control in PCR Department Molecular Virology Version 1 2020 approved by CB.<br>e. Prophase Diagnostic Laboratories COVID-19 Real-Time (RT-PCR) Assay Manual 2021 approved by CB/AV<br><br>5. There is no LD approval on items 7, 8 and 9<br><br>6. There were no education records or training records for the technical supervisor, clinical consultant, general supervisor or testing personnel from 4/8/20 to the date of the survey. | D6079 | | |
| D6080 | LABORATORY DIRECTOR RESPONSIBILITIES CFR(s): 493.1445(c)<br><br>The laboratory director must be accessible to the laboratory to provide onsite, telephone or electronic consultation as needed.<br>This STANDARD is not met as evidenced by:<br>Based on surveyor visit to the laboratory and interview with the Laboratory Supervisor (LS), the Laboratory Director (LD) listed on the CMS 116 was not on site at the time of the initial survey or | D6080 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>33D0126129 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>03/31/2021 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>PROPHASE DIAGNOSTIC LABORATORY | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>42 THROCKMORTON LN<br>OLD BRIDGE, NJ 08857 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6080 | Continued From page 11<br><br>accessible by telephone or electronically. It was stated by office personnel "the LD listed on the CMS 116 was not the LD". The LD confirmed on 3/31/21 at 9:50 am the LD was not available. | D6080 | | |
| D6086 | LABORATORY DIRECTOR RESPONSIBILITIES CFR(s): 493.1445(e)(3)(ii)<br><br>The laboratory director must ensure that verification procedures used are adequate to determine the accuracy, precision, and other pertinent performance characteristics of the method.<br>This STANDARD is not met as evidenced by:<br>Based on surveyor review of the Performance Specification (PS) records and interview with the Laboratory Supervisor (LS), the Laboratory Director (LD) failed to ensure that PS were adequate to perform Molecular SARS COV 2 RT PCR tests on the QuantStudio 12K flex analyzer from 4/8/20 to the date of survey. The findings include:<br><br>1. There was no documented evidence validation was performed for:<br>a. Saliva tests. The laboratory performed 81,278 saliva tests from 10/20/20 to 3/30/21.<br>b. The stability of the specimen. Room Temperature, Refrigerated and Frozen<br>c. The expiration date of reagents, working solutions and controls<br>d. The performance of the MagMax Viral/Pathogen II Nucleic Acid Isolation Kit.<br>e. There was no verification of the Lucigen Extraction<br>f. Accuracy of concentration techniques and aliquoting<br>g. Time and temperature of the thermocyclers.<br>h. Quality Control | D6086 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 33D0126129 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 03/31/2021 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| PROPHASE DIAGNOSTIC LABORATORY | 42 THROCKMORTON LN OLD BRIDGE, NJ 08857 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6086 | Continued From page 12<br><br>i. Software used or transmitted results<br><br>2. Raw data to confirm nasopharyngeal swab validation was not found on site at the time of the survey.<br><br>3. The validation was performed on swabs in transport media but swabs are received in saline in the laboratory.<br><br>4. There was no documented evidence found on site at the day of the surveyor to show the validation was done in the laboratory or by laboratory staff.<br><br>5. Validation data was submitted by CB or CB and AV. The LS stated they work in New York.<br><br>6. The LS confirmed on 3/30/21 at 1:50 pm that PS were not adequate. | D6086 | | |
| D6094 | LABORATORY DIRECTOR RESPONSIBILITIES<br>CFR(s): 493.1445(e)(5)<br><br>The laboratory director must ensure that the quality assessment programs are established and maintained to assure the quality of laboratory services provided and to identify failures in quality as they occur.<br>This STANDARD is not met as evidenced by:<br> Based on surveyor review of the laboratory Procedure Manual (PM) and interview with the Laboratory Supervisor(LS), the Laboratory Director failed to ensure a Quality Assurance (QA) program was accurately established to assure quality of laboratory services for Molecular SARS-COV-2 RT PCR tests provided from 4/8/20 to the date of the survey. The findings include: | D6094 | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|
| | 33D0126129 | A. BUILDING _____ <br> B. WING _____ | 03/31/2021 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| PROPHASE DIAGNOSTIC LABORATORY | 42 THROCKMORTON LN <br> OLD BRIDGE, NJ 08857 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| D6094 | Continued From page 13 <br><br> 1. The QA procedure did not include review of: <br> a. Positivity rate monitoring for contamination <br> b. False positive and negative results in reference to patients history. <br> c. Rejected samples <br> d. Daily Quality Control (QC) and extraction QC <br> e. Requestions received <br><br> 2. The LS confirmed on 3/30/20 at 2:45 pm that a QA program was not accurately established. | D6094 | | |
| D6102 | LABORATORY DIRECTOR RESPONSIBILITIES CFR(s): 493.1445(e)(12) <br><br> The laboratory director must ensure that prior to testing patients' specimens, all personnel have the appropriate education and experience, receive the appropriate training for the type and complexity of the services offered, and have demonstrated that they can perform all testing operations reliably to provide and report accurate results. <br> This STANDARD is not met as evidenced by: <br> Based on lack of Personnel Records (PR) and interview with the Laboratory Supervisor (LS), the Laboratory Director (LD) failed to ensure that education and training was adequate to perform Molecular tests for twelve Testing Personnel from 4/8/20 to the date of the survey. The LS confirmed on 3/31/21 at 1:10 pm that all education and training records were not available to ensure Testing Personnel had the proper education and training to perform testing. | D6102 | | |

FORM CMS-2567(02-99) Previous Versions Obsolete    Event ID: ZF8L11    Facility ID: NJ22031261    If continuation sheet Page 14 of 14

# Exhibit 2



Lunch Room

Accessioning

ENTER

Office

Office

Lab Area

Accessioning

Wall

Prep Area

EXIT