<table>
<tr><td>

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**
Caption in Compliance with D.N.J. LBR 9004-2(c)

**STARK & STARK, PC**
Joseph H. Lemkin, Esq.
100 American Metro Blvd.
Hamilton, NJ 08619
Telephone (609) 791-7022
jlemkin@stark-stark.com

*Attorneys for Drexel Distribution, Inc. d/b/a EZ Test NY*

</td></tr>
</table>

| | |
|---|---|
| In re: | Chapter 11 |
| ProPhase Diagnostics, Inc., et. al., | Case No. 25-19833 (CMG) |
| Debtors. | Jointly Administered |
| | Ref. Docket Nos. 107 & 109 |

**DREXEL DISTRIBUTOR, INC.'S OBJECTION TO (I) DEBTORS' SECOND
MOTION TO EXTEND EXCLUSIVITY PERIODS AND (II) MOTION FOR
ENTRY OF ORDER ESTABLISHING TERMS AND CONDITIONS OF DIP
RECEIVABLES TRUST ACCOUNT**

**PRELIMINARY STATEMENT**

Drexel Distributors, Inc. d/b/a EZ Test NY ("Drexel") respectfully submits this objection

(the "Objection") to: (i) the Debtors' second request to extend the exclusive periods to file and

solicit a plan (the "Exclusivity Motion"); and (ii) the Debtors' motion seeking entry of an order

establishing a so-called DIP receivables trust account (the "Trust Motion," and together with the

Exclusivity Motion, the "Motions").

The Motions reflect a single strategy: to maintain control over a non-operating estate

while deferring any meaningful progress toward plan confirmation. The Debtors have no

1

employees, no ongoing business operations, and no present ability to propose a plan. Instead, they seek additional time to pursue speculative receivables collections and litigation outcomes while incurring continuing administrative expenses.

The Bankruptcy Code does not permit exclusivity to be extended under such circumstances, nor does it authorize the imposition of an extra-statutory trust and lien structure governing estate assets outside a confirmed plan or properly authorized financing. Because the Debtors have failed to establish "cause" under section 1121(d), and the proposed trust structure is legally and procedurally defective, both Motions should be denied.

## BACKGROUND

1.      The Debtors commenced these jointly administered Chapter 11 cases over seven months ago, on September 22, 2025 (the "Petition Date").  Since that time, little more than a catalog of basic administrative milestones – attending the initial debtor interview, opening DIP accounts, filing amendments to schedules, filing Monthly Operating Reports (most of them significantly late); assessment of receivables with a collection professional – has been accomplished.  However, these are threshold, procedural requirements of any Chapter 11 debtor and do not constitute substantive movement toward a confirmable plan or meaningful restructuring progress.

2.      These cases do not involve an operating business. The Debtors have no employees and do not generate revenue in the ordinary course. Instead, the estates consist primarily of accounts receivable and litigation.  Their own Monthly Operating Reports reflect continuing losses, minimal receipts, and ongoing administrative expenses.

4911-3415-3894, v. 1

3. As reflected in the Debtors' Monthly Operating Reports, the estates have incurred approximately $137,000 in cumulative losses through February, with minimal receipts and ongoing administrative expenses.

4. The Debtors have not filed a plan or disclosure statement, and claim, without explanation, that a plan "…cannot be filed until the collection efforts…are further advanced… and until further receivables are collected and litigation matters are resolved." *See* Certification of Ted Karkus submitted in support of the Exclusivity Motion ("Karkus Cert."), at ¶ 4.

5. The Debtor also purports to have worked with large creditors seeking to negotiate "Consent Orders fixing Allowed Claims and attaining support for Plans of Reorganization".  See Karkus Cert., at ¶ 3 (O). This appears to be a direct reference to negotiations with Drexel regarding its claim.  Notably, negotiations with Drexel commenced on or about February 4th, at or around the time of the hearing on Debtors' initial motion to extend exclusivity.

6. At that time the amount of an allowed fixed claim amount was discussed and agreed upon, with the limited open issue being payment terms.  Due to a death in counsel for Drexel's family, the negotiations on terms for payment were delayed.  Counsel for the Debtor and Drexel finally spoke at length on March 26th and discussed terms which both parties believed would resolve the parties' ongoing dispute.  Indeed, a term sheet was to be shared by Debtor's counsel on March 27th.

7. When the term sheet was not forthcoming, Drexel's counsel followed up via email on April 1st, April 3rd, April 5th - with no response.  Finally, on April 7th, Drexel was told we would have a term sheet no later than April 8th.  When no term sheet was received, Drexel's counsel followed up on April 10th and April 14th by e-mail.  Also, counsel followed up with a telephone call on April 15th.  Debtors' counsel, for the first time, advised that one of the Debtor's

principals was amenable to the proposed settlement, while one was not amenable to settlement.

To advance the process, counsel for the Debtors requested that Drexel, rather than the Debtors,

provide a term sheet to Debtors.  Drexel provided the term sheet on April 14th.  To date Drexel

has not received a response from the Debtors regarding the term sheet. So, other than repeated

follow-ups by Drexel's counsel and its preparation of a term sheet, there has been no progress

and no effort by Debtors' to resolve Drexel's claim.

8.      This is the Debtors' second request to extend exclusivity. The prior extension has

not resulted in the filing of a plan or any meaningful progress toward confirmation.

9.      Earlier in these cases, Drexel joined in a motion to dismiss filed by the United

States Trustee's office.  Drexel raised concerns about inter-company transactions; potential

fraudulent transfers; and potential diversion or upstreaming of funds to Debtors' parent ProPhase

Labs, Inc. ("Labs").   Those concerns have only intensified based on the conduct of the Debtors

over the past couple months.  The Debtors' purported litigation-backed receivable financing in

the amount of $6 million, with $4.5 million allocated to Labs, further exacerbates Drexel's

concerns about Debtors' misconduct with re-allocation of funds for Labs' benefit. That proposal

underscores that these cases are being managed to protect insiders and affiliates, not to move

toward a fair, confirmable reorganization.

## I. THE DEBTORS HAVE NOT ESTABLISHED "CAUSE" TO EXTEND EXCLUSIVITY

10.      Section 1121(d) permits extension of exclusivity only upon a showing of "cause."

The moving party bears the burden of proving that "cause" exists justifying the grant of an

extension. *In re Service Merchandise Co. Inc.*, 256 B.R. 744, 751 (Bankr. M.D. Tenn. 2000).

4

*Geriatrics Nursing Home v. First Fid. Bank, N.A.* (*In re Geriatrics Nursing Home*), 187 B.R. 128, 131 (D.N.J. 1995). Courts evaluate "cause" based upon well-established factors: (i.) the size and complexity of the case, (ii.) the necessity of sufficient time to negotiate and prepare adequate information, (iii.) the existence of good faith progress, (iv.) whether the debtor is paying its debts as it becomes due, (v.) whether the debtor has demonstrated reasonable prospects for filing a viable plan, (vi.) whether the debtor has made progress negotiating with creditors, (vii.) the length of time a case has been pending, (viii.) whether the debtor is seeking an extension to pressure creditors, and (ix.) whether or not unresolved contingencies exist. *In re Serv. Merch. Co.*, 256 B.R. at 751 ; *In re Crescent Mfg. Co.*, 122 B.R. 979, 982 (Bankr. N.D. Ohio 1990); *In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987).   These factors overwhelmingly weigh against extension.

### A. These Cases Are Not Complex

11.    The Debtors reliance on "complexity" is misplaced. These cases involve no operating business, no employees and no restructuring of the Debtors' capital structure. At most, these cases are collection efforts involving aged receivables and litigation. A liquidation or collection process does not constitute the type of complexity that justifies extended exclusivity.

### B. The Debtors Have Made No Meaningful Progress Toward a Plan

12.    After more than seven months in Chapter 11: (i) no plan has been filed; (ii) no disclosure statement has been filed; (iii) and no timeline for filing either has been provided.  The Debtors' position – that a plan must await uncertain future recoveries – is legally insufficient. Courts require concrete progress, not speculative contingencies.  Because the Debtors bear the burden, conclusory assertions cannot suffice. *In re Cent. Jersey Airport Servs.*, 282 B.R. 176

5

(Bankr. D.N.J. 2002). Debtors' showing does not address the core considerations of viability, timing, or creditor support.

13.     The Debtors stated position amounts to an open-ended request to hold exclusivity hostage to contingencies entirely outside any fixed schedule.  That is not "cause" within the meaning of § 1121(d).  Exclusivity is intended to foster prompt formulation of a plan, not to provide a debtor indefinite control while it pursues asset monetization on a their own undefined timetable.  Where, as here, the Debtors concede they cannot file a plan now and offer no date-certain for when they will be able to file a plan, an extension becomes a tool for delay rather than reorganization.

14.     Moreover, the Debtors have not shown that any delay is necessary to prepare a confirmable plan.  A debtor may file a plan that provides for liquidation, establishes a process for pursuing receivables and litigation, and incorporates contingent distributions based on recoveries, without waiting for recoveries to be realized.  The Debtors' failure to do so underscores that the requested extension is not driven by plan feasibility, but by a desire to continue operating the case without meaningful plan accountability.

15.     The Debtors' invocation of a proposed financing transaction and ongoing creditor negotiations as evidence of "progress" are misplaced and misleading.

### C. The Debtors' Asserted "Progress" Does Not Support Extension

#### Receivables

16.     The Debtors' case rests on a purported receivables portfolio now asserted to be worth approximately $201.2 million across 649,205 claims and 194 matters.  Karkus Cert ¶ 6(A). Yet the Debtors' own operating reports have repeatedly shown that their receivables are over

ninety (90) days old, with no meaningful evidence of actual collection, no payer-by-payer substantiation, no explanation of denial history, no reserve analysis, and no evidentiary support tying these figures to realizable cash.  It is insufficient to ask the Court to extend exclusivity based on unsubstantiated projected value.  The Court should not rely upon uncertain, contingent, or speculative assets to extend exclusivity.

17.     The Debtors claim that the estate's receivables somehow increased from approximately $32.3 million to $83.5 million through Crown Medical Collections ("CMC") efforts only heightens concern.  See Karkus Cert. ¶ 6(c).  An increase in stated receivables value without corresponding cash collections suggests reclassification, rebilling, or aggressive valuation, not demonstrated recoverability.

18.     The Debtors rely heavily on asserting that CMC has issued demand correspondence on $121.3 million, that $79.9 million is in "active settlement negotiations," and that net recoveries of $50 to $60 million are expected after CMC's 30% contingency fee.  Karkus Cert. ¶ 6(B).  But demand letters are not recoveries and negotiations are not settlements.  The Debtors have not shown any executed settlement agreements or collected funds, or reconciliations to actual deposits.  Exclusivity cannot be extended on promises of future success by a collection professional, in this case CMC, especially where the estate continues to incur losses.

### Proposed Financing

19.     The proposed financing structure – directing most proceeds to an affiliate - does not demonstrate a reasonable prospect of filing a confirmable plan and instead raises concerns regarding adherence to the Bankruptcy Code's priority scheme.  According to the Karkus Cert, $4.5 million would be paid to Labs in exchange for "voluntarily subordinating" its purported

7

senior secured position, while only $1.5 million would fund estate operations. See Karkus Cert. ¶ 6(D).  The structure of the proposed transaction reflects not a path to reorganization, but a mechanism for value transfer and delay.  Under the proposal, $4.5 million of estate-related value is to be paid to the Debtors' parent – Labs, ostensibly in exchange for a "voluntary subordination" of its purported senior secured position.  This is precisely the type of upstream value transfer that Drexel previously identified as problematic.  Rather than preserving estate value for creditor recovery, the financing is conditioned on diverting substantial consideration to the equity layer at a time when unsecured creditor recoveries are not certain.

20.     Equally problematic is the allocation of $1.5 million to the estate's operating account, justified as necessary to "stabilize operations" and fund a so-called CMC recovery program. That assertion is conclusory and unsupported. The Debtors' business model appears to be limited to collections activity; there is no meaningful ongoing operating enterprise that requires capital infusion at this scale. The allocation therefore appears less tied to operational necessity and more to the artificial support of a financing construct designed to facilitate the upstream payment.

21.     Courts have repeatedly held that parties may not circumvent the Code's distribution framework through creative structuring.  *See In re Armstrong World, Indus. Inc.* 432 F.3d 507, 513-514 (3d Cir. 2005); *Czyzewski v. Jevic Holding Corp.,* 580 U.S. 451, 137 S. Ct. 973, 986-87 (2017).  The Debtors cannot use "financing" labels to justify what is substantively a pre-confirmation distribution and a reordering of priorities.

22.     Accordingly, the purported financing provides no meaningful support for extending exclusivity, as it does not reflect progress toward a confirmable plan, but rather further entrenchment of pre-confirmation value reallocations.

4911-3415-3894, v. 1

**Creditor Negotiations**

23.     The Debtors' inability to finalize even a bilateral agreement with Drexel reflects internal dysfunction, not progress. Failure to finalize negotiations weighs against extension under the established factors.

24.     The record also supports the inference that exclusivity is being used as leverage. Drexel engaged in good-faith settlement discussions, reduced issues to a near-final position, and prepared a term sheet at Debtors' request, only to receive silence and an explanation that internal principals could not agree on whether to settle the claim.  That is not meaningful progress.  At a minimum, it confirms that creditors should not be forced to wait further while the Debtors' insiders determine whether and on what terms claims will be resolved.

## C. Continuing Losses Weigh Against Extension

25.     The Debtors' financial reporting through their February Monthly Operating Reports, reflects ongoing losses of approximately $137,000, with minimal incoming revenue and continued professional fee accrual.  This ongoing diminution of estate value weighs strongly against extending exclusivity.

26.     Continuing losses in a non-operating case raise the likelihood of administrative insolvency.  Where the estate's primary "operations" are professional services, collection efforts, and litigation, the Court must be especially vigilant that extended exclusivity does not merely facilitate ongoing fee accrual while diminishing the pool available for creditor distributions. Absent a credible near-term plan path and a budget tied to demonstrable net recoveries, the Court should not extend a period that effectively insulates Debtors from competitive plan pressure.

9

4911-3415-3894, v. 1

**D. This Is a Liquidation Case, Not a Reorganization**

27.    The Debtors have no business to reorganize. Their activities are limited to collecting aged receivables and managing litigation – hallmarks of liquidation – certainly, not the basis for extending exclusivity, where creditors are prevented from proposing alternative paths.

28.    In such circumstances, courts commonly view extended exclusivity with skepticism because the principal consequence is not preservation of operations but continued accrual of professional fees and other administrative expenses.  The longer exclusivity remains in place, the longer creditors are prevented from proposing alternative value-maximizing structures, such as credit-sponsored liquidation plan, appointment of a responsible fiduciary, or other governance mechanisms designed to prevent further dilution of the estate.

**E.    Unresolved Litigation Does Not Constitute Cause**

29.    The Debtors' reliance on pending litigation as justification for delay is misplaced. Courts consistently hold that litigation contingencies, standing alone, do no establish cause to extend exclusivity. See, e.g. In re *Lake in the Woods, L.P.*, 10 B.R. 338, 342 (E.D. Mich. 1981) (holding that pending litigation over title to the land on which the debtor's apartment complex was situated was not sufficient cause to extend exclusivity). "The ordinary Chapter 11 debtor is expected to bring with it litigation, or the potential for it. Litigation with creditors is not an unusual circumstance, and the fact that litigation is pending with creditors is not in itself sufficient cause to justify an extension of the exclusivity period. Only under extreme circumstances would the existence of litigation constitute cause for an extension…." *In re Southwest Oil Co. of Jourdanton, Inc.*, 84 B.R. 448, 452 (Bankr. W.D. Tex. 1987).

4911-3415-3894, v. 1

### G. Denial of Exclusivity Restores Creditor Rights Without Prejudice

30. The Bankruptcy Code limits exclusivity to balance debtor and creditor interests. *See, Lake in the Woods*, 10 B.R. at 342-344. "The fact that the debtor no longer has the exclusive right to file a plan does not affect its concurrent right to file a plan. Denying [the] motion only affords creditors their right to file a plan; there is no negative affect [sic] upon the debtor's coexisting right to file its plan." *In re Parker Street Florist & Garden Center, Inc.,* 31 B.R. 206, 207 (Bankr. D. Mass. 1983). *See also*, *In re R.G. Pharm., Inc.*, 374 B.R. 484, 487 (Bankr. D. Conn. 2007).

### II. THE TRUST MOTION IS IMPROPER AND SHOULD BE DENIED

31. The Trust Motion seeks to impose a novel and extra-statutory regime governing estate funds through a "DIP Receivables Trust Account" into which all proceeds collected by CMC would be deposited, with disbursements limited to a carve-out for the United States Trustee, professionals, CMC, and such other uses as the Court may later approve. (Proposed Order ¶¶ 3-16). It lacks statutory basis and improperly alters the Bankruptcy Code's priority framework.

### A. No Statutory Authority

32. The proposed trust arrangement does not fit within any provision of the Bankruptcy Code. It is not: (i) a cash collateral arrangement under section 363; (ii) a financing under section 364, (iii) a recognized structure under section 541. Yet it imposes restrictions on estate property and dictates how funds may be used. The Debtors cite no authority for this hybrid construct. The absence of a clear statutory basis is reason enough to deny the motion. The Court should reject this "hybrid" structure precisely because it is designed to avoid the Bankruptcy Code's gatekeeping protections.

11

**B. Improper Grant of Liens and Priorities**

33.     The proposed order grants "first-priority" security interests in estate funds to various parties, including professionals and a collection agent, without compliance with Section 364 of the Bankruptcy Code.  The Third Circuit has made it clear that parties cannot alter the Bankruptcy Code's distribution and priority framework through procedural end-runs.  *See Armstrong World Indus.*, 432 F.3d 507, 513-14 (3d Cir. 2005).  *See also Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 137 S.Ct. 973, 986-87, 197 L.Ed.2d 398 (2017) (neither parties, nor the courts, are free to circumvent the Bankruptcy Code's rules and policies regarding priorities and distributions through manipulation of substantive and procedural protections).

**C. Improper Delegation of Control**

34.     The requirement that disbursements be jointly authorized by the Debtors and a third-party collection agent improperly cedes control over estate property to a non-fiduciary. The proposed order requires dual authorization for disbursements by both the Debtors and CMC. Proposed Order ¶ 10.  There is no statutory basis to give a third-party collection agent this degree of leverage over disbursements.  It is especially troubling where CMC itself would benefit from the same trust through carve-out and contingent compensation rights.

35.     The arrangement also creates an inherent conflict.  CMC would be both (i) a gatekeeper over disbursements and (ii) a beneficiary of disbursements from the same restricted account.  Nothing in the Bankruptcy Code authorizes a non-fiduciary vendor to hold veto power

12

over estate funds, and the proposed mechanism undermines the Debtors' fiduciary accountability for estate cash.

### D. The Trust Motion Reinforces the Lack of a Reorganization Strategy

36. The Trust Motion reinforces that the Debtors are pursuing a "collect and hold" strategy rather than progressing toward confirmation.

37. Finally, the Trust Motion is procedurally problematic because it would channel essentially all meaningful estate inflows into a restricted account without proposing transparency and creditor protections. The proposed order does not establish detailed, recurring reporting of deposits, disbursements, reserve levels, or reconciliation to CMC's collection activity. It also does not provide a mechanism for creditor objections to specific categories of payments on a timely basis. In a case such as this where Debtors' only meaningful asset is cash collected on receivables, any court-approved structure governing that cash must include clear statutory authority, strict standards, and meaningful oversight.

### RESERVATION OF RIGHTS

38. Drexel reserves all rights, including the right to seek conversion or dismissal of these cases.

### CONCLUSION

For the foregoing reasons, Drexel respectfully requests that the Court:

1. Deny the Debtors' request to extend exclusivity;

2. Deny the Trust Motion in its entirety; and

4911-3415-3894, v. 1

3.      Grant such other and further relief as the Court deems just and proper.

In the alternative, if the Court is inclined to grant any further extension of exclusivity, it should be strictly limited and conditioned on concrete, near-term milestones, and that any relief with respect to estate funds must proceed, if at all, under clear statutory authority and with protections that preserve the Bankruptcy Code's requirements.

Dated: April 28, 2026

**STARK & STARK, PC**

By: /s/ *Joseph H. Lemkin*
Joseph H. Lemkin, Esq.
100 American Metro Blvd.
Hamilton, NJ 08619
Telephone (609) 791-7022
jlemkin@stark-stark.com
*Attorneys for Drexel Distribution, Inc. d/b/a*
*EZ Test NY*

14

4911-3415-3894, v. 1