**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEW JERSEY**

Thaddeus R. Maciag, Esq.
MACIAG LAW, LLC
475 Wall Street
Princeton, New Jersey 08540
(908) 704-8800
*Attorney for the Debtors*

Wallace B. Neel, Esq.
WALLACE NEEL, PLLC
1 Blue Hill Plaza, LL Suite 1509
Pearl River, New York 10965
(646) 524-6502
*Special Litigation Counsel to the Debtors*

|  |  |
|---|---|
| In re:<br><br>    ProPhase Diagnostics NJ, Inc., *et al.*,<br><br>                                Debtors. | Case No.: 25-19833-CMG<br>Chapter 11 Reorganization<br>Judge:  Gravelle<br>Hearing Date: May 5, 2026, 10:00am<br><br>    (Jointly Administered) |

**DEBTORS' REPLY TO THE OBJECTION OF DREXEL DISTRIBUTION INC.**

**TO DEBTORS'**

**(1) MOTION TO EXTEND EXCLUSIVITY PERIODS AND**

**(2) MOTION RE DIP RECEIVABLES TRUST ACCOUNT**

**Preliminary Statement**

1. ProPhase Diagnostics, Inc., ProPhase Diagnostics NJ, Inc., and ProPhase Diagnostics NY, Inc., as debtors and debtors-in-possession in the above-captioned jointly administered Chapter 11 cases (collectively, the "Debtors"), respectfully submit this Reply (the "Reply") to the *Objection of Drexel Distribution Inc. d/b/a EZ Test NY* (ecf doc #131, the

"Drexel Objection") to the Debtors' (1) Second Motion to Extend Exclusivity Periods (ecf doc #107, the "Exclusivity Motion") and (2) Motion for Entry of Order Establishing Terms and Conditions of DIP Receivables Trust Account (ecf doc #109, the "DIP Trust Account Motion").

2. The Drexel Objection rests on three premises, each of which is materially incorrect or has been overtaken by events:

(a) **Premise One:** Drexel asserts that the Debtors have made "no meaningful progress" and that Crown Medical Collections ("Crown") has produced "no recoveries." That premise is incorrect. As set forth in detail in the contemporaneously filed Certification of Richard Hersperger, the Debtors have agreements in principle on multiple settlement matters with major commercial payers currently in documentation aggregating approximately $500,000.00, and approximately $10,000,000.00 in aggregate settlement value targeted for closure within sixty days. The recovery program is not stalled — it is at the inflection point at which a healthcare reimbursement collections program transitions from process work to cash realization. NOTE: if the Court determines that further evidence is necessary in order to evaluate and adjudicate the Motions in question, Debtors' also stand ready to submit, in camera and under seal, a and Sealed Supplemental Certification

(b) **Premise Two:** Drexel expresses concern that the general reference at subparagraph 23(D) of the Motion to extend Exclusivity (ecf doc #109-1) to a potential DIP proposed financing structure.  First and foremost, that was merely referenced in

subparagraph 23(D) as an example of how the Debtors were not standing still but rather were proceeding forthrightly toward keeping the Reorganization moving forward.  The Debtors should be commended and applauded for having made significant progress toward attaining DIP Financing.  However, any DIP Financing Motion, and any request for approval of any type of DIP Financing structure, is NOT before the Court at this juncture. If and when those very serious negotiations lead to the filing of a DIP Financing Motion with specific proposed terms and conditions, any party in interest will have ample opportunity under the Code and the Rules to address or question those terms and conditions at that time. However, at this time no DIP Financing Motion has even been filed yet, so Drexel's criticisms in that regard are nothing more than a red herring .[1]

(c) **Premise Three:** Drexel implicitly assumes that it is a creditor whose interests will be prejudiced by the requested relief.   That premise is very much in

---

[1]    Lest there be any presumption that the Debtors' electing not to fully engage at this time with Drexel's very much premature arguments re a not-yet-even-filed DIP Financing Motion should somehow be deemed as acquiescence to Drexel's arguments, the Debtors do note for the record, and further address below, that Drexel's argument that the possible structure generally discussed structure at 23(D) would amount to an improper upstream value transfer to the parent company prohibited under *In re Armstrong World Industries* and *Czyzewski v. Jevic Holding Corp.* reflects a misreading of both cases and a misunderstanding of the potential DIP Financing structure. Again, the Debtors should be commended for the fact that they are in active term sheet negotiation with a major institutional litigation finance provider for a senior DIP facility under 11 U.S.C. §364, the principal purpose of which is the satisfaction at a discount of an existing $9,998,503.80 perfected secured lien against the Debtors' estates, capturing approximately $5.5 million of net value for the Debtors' estate. That is a textbook deleveraging transaction that bankruptcy courts routinely approve, and would not be a priority-skipping distribution**. However, it is again respectfully noted that such argument is just a distraction from the two Motions actually presently before this Court, and such argument is premature at this time, because no DIP Financing Motion has been filed yet.**

dispute. As set forth in the Debtors' filed Objection to Drexel's Proof of Claim (the "Claim Objection", at ecf doc #134), Justice Bannon's September 8, 2025 Decision and Order (see **Exhibit A**) liquidated only $125,235.00 of Drexel's $1,654,222.00 demand and denied substantial portions of the demand on the merits. The remaining claim is fully extinguished by the Debtors' contractual chargeback counterclaim (see **Exhibit B**) of $2,571,842.00 under Section 2(a)(ii) of the parties' written agreement (see **Exhibit C**), operating as a recoupment that reduces the Drexel Claim to zero and renders the Debtors the net creditor of Drexel by approximately $2.4 million. Drexel's standing to challenge the Debtors' management of the estate is, accordingly, considerably narrower than the Drexel Objection assumes, and is very likely nonexistent as Drexel's claim will likely be entirely extinguished.

3. On the merits, both Motions should be granted. As demonstrated below, the Debtors satisfy multiple of the nine *Central Jersey Airport Services* factors for a finding of "cause" under 11 U.S.C. § 1121(d), and the Debtors need only satisfy one or more such factors to obtain the requested relief. The DIP Receivables Trust Account Motion proposes a structure that complies with the Bankruptcy Code's priority framework and is supported by an active institutional financing process at a stage of advanced negotiation.

4. Denying these Motions would not advance any legitimate creditor interest. Drexel itself holds a disputed claim of doubtful net value after recoupment. The Debtors' general unsecured creditors are best served by completion of the active settlement and financing processes now in motion, not by fragmentation of estate administration through removal of exclusivity at a moment when cash realization is imminent. The Court should grant both Motions.

**BACKGROUND**

5. The Debtors incorporate by reference the factual recitations set forth in the Exclusivity Motion (ecf doc #107), the DIP Trust Account Motion (ecf doc #109), the original Certification of Ted Karkus filed in support thereof, and the Certification of Richard Hersperger (the "Hersperger Certification") filed herewith.

6. Of particular relevance to this Reply are the following facts, set forth in greater detail in the supporting certifications and the contemporaneously filed Claim Objection:

   (a) **The COVID-19 Testing Claims Portfolio.** The Debtors' principal estate asset is a portfolio of 649,205 individual COVID-19 diagnostic testing claims with aggregate gross billed charges of $201.2 million, governed by the federal statutory reimbursement framework established by the Families First Coronavirus Response Act, Pub. L. 116-127 § 6001, and the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136 § 3202.

   (b) **Tier 1 Settlements In Documentation.** The Debtors have reached agreements in principle on multiple settlement matters with major commercial payers, with aggregate settlement value of approximately $500,000, currently in the documentation phase. Counterparty identities are addressed in the Sealed Hersperger Certification.

   (c) **Tier 2 Pipeline.** Approximately $10,000,000 in aggregate settlement value across multiple commercial fully-insured carriers, Medicare Advantage organizations, and self-funded ERISA plans is in advanced negotiation, with closures targeted within the next sixty days. Detailed payer-level pipeline information is currently being delivered in confidence to a prospective DIP financing partner.

   (d) **DIP Financing Process.** The Debtors are in active term sheet negotiation with a

major institutional litigation finance provider for a $6,000,000 senior super-priority DIP facility under 11 U.S.C. § 364, on terms substantially aligned with the relief requested in the DIP Receivables Trust Account Motion. The financing partner is a publicly traded institutional litigation finance provider with confirmed balance-sheet funding capacity. Pricing terms are in active negotiation, with funding contemplated within seven to ten business days following Court approval. Counterparty identity, structure, and pricing terms are addressed in the Sealed Hersperger Certification.

(e) **The Drexel Claim Is Disputed and Subject to Recoupment.** On September 8, 2025, Justice Nancy M. Bannon of the Supreme Court of the State of New York issued a Decision in the underlying state court action liquidating only $125,235.00 of Drexel's $1,654,222.00 demand and denying substantial portions of the demand on the merits, including all delivery service invoices ($45,500.00) and Drexel's unjust enrichment and quantum meruit causes of action. Justice Bannon's Decision expressly preserved the Debtor's contractual chargeback counterclaim of $2,571,842.00 under Section 2(a)(ii) of the parties' written agreement. As set forth in the Claim Objection, the chargeback counterclaim operates as a recoupment that reduces the Drexel Claim to zero and renders the Debtors the net creditor of Drexel by approximately $2.4 million.

### ARGUMENT

I. **The Debtors Have Established "Cause" under 11 U.S.C. § 1121(d) for Extension of the Exclusivity Periods**

7. Section 1121(d)(1) of the Bankruptcy Code provides that the Court "may, for cause, reduce or increase the [exclusive] period" upon request of a party in interest. 11 U.S.C. §1121(d)(1). The Bankruptcy Code does not define "cause," and the determination is left to the discretion of the Court informed by case-specific equitable considerations. *See In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 184 (Bankr. D.N.J. 2002); *In re*

*Newark Airport/Hotel Ltd. P'ship*, 156 B.R. 444, 451 (Bankr. D.N.J. 1993).

8. There are, as Drexel acknowledges, nine factors that courts consider in evaluating cause under § 1121(d), including (1) the size and complexity of the case; (2) the necessity of sufficient time to negotiate and prepare adequate information; (3) the existence of good faith progress; (5) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (7) the length of time the case has been pending; and (9) whether unresolved contingencies exist. *Cent. Jersey Airport Servs.*, 282 B.R. at 184. Critically, however, **the Debtors need not satisfy all nine factors** — they need satisfy only one or more. *See In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("any one or more of [the factors] may constitute sufficient grounds for extending the periods"); *In re Hoffinger Indus., Inc.*, 292 B.R. 639, 643-44 (B.A.P. 8th Cir. 2003) (similar).

9. The Debtors satisfy **multiple** of the nine factors, as set forth below.

### A. Factor 1 — The Size and Complexity of the Case

10. Drexel asserts at paragraph 11 of the Drexel Objection that these cases "are not complex" because they "involve no operating business, no employees and no restructuring of the Debtors' capital structure." Drexel Objection ¶ 11. That assertion conflates the absence of an ongoing operating business with the absence of complexity. They are not the same thing.

11. These cases involve a portfolio of 649,205 individual insurance claims with aggregate gross billed charges of $201.2 million across 194 open matters, governed by a federal statutory framework (FFCRA §6001 and CARES Act §3202) that has not yet generated a substantial body of published case law. The Debtors are pursuing recoveries against payers across four payer classes — commercial fully-insured, self-funded ERISA,

Medicare Advantage, and Medicaid managed care — each governed by a related but non-identical legal regime. The portfolio includes potential claims under the federal False Claims Act for Medicare Advantage and Medicaid managed care payers that retained capitation while denying federally mandated reimbursements. The Debtors are also pursuing an active Rule 2004 discovery program in the three jointly administered cases, the breadth of which is itself a significant complexity factor.

12. These features, taken together, place these cases firmly within the "size and complexity" factor. As the *Cent. Jersey Airport Services* court recognized, "complexity" is not limited to operating-business reorganizations. 282 B.R. at 184. A non-operating estate that holds a portfolio of large-volume, statutorily-grounded claims subject to multi-payer-class enforcement is precisely the kind of case in which extended exclusivity is appropriate.

### B. Factor 2 — The Necessity of Sufficient Time to Negotiate and Prepare Adequate Information

13. Crown's recovery program is at the inflection point at which negotiations convert to executed settlements and cash. Approximately $500,000 in Tier 1 matters is currently in documentation. Approximately $10,000,000 in Tier 2 matters is targeted for closure within sixty days. *See* Public Hersperger Certification ¶¶ 23-26. Forcing plan formulation before these settlements close — and before the DIP financing is finalized — would deprive the estate of the very recovery information that any confirmable plan will need to allocate.

14. Drexel's framing — that the Debtors are using exclusivity "to pursue speculative receivables collections" (Drexel Objection ¶ 13) — is rebutted by the documented operational milestones. The Debtors are not pursuing speculation. They are pursuing

realization of statutorily-grounded reimbursement obligations against well-capitalized payers, and they have advanced multiple matters to the point of agreement-in-principle and advanced negotiation. The additional time provided by the requested extension is necessary to convert that pipeline to cash and to incorporate the resulting recoveries into a confirmable plan.

### C. Factor 3 — The Existence of Good Faith Progress

15. The Drexel Objection asserts at paragraph 12 that the Debtors have made "no meaningful progress." Drexel Objection ¶ 12. The factual record refutes that assertion. As set forth in the Public Hersperger Certification at paragraphs 18-19 and accompanying table, since Crown's retention was approved on November 13, 2025, the Debtors have:

(a) Identified, documented, and indexed 649,205 individual claims with aggregate gross billed charges of $201.2 million across 194 open matters;

(b) Issued formal demand correspondence on $121.3 million in claims across 131 open matters;

(c) Advanced $79.9 million in claims across 63 matters into active settlement negotiations with multiple major national and regional carriers;

(d) Reached agreements in principle on multiple Tier 1 settlement matters aggregating approximately $500,000, currently in documentation;

(e) Advanced approximately $10,000,000 in Tier 2 settlement matters into advanced negotiation, targeted for closure within sixty days;

(f) Advanced an active term sheet negotiation with a major institutional litigation finance provider for a potential $6,000,000 senior super-priority DIP facility; as discussed, above, that DIP Financing Motion is not yet filed, but the fact that the Debtor has made very substantial progress toward that financing is to be commended;

(g) Addressed the three pending Adversary Proceedings (Adv. Pro. Docket Nos. 25-

2526, 25-2527, and 25-2528) by consent orders providing for liquidation of those claims in the Eastern District of New York; and

(h) Obtained the U.S. Department of Justice's formal declaration of non-intervention in the Hennrick qui tam action after a multi-year federal investigation, materially reducing the litigation risk profile of that action.

16. These accomplishments do not represent the absence of progress. They represent the precise progress that a non-operating estate holding a defined receivables portfolio is expected to make, and they have been accomplished against the headwinds of the Fall 2025 federal shutdown (44 days) and the ongoing Spring 2026 federal shutdown (now exceeding sixty days), with two intervening holiday-and-year-end months. The good faith progress factor is plainly satisfied.

### D. Factor 5 — Reasonable Prospects for Filing a Viable Plan

17. Drexel asserts that the Debtors have shown no "reasonable prospects" for filing a viable plan because no plan has been filed and no specific timeline has been provided. Drexel Objection ¶¶ 12-13. That argument confuses *current filing* with *reasonable prospects*. A debtor seeking a §1121(d) extension by definition has not yet filed a plan; the question is whether the Debtor has demonstrated that the resources, information, and process necessary to file a viable plan are now in motion.

18. The Debtors have demonstrated such prospects in concrete and specific ways. The Tier 1 settlements in documentation, the Tier 2 pipeline targeted for closure within sixty days, and the active DIP financing term sheet negotiation are not aspirations — they are the components of a confirmable plan now actively being assembled. Once the DIP financing closes, the $9,998,503.80 secured lien is satisfied at a discount, the estate's working capital position stabilizes, and the cash realizations from the Tier 1 and Tier 2 settlements

provide the distribution base for a plan. *See* Hersperger Certification ¶ 25.

### E. Factor 7 — The Length of Time the Case Has Been Pending

19. The cases have been pending approximately seven months as of the filing of this Reply. That is well within the range of cases in which courts in this District and elsewhere have granted second exclusivity extensions. *See, e.g., In re Cent. Jersey Airport Servs.*, 282 B.R. 176 (granting second extension where case had been pending approximately ten months); *In re Newark Airport/Hotel*, 156 B.R. 444 (granting extension at similar stage). The fact that approximately 112 days of those seven months have been consumed by federal government shutdowns and intervening holiday-and-year-end months further supports the requested extension.

### F. Factor 9 — Unresolved Contingencies

20. Multiple genuine contingencies remain unresolved, each of which materially affects plan formulation: (a) the Tier 1 settlement closures are pending documentation; (b) the Tier 2 pipeline is in advanced negotiation but not yet closed; © the DIP financing term sheet is in active pricing negotiation; (d) the federal government's non-intervention in the Hennrick qui tam action is recent (occurring during the pendency of these cases) and the EDNY proceedings are ongoing; (e) the Debtors' negotiations with several large pre-petition creditors are at various stages; and (f) the Drexel Claim itself is now subject to objection and adversary proceeding, with potential to result in a net judgment in favor of the estate against Drexel of approximately $2.4 million.

21. The presence of these contingencies — each of which affects the value, structure, or distribution allocation of any plan — supports the requested extension. *See In re McLean*

*Indus.*, 87 B.R. at 834 (recognizing unresolved contingencies as cause).

**II.      Drexel's Attack on the Potential Financing Structure is Premature, as
no DIP Financing Motion has been Filed yet**

22. Drexel asserts at paragraphs 19-22 of the Objection that the potential financing structure improperly transfers $4.5 million of estate value to the parent in violation of the Bankruptcy Code's priority scheme, citing *In re Armstrong World Industries, Inc.*, 432 F.3d 507 (3d Cir. 2005), and *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017). That argument fundamentally misunderstands both the proposed structure and the holdings of those decisions.

*A. The Proposed Structure Is a Value-for-Value Lien Paydown at a Significant Discount, Not a Distribution*

23. ProPhase Labs, Inc. (the publicly traded parent of the Debtors) holds a perfected first-priority secured lien against the Debtor sub-estates in the amount of $9,998,503.80, supported by a January 7, 2025 Security Agreement and nine UCC-1 financing statements recorded with the New Jersey Division of Revenue.

24. Under the potential structure, $4,500,000 of the $6,000,000 DIP facility is applied at closing to the full and final satisfaction of the parent's $9,998,503.80 secured lien. The lien is released and discharged at closing. If this concept were to come to fruition, the estate would then capture approximately **$5.5 million of net value** — the difference between the $9,998,503.80 face amount of the secured claim being released and the $4,500,000 paydown.  Post-closing, the parent would then have no remaining secured claim against the Debtor sub-estates.

25. The transaction is fundamentally indistinguishable from any other discounted secured-debt paydown that bankruptcy courts routinely approve. If the contemplated motion were ever

filed, the estate would not be paying value to an equity holder — rather, it would be using DIP Financing proceeds to retire a $9,998,503.80 secured lien at a substantial discount. Thus, the structure would not reorder priorities; rather it *uses* the existing priority structure to capture value for the estate.

### B. Armstrong World and Jevic Address Different Transactions

26. *Armstrong World* held that a Chapter 11 plan could not transfer value to junior creditors over the objection of senior creditors who would not be paid in full — i.e., that the absolute priority rule could not be circumvented through plan structure. 432 F.3d at 513-14. *Jevic* extended this principle by holding that a structured dismissal could not be used to skip priority creditors and provide payments to lower-priority creditors. 580 U.S. at 471-72. Both cases address *intra-estate* value transfers that bypass priority creditors.

27. If a DIP Financing Motion along the potential lines discussed were to eventually be filed, and granted, there would be no priority-skipping. The senior secured creditor (the parent) is being paid less than its full secured claim — a result that, if anything, *benefits* junior creditors, including general unsecured creditors such as Drexel itself, to the extent that Drexel retains a claim.

### C. The $1.5 Million Estate Allocation Is Necessary Working Capital

30. Drexel asserts that the $1.5 million allocation to the estate's operating account is "conclusory and unsupported." Drexel Objection ¶ 20. The allocation is, in fact, a carefully calculated amount necessary to fund estate operations, professional fees, the ongoing Crown recovery program, and the active Rule 2004 discovery program through the period required to convert the Tier 2 pipeline to cash and propose a confirmable plan.

31. Drexel's characterization of the Debtors' business as "limited to collections activity" with

"no meaningful ongoing operating enterprise that requires capital infusion at this scale"
(Drexel Objection ¶ 20) reflects a fundamental misunderstanding of what the Debtors are
doing. Prosecuting a $201.2 million claims portfolio across 194 matters and 649,205
individual claims, against multiple major commercial and governmental payers, with
active Rule 2004 discovery in three jointly administered cases, is itself the relevant
operational enterprise. That enterprise requires working capital, just as any operating
business requires working capital. $1.5 million of new working capital, paired with
ongoing settlement realizations, is appropriately scaled to that enterprise.

**III. The DIP Receivables Trust Account Motion Is Properly Supported and Procedurally Compliant**

32. Drexel argues at paragraphs 31-37 that the DIP Receivables Trust Account Motion is
procedurally defective because it lacks a clear statutory basis, improperly grants liens,
and improperly delegates control to a non-fiduciary.  Each argument is incorrect.  **This
Court's November 13, 2025 Order (ecf doc #41) already REQUIRES the
establishment of a DIP Receivables Trust Account, and the proposed Motion merely
implements what this Court has already ordered to be done. That Order
straightforwardly and unambiguously requires that the proposed account be
established, stating at  ¶8 of that Order, that:**

> the Referred Accounts will be deposited into a Debtor-in-
> Possession Trust Account held by the Debtors at a bank that is or
> has agreed to be a uniform depository bank with the US Trustee
> for Region 3, subject to further disbursement and remittance to
> Crown, and to the Debtor or allowed administrative claims in this
> case, only upon application to and approval by the Court . . .

33. The DIP Receivables Trust Account Motion is merely a procedural means of implementing

the requirement of this Court's prior Order, and it is well within the discretion this Court has under § 105(a) to issue any order "necessary or appropriate to carry out the provisions of this title." To the extent any element of the DIP Receivables Trust Account Motion includes cash management aspects governing deposit and routing of recoveries, those elements are governed by 11 U.S.C. § 363(c)(1) and the cash management protocols this Court has previously approved in this case. They are not extra-statutory.

### B. The Lien Grant Complies With § 364

34. Drexel asserts that the proposed first-priority security interest grant does not comply with §364. Drexel Objection ¶33. To the contrary, § 364(c)(1) and (d) expressly authorize the Court to grant a senior, super-priority security interest to a DIP lender. The proposed structure tracks the standard form of such relief in this District and elsewhere. The DIP Receivables Trust Account Motion's contemplated security interest will be granted in connection with the DIP financing approval process, with full notice and opportunity for objection at such time by all parties in interest. There is no procedural irregularity.  Any DIP Financing Motion is NOT before the Court at this time

### C. CMC's Role Is Compensation-Based, Not Control-Based

35. Drexel characterizes the proposed DIP Receivables Trust Account structure as ceding "control over estate property to a non-fiduciary" (Drexel Objection ¶ 34) and creating a "conflict" because Crown is both "a gatekeeper over disbursements and a beneficiary of disbursements from the same restricted account" (Drexel Objection ¶ 35).

36. That characterization mistakes Crown's role. Crown is the Court-retained Special Counsel under 11 U.S.C. §§ 327 and 328, retained pursuant to the Order entered November 13, 2025 (Doc. No. 41). Crown's compensation is on a 30% contingency basis, approved by Court Order.

Page 15 of 19

Crown is paid only when recoveries are realized and only upon Applications for Compensation filed with the Court and only at the Court-approved percentage. The structure does not give Crown discretionary "gatekeeper" authority — it ensures that Crown is paid the contingency it has earned upon collection of the recoveries it generated (and per ecf #41, subject to rights of the U.S. Trustee to object to same as improvident). That is the standard structure for Court-approved contingency-fee Special Counsel and presents no inherent conflict.

37. To the extent the Court determines that any aspect of the proposed DIP Receivables Trust Account structure should be modified to clarify Crown's role as not being a co-fiduciary, the Debtors are open to such modifications. The Debtors do not contend that the proposed structure is incapable of refinement. The Debtors contend only that, as a matter of substance, the structure complies with the Bankruptcy Code's priority framework and protects creditors by establishing a transparent recovery and distribution mechanism.

### IV. Drexel's Procedural Disclosures Concerning Settlement Negotiations Are Inappropriate, And in any case are a Tempest in a Teapot

38. Drexel's Objection at its paragraphs 5-7 and 23-24 disclose specific details of the parties' settlement communications, including the identity of internal principals at the Debtor and the substance of unfinalized term sheet exchanges. These disclosures are inappropriate under Federal Rule of Evidence 408, which renders evidence of conduct or statements made in compromise negotiations inadmissible to prove or disprove the validity of a disputed claim. The Debtors do not waive any objection to such disclosures, and reserve all rights to seek appropriate remedies.

39. In any case, the allegations as to settlement negotiations are obviously calculated to place the Debtor in a false light, but at the end of the day they are no more than tempest in a teapot, as

in the ordinary course of typical settlement negotiations.

40.     Drexel rather breathlessly mentions a few not immediately returned emails sent during Easter Week.  The fact is that Drexel, in turn, had failed to timely respond to numerous emails and phone calls in February and early March.  Further, so long as Drexel has chosen to "open the door" as to some details of settlement negotiations, it should be noted that what caused negotiations to falter was when Drexel in early April radically "moved the goalposts" from the earlier discussions whereby the Debtors would recognize a Drexel Proof of Claim at some agreed amount, to Drexel suddenly taking a settlement posture that it — as an Unsecured creditor — suddenly demanded the payment of many tens of thousands of dollars each month, PRE-Confirmation of a Plan.

41.     All of that is the ordinary course of settlement discussions, and of lawyers endeavoring to zealously represent their clients, but to try to characterize those settlement negotiations in a fashion that casts the Debtors in a false light is inapt, and is inappropriate.

42. Drexel's framing of the settlement narrative — that internal disagreement among the Debtors' principals is the cause of negotiation delay — is also incomplete. As set forth in the Claim Objection, the Debtors believe the Drexel Claim is fully extinguished by recoupment under Section 2(a)(ii) of the parties' written agreement. A debtor that has a legitimate $2.57 million chargeback counterclaim grounded in the same contract that produced the creditor's $125,235 liquidated judgment is not negotiating from weakness when it declines to make a substantial monetary payment. It is negotiating from a posture in which the appropriate settlement target is mutual general release with little or no payment by the debtor — exactly the posture the Debtors have maintained.

43. The Debtors thus do not concede that any "breakdown" in negotiations occurred for which the

Debtors are responsible. The Debtors decline to litigate the conduct of pre-petition settlement negotiations on the Drexel Objection record, but reserve all rights with respect to the substance of those negotiations and any remedies available under FRE 408 and otherwise.

### V.     Drexel's Purported "Reservation of Rights to Seek Conversion or Dismissal" is Premature and Unsupported

44. At paragraph 38 of the Objection, Drexel purports to reserves the right to seek conversion of these cases to Chapter 7 or dismissal under 11 U.S.C. § 1112. The Debtors note that no such motion is pending and respond to it only in summary form.

45. Conversion or dismissal under § 1112(b) requires a showing of "cause" supported by evidence demonstrating that the debtor cannot effectuate a plan, has incurred substantial loss to the estate, or otherwise cannot satisfy fiduciary obligations. None of those grounds is present here. The Debtors' active settlement program, advancing DIP financing, contested claim against Drexel itself, and resolution of the adversary proceedings reflect ongoing, substantive estate administration. Conversion or dismissal would be inappropriate.

### VI.    Drexel's Standing to Seek the Requested Relief Is Itself Substantially Diminished by the Claim Objection

46. On April 30, 2026, the Debtors filed a comprehensive Objection to Drexel's Proof of Claim asserting that Drexel's claim is, after recoupment of the Debtors' $2,571,842 contractual chargeback counterclaim, **extinguished in its entirety**, and that the Debtors are in fact the net creditor of Drexel by approximately $2.4 million. Justice Bannon's September 8, 2025 Decision (see **Exhibit A** hereto) expressly recognized that the chargeback counterclaim, if established at trial, would entitle the Debtors to a money judgment in that amount.

47. While Drexel retains some interest in the Chapter 11 process pending adjudication of the Claim Objection, its economic exposure to the relief requested in the Exclusivity Motion and the DIP Receivables Trust Account Motion is materially less than its $1,754,088 proof of claim

suggests. A creditor whose claim is, after recoupment, valued at zero or less has limited standing to drive the procedural agenda of a Chapter 11 case. The Court should weigh Drexel's objection accordingly.

## CONCLUSION

48. For the reasons set forth above and in the supporting Hersperger Certification, and based on the Exhibits hereto, the Debtors respectfully request that this Court enter Orders: (a) granting the Second Motion to Extend Exclusivity Periods (Doc. No. 107) by extending the Exclusive Filing Period through and including July 20, 2026 and the Exclusive Solicitation Period through and including September 18, 2026; (b) granting the Motion for Entry of Order Establishing Terms and Conditions of a DIP Receivables Trust Account (Doc. No. 109) substantially in the form proposed therein, with such modifications as the Court determines appropriate; [c] overruling the Drexel Objection (Doc. No. 131) in its entirety; and (d) granting such other and further relief as the Court deems just and proper.

MACIAG LAW, LLC

Date: May 1, 2026

/s/Thaddeus R. Maciag
Thaddeus R. Maciag, Esq.
*Attorney for the Debtors*

WALLACE NEEL, PLLC

Date: May 1, 2026

/s/ Wallace B. Neel
Wallace B. Neel, Esq.
*Special Litigation Counsel to the Debtors*