**WALLACE NEEL PLLC**
Wallace B. Neel, Esq. (Admitted Pro Hac Vice)
1 Blue Hill Plaza, LL Suite 1509
Pearl River, New York 10965
Tel: (646) 524-6502
Email: wallace@wallaceneel.com
*Special Litigation Counsel to the Debtors*

**MACIAG LAW, LLC**
Thaddeus R. Maciag, Esq.
475 Wall Street
Princeton, New Jersey 08540
Tel: (908) 704-8800
Email: MaciagLaw1@aol.com
*Counsel for the Debtors*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEW JERSEY**

---

In re:  **PROPHASE DIAGNOSTICS NJ, INC., et al.,**

Debtors.

|  |  |
|---|---|
| | Chapter 11 |
| (Jointly Administered) | Case No. 25-19833 (CMG) |
| | Hearing date: June 23, 2026, 10:00 a.m. |
| | Judge: Hon. Christine M. Gravelle, U.S.B.J. |

---

**DEBTORS' MEMORANDUM OF LAW IN OPPOSITION
TO THE MOTION OF DREXEL DISTRIBUTION, INC. d/b/a EZ TEST NY
TO CONVERT THESE CHAPTER 11 CASES TO CHAPTER 7
PURSUANT TO 11 U.S.C. § 1112(b)**

**Preliminary Statement**

Drexel Distribution, Inc. d/b/a EZ Test NY (**"Drexel"**) asks this Court to take a step that the United States Trustee, the neutral statutory officer charged with protecting creditors and the integrity of the estate, declined to take months ago on essentially the same record. The U.S. Trustee filed a motion to convert or dismiss these jointly administered Chapter 11 cases under 11 U.S.C. § 1112(b) on January 15, 2026 (Doc 59). Drexel filed a joinder to that motion on

February 2, 2026 (Doc 69). After briefing and a hearing on February 10, 2026, the U.S. Trustee withdrew the motion. The neutral case administrator, with full familiarity with the Debtors' position, declined to press conversion. Drexel does not mention this withdrawal anywhere in its motion. The omission is telling, and the procedural fact is powerful evidence on the threshold question whether conversion serves the best interests of creditors and the estate under § 1112(b)(1).

The motion is filed by the creditor holding the largest adverse substantive position against the Debtors. On September 8, 2025, Justice Bannon of the New York Supreme Court granted Drexel partial summary judgment on the HRSA-period component of its claim in the amount of $125,235, denied other portions of Drexel's demand, denied Drexel's claims for unjust enrichment and quantum meruit, and expressly preserved the Debtors' chargeback counterclaim. The $125,235 is the only portion of Drexel's asserted claim that any court has liquidated in Drexel's favor; the balance remains unliquidated and subject to the Debtors' counterclaim. On May 4, 2026, the Debtors commenced Adversary Proceeding No. 26-01208 (Doc 141) against Drexel and its principal Bedis Zormati individually, prosecuting the preserved chargeback counterclaim and seven additional counts. The Adversary Complaint seeks not less than $2,571,842 in contractual chargeback damages plus operational loss damages, lost profits, and exemplary damages. The Debtors' objection to Drexel's proof of claim (Doc 134) is pending and remains unresolved. On the substantive merits, Drexel is, in net terms, a debtor of the estate, not a creditor whom liquidation would protect.

The relief Drexel seeks does not serve Drexel as a creditor; it exposes Drexel. A Chapter 7 trustee inheriting these estates would inherit the chargeback counterclaim against Drexel, the seven additional intentional-tort counts against Drexel and Mr. Zormati personally under the New Jersey participation theory of personal officer liability, *Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297, 303 (2002), the claim objection against Drexel's proof of claim, and the Rule 2004 examination process developing the financial-capacity and corporate-structure record for collection on any judgment. The trustee's statutory commission under 11 U.S.C. § 326(a) is calibrated to estate recoveries, the trustee has no relationship constraint with Drexel, and the trustee has every incentive to prosecute the counterclaim and the tort counts to judgment and to disallow Drexel's claim in substantial part. That Drexel has nonetheless pressed this motion,

against its own creditor interest, is itself evidence that the motion is filed for collateral purposes rather than for the protective purposes § 1112(b) contemplates. *See In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 336 (3d Cir. 2015).

The Debtors are committed to resolving this dispute and have pursued settlement in good faith, most recently by conveying a further settlement proposal to Drexel that exceeds the only amount Drexel has liquidated in its favor. The Debtors will participate in the Court-scheduled settlement conference set for June 22, 2026 with the goal of a global resolution. A creditor whose sole adjudicated recovery is being more than satisfied, and who nonetheless presses for the drastic remedy of conversion, is not acting to protect a creditor interest. That posture confirms, rather than undermines, that the motion is directed at collateral objectives.

The timing of the motion is its most telling feature. Drexel filed at 4:11 p.m. on Friday, May 15, 2026, without notice and without service on the Debtors. The filing came eleven days after Drexel and Mr. Zormati were named as adversary defendants, three days after Drexel received four Rule 2004 subpoenas, nine days after this Court entered the order extending the Debtors' exclusive period through June 29, 2026 over Drexel's opposition, and three days before a chambers settlement conference this Court had scheduled for Monday, May 18, 2026 for the express purpose of mediating a resolution between the Debtors and Drexel. The motion is a tactical response to substantive litigation pressure and a unilateral attempt to defeat a Court-scheduled settlement track, not a principled application of § 1112(b).

The procedural posture confirms the point. Following the May 18 settlement conference, this Court, on its own initiative and over the Debtors' objection, stayed the Adversary Proceeding by text order entered May 19, 2026, until June 29, 2026, to permit the parties to pursue settlement without the expense of active litigation. On June 3, 2026, Drexel's counsel wrote to the Court characterizing that court-ordered pause as a consensual stay agreed "per the discussions" at the conference. The Debtors did not agree to any stay; the Court imposed it. Drexel's attempt to recast a court-ordered settlement pause as a negotiated standstill, while simultaneously pressing a motion to convert the entire case, is of a piece with the conduct described above: Drexel seeks the benefit of suspended litigation while pursuing a conversion remedy that serves no legitimate creditor purpose.

Each of Drexel's grounds fails as a matter of law. The continuing-loss ground under §

1112(b)(4)(A) collapses because the Debtors are non-operating debtors with concrete recoveries in process pursuing a reorganization, and both liquidating and reorganizing Chapter 11 Plans are expressly authorized under §§ 1123(b) and 1129. The failure-to-file-a-Plan ground under § 1112(b)(4)(J) fails because this Court's own exclusivity order (Doc 143, as amended by Doc 155) extends the Debtors' Plan filing period through June 29, 2026. The bad-faith ground fails on the merits and on the comparative procedural posture, where Drexel's own conduct supports the opposite inference. The gross-mismanagement ground under § 1112(b)(4)(B) is a Rule 2004 scope dispute mislabeled; the proper remedy is a motion to quash, which Drexel has not filed. The parent-benefit theory misreads § 1129(b) and the structure of the cases: ProPhase Labs is the Debtors' sole owner and holds a claim of record against them, and any distribution of estate value occurs only under the Bankruptcy Code's priorities and through Court-approved mechanisms, so the parent's position reflects supervised administration, not diversion, and is not grounds for conversion.

Even if any ground established cause, conversion fails the best-interests prong of § 1112(b)(1). The U.S. Trustee's withdrawal is powerful evidence on that question. Conversion would disrupt the Crown Medical Collections receivables collection program, extinguish an available § 364 debtor-in-possession financing opportunity that exists only while the cases remain in Chapter 11, impair the estate's settlement pipeline, and force a Chapter 7 trustee to start fresh on substantive matters already developed. The trustee's statutory commission under § 326(a), applied to a substantial projected net portfolio, would exceed many times over the supposed savings on debtor's counsel fees that Drexel posits. Conversion does not even serve Drexel, because the Adversary Proceeding seeking more than $2.5 million from Drexel and Mr. Zormati survives conversion and follows the estate to a Chapter 7 trustee with every incentive to prosecute it.

Drexel's conduct also carries consequences beyond the four corners of this motion. The deliberate filing of a conversion motion timed for maximum impairment of the Debtors' financing pipeline and settlement leverage, with documented knowledge of that pipeline through months of counsel-to-counsel communications, presents the elements of tortious interference with prospective economic advantage under New Jersey law. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir. 1993) (applying New Jersey law); *Printing Mart-Morristown*

*v. Sharp Elecs. Corp.*, 116 N.J. 739 (1989). The Third Circuit in *Lightning Lube* affirmed a compensatory judgment that included approximately $7 million in tortious-interference damages. In *Rosenberg v. DVI Receivables XIV, LLC*, a jury awarded $1.1 million in compensatory and $5 million in punitive damages against a party for a bad-faith bankruptcy filing, and the judgment was affirmed and held non-offsettable. New Jersey holds corporate principals personally liable for their own intentional torts under the participation theory. *Saltiel*, 170 N.J. at 303. Mr. Zormati's personal assets are within the field of exposure.

The Debtors respectfully submit that the motion should be denied in its entirety.

## Statement of Facts

### A.  The Debtors and the Receivables Portfolio

The Debtors are three jointly administered Chapter 11 debtors: ProPhase Diagnostics NJ, Inc. (Case No. 25-19833-CMG); ProPhase Diagnostics NY, Inc. (Case No. 25-19834-CMG); and ProPhase Diagnostics, Inc. (Case No. 25-19836-CMG). Each is a CLIA-certified clinical laboratory that operated COVID-19 diagnostic testing services during the federal Public Health Emergency under the CARES Act. Karkus Certification. ¶¶ 4 to 8. The Debtors ceased COVID-19 testing operations in 2025 as the Public Health Emergency ended and reimbursement contracted. Karkus Certification ¶ 9.

The principal asset of the estates is the Receivables Portfolio: unpaid commercial insurance claims for COVID-19 testing services rendered during the Public Health Emergency. The portfolio aggregates a substantial sum in gross billed claims, with material projected net recoveries after collection costs, settlement compromises, and write-offs. Hersperger Certification ¶¶ 7 to 11. The non-debtor parent, ProPhase Labs, Inc. (NASDAQ: PRPH), owns one hundred percent of the equity of the Debtors and is the residual owner of the enterprise. ProPhase Labs also holds a security interest of record in the Receivables Portfolio and other estate assets, documented by a Security Agreement dated January 7, 2025 and a related forbearance agreement, with UCC-1 financing statements of record filed in New York and New Jersey, and a claim scheduled on Schedule D as amended (Doc 98) in the amount of $9,998,503.80. Karkus Certification ¶¶ 18 to 24.

## B.  Crown Medical Collections as Court-Retained Special Counsel

By order entered November 13, 2025 (Doc 41), this Court approved the retention of Crown Medical Collections (**"Crown"**) as Special Counsel to the Debtors under 11 U.S.C. §§ 327(a) and 328(a). Crown is responsible for the collection of the Receivables Portfolio against commercial payers, operates on a Court-approved contingency-fee structure, and acts as the operational instrument through which the Debtors prosecute and settle claims with commercial payers. Hersperger Certification ¶¶ 4 to 14. Crown's retention, the absence of any non-Crown collection apparatus, and the integration of Crown's operations with the Debtors' debtor-in-possession authority are all material to whether conversion to Chapter 7 would advance the interests of creditors and the estate. Hersperger Certification ¶¶ 15 to 18.

The collection program is producing concrete results. Crown presently has approximately $1.2 million in commercial payer settlements in active process, in addition to recoveries already executed and pending Court approval. Hersperger Certification ¶¶ 19 to 26. This pipeline is direct evidence that the estate is functioning at a high level and that the receivables-collection thesis underlying these cases is being realized in practice, not merely projected.

## C.  The U.S. Trustee's Withdrawn Conversion Motion

The procedural history of conversion in these cases begins not with Drexel but with the U.S. Trustee. On January 15, 2026, the U.S. Trustee filed a motion to convert these cases to Chapter 7, or in the alternative to dismiss, under § 1112(b) (Doc 59), accompanied by a certification and memorandum of law. On February 2, 2026, Drexel filed a joinder to that motion (Doc 69). The Debtors filed substantive oppositions, including the Karkus certification (Doc 91) and the Crown certification, and reply papers.

On February 10, 2026, after briefing was complete and after a hearing held that date, the U.S. Trustee withdrew the motion. The U.S. Trustee, the neutral statutory officer with full access to the case record and full familiarity with the Debtors' position and prospects, declined to press conversion. The joinder filed by Drexel died with the underlying motion. In the period since the withdrawal, no other party in interest, not the parent secured creditor, not any other commercial creditor, and not the United States in connection with the pending *qui tam* matter, has sought conversion. Drexel is the lone party pressing the remedy the neutral administrator declined to

press.

### D.  The Justice Bannon Decision and the Adversary Proceeding

In or about 2022, Drexel commenced an action against ProPhase Diagnostics, Inc. in the Supreme Court of the State of New York, County of New York (the **"State Court Action"**), seeking damages for alleged specimen-collection services rendered during the Public Health Emergency. ProPhase Diagnostics asserted counterclaims, including a chargeback counterclaim under the parties' Independent Contractor Agreement, which authorized chargebacks against Drexel for failures to comply with specimen-collection protocols that resulted in payer denials.

On September 8, 2025, after motion practice, Justice Bannon entered a Decision and Order (the **"Justice Bannon Decision"**) (Ex. A hereto). The Justice Bannon Decision granted Drexel partial summary judgment on the HRSA-period component of its claim in the amount of $125,235, denied summary judgment on the balance of Drexel's contract claim, denied Drexel's claims for unjust enrichment and quantum meruit, and expressly preserved the chargeback counterclaim for trial. See Decision and Order of the Hon. Andrea Bannon (Doc 134, Ex. A). The $125,235 is the only portion of Drexel's asserted claim that has been liquidated in Drexel's favor by any court. The remainder of Drexel's asserted claim is unliquidated and remains subject to the Debtors' chargeback counterclaim, which Justice Bannon expressly preserved.

On May 4, 2026, the Debtors commenced Adversary Proceeding No. 26-01208 (Doc 141) against Drexel and Mr. Zormati individually. See Adversary Complaint (Adv. Pro. No. 26-01208, Doc 1). The Adversary Complaint pleads eight counts: (1) the preserved chargeback counterclaim, seeking not less than $2,571,842 in contract damages; (2) fraudulent inducement; (3) breach of contract; (4) breach of the implied covenant of good faith and fair dealing; (5) unjust enrichment; (6) conversion; (7) tortious interference with prospective economic advantage; and (8) civil conspiracy. The Adversary Complaint also seeks operational loss damages, lost profits, and exemplary damages. Mr. Zormati is named individually in connection with the counts that allege his personal participation in tortious conduct. The summons issued on May 5, 2026, setting answer deadlines of June 4, 2026 and a pretrial conference for July 7, 2026. Before the answer date arrived, this Court stayed the entire Adversary Proceeding by text order entered May 19, 2026, until June 29, 2026, to facilitate the parties' settlement discussions. The Adversary Proceeding is accordingly at its earliest stage and remains stayed by order of the

Court.

### E.  The Claim Objection and Rule 2004 Subpoenas

On April 30, 2026, the Debtors filed a Motion to Modify, Reduce, and Object to the Claim of Drexel (Doc 134) (the **"Claim Objection"**). The Claim Objection is pending before the Court. It seeks to reduce Drexel's proof of claim to the $125,235 liquidated by the Justice Bannon Decision and to disallow or subordinate the balance, which remains subject to the chargeback counterclaim, and it is supported by a complete copy of the Justice Bannon Decision. Drexel's proof of claim is therefore disputed of record. The hearing on the Claim Objection, originally set for an earlier date, has been consolidated with the conversion motion for June 23, 2026.

On May 12, 2026, the Debtors served, or caused to be issued, four Rule 2004 subpoenas directed to Drexel, Mr. Zormati personally, and two additional individuals. The subpoenas seek information on estate-administration topics: principally the financial capacity of Drexel and its principals (relevant to collectability of any judgment in the Adversary Proceeding), the corporate structure and transactional history (relevant to potential avoidance actions and the integrity of the proof of claim), and related matters. See Rule 2004 subpoenas of record. The subpoenas were scoped to avoid the substantive merits of the Adversary Proceeding, which are properly developed through adversary discovery under Bankruptcy Rule 7026 et seq. Drexel has not moved to quash any subpoena, as the docket reflects.

### F.  The Estate's Settlement Pipeline and Recoveries in Process

The estate has executed a global settlement with a major commercial payer that produces a substantial recovery to the Debtors' estates, which recovery is subject to a forthcoming motion for approval under Bankruptcy Rule 9019. Hersperger Certification ¶¶ 19 to 26. In addition, as noted above, Crown has approximately $1.2 million in further commercial payer settlements in active process. These recoveries are concrete, documented, and in motion. They are direct evidence that the receivables-collection program is generating value for the estate and its creditors.

### G.  The Financing in Development and Drexel's Documented Knowledge

Throughout 2026, the Debtors and their non-debtor parent, ProPhase Labs, Inc., have engaged in active financing efforts with institutional lenders, directed at funding the orderly administration of the estate and the prosecution of estate causes of action consistent with ProPhase Labs's senior secured position. Those efforts have now advanced to their final stage. ProPhase Labs has negotiated a senior secured financing facility that is in final documentation, the proceeds of which are available to support the orderly administration of these estates consistent with ProPhase Labs's senior secured position. Karkus Certification ¶¶ 28 to 29; Maciag Certification ¶¶ 6 to 9. The same institutional lender has further expressed its willingness to provide debtor-in-possession financing to the estates under 11 U.S.C. § 364, subject to notice, a hearing, and this Court's approval, and has sought a right of first refusal with respect to any such debtor-in-possession financing. Karkus Certification ¶¶ 30 to 31; Maciag Certification ¶¶ 6 to 9. That prospective debtor-in-possession financing is available only while these cases remain in Chapter 11, because it depends on the existence of a debtor in possession and the financing protections of § 364. Drexel had documented knowledge of the Debtors' financing efforts through counsel-to-counsel communications between approximately February and May 2026, in which the Debtors' counsel disclosed in substance the existence, general structure, and approximate timing of those efforts. Maciag Certification ¶¶ 6 to 9.

### H.  The Court's Exclusivity Extensions, Each Entered Over Drexel's Opposition

This Court has twice extended the Debtors' exclusive period to file a plan under 11 U.S.C. § 1121(d), each time over Drexel's opposition. By order entered May 6, 2026 (Doc 143), following the Debtors' Second Motion to Extend Exclusivity (Doc 109) and Drexel's objections (Doc 131; Doc 140), this Court extended the Debtors' exclusive period to file a plan through June 22, 2026, and by amended order entered May 26, 2026 (Doc 155) the Court further extended that exclusive period through June 29, 2026, and the exclusive solicitation period through August 28, 2026. The Court entered the extension after a hearing on May 5, 2026 at which Drexel's counsel appeared and stated Drexel's opposition on the record. Maciag Certification ¶ 16. As of the May 15, 2026 filing of Drexel's motion, the Court-set deadline for the Debtors to file a Plan had not expired and would not expire for forty-five days. As of the June 23, 2026 hearing, that deadline still will not have expired.

Drexel's motion asserts that this Court "authorized a limited extension through June 21, 2026." That is incorrect. The May 6, 2026 order (Doc 143) extended exclusivity through June 22, 2026, and the amended order entered May 26, 2026 (Doc 155) extended it through June 29, 2026.

## I.  The Motion to Convert and Drexel's June 3 Stay Letter

On May 15, 2026, at 4:11 p.m., Drexel filed the present Motion to Convert (Doc 150), comprising a memorandum of law, a notice of motion, a lengthy certification of Mr. Zormati with exhibits, a certificate of service, and a proposed order. The motion was filed eleven days after the Adversary Complaint named Drexel and Mr. Zormati, three days after the Rule 2004 subpoenas issued, three days before this Court's May 18, 2026 settlement conference, and while Drexel's own proof of claim was subject to the pending Claim Objection. The hearing on the motion, originally scheduled for an earlier date, has been consolidated with the Claim Objection for June 23, 2026.

On June 3, 2026, Drexel's counsel submitted a letter to the Court characterizing the stay of the Adversary Proceeding and the Rule 2004 subpoenas as a standstill agreed "per the discussions" at the settlement conference, and stating that the complaint and subpoenas had not been served. In fact, the stay was entered by the Court on its own initiative. By text order entered May 19, 2026, this Court stayed the Adversary Proceeding until June 29, 2026, or further order of the Court, following the May 18 settlement conference and over the Debtors' objection. The Debtors did not agree to a consensual standstill; the Court imposed the stay to facilitate settlement. The Debtors corrected the record accordingly. The settlement conference is now scheduled for June 22, 2026, and the stay extends through June 29, 2026, past the June 23 consolidated hearing.

**ARGUMENT**

## I.  Section 1112(b) Requires Both Cause and a Best-Interests Finding; Conversion Is Not a Mechanical Remedy

Section 1112(b)(1) provides that, on request of a party in interest and after notice and a hearing, the court shall convert or dismiss a case, "whichever is in the best interests of creditors and the estate, for cause," unless the court determines that appointment of a trustee or examiner

under § 1104(a) is in the best interests of creditors and the estate. 11 U.S.C. § 1112(b)(1). The statute requires the movant to establish cause, and the court must independently determine that the chosen remedy is in the best interests of creditors and the estate. The movant bears the burden.

Section 1112(b)(2) provides a further limitation: even where cause is established, the court may not convert or dismiss if there are unusual circumstances establishing that conversion or dismissal is not in the best interests of creditors and the estate, the debtor or another party establishes a reasonable likelihood that a Plan will be confirmed within a reasonable period, and the grounds include an act or omission for which there is a reasonable justification that will be cured within a reasonable time. 11 U.S.C. § 1112(b)(2).

Section 1112(b)(4) supplies a non-exclusive list of grounds that may constitute cause. Drexel asserts several: (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; (B) gross mismanagement; and (J) failure to file or confirm a Plan within the time fixed by the Code or by court order; together with extra-statutory contentions of bad faith and parent benefit. The Court evaluates each, then assesses the totality under § 1112(b)(1).

The Third Circuit has emphasized that the § 1112(b) inquiry is fact-intensive and contextual, not mechanical, and that the decision is committed to the sound discretion of the bankruptcy court. *In re SGL Carbon Corp.*, 200 F.3d 154, 159, 165 (3d Cir. 1999). The court considers the totality of facts and circumstances rather than any single mechanical factor.

The Debtor intends to propose a Plan of Reorganization which includes not merely liquidation and collection of outstanding Receivables, but, as noted below, that collection of tens of millions of dollars in receivables will lead to a structured Reorganization, as the Debtors intend to use the value generated by the receivables portfolio to restructure the estates and return the Debtors to operation as going concerns, including by repurposing their laboratory operating platform; the Debtors intend to file a Plan within the Court's exclusivity period. Karkus Certification ¶¶ 34 to 37. (. . . and even assuming, *arguendo*, that the Plan were to be perceived as a Plan of Liquidation, it is noteworthy that liquidating Chapter 11 plans are expressly authorized. Section 1123(b)(4) permits a plan to provide for the sale of all or substantially all of the property of the estate and the distribution of the proceeds among holders of claims or

interests. Section 1129(a)(11)(b) requires that confirmation not be likely to be followed by liquidation or further reorganization "unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. §§ 1123(b)(4), 1129(a)(11). Even for a liquidating debtor without a plan for further restructuring and reorganization as in the instant case, the rehabilitation inquiry under § 1112(b)(4)(A) asks not whether the debtor will guarantee a return to operations but whether the case has a reasonable likelihood of <u>confirming a Plan that maximizes recovery to creditors</u>.

## II.  Drexel Fails to Establish Cause Under § 1112(b)(4)(A): The Debtors have a Concrete Path to a Confirmable Plan

Section 1112(b)(4)(A) requires two conjunctive elements: substantial or continuing loss to or diminution of the estate, and the absence of a reasonable likelihood of rehabilitation. Both must be shown. The rehabilitation prong is dispositive against Drexel.

### A.   The Operating-Report Figures Reflect Wind-Down Administration Costs, Not Operational Loss

The cumulative losses Drexel cites are professional fees and case-administration expenses, not the operational losses of a functioning business in decline. Karkus Certification ¶¶ 30 to 32. The Debtors ceased COVID-19 testing operations in 2025; they are presently non-operating clinical-laboratory entities whose principal asset is the Receivables Portfolio, which generates recoveries on a contingent basis as Crown's collection program progresses. The authorities Drexel cites involved operating businesses experiencing operational deterioration, not liquidating debtors actively managing the collection of Receivables. *See Moody v. Sec. Pac. Bus. Credit, Inc.*, 85 B.R. 319 (Bankr. W.D. Pa. 1988); *In re Union Cnty. Wholesale Tobacco & Candy Co.*, 8 B.R. 439 (Bankr. D.N.J. 1981). The category mismatch is fundamental.

### B.  The Case has a Reasonable Likelihood of Confirming a Plan

Even if case-administration expenses qualified as continuing loss, Drexel cannot establish the absence of a reasonable likelihood of rehabilitation. Concrete factors establish the presence of just such a reasonable likelihood. The estate has executed a global settlement with a major commercial payer producing a substantial recovery, subject to a forthcoming Rule 9019 motion, and Crown has approximately $1.2 million in additional imminent commercial payer settlements in active process. Hersperger Certification ¶¶ 19 to 26.

Financing to fund the orderly administration of the estate and the prosecution of estate causes of action is in its final stage: ProPhase Labs has negotiated a senior secured facility in final documentation, and the same institutional lender has expressed its willingness to provide § 364 debtor-in-possession financing to the estates subject to this Court's approval. Karkus Certification ¶¶ 28 to 31.

A debtor with executed and in-process settlements, an operating Court-approved collection program, and financing in final documentation is not a debtor without a reasonable likelihood of confirming a plan; it is the ordinary profile of a debtor advancing toward confirmation. Moreover, the Debtors' objective is not a mere liquidation but a structured reorganization: the Debtors intend to use the value generated by the liquidated Receivables portfolio to restructure the estates and return the Debtors to operation as going concerns, including by repurposing their laboratory operating platform, and they intend to file a Plan within the Court's exclusivity period. Karkus Certification ¶¶ 34 to 37.

A Debtor thus pursuing a genuine reorganization with a going-concern endgame is the antithesis of the rehabilitation failure that § 1112(b)(4)(A) addresses. The chargeback counterclaim and the seven additional counts in the Adversary Proceeding seek not less than $2,571,842 plus additional damages. The Receivables Portfolio remains in active prosecution by Crown under its Court-approved engagement, producing the recoveries that fund the path to confirmation. Hersperger Certification ¶¶ 7 to 18. The Debtors intend to file a plan and disclosure statement within the Court's exclusivity window, which deadline by Court Order (Doc 155) has been set at June 29, 2026.

## C.  Drexel's Implicit Definition of "Rehabilitation" Is Inconsistent With the Statute

Drexel implicitly defines rehabilitation as solely a prompt return to full operations. That definition is inconsistent with the Code's express authorization of liquidating plans under §§1123(b)(4) and 1129(a)(11)(b), and by the fact that here the Debtor is proceeding to a structured reorganization (Karkus Certification ¶¶ 34 to 37) — yet even if a Chapter 11 Debtor were to cease operations and pursue a liquidating plan such is not, on that account, the rehabilitation failure that § 1112(b)(4)(A) addresses. If Drexel's framing were correct, every liquidating Chapter 11 case would have to be converted, because every liquidating debtor by definition has ceased or will cease operations. That is not the law. The statutory rehabilitation

question for a Debtor is whether the case has a reasonable likelihood of confirming a plan, whether it be a plan of reorganization or a plan of liquidation, or, as here, a plan to liquidate and collect tens of millions of dollars of Receivables as a path to a structured reorganization, to restructure the Debtors' estates and return the Debtors to operation as going concerns, including by repurposing their laboratory operating platform. Karkus Certification ¶¶ 34 to 37.

## III. Drexel Fails to Establish Cause Under § 1112(b)(4)(J): The Court's Own Exclusivity Deadline Has Not Expired

Section 1112(b)(4)(J) defines cause to include failure to file a disclosure statement, or to file or confirm a plan, "within the time fixed by this title or by order of the court." 11 U.S.C. § 1112(b)(4)(J). The failure must be measured against the time fixed by the Code or by court order. This Court extended the Debtors' exclusive period to file a Plan through June 22, 2026 by order entered May 6, 2026 (Doc 143), and further extended it through June 29, 2026 by amended order entered May 26, 2026 (Doc 155). As of the June 23, 2026 hearing, that deadline will not yet have expired. Drexel asks this Court to convert these cases for failure to file a Plan within a period the Court itself has not allowed to expire. That request is inconsistent with the statutory text, and the Court may take judicial notice of its own order.

Drexel's time-allocation argument, that the Debtors' counsel devoted disproportionate hours to litigation rather than Plan preparation, is not at all probative, particularly where a good deal of the litigation in this case has been fomented by Drexel itself. It ill becomes Drexel to, first, cause the Debtor to spend time and resources on defending itself again Drexel's aggressive litigation tactics, then to complain that the Debtor has been obliged to spend time and resources on defending itself against Drexel's aggressive litigation tactics!

Plan preparation in a case of this kind is the development of the operational structure the Plan will memorialize: the secured-creditor position, the collection program, the settlement pipeline, the financing structure, and the disputed-claim resolution mechanism. Each is Plan-relevant. Maciag Certification ¶¶ 21 to 24. In any event, conversion under § 1112(b)(4)(J) is committed to the Court's discretion, and a court that has itself set the Plan-filing deadline does not, absent extraordinary circumstances, convert a case for failure to meet that deadline before it has run.

**IV.  Even If Cause Were Found as to Any Ground Other Than § 1112(b)(4)(A), Conversion Is Barred by the Unusual-Circumstances Exception of § 1112(b)(2)**

Even if the Court were to find cause under any ground other than § 1112(b)(4)(A), conversion would still be prohibited. Section 1112(b)(2) provides that the Court shall not convert or dismiss a case, notwithstanding the existence of cause, if the movant's identified cause is something other than continuing loss and absence of rehabilitation under § 1112(b)(4)(A), and if the debtor establishes that (I) there are unusual circumstances establishing that conversion or dismissal is not in the best interests of creditors and the estate; (ii) there is a reasonable likelihood that a Plan will be confirmed within a reasonable time; and (iii) the grounds for cause have a reasonable justification and will be cured within a reasonable time. Each element is satisfied as to Drexel's non-§ 1112(b)(4)(A) grounds.

**First, unusual circumstances exist.** This motion is pressed solely by Drexel, the target of both a pending claim objection and a $2.57 million adversary proceeding that would survive conversion and be prosecuted by a Chapter 7 trustee with no settlement incentive. The estate is actively collecting, with approximately $1.2 million in commercial-payer settlements in process and an executed payer settlement pending approval under Bankruptcy Rule 9019. A § 364 debtor-in-possession financing avenue is available only while these cases remain in Chapter 11. These circumstances make conversion contrary to the best interests of creditors and the estate.

**Second, there is a reasonable likelihood of confirmation within a reasonable time.** The Debtors' exclusive period to file a Plan runs through June 29, 2026 (Doc 143, as amended by Doc 155), an active Court-approved collection program is generating recoveries, an executed payer settlement is in process toward Rule 9019 approval, and financing to support administration has been negotiated and is in final documentation. The Debtors intend to file a Plan within the exclusivity period. Karkus Certification ¶¶ 34 to 37.

**Third, any grounds for cause are reasonably justified and curable within a reasonable time.** To the extent the Court views the pace of the Plan process or the allocation of professional effort as a concern, those matters are justified by the complexity of the collection program, the multi-front litigation with Drexel, and the need to stabilize the estates before proposing a Plan, and they are curable within the existing exclusivity period. The statutory cure

requirement is directed at grounds other than § 1112(b)(4)(A), and the Debtors' showing here meets it.

Because the requirements of § 1112(b)(2) are satisfied as to Drexel's grounds other than § 1112(b)(4)(A), and because Drexel cannot establish the § 1112(b)(4)(A) ground on its merits for the reasons stated in Section II above, conversion is statutorily prohibited even if cause were found.

## V.  Drexel Fails to Establish Bad Faith by the Debtors, and the Totality of Circumstances Points the Other Way

### A.  The Forever Green Totality-of-Circumstances Standard

The Third Circuit's bad-faith standard under § 1112(b) is fact-intensive and contextual. *SGL Carbon*, 200 F.3d at 159, 165. In *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015), the court affirmed a bad-faith finding where a creditor used the bankruptcy process for improper purposes, holding that the filing "ran counter to the spirit of collective creditor action" and that the creditor "was motivated by two improper purposes: to frustrate [the debtor's] efforts to litigate its claim against [the related entity] and to collect on a debt." *Id.* at 332, 336. The improper-purpose inquiry asks whether the movant used the court's machinery for the protective collective-creditor purposes Chapter 11 contemplates or for collateral purposes in pending litigation. Drexel's conduct fails that test.

### B.  Each Filing the Debtors Made Was Substantively Justified

The Claim Objection (Doc 134) tracks the determination of a court of competent jurisdiction: it seeks to conform Drexel's proof of claim to the $125,235 Justice Bannon liquidated, with the balance subject to the preserved chargeback counterclaim. Filing such an objection is the proper administration of the estate, not bad faith. The Adversary Complaint (Doc 141) prosecutes the counterclaim Justice Bannon expressly preserved, plus related counts arising from the same factual nexus. And the Rule 2004 subpoenas address estate-administration topics within the express authorization of Rule 2004(b). None of these is a tactical maneuver; each is the ordinary discharge of the Debtors' fiduciary duties.

## C.  The Timing Inference Cuts Against Drexel

If bad faith is to be evaluated through timing, the evidence points at Drexel. Drexel filed its motion at 4:11 p.m. on Friday, May 15, 2026: eleven days after Drexel and Mr. Zormati were named in the Adversary Proceeding; three days after the Rule 2004 subpoenas issued; three days before this Court's May 18 settlement conference; nine days after the Court entered the exclusivity extension over Drexel's opposition; and while Drexel's own claim was subject to the pending Claim Objection. A creditor genuinely seeking conversion for the collective creditor body does not file on the eve of a court-scheduled settlement conference, without notice or service, immediately after the court has entered an order designed to permit the debtors to proceed in Chapter 11. The timing is consistent with a purpose other than the one § 1112(b) serves.

## D.  Drexel's June 3 Effort to Manufacture a Stay Confirms the Litigation-Avoidance Purpose

On June 3, 2026, Drexel's counsel wrote to the Court characterizing the stay of the Adversary Proceeding and the Rule 2004 subpoenas as a standstill agreed at the settlement conference. In fact, this Court entered the stay on its own initiative by text order dated May 19, 2026, over the Debtors' objection, to permit settlement discussions to proceed without the expense of active litigation. The maneuver is nonetheless revealing. Drexel seeks simultaneously to convert the entire case and to characterize the court-ordered litigation pause as a consensual freeze of the estate's affirmative claims. A party genuinely invoking § 1112(b) to protect creditors would not, in the same breath, seek to convert the estate to Chapter 7 while the estate's largest affirmative claims against that very party sit stayed for settlement. Drexel's objective is to relieve itself of litigation pressure, not to protect the creditor body.

## E.  Drexel's Use of Settlement-Disclosed Financing Information

During counsel-to-counsel communications between approximately February and May 2026, the Debtors' counsel disclosed in substance the existence, general structure, and approximate timing of the Debtors' financing diligence. Maciag Certification ¶¶ 6 to 9. Drexel's motion attacks that financing as inadequate and was filed at a moment calculated to impair it. Rule 408 does not shield this use of the disclosures: Rule 408(b) permits settlement-related

communications to be admitted for purposes other than proving the validity or amount of a disputed claim, including to prove a party's knowledge or improper purpose. Fed. R. Evid. 408(b); N.J.R.E. 408. The Debtors offer the disclosures not to prove the validity or amount of Drexel's claim, but to establish Drexel's documented knowledge of the financing pipeline at the time of the May 15 filing and to support the inference, under the *Forever Green* totality test, that the motion was filed for an improper purpose.

## F. Drexel's Conduct Creates Independent Tort Exposure

The Court need not adjudicate Drexel's tort exposure to deny conversion, but the § 1112(b) bad-faith analysis is informed by the broader legal posture of the movant's conduct. Drexel's filing of this motion, with documented knowledge of the Debtors' financing diligence that the motion was timed to disrupt, and with knowledge that the filing would impair the estate's settlement leverage, presents the elements of tortious interference with prospective economic advantage under New Jersey law. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir. 1993) (applying New Jersey law); *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 751 to 752 (1989). The Debtors had a reasonable expectation of economic advantage in the financing pipeline; Drexel had documented knowledge of that expectancy; the interference was intentional and timed for maximum effect; and the resulting damages, including disrupted financing efforts and impaired settlement leverage, are measurable. Karkus Certification ¶¶ 28 to 31; Maciag Certification ¶¶ 6 to 9.

The magnitude of such exposure is substantial. In *Lightning Lube*, the Third Circuit affirmed a compensatory judgment that included approximately $7 million in tortious-interference damages. 4 F.3d at 1158 to 1159. In *Rosenberg v. DVI Receivables XIV, LLC*, a jury awarded $1.1 million in compensatory and $5 million in punitive damages against a party for a bad-faith bankruptcy filing; the Eleventh Circuit affirmed, and the judgment was subsequently held non-offsettable. 818 F.3d 1283 (11th Cir. 2016); *U.S. Bank, N.A. v. Rosenberg*, 2018 WL 3640987 (3d Cir. July 31, 2018) (non-precedential). Punitive damages are available under the New Jersey Punitive Damages Act where conduct is actuated by actual malice or a wanton and willful disregard of foreseeably affected persons, subject to the statutory cap. N.J. Stat. Ann. §§ 2A:15-5.12(a), 2A:15-5.14(b).

Mr. Zormati's personal exposure is independent of and additional to Drexel's. Under

New Jersey law, a corporate officer who personally directs or participates in the commission of an intentional tort is personally liable for that conduct. *Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297, 303 (2002). The participation theory applies to intentional torts such as fraud, conversion, tortious interference, and abuse of process, and the Debtors' tort theories against Mr. Zormati are intentional torts, not contract claims. Mr. Zormati personally authorized the conversion motion, personally signed the supporting certification, and is the natural-person counterparty to the relevant communications. See Motion to Convert (Doc 150) and Certification of Bedis Zormati (Doc 150, Ex. 2). His personal assets are within the field of exposure.

## G. Conversion Does Not Serve Drexel's Own Creditor Interest

The bad-faith analysis is sharpened by a fact Drexel appears not to have weighed: the relief it seeks does not serve Drexel as a creditor. A Chapter 7 trustee inherits the Adversary Proceeding seeking not less than $2,571,842 against Drexel and Mr. Zormati personally, operates under a statutory commission calibrated to estate recoveries under § 326(a), has no preexisting relationship with Drexel and no settlement history to manage, and has every incentive to prosecute the counterclaim and the tort counts to judgment, to pursue Mr. Zormati's personal assets under *Saltiel*, and to disallow Drexel's proof of claim in substantial part. Drexel's settlement leverage with a Chapter 7 trustee is materially worse than with the Debtors-in-possession. A motion under § 1112(b) filed against the movant's own creditor interest cannot be the protective collective-creditor motion the statute contemplates; it must be filed for collateral purposes, which is precisely what the *Forever Green* totality test addresses.

## VI. The Debtors' Pending Settlement Offer Exceeds Drexel's Only Adjudicated Recovery, Confirming That Conversion Serves No Legitimate Creditor Purpose

The Debtors have not merely defended; they have extended their hand. The Debtors recently conveyed a further settlement proposal to Drexel offering consideration that exceeds the $125,235 that Justice Bannon liquidated, which is the only portion of Drexel's asserted claim that any court has adjudicated in Drexel's favor. The Debtors will participate in the further settlement conference the Court has scheduled for June 22, 2026, the day before the consolidated hearing, in good faith and seek a global resolution.

This posture is dispositive of Drexel's asserted creditor interest. A creditor whose sole

adjudicated recovery is being more than satisfied has no cognizable injury that conversion would remedy. The remainder of Drexel's asserted claim is unliquidated, disputed of record through the pending Claim Objection, and subject to a chargeback counterclaim that exceeds it. When the only liquidated component of a creditor's claim is offered in full and then some, and the creditor nonetheless presses for the drastic remedy of converting three estates to Chapter 7, the conversion motion is revealed as serving a purpose other than the protection of the creditor's claim. Under *Forever Green*, that collateral purpose is the hallmark of a bad-faith filing. 804 F.3d at 336.

The appropriate course is plain. If Drexel accepts a resolution that satisfies its adjudicated recovery, the claim objection, the Adversary Proceeding, and the subpoenas resolve along with it, and the conversion motion becomes moot. If Drexel declines, the Adversary Proceeding remains an estate asset to be prosecuted within these Chapter 11 cases, and the Debtors are entitled to retain the timing and status of their pending matters rather than surrender that leverage on the eve of the hearings. Either way, conversion is unnecessary to protect Drexel, and the motion should be denied.

## VII.  Drexel Fails to Establish Gross Mismanagement Under § 1112(b)(4)(B): The Rule 2004 Subpoenas Are a Scope Dispute, Not Estate Mismanagement

Section 1112(b)(4)(B) requires gross mismanagement of the estate, which means material harm to the estate, not a procedural complaint about discovery scope. Rule 2004(b) authorizes examination on the acts, conduct, property, liabilities, and financial condition of the debtor, or any matter that may affect the administration of the estate. The subpoenas the Debtors served address topics squarely within that authorization: the financial capacity of Drexel and its principals, relevant to the collectability of any judgment on the chargeback counterclaim; and the corporate structure and transactional history, relevant to potential avoidance actions and the integrity of Drexel's proof of claim. See Rule 2004 subpoenas of record.

If Drexel believed any subpoena request overbroad, the proper remedy is a motion to quash directed to the specific request. Fed. R. Bankr. P. 2004©; Fed. R. Civ. P. 45(d). Drexel has filed no such motion, as the docket reflects. Conversion of three jointly administered estates is grossly disproportionate to a discovery-scope dispute and would not even remedy it, because a

Chapter 7 trustee would hold the same Rule 2004 authority. The proposed remedy reveals the asserted ground as pretextual.

## VIII.  Drexel's Parent-Benefit Theory Misreads the Absolute Priority Rule

Drexel's theory that the Debtors are operated for the benefit of the non-debtor parent misreads § 1129(b) and the operational structure of the cases. ProPhase Labs owns one hundred percent of the equity of the Debtors and has supported these estates, including by pursuing financing to fund their administration and the collection effort. Its interest lies in the success of the collection program and the reorganization of the Debtors, the very things conversion would destroy, and a working estate that realizes the value of the Receivables Portfolio serves ProPhase Labs and the Debtors' creditors alike. Separately, ProPhase Labs holds a security interest of record in the Receivables Portfolio, documented by a Security Agreement dated January 7, 2025 and a related forbearance agreement, with UCC-1 filings of record, and a claim scheduled at $9,998,503.80 on the amended Schedule D (Doc 98). Karkus Certification ¶¶ 18 to 24. The allowance, validity, and priority of that claim are matters for the ordinary claims-allowance and Plan-confirmation process. Critically, any distribution of estate value, including any payment on account of ProPhase Labs' claim, occurs only in accordance with the Bankruptcy Code's priorities and only through Court-approved mechanisms, including the Court-approved debtor-in-possession trust account (Doc 154) and any confirmed Plan. There is no diversion; there is only supervised administration under this Court's oversight.

That a parent holds both an equity interest and a claim against its subsidiaries is unremarkable and does not establish that the estates are being mismanaged. To the extent ProPhase Labs holds an allowed claim, it will be treated according to its lawful priority through the claims-allowance and Plan-confirmation process, and any distribution of estate value occurs only under the Bankruptcy Code's priorities and through Court-approved mechanisms, including the debtor-in-possession trust account (Doc 154) and any confirmed Plan. The parent's position is therefore governed by supervised administration under this Court's oversight, not by any diversion of estate value. The proper question under § 1112(b) is whether that structure is being honored, which it is, not whether a claimant happens also to be an affiliate. To the extent Drexel relies on statements from a public investor call or on a memorandum of understanding concerning ProPhase Labs's independent strategic alternatives, those matters concern the non-

debtor parent and do not establish mismanagement of these estates. Karkus Certification ¶¶ 26 to 27.

## IX.   Conversion Is Not in the Best Interests of Creditors and the Estate Under § 1112(b)(1)

Even if Drexel established cause, and it does not, the motion fails the best-interests prong. The Court must independently determine that conversion is in the best interests of creditors and the estate. 11 U.S.C. § 1112(b)(1). The record points decisively against conversion.

### A.   The U.S. Trustee's Withdrawal Is Powerful Evidence

The most significant fact for the best-interests analysis is the U.S. Trustee's withdrawal of its own conversion motion in February 2026. The U.S. Trustee is the neutral statutory officer charged with monitoring Chapter 11 cases and protecting the integrity of the estate and the interests of creditors. After filing its motion with a full certification and memorandum, and after briefing and a hearing, the U.S. Trustee withdrew it. The Court is entitled to give that considered judgment substantial weight. A single creditor holding the largest adverse substantive position, filing the same motion months later on essentially the same record, asks the Court to take a step the neutral administrator declined to take.

The procedural history reinforces the point. Drexel did not bring an independent conversion motion in the first instance; it proceeded by joining the U.S. Trustee's motion (Doc 69), and it allowed that joinder to be extinguished when the U.S. Trustee withdrew, without seeking leave to maintain an independent motion at that time. While the withdrawal of the earlier motion is not a formal adjudication, the equities and the good-faith inquiry weigh heavily against permitting Drexel to relitigate the identical grounds months later on essentially the same record. No materially changed circumstances justify a second conversion effort. To the contrary, the only material developments since February, the Adversary Proceeding, the Claim Objection, and the Rule 2004 subpoenas, all cut against Drexel. And in the period since the withdrawal, no other party in interest, not the parent, not any other commercial creditor, and not the United States in connection with the pending qui tam matter, has sought conversion. Drexel stands alone in pressing the remedy the neutral administrator considered and declined.

## B.  Conversion Would Disrupt the Estate's Affirmative Value

Conversion would harm the estate across multiple dimensions. It would disrupt the Crown collection program, which is in active prosecution and producing recoveries, including the approximately $1.2 million in settlements presently in process and the executed payer settlement awaiting Rule 9019 approval. Hersperger Certification ¶¶ 15 to 26. It would extinguish an available financing opportunity that conversion cannot preserve. An institutional lender is prepared to provide § 364 debtor-in-possession financing to these estates, and that financing exists only so long as the cases remain in Chapter 11: a Chapter 7 conversion leaves no debtor in possession to finance and forecloses the § 364 platform on which the financing depends. Conversion therefore does not merely disrupt the financing structure; it destroys a specific, presently available facility from a lender already at the table, to the direct detriment of creditors. Hersperger Certification ¶ 25; Karkus Certification ¶¶ 30 to 31; Maciag Certification ¶¶ 6 to 9. It would impair the estate's settlement pipeline, as commercial-payer counterparties price the changed procedural posture into their positions. And it would force a Chapter 7 trustee to develop anew the substantive matters the Debtors have already advanced, including the Adversary Proceeding, duplicating cost and reducing net recovery to the estate.

## C.  Conversion Costs Exceed Conversion Benefits

Drexel's principal benefit-side argument, that conversion would reduce administrative cost by eliminating the Debtors' counsel fees, is contradicted by trustee economics. A Chapter 7 trustee earns a statutory commission under § 326(a) of up to twenty-five percent of the first $5,000, ten percent of the next $45,000, five percent of the next $950,000, and three percent of amounts above $1 million. Applied to a substantial projected net portfolio, the trustee's commission alone would run into seven figures, before separate trustee's counsel and professionals retained to evaluate and prosecute the Adversary Proceeding and the collection program. The supposed savings on debtor's counsel fees would be offset many times over. Conversion does not reduce administrative cost on a portfolio of this size; it increases it.

## D.  The Equities Favor Continued Administration

No party in interest beyond Drexel supports conversion. The U.S. Trustee withdrew its motion; no other creditor has joined Drexel; the parent secured creditor opposes conversion; and

the United States, which has appeared in the *qui tam* matter, has not sought conversion. Drexel's tactical interest in disrupting the litigation it faces is not the best-interests calculation § 1112(b)(1) requires. The equities favor continued administration of the case on its current path: completion of the settlement and financing processes, prosecution of the Adversary Proceeding, and timely filing of a Plan within the Court's exclusivity window.

**Conclusion**

For the foregoing reasons, the Debtors respectfully request that the Court enter an order denying the Motion of Drexel Distribution, Inc. d/b/a EZ Test NY to convert these Chapter 11 cases to Chapter 7, and granting such other and further relief as the Court deems just and proper.

Dated: June 16, 2026
Pearl River, New York

Respectfully submitted,

**WALLACE NEEL PLLC**

By:  */s/ Wallace B. Neel*
Wallace B. Neel, Esq. (Admitted Pro Hac Vice)
1 Blue Hill Plaza, LL Suite 1509
Pearl River, New York 10965
*Special Litigation Counsel to the Debtors*

- and local counsel:

**MACIAG LAW, LLC**

By:  */s/ Thaddeus R. Maciag*
Thaddeus R. Maciag, Esq.
475 Wall Street
Princeton, New Jersey 08540
*Counsel for the Debtors*