| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**FOR THE DISTRICT OF NEW JERSEY** | |
| **STARK & STARK, PC**<br>Joseph H. Lemkin, Esq.<br>100 American Metro Blvd.<br>Hamilton, NJ 08619<br>Telephone (609) 791-7022<br>*Attorneys for Drexel Distribution, Inc.* | **Hearing Date: June 23, 2026**<br>**Time:**            **10:00 a.m.** |
| In re:<br><br>PROPHASE DIAGNOSTICS NJ, INC., et al.,<br><br>    Debtors. | Chapter 11<br><br>Case Nos. 25-19833 (CMG)<br><br>Jointly Administered<br><br>Hon. Chief Judge<br>Christine M. Gravelle |

## DREXEL DISTRIBUTION, INC.'S D/B/A EZ TEST NY'S REPLY IN FURTHER SUPPORT OF MOTION TO CONVERT THE DEBTORS' CHAPTER 11 CASES TO CHAPTER 7 PURSUANT TO 11 U.S.C. § 1112(b)

## PRELIMINARY STATEMENT

Drexel[1] respectfully submits this Reply in Further Support of its Motion to Convert the Debtor's Chapter 11 Cases to Chapter 7 Pursuant to 11 U.S.C. §1112(b).  The Debtors' opposition (the "Opposition") does not refute these essential facts that compel conversion: the Debtors are non-operating entities with no employees, no revenue, combined cumulative losses exceeding $351,000, and no filed plan or disclosure statement after nearly nine months in chapter 11. Instead, the Debtors mischaracterize the record, and - most troublingly - threaten their largest creditor with tort liability for exercising rights specifically afforded to interested parties under Bankruptcy Code

---

[1] Capitalized terms not defined herein have the same meaning ascribed to them in Drexel's initial motion papers.

1

§ 1112(b). That posture confirms, rather than refutes, that these cases are being administered as a litigation platform rather than a reorganization.

The Opposition is remarkable not for what it establishes (because, as explained below, it establishes nothing) but for what it reveals.  That is, the Debtors have engaged in avoidable/fraudulent transfers just months prior to the bankruptcy filings, have breached fiduciary obligations to creditors while in the zone of insolvency, have focused on frivolous litigation tactics against its largest creditor rather than working toward a confirmable plan, and have failed (again) to file monthly operating reports since February 2026.  These cases should be converted.

## ARGUMENT

## I.

### The Debtors Cannot Escape § 1112(b)(4)(A):
### The Losses Are Real And Rehabilitation Is Speculative

"Rehabilitation is a more demanding standard than reorganization, and is defined by whether the debtor will be able to reestablish his business on a firm, sound basis.…  In this manner, rehabilitation is understood as referring to the debtor's ability to restore the viability of its business. This prospect must be premised on objective facts, not merely speculative data, and is determined by the Court based on evidence presented at the hearing…." *In re Paterno*, 511 B.R. 62, 68–69 (Bankr. M.D.N.C. 2014) (cleaned up).

### A.      Administrative Costs Are Estate Losses

The Debtors try to gloss over the $351,000 in combined cumulative losses by mischaracterizing the intent of Bankruptcy Code § 1112(b)(4)(A).  Indeed, the Debtors incorrectly contend that § 1112(b)(4)(A) is somehow inapplicable to them because their losses are due to "professional fees and case-administration expenses, not the operational losses of a functioning business in decline."  But that is a distinction without a difference.  Bankruptcy Code §

1112(b)(4)(A) refers to "substantial or continuing loss to or diminution of the estate," and not just "operational losses from active business operations."   In that regard, an entity with no operations or other expenses that accrues attorney's fees and costs in bankruptcy is still subject to the § 1112(b)(4)(A) standard. *See*, *e.g.*, *In re Traxcell Techs., LLC*, 657 B.R. 453, 463 (Bankr. W.D. Tex. 2024) (holding that "attorney's fees and costs 'effectively [come] straight from the pockets of creditors' and establish substantial loss or diminution of the estate under § 1112(b)(4)(A).'") (cleaned up).

Similarly here, every dollar spent on professional fees – including the $147,420 in counsel fees alone through the first quarter of 2026, plus separate and additional Special Litigation Counsel fees - diminishes the Debtors' estates and is not available for creditor distributions. The Debtors' efforts to recharacterize those losses as something other than what §1112(b)(4)(A) says, is unsupported by the language of the statute itself and by case law interpreting it.

**B.**     **The Debtors' "Rehabilitation" Is Entirely Speculative**

The Debtors contend that they have a path forward to a confirmable plan but, when reviewed with a critical eye, that path is littered with nothing but speculation and/or unsubstantiated claims.

**Crown Medical Collections.** The Debtors assert that Crown has approximately $1.2 million in "commercial payer settlements in active process." But that dollar figure is presented without *any* independent verification or other corroboration, such as term sheets or executed stipulations of settlement.  And importantly, after several months in this chapter 11 process, the alleged $1.2 million should be viewed against Crown's initial projection of "approximately $50 million in insurance payments, net of contingency fees" - a figure that ProPhase Labs itself touted.

The gap between the projected $50 million recovery and an uncorroborated $1.2 million "in process" after months of collection efforts speaks for itself.

And to make matters worse, the Debtors have represented to this Court that they have executed a settlement with a "major commercial payer" that will produce a "substantial recovery" to the Debtors' estates, which settlement is supposedly "pending approval" under Bankruptcy Rule 9019 (*see*, *e.g.*, Opp., p. 15), but the Debtors have *not* provided any signed settlement stipulation or even a term sheet to back up that statement.  And the claim that the settlement is "pending approval" is a gross misrepresentation because there is no 9019 motion pending.

**DIP Financing.** The Debtors assert that an institutional lender has "expressed its willingness" to provide debtor-in-possession financing.  But an "expression of willingness" is not a commitment letter.  No § 364 motion has been filed, no term sheet or financing commitment has been presented to the Court, and clearly no DIP financing is in place. Moreover, as the Debtors themselves disclosed in their DIP Receivables Trust Account Motion (ECF Doc. No. 107, 109), the proposed financing structure would allocate $4.5 million of a $6 million facility *to the non-debtor parent ProPhase Labs*, with only $1.5 million going to the Debtors' estates.[2] That is not rehabilitation; it is insider enrichment cloaked as estate financing.

Incredibly, the Debtors assert that ProPhase Labs has an interest in seeing the Debtors' reorganize because ProPhase Labs purportedly has a secured interest in the Debtors' assets under a January 7, 2025 Security Agreement and UCC Financing Statements filed in May and June 2025. It is precisely this type of insider self-dealing that highlights the need for a chapter 7 trustee and puts a spotlight on *why* the Debtors do not want one – because those "security interests" are transfers made to an insider made just months before the Filing Date and are subject to avoidance

---

[2] As discussed below, Drexel notes that the arrangement to funnel this money to the parent entity is wholly manufactured anyway, and is subject to avoidance.

under Bankruptcy Code §§ 547 and/or 548.  These facts further highlight the need for a chapter 7

trustee to review the conduct of insiders who have effectively breached their fiduciary obligations

owed to creditors in favor of equity holders during a time when the Debtors were within the zone

of insolvency.  *See In re Immune Pharms. Inc.*, 635 B.R. 118, 123 (Bankr. D.N.J. 2021) ("The

fiduciary duties of a corporate director or officer extend to creditors when the debtor is in the 'zone

of insolvency.'").

 **The "Reorganization" Plan.** The Debtors claim that they "intend to use the value

generated by the liquidated receivables portfolio to restructure the estates and return the Debtors

to operation as going concerns, including by repurposing their laboratory operating platform."

That assertion is entirely new, wholly conclusory, and totally unsupported.  The Debtors have no

employees, no operations, no revenue, and no customers. They ceased COVID-19 testing in 2025

and have no business to reopen. The bare assertion that the Debtors intend to "repurpose" their

laboratory operating platform is exactly the kind of speculative and conclusory claim that courts

have found insufficient to establish a reasonable likelihood of rehabilitation.  *See*, *e.g.*, *In re*

*Royalty Props., LLC*, 604 B.R. 742, 751 (Bankr. N.D. Ill. 2019) ("The Debtor's proposed course

of rehabilitation appears to consist of the sale or other agreement to operate the Real Estate

Collateral to an as-of-yet to be identified third party purchaser. Such proposed course of action is

speculative and will not qualify as a "rehabilitation" as required by Section 1112(b)(4)(A)"); and

*In re Costa Bonita Beach Resort, Inc.*, 513 B.R. 184, 198 (Bankr. D.P.R. 2014) ("The Forest

Preserve District argues that the Debtor is not reorganizing a business, but starting a new business

when chapter 11 is designed to reorganize existing businesses. It is correct. While the Debtor has

not set up a new corporate entity, it is attempting to organize a new line of business, totally different

5

from its past operations. The purpose of bankruptcy is to preserve going concerns and to maximize

value for creditors, not to leverage a secured creditor's collateral for a new venture.").

## **II.**

### **The Debtors Are Mismanaging Their Estates Under § 1112(b)(4)(B), And Their Arguments Confirm The Litigation-Driven Nature Of These Cases**

### **A.      The Timing Of Events Supports Drexel, Not The Debtors**

The Debtors argue that because Drexel filed the conversion motion after the Adversary

Complaint and Rule 2004 subpoenas, the conversion motion is improper or was filed in bad faith.

But that argument is misplaced.

First, as the Debtors recognize (but then ignore when making their argument on this point)

Drexel joined the UST's motion to convert these chapter 11 cases well *before* the Debtors

undertook their vexatious (and wholly frivolous) litigation campaign.

Second, the Debtors' litigation crusade against Drexel and Mr. Zormati, personally,

demonstrates that these cases were and are not progressing toward a plan but, rather, are being

used as a platform for multi-faceted litigation.  A creditor who sees estate resources being

consumed by litigation while plan preparation receives less than 2% of professional effort is not

acting in bad faith by seeking conversion; instead, it is doing exactly what Bankruptcy Code §

1112(b) contemplates and authorizes.

### **B.      The Debtors' Representations To The Court Are Inconsistent With Their Conduct**

The Debtors avoid the essential point of Drexel's bad-faith argument: the contrast between

the Debtors' representations of active settlement negotiations and their actual conduct.  The

Debtors' CEO, Ted Karkus, certified in the second exclusivity motion that the Debtors made

"considerable progress" toward working with creditors and were negotiating consent orders to fix

allowed claims.  At the April 14, 2026 status conference, the Debtors' counsel further represented that the Debtors and Drexel were working toward a settlement.

In reality, however, the Debtors never provided the promised term sheet, never responded to Drexel's term sheet provided on April 14, 2026, and then pulled an "about-face" by filing an Adversary Complaint, a Claim Objection, and four improper Rule 2004 subpoenas. The Debtors' Opposition notably fails to address that conduct.

Instead, the Debtors argue that "a good deal of the litigation in this case has been fomented by Drexel itself."  But that is simply inaccurate - Drexel filed a proof of claim, a typical creditor action, and the Debtors responded with an eight-count Adversary Complaint, a Claim Objection, four Rule 2004 subpoenas, and the retention of Special Litigation Counsel - all while devoting only 2.7 hours (less than 2% of billed time) to plan preparation in an entire quarter.  It was the Debtors, not Drexel, who overwhelmingly allocated resources to litigation rather than to the formulation of a (confirmable) plan.

Bankruptcy Code § 1112(b)(4)(J) requires actual progress toward a filed plan and disclosure statement. Here, there has been none.

## C.     **Drexel Is Exercising Its Statutory Rights**

The Debtors threats regarding Drexel's conversion motion are not well taken.  Bankruptcy Code § 1112(b)(1) specifically authorizes parties-in-interest to seek conversion, and the Debtors' threatened tort liability claims in their Opposition are as frivolous as their claims in the Adversary Proceeding.[3]

---

[3] The Debtors devote substantial time discussing those meritless claims and the meritless Rule 2004 subpoenas issued after the Adversary Proceeding was commenced and the Claim Objection filed.  Drexel will not reiterate the reasons why the claims lack merit, and respectfully refers the Court to Drexel's opposition to the Claim Objection filed at ECF Doc. No. 161, which is incorporated herein by reference in its entirety.  Further, the Rule 2004 subpoenas are a nullity; they were not properly served on the witnesses and are improper in any event because the Debtors have elected to pursue litigation through the Adversary Proceeding and the Claim Objection (a contested matter), and discovery is

Drexel is a creditor of record.  Filing a motion that the statute expressly authorizes based on the Debtors' objective conduct is not bad faith or tortious interference - it is the exercise of a statutory right. [4] The Debtors' attempt to recast Drexel's good faith motion as actionable misconduct reveals their hostile litigation tactics in these cases, undertaken to either extract a favorable settlement or to chill Drexel's legitimate exercise of its statutory rights in order to deter future creditor oversight.

### **III.**
### **The U.S. Trustee's Withdrawal Of Its Motion Is Meaningless**

The Debtors repeatedly claim that the UST's withdrawal of its conversion motion has some real meaning; it does not. The UST's motion was based on the Debtors' failure to file monthly operating reports ("MOR's"). *See* ECF Doc. No. 59.  Once the Debtors finally complied with their filing obligations, the UST withdrew the motion.  But that withdrawal was not a finding of fact and certainly not a legal conclusion that conversion was and is not warranted.

The Debtors ignore the fact that, since February 2026, the record has changed dramatically. Indeed, at the time the UST withdrew its motion, the Debtors had not yet filed the Adversary Complaint, the Claim Objection, the four Rule 2004 subpoenas, and had not yet obtained a second extension of exclusivity while devoting less than 2% of professional time to plan preparation.

---

now only available under the Fed. Rules of Bankr. Pro. in those proceedings. *See*, *e.g.*, *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614 (Bankr. D. Del. 2016).

[4] The cases the Debtors rely upon for the proposition that a creditor who files a motion may face tort liability, *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015) and *Rosenberg v. DVI Receivables XIV, LLC*, 818 F.3d 1283 (11th Cir. 2016), each involve creditors who improperly filed involuntary petitions.  In those cases, the courts found that the filings rose to the level of malicious prosecution.  Drexel has not found a single case where a creditor exercising its statutory right under 11 U.S.C. § 1112(b) resulted in a claim for tort liability, likely because the notion is ludicrous.

Moreover, after the UST withdrew its motion, the Debtors again ignored their filing obligations and have not filed any MOR's since that time.[5]

Each of those developments reinforces the conclusion that these cases have devolved into a litigation vehicle rather than progressing toward a plan, and that the Debtors continue to ignore their obligations in bankruptcy.

Moreover, the Debtors contention that Drexel stands alone in requesting conversion is simply untrue.  Before the Debtors docketed their Opposition, another creditor, ATC Testing and Screening Services, with a $643,052.36 judgment against the debtor ProPhase Diagnostics, Inc., filed a joinder to Drexel's motion.  *See* ECF Doc. No. 163.   The Debtors have not corrected their Opposition in that regard.

## **IV.**
### **Conversion Is In The Best Interest Of Creditors**

The Debtors' contention that conversion would disrupt the Crown collection activity or somehow impair the purported settlements is unavailing.

A chapter 7 trustee can elect to retain Crown (or any other collection professional) to continue collecting the receivables.  Nothing about a chapter 7 conversion requires the termination of a collection program. What conversion would accomplish, however, is the removal of current management, which has demonstrated that its primary interest is in prosecuting frivolous litigation while expending estate resources on professional fees along that route, rather than on plan formulation.

The Debtors' argument that a chapter 7 trustee's statutory commission would exceed the Debtors' counsel fees is speculative, and assumes a level of recovery that the Debtors have not

---

[5] This alone warrants conversion under 11 U.S.C § 1112(b)(4)(F) and/or (H).

even remotely substantiated.  Moreover, a trustee's commission is paid from actual distributions -

it is a success-based fee, not an overhead drain. By contrast, the Debtors' counsel fees are paid

regardless of outcome, and they are accruing at a rate that threatens to consume all funds before

creditors can see any type of distribution.

The Debtors' Opposition admits that a chapter 7 trustee would inherit the "chargeback"

claim against Drexel (and the seven additional claims).  According to the Debtors, a chapter 7

trustee would have "every incentive" to pursue those claims and, if true, the argument that

conversion would harm the estate totally fails.  That is, *if* the claims against Drexel have merit

(they clearly do not for the reasons set forth in Drexel's opposition to the Claim Objection),[6] then

a neutral trustee will pursue them.  But if they lack merit (which they clearly do), then the Debtors'

estates are better served by not wasting precious resources on them.  Either way, the estates are

better served by a neutral fiduciary than by current management, which has demonstrated that its

only objective is the prosecution of multi-front litigation and not plan formulation.

---

[6] Without getting into the merits of the Debtors' claims, or more aptly, the lack thereof, the Debtors blindly reference the application of New Jersey common law for "personal officer liability" without any choice-of-law analysis. However, "when a cause of action sounds in tort, the general choice-of-law rule is to ascertain the state with 'the most significant relationship to the occurrence and the parties under the principles stated in [section] 6' [of the] *Restatement (Second)*,*[Conflict of Laws]*. That determination is to be made for each 'issue in tort,' meaning each element needed to establish the tort or a defense to it. In making that determination, certain contacts are 'to be taken into account,' including: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Fairfax Fin. Holdings Ltd. v. S.A.C. Cap. Mgmt., L.L.C.*, 450 N.J. Super. 1, 50–51, 160 A.3d 44, 74 (App. Div. 2017) (cleaned up).  With those factors in mind, given the contract was performed in New York, between New York entities, it is difficult to imagine why New Jersey law would apply.

**V.**

**The § 1112(b)(2) "Unusual Circumstances" Exception Does Not Apply**

The Debtors assert that unusual circumstances exist under § 1112(b)(2) to prevent conversion, even if cause is found. But there are no unusual circumstances here.

Non-operating Debtors with no plan, no employees, escalating professional fees, and a litigation-driven management team does not constitute an "unusual circumstance." And there is no reasonable likelihood of plan confirmation within a reasonable time: after nine months, the Debtors have devoted less than 2% of professional effort to plan preparation. And the grounds for cause - continuing losses, no plan, litigation-driven administration, and no MOR's for months - are not "curable" in any real sense because they are inherent in the Debtors' approach to these cases rather than the product of isolated acts or omissions.

**CONCLUSION**

For the foregoing reasons, and for the reasons set forth in Drexel's initial papers on its motion to convert, Drexel respectfully requests that the Court enter an order converting these jointly administered chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, and granting Drexel such other and further relief as the Court deems just and proper.

Respectfully submitted,

**STARK & STARK, P.C.**
A Professional Corporation

By: */s/ Joseph H. Lemkin*
        Joseph H. Lemkin, Esq.
        100 American Metro Boulevard
        Hamilton, N.J. 08619-2319
        (609) 791-7022
        jlemkin@stark-stark.com
        *Attorneys for Drexel Distribution, Inc. d/b/a*
        *Drexel Distribution, Inc. d/b/a EZ Test NY*

11