**WALLACE NEEL PLLC**
Wallace B. Neel, Esq. (Admitted Pro Hac Vice)
1 Blue Hill Plaza, LL Suite 1509
Pearl River, New York 10965
Tel: (646) 524-6502
Email: wallace@wallaceneel.com
*Special Litigation Counsel to the Debtors*

**MACIAG LAW, LLC**
Thaddeus R. Maciag, Esq.
475 Wall Street
Princeton, New Jersey 08540
Tel: (908) 704-8800
Email: MaciagLaw1@aol.com
*Counsel for the Debtors*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEW JERSEY**

---

In re:  **PROPHASE DIAGNOSTICS NJ, INC., et al.,**

|  |  |
|---|---|
| Debtors. | Chapter 11 |
| (Jointly Administered) | Case No. 25-19833 (CMG) |
|  | Hearing: June 23, 202, 10:00 am |
|  | Hon. Christine M. Gravelle, U.S.B.J. |

---

**DEBTORS' REBUTTAL IN FURTHER SUPPORT OF
OBJECTION TO PROOF OF CLAIM FILED BY
<u>DREXEL DISTRIBUTION INC. d/b/a EZ TEST NY</u>**

**<u>PRELIMINARY STATEMENT</u>**

The Debtors, ProPhase Diagnostics NJ, Inc. and the jointly administered debtors (collectively, the "Debtors"), respectfully submit this omnibus reply (this "Reply") (I) in further support of their Objection to the Proof of Claim of Drexel Distribution, Inc. d/b/a EZ Test NY ("Drexel") (ECF No. 134) (the "Claim Objection") and in response to Drexel's Opposition

thereto (ECF No. 161) (the "Opposition" or "Opp. Br."), and (ii) in further support of the Debtors' motion to extend the exclusive periods within which the Debtors may file and solicit acceptances of a chapter 11 plan (the "Exclusivity Motion"), and in response to Drexel's Supplemental Objection thereto (ECF No. 140) and the eleventh-hour joinder filed by ATC. For the reasons set forth below, the Opposition should be overruled and the Exclusivity Motion should be granted.

Drexel's Opposition rests on two factual narratives, and the Debtors' own evidentiary record — including sworn deposition testimony given by Drexel's principal, Bedis Zormati — refutes both. *First*, Drexel opens its brief by leaning on the rhetorical weight of a state-court "judgment" to claim presumptive validity for its full $1,754,088.00 proof of claim, only to concede, a few pages later, that the judgment actually entered resolved two invoices totaling $125,235.00 and left everything else — including the very chargeback dispute at the heart of this contested matter — open for trial. *Second*, Drexel now advances a theory, for what appears to be the first time, that ProPhase agreed in writing to "assume the risk of non-payment on all testing" once the HRSA program ended. Opp. Br. at 9 (citing Zormati Decl., Exh. 5). That characterization is contradicted by the plain text of the very exhibit Drexel cites, and by Mr. Zormati's own sworn deposition testimony in the underlying State Court action.

### REBUTTAL POINT I

### THE STATE COURT DECISION WAS NOT, AND COULD NOT HAVE BEEN, A JUDGMENT ON DREXEL'S FULL CLAIM

Drexel's procedural history is not framed accurately. The N.Y. State Court Decision granted partial summary judgment on exactly two invoices — EZ-0026 ($52,659.00) and EZ-0026A ($72,576.00) — for a combined total of $125,235.00, plus statutory interest from May 29,

2022. Opp. Br. at 2-3; Zormati Decl. ¶ 5 n.2. By Drexel's own account, that order is "expressly marked 'NON-FINAL DISPOSITION' on its face," and the State Court reserved for trial "the invoices referenced in Drexel's first cause of action for which summary judgment was not granted, Drexel's two remaining causes of action (i.e., unjust enrichment and quantum meruit), and ProPhase's defenses and counterclaims." Opp. Br. at 3, 9 (quoting ECF Doc. No. 134-1 at p. 8 of 8). Drexel's own Section III argues at length that "non-final orders … do not have preclusive effect" and that issue preclusion cannot apply because "Justice Bannon did not decide the validity or amount of Drexel's delivery service claims, the other invoices, damage calculations, or Drexel's equitable claims." Opp. Br. at 9-10.

The Debtors agree with that account — it is, in substance, the position the Claim Objection takes. Which is precisely why it is misleading for the Opposition to open, on page 1, by stating that the N.Y. State Court Decision "was subsequently reduced to a judgment," immediately followed by the assertion that "[t]he Debtors bear the burden of producing specific, admissible evidence sufficient to overcome the presumptive validity of a filed proof of claim." Opp. Br. at 1-2. Only $125,235.00 was ever reduced to a judgment. No appeal of that narrow, partial ruling was ever taken, or could have been taken, because the Debtors' bankruptcy filing intervened before the appeal window on that order closed. Opp. Br. at 4 (noting the bankruptcy was filed eleven days after the N.Y. State Court Decision).

The remaining $1,628,853.00 that Drexel's Proof of Claim seeks was never adjudicated by any court on any record and is not entitled to the deference that attaches to a final judgment. See *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992) (objector need only produce evidence "equal in probative force" to the unadjudicated portion of a claim to shift the burden of proof back to the claimant). To the extent Drexel's page-1 framing is meant to color this Court's

view of the balance of its claim, the Debtors respectfully submit that Drexel should be held to the more candid account its own brief gives eight pages later.

## REBUTTAL POINT II.

### DREXEL'S NEW "ASSUMPTION OF ALL RISK" THEORY IS CONTRADICTED BY THE TEXT OF ITS OWN EXHIBIT AND THE SWORN TESTIMONY OF ITS OWN WITNESS

**A.      The Text of the Email Zormati Touts Shifts the Risk of Non-Reimbursement *to Drexel* — Not to ProPhase**

The Opposition asserts that "once the HRSA program ended, ProPhase specifically, and in writing, advised its collection partners (including Drexel) that it would assume the risk of non-payment on all testing." Opp. Br. at 9 (citing Zormati Decl., Exh. 5). That is *the opposite* of what Exhibit 5 says: The March 19, 2022 email from Ted Karkus that Drexel relies on gave testing companies a choice: they (including Drexel) agreed that ProPhase would pay Drexel nothing — no upfront fee and no later balance — for any uninsured specimen unless and until ProPhase itself was reimbursed by HRSA or insurance:

> [W]e will accept and process uninsured patient's specimens going forward … and assume the cost of lab processing and the risk of not getting reimbursed by HRSA, IF AND ONLY IF, you also agree that *we do not pay you anything (no upfront fees) for the collection of these uninsured patient's specimens unless or until we receive reimbursement.*

Zormati Decl., Exh. 5 (Karkus email, Mar. 19, 2022, 1:07 p.m.) (ALLCAPS in original; italics added). The follow-up email the next day asked each collection partner to confirm, in writing, that it would "waive the right to any payment or fee for any patient that is uninsured for which ProPhase Labs does not receive reimbursement from HRSA or another insurance provider." Id. (Karkus email, Mar. 20, 2022, 8:10 p.m.).

That arrangement shifts the risk of non-reimbursement to the collection partner — here, Drexel — not to ProPhase. Whatever cost ProPhase bore under that proposal was simply the lab-processing cost it was always going to incur.  The entire point of the email was to avoid also paying Drexel for specimens ProPhase never got reimbursed for.

For Drexel to now describe that arrangement as ProPhase "assum[ing] the risk of non-payment on all testing" inverts what the document actually says.

**B.      Mr. Zormati's Own Sworn Deposition Testimony
         Forecloses Drexel's Characterization**

Mr. Zormati's own testimony forecloses Drexel's characterization more directly still. At his June 11, 2024 deposition in the NY Action, Drexel's own counsel walked Mr. Zormati through this identical email chain (there marked Prophase Exhibit 14, Bates EZ Test NY 3919–3921) and had him confirm that it was the email in which he told Mr. Karkus that EZ Test "will be collecting and submitting PCR samples from uninsured individuals for at least two weeks at which point it will be reevaluating its course." Zormati Dep. Tr. 178:2-18.[1] Asked what happened after that email, Mr. Zormati testified:

> I'm not sure. I mean, it -- it continued because there were, like, a lot of people had insurance so I mean, we had to filter and reject a lot of non-insured people, it's important I think. *I received a call from Jason Karkus saying that to stop taking in non-insured under any circumstance. Non-insured, you know, they didn't have an insurance card and a valid insurance card. Then would not take them.*

Zormati Dep. Tr. 178:22–179:8 (Neel Decl. Exh. A)(emphasis added).  Mr. Zormati testified that, in the period after that email, an uninsured patient who needed lab PCR testing — as opposed to an on-site rapid result — was instructed to pay ProPhase directly through what he

---

[1] The Zormati Transcript is annexed to the Declaration of Wallace Neel as Exhibit A.

described as "the pay now portal," rather than through Drexel: "If they need a lab PCR and they didn't have insurance ... we would instruct them to pay through the portal, the pay now portal ... It's the Prophase payment method." Zormati Dep. Tr. 181:14-182:19.  He confirmed that, apart from the small minority of patients — under three percent of volume — who paid EZ Test directly by credit card, EZ Test stopped collecting from uninsured patients altogether. *Id.* at 179:9-20.  A specimen handled in that manner generates no Drexel invoice line implicating the Exhibit 5 risk allocation at all, because Drexel was never in the payment chain for it. Mr. Zormati further estimated that the substantial majority of the patients EZ Test tested — on the order of 80%, by his account — had insurance. *Id.* at 183:1-22.

More fundamentally, Mr. Zormati's testimony about the written Agreement itself — independent of the Exhibit 5 email — confirms that the Agreement contains no insured/uninsured carve-out of any kind. Asked whether it made any economic difference to EZ Test whether a tested patient was insured or uninsured, he testified: "As per the contract, no." Asked whether the same was true for PCR testing "except for the potential clawback," he answered: "That's correct." *Id.* 152:15-25; see also id. at 148:8-25 (same testimony regarding the Agreement's terms). The only mechanism the parties' written Agreement provides for non-reimbursed testing — insured or uninsured alike — is the ordinary 180-day clawback on the $10 balance. The Agreement contains no version of the zero-upfront-payment term Exhibit 5 proposed, and Mr. Zormati does not testify that Exhibit 5 was ever incorporated into it.[2]

---

[2] Zormati's credibility on this exact category of invoice has already been called out by Judge Bannon in the NY Action — and failed. In Drexel's Second Amended Verified Complaint, which Zormati personally verified under oath, Drexel alleged that "ProPhase paid Drexel's invoices in full through Drexel invoice numbers EZ-0025, EZ-0025A and EZ-0025B." (Neel Decl., Ex. B, ¶ 14 & Verification [NYSCEF Doc. No. 155].) Invoices EZ-0014 and EZ-0019A necessarily fall within that sworn representation, as both predate and numerically precede the EZ-0025 series.

Less than a year later, moving for partial summary judgment on those same invoices, Zormati swore the

Taken together, this testimony forecloses Drexel's reliance on Exhibit 5 to govern the disputed post-HRSA invoices on two independent grounds. First, by its own terms, the email proposed only a two-week accommodation after which the parties were to "reevaluat[e]"; nothing in the record shows that accommodation was ever extended or formalized, and Mr. Zormati's testimony that ProPhase soon directed Drexel to stop taking uninsured patients altogether, together with his testimony that any remaining uninsured testing was redirected to ProPhase's own payment portal, is consistent with the accommodation having lapsed rather than continued. Second, and independently, the written Agreement that actually governs the parties' relationship contains no uninsured-specific risk allocation at all. Whatever happened to the comparatively small population of uninsured patients EZ Test may have continued to test after the two-week trial is a question for discovery and trial; what the record forecloses is Drexel's assertion that Exhibit 5 settles the question by establishing that "ProPhase ... would assume the risk of non-payment on all testing." Opp. Br. at 9.

This is precisely the kind of "actual evidence" — as opposed to "bare allegations" — that an objecting party must produce to shift the burden back to the claimant. *See In re Allegheny Int'l,* 954 F.2d at 173-74*; In re Giordano*, 446 B.R. 744 (Bankr. E.D. Va. 2010). The Debtors have produced it twice over: from the face of Exhibit 5 itself, and from Drexel's own witness's

---

opposite — that EZ-0014 "was not paid at all" and that $167,760.00 remained outstanding on EZ-0019A. (Neel Decl., Ex. C, ¶¶ 2, 28–29 & n.8 [NYSCEF Doc. No. 178].)

Justice Bannon caught the contradiction and denied summary judgment on both invoices for that reason, holding that "in paragraph 14 of the second amended complaint, Drexel pleads that Prophase paid the invoices in full up until EZ-0025, EZ-0025A, EZ-0025B, meaning that prior invoices, including EZ-0014 and EZ-0019A, were paid." (Neel Decl., Ex. D, at 4 [NYSCEF Doc. No. 229].) A witness who swears one version of the facts in a verified pleading and the opposite version in an affidavit seeking judgment on the strength of that pleading — and is caught doing so by the very judge asked to credit the second version — is entitled to no credibility on the remainder of his testimony in this litigation.

sworn account of both what became of that accommodation and what the underlying written Agreement actually provides.

## REBUTTAL POINT III.

### THE CHARGEBACK CLAIM WAS EXPRESSLY RESERVED FOR TRIAL — ON THIS POINT, THE PARTIES AGREE

On one point, the Debtors and Drexel are in complete agreement: Justice Bannon expressly declined to resolve ProPhase's chargeback counterclaim, holding that "should Prophase establish at trial that it is entitled to any amount as chargebacks, it would be entitled to a money judgment in that amount." *See* Opp. Br. at 4, 10 (quoting ECF Doc. No. 134-1).

The Debtors' litigation conduct since the petition date reflects exactly that posture. The parties were close to a negotiated resolution payable out of receivable collections as recently as February 2026. Drexel then went silent for months and returned with a materially different demand: the same headline dollar figure, restructured as $40,000 per month for six months , then followed by a balloon payment—and all of it to be payable in full regardless of whether the receivables ProPhase was counting on to fund that schedule ever materialized.

Faced with that change in position, the Debtors filed the Claim Objection and the related Adversary Complaint (Adv. Pro. No. 26-01208-CMG) to bring the $2,571,842.00 chargeback claim — the very claim Justice Bannon left open for trial — before this Court for adjudication on a full record. Drexel's suggestion that the Debtors have needlessly multiplied this litigation rings hollow given that it was Drexel's own change in position that made litigation, rather than the negotiated resolution the parties had nearly reached, necessary.

8

**REPLY POINT IV**

**DREXEL'S PURPORTED "2%" METRIC MEASURES RECORDED
ATTORNEY TIME, NOT PLAN PROGRESS**

Drexel repeatedly characterizes the fact that only approximately 2% of recorded professional time in this case relates to the forthcoming Plan as proof that the Debtors have made no progress toward confirmation. The premise does not hold up. That figure is drawn solely from lead bankruptcy counsel's billable-hour entries; it does not capture the substantial time the Debtors' officers, staff, consultants, and other retained professionals have devoted to Plan-related work. A percentage of recorded attorney time measures recorded attorney time — nothing more — and is not evidence of whether a Plan exists, how complete it is, or how close the case is to confirmation.

More to the point, a Plan has in fact been in the works and is on schedule to be filed prior to the deadline date of June 29.  The fact that lead counsel's time was not overwhelmingly skewed toward Plan development until later in the matter is exactly the sequencing any competent practitioner follows. The substantive predicates that a confirmable Plan requires — ascertaining and handicapping the sources of potential revenues (here, the Crown collections), predicting the timing of negotiated settlements, triaging the claims and counterclaim, arranging DIP financing, and negotiating settlements among the various creditors — had to be developed before a workable Plan reflecting all of that could be finalized. The Plan is the final step in memorializing that structure; it cannot precede it. No practitioner devotes meaningful drafting time to Plan language before those inputs are known, at least in rough terms.

At page 5 (of 156) of its May 15, 2026 Motion, Drexel makes the following argument: *"Critically, the fee application breakdown reveals where the Debtors through counsel*

9

*spend their time: of the 133.8 hours billed in the second application period, 28.2 hours ($13,395.00) were devoted to litigation, while only 2.7 hours ($1,282.50) — less than 2% of the application — were devoted to [P]lan preparation. This allocation of time reveals that the cases are being run as a litigation vehicle, not a reorganization.*"

This is much ado about nothing, as Drexel is trying too hard, in seeking to manufacture an issue where none actually exists.  First, a quick perusal of the second application reveals that approximately 16.1 of those 28.2 litigation hours were directly due to Litigation matters *with Drexel itself.*

As to the 2.7 hours involved in Plan preparation, that is actually a reasonably significant amount of time to have devoted to discussing and reviewing the potential design of a Plan of Reorganization that was not even due yet for many weeks. Just as in preparing motion papers, the preparation of Plan documents is a concrete task of compiling exhibits and preparing paperwork, much like preparing a complex Motion, as to which effort, it is respectfully submitted, the typical Debtors' Attorney begins the concrete task of typing and drafting papers, and of compiling exhibits, perhaps at most two or three weeks before it is due, not several months in advance.  Quaere: did Drexel's counsel start drafting its May 15 Motion papers back in February or March, weeks before the Motion was even filed?  In fact, had the application shown much more than the 2.7 hours devoted to preparation of a Plan that was not even due until weeks or months later, one might have anticipated an argument from Drexel that the applicant was prematurely spending too much time on the Plan at an early stage in the case well before it was even due to be filed.

Indeed, had Debtors' lead counsel's billed time skewed toward the finer points of the Plan before the required clarity about the various inputs existed, Drexel would have trained its

criticism on Debtors for jumping the gun and unnecessarily billing on matters that were not yet ripe. Now that the relevant settlement and collection variables have sufficient visibility and money is beginning to flow into the estates, the Debtors are positioned to file a Plan built on realistic recovery assumptions and a realistic timeline.

**REBUTTAL POINT V**

**$147,000 IN PROFESSIONAL FEES OVER SEVEN MONTHS, IN A JOINTLY ADMINISTERED, THREE-DEBTOR CASE, IS GARDEN-VARIETY PRACTICE**

Drexel's counsel professes shock at the Debtors having incurred approximately $147,000 in professional fees during the first seven months of this case. That reaction does not withstand scrutiny.

1.  A substantial portion of those fees — and of the litigation activity Drexel separately criticizes as excessive — was generated by Drexel itself, which has litigated this case very aggressively and has filed several hundred pages of papers to date. It ill becomes Drexel to foment a great deal of aggressive litigation and then complain that the case has involved too much litigation.

2.  This is not a single-debtor case. It involves three jointly administered chapter 11 cases, together with several adversary proceedings.

3.  Drexel's own counsel is well acquainted with the professional fees typical of chapter 11 practice in this District, having appeared as creditor-side counsel in numerous recent cases here. A review of debtor's-professional fees in recent District of New Jersey chapter 11 matters in which Drexel's lead counsel, Mr. Lemkin, has appeared shows, for example, professional fees of: $234,398.77 in the first five months of Case No. 25-

11

10813-VFP; $5,166,701.30 in the first eight months of Case No. 25-14831-MBK; $961,372.82 in the first four months of Case No. 25-15047-JNP; and $2,458,484.30 in the first four months of Case No. 26-10258-MEH. Chapter 11 cases vary in size and complexity, of course, but the instant jointly administered cases involve more than $141.8 million in assets, and the associated dockets presently comprise an aggregate of 268 entries. Measured against comparable matters — including matters in which Drexel's own counsel has appeared — $147,000 in professional fees over seven months in a case of this size is not the outlier that Drexel suggests, and should not shock the conscience of either Drexel's counsel or this Court.

## REBUTTAL POINT VI

### THE STATUS OF CROWN'S COLLECTIONS
### DOES NOT SUPPORT ANY INFERENCE OF MISMANAGEMENT

To the extent Drexel questions whether funds collected through Crown's efforts have actually reached the estate, the answer is straightforward. The Debtors will present to this Court within a matter of days proof that an initial collection of settled Insurance Receivables in the amount of approximately $289,000.00 has already been settled and received by Crown, and is now being transferred to the Debtors' DIP Receivables Trust Account in the ordinary course.

## REBUTTAL POINT VII

### THE DEBTORS' MONTHLY OPERATING REPORTS
### ARE FULLY CURRENT AND UP TO DATE

The Debtors' Monthly Operating Reports ("MORs") are fully current, filed and up to date. Notably, while Drexel feigns outrage that the May 2026 MOR is not filed, the fact is that the May report *is not even due* until June 25, 2026. More faux outrage can be seen in the fact that

when Drexel filed the motion underlying this argument on May 15, 2026, the Debtors were at that time only *one month behind*. An occasional MOR reporting lag of one or even two months is not at all unusual in cases of comparable size and complexity, particularly when then swiftly brought current.  This argument, too, is a tempest in a teapot.

## REBUTTAL POINT VIII

### CONTINUED OPERATIONS DURING AN ORDERLY LIQUIDATION ARE EXPRESSLY CONTEMPLATED BY THE BANKRUPTCY CODE

Drexel's suggestion that the Debtors should not be permitted to remain in operation misunderstands what is occurring in this case. The Bankruptcy Code expressly contemplates plans of liquidation, and a planned liquidation looks materially different from a chapter 7 conversion in which the Debtors would close the doors, change the locks, turn off the lights, and mail the keys to the bank the next morning. A planned liquidation requires staff to keep the business functioning long enough to collect outstanding accounts receivable. The Debtors' monthly operating reports have consistently shown approximately $60,000 in employee salaries attributable to the diagnostics entities for that collection effort; those employees, while paid through a single payroll at the parent level, are devoting the bulk of their time to the diagnostics entities and to working with Crown on collection. This would be a classic planned-liquidation scenario (even if, arguendo, the plan were deemed to be a liquidating plan), and it requires keeping the entities open and operating to collect for the full benefit of creditors.

Further, the Debtors again note that this is not merely a plan of liquidation scenario. As was  noted in the Debtors' June 16, 2026 filing, the Debtors intend to use the value generated by the receivables portfolio to restructure the estates and return the Debtors to operation as going concerns, including by repurposing their laboratory operating platform; the Debtors intend to file

13

such a Plan within the Court's exclusivity period. See the June 16, 2026 Karkus Certification at ¶¶ 34 to 37.

Thus the anticipation remains that incoming funding will reach a level sufficient to support reopening. The laboratory equipment and leases, the CLIA government licenses, and goodwill owned are valuable assets, and it makes far more sense to keep them operating under current management — which is familiar with the books, records, and collection efforts already underway — than to have a chapter 7 trustee install new personnel with no familiarity with any of it.

On the broader question of professional fees, Chapter 11 remains the superior vehicle for the same reason. A Chapter 7 trustee's statutory compensation is a percentage of recovery and would come off the top of estate recoveries before creditors would even see a dollar. The amounts lost to the creditors in favor of the trustee would dwarf the hourly professional fees incurred to date.  A few hundred thousand dollars in hourly professional fees is a fraction of what trustee compensation would consume in a chapter 7 case of this size.

**REBUTTAL POINT IX**

**ATC'S ELEVENTH-HOUR JOINDER DOES NOT SUPPORT
AN INFERENCE OF BAD FAITH BY THE DEBTORS**

Finally, any suggestion that the Debtors acted improperly by filing their papers without addressing ATC's joinder is not well taken. ATC's joinder was filed only an hour before Drexel's own rebuttal filing — through the *same counsel*, Westerman Ball Ederer Miller Zucker & Sharfstein, LLP, that represents Drexel itself as special counsel. The Debtors had neither read

nor seen that joinder at the time their own papers were prepared and filed. The Debtors cannot be

faulted for failing to respond to a filing that, from the Debtors' vantage point, did not yet exist.

**CONCLUSION**

For the foregoing reasons, the Debtors respectfully request that the Court:

1. overrule Drexel's Opposition and sustain the Claim Objection, or, in the alternative, direct that the disputed amounts be determined at an evidentiary hearing in this contested matter or in the related adversary proceeding (Adv. Pro. No. 26-01208-CMG);

2. overrule Drexel's Supplemental Objection (ECF No. 140) and ATC's joinder thereto, and grant the Debtors' motion to extend the exclusive periods; and

3. grant such other and further relief as the Court deems just and proper.

Dated:  June 19, 2026
Pearl River, New York

Respectfully submitted,

**WALLACE NEEL PLLC**

by*:  /s/ Wallace B. Neel*
Wallace B. Neel, Esq.
(Admitted Pro Hac Vice)
1 Blue Hill Plaza, LL Suite 1509
Pearl River, New York 10965
(646) 524-6502
*Special Litigation Counsel to the Debtors*

-and-

**MACIAG LAW, LLC**

by:  */s/ Thaddeus R. Maciag*
Thaddeus R. Maciag, Esq.
475 Wall Street
Princeton, New Jersey 08540
(908) 704-8800

*Local Counsel for the Debtors*