| |
|---|
| **UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY** |

**STARK & STARK, PC**
Joseph H. Lemkin, Esq.
100 American Metro Blvd.
Hamilton, NJ 08619
Telephone (609) 791-7022

-and-

**WESTERMAN BALL EDERER MILLER ZUCKER & SHARFSTEIN, LLP**
Jay S. Hellman, Esq., Admitted *Pro Hac Vice*
1201 RXR Plaza
Uniondale, New York 11556
Telephone (516) 622-9200

*Attorneys for Drexel Distribution, Inc.*

In re:

PROPHASE DIAGNOSTICS NJ, INC., et al.,

    Debtors.

**Hearing Date: July 14, 2026**
**Time:**        **10:00 a.m.**

Chapter 11

Case Nos. 25-19833 (CMG)

Jointly Administered

Hon. Chief Judge
Christine M. Gravelle

## DREXEL DISTRIBUTION, INC.'S D/B/A EZ TEST NY'S SUPPLEMENTAL SUBMISSION IN FURTHER SUPPORT OF MOTION TO CONVERT THE DEBTORS' CHAPTER 11 CASES TO CHAPTER 7 OR, IN THE ALTERNATIVE, TO APPOINT A CHAPTER 11 TRUSTEE

Drexel[1] respectfully submits this Supplemental Submission in Further Support of its

Motion to Convert the Debtor's Chapter 11 Cases to Chapter 7 (the "Motion"). The Court directed

this submission at the June 23, 2026 hearing on Drexel's Motion in order to further supplement

the written record. Alternatively, as Drexel suggested at the hearing in response to concerns the

---

[1] Capitalized terms not defined herein have the same meaning ascribed to them in Drexel's initial motion papers.

1

Debtors raised regarding the feasibility of future collection of unreimbursed insurance receivables if the cases are converted, if the Court is not inclined to convert the cases outright, then, at a minimum, a chapter 11 operating trustee should be appointed.

## I.

## Conversion And The Appointment Of A Chapter 7 Trustee Is Warranted

**A.    Bankruptcy Code § 1112(b)(4)(A)**

As stated at the hearing, the Debtors have no realistic prospect of rehabilitation under Bankruptcy Code § 1112(b)(4)(A). Their asserted intention to "<u>... use the value generated by the liquidated Receivables portfolio to restructure the estates and return the Debtors to operation as going concerns, including by repurposing their laboratory operating platform ...</u>" (ECF Doc. No. 164, at p. 13 of 24, emphasis in original) is flatly contradicted by the public filings of ProPhase Labs, Inc. ("Labs"), the Debtors' admitted "non-debtor parent" and the "owner of one hundred percent of the equity of each of the three Debtor entities." (Decl. of Ted Karkus, ECF Doc. No. 164-1, at ¶¶ 1, 18). Specifically, in the Form 10-Q that Labs filed with the United States Securities and Exchange Commission (the "SEC") for the period ending <u>September 30, 2025</u> (which post-dates the Filing Date in these cases), which Ted Karkus certified as Chairman of the Board and Chief Executive Officer for filing on <u>November 19, 2025</u>, Labs reported:

***Operating Leases***

*New Jersey Laboratory Lease*

On October 23, 2020, we completed the acquisition of CPM, which included a 4,000 square foot CLIA accredited laboratory located in Old Bridge, New Jersey, which was owned by CPM (which is now known as ProPhase Diagnostics NJ, Inc.). The lease was renewed in February 2023, for an additional 36 months ***until February 2026***. The monthly base is $5,500 per month. The lease renewal resulted in the recognition of an additional right-of-use asset and operating lease liability of $170,000, respectively in Fiscal 2023.

As a result of the deconsolidation of PDX (see Note 14), the operating lease liability and right-of-use asset associated with the New Jersey operating lease was derecognized on the Company's consolidated balance sheet as of September 30, 2025.

*New York Second Floor Lease*

On December 8, 2020, the Company entered into a Lease Agreement (the "NY Second Floor Lease") with BRG Office L.L.C. and Unit 2 Associates L.L.C. (the "Landlord"), pursuant to which the Company leases certain premises located on the second floor (the "Second Floor Leased Premises") of 711 Stewart Avenue, Garden City, New York (the "Building"). The Second Floor Leased Premises serve as the Company's second location and corporate headquarters, offering a wide range of laboratory testing services for diagnosis, screening and evaluation of diseases, including COVID-19 and Respiratory Pathogen Panel Molecular tests.

On June 10, 2022, the Company entered into a First Amendment to the NY Second Floor Lease (the "Second Floor Lease Amendment"). The Second Floor Lease Amendment amends the NY Second Floor Lease to provide that any uncured default by the Company or any of its affiliate under the NY First Floor Lease (defined below) will constitute a default by the Company under the NY Second Floor Lease.

On March 1, 2025, the Company entered into a Surrender Agreement with the Landlord, pursuant to which *the Company agreed to surrender the Second Floor Leased Premises on or before May 30, 2025* (the "Surrender Date"). Under the agreement, the Company will remain responsible for rent and other charges through the Surrender Date and will pay the Landlord a settlement amount of approximately $740,000 in seven equal monthly installments from June 1, 2025 through December 1, 2025. Upon timely performance of the Company's obligations under the Surrender Agreement, the NY Second Floor Lease will be deemed terminated as of the Surrender Date, and the Company will have no further obligations thereunder, other than as set forth in the Surrender Agreement. As of the date of this report, the Company has made all required payments under the Surrender Agreement. As of the date of this report, the Company has made all required payments under the Surrender Agreement (sic).

*New York First Floor Lease*

On June 10, 2022, the Company entered into a second Lease Agreement (the "NY First Floor Lease") with Landlord, pursuant to which the Company leases approximately 4,516 sq. feet located on the first floor (the "NY First Floor Leased Premises") of the Building. As described above, the Company currently leases space on the second floor of the Building. The First Floor Leased Premises will be used to expand the Company's in-house lab capabilities to include traditional clinical testing across multiple specialty areas and Next Generation Sequencing (NGS), Whole Genome Sequencing (WGS) and an array of genetic diagnostic test offerings for both clinical and research purposes. The NY First Floor Lease had an initial term through July 15, 2031, with an early termination option effective July 31, 2027.

The NY First Floor Lease became effective as of June 10, 2022. On March 1, 2025, the Company entered into a Surrender Agreement with the Landlord for the First Floor Leased

Premises. Under the agreement, *the Company will surrender the premises on or before May 30, 2025* and will pay the Landlord a settlement amount of approximately $127,000 in seven equal monthly installments from June 1, 2025 through December 1, 2025. Upon timely performance of the Company's obligations under the Surrender Agreement, the NY First Floor Lease will be deemed terminated as of the Surrender Date, and the Company will have no further obligations thereunder, other than as set forth in the Surrender Agreement. As of the date of this report, the Company has made all required payments under the Surrender Agreement. As of the date of this report, the Company has made all required payments under the Surrender Agreement (sic).

As a result of NY office lease termination, the Company reduced its operating lease liabilities by approximately $5.1 million and reduced its right-of-use assets by approximately $3.9 million. The Company also wrote off non-refundable security deposit of $308,000, and fixed assets and leasehold improvements of approximately $1.4 million. The Company recognized a loss on lease termination for total $1.4 million during the three and nine months ended September 30, 2025, which as included in general and administrative expense on the consolidated statement of operations.

*See* ECF Doc. No. 150, at p. 79 of 156, *Note 10 – Leases.* (Emphasis added in text).

These SEC disclosures are significant. First, the New Jersey laboratory lease already expired by its own terms in February 2026. Second, the New York premises at 711 Stewart Avenue in Garden City - the location where Drexel did business with ProPhase - have already been surrendered to the landlord in May 2025. Accordingly, based on Labs' SEC filings, there is no "laboratory operating platform" left to "repurpose," notwithstanding the Debtors' contrary representations to this Court.

As set forth in the Motion and at argument, the Debtors cannot be rehabilitated. They have no employees, no revenue stream, and - as Labs' Form 10-Q confirms - no legitimate reorganizational purpose. The Debtors' entire restructuring strategy depends on monetizing an insurance receivables portfolio whose collectability is highly uncertain. Those receivables are subject to unresolved reimbursement disputes, billing issues, ongoing collection litigation, and a pending federal False Claims Act investigation into the Debtors' COVID-19 reimbursement practices. The Debtors have also failed to produce meaningful documentation supporting the validity or collectability of those receivables. Because the Debtors' proposed rehabilitation

4

depends almost entirely on assets whose value and enforceability remain materially uncertain, there is no reasonable likelihood of rehabilitation within the meaning of Bankruptcy Code § 1112(b)(4)(A). Conversion is therefore appropriate.

But even if the Debtors' inability to reorganize were not enough to warrant conversion, their deliberate lack of transparency[2] and mismanagement of these cases for Labs' benefit independently require it.

## B.      Bankruptcy Code § 1112(b)(4)(B)

The Debtors' lack of candor with the Court, together with what appear to be unilateral parent-level decisions made for Labs' benefit and to the creditors' detriment, warrants conversion. Indeed, in their Opposition the Debtors admitted *for the first time* that Labs purportedly "holds a security interest of record in the Debtors' assets..." that Labs acquired and/or perfected only *months* before the Filing Date (Ted Karkus Decl., ECF Doc. 164-1, at ¶ 18).[3]

According to Mr. Karkus, the alleged security interest totals $9,998,502.80 and is evidenced by a January 7, 2025 Security Agreement and UCC financing statements filed in May and June 2025. *Id.* ¶¶ 19, 20.  Mr. Karkus further asserts that the security interest was granted "in connection with ProPhase Labs' financial support of the Debtors." *Id.* ¶ 21. Although the basis for that alleged financial support remains unclear, it appears to relate to antecedent debts: the MORs do not show anything close to $10 million in any DIP operating account for any of the Debtors, and the Debtors' schedules do not show those funds as an asset belonging to any of them.  Nor

---

[2] Upon filing a chapter 11 petition, "the debtor assume[s] the same fiduciary duties as would an appointed trustee ... [t]hese obligations include '[o]pen, honest, and straightforward disclosure to the Court and creditors.'" *Martelli v. Colts Neck Golf & Country Club*, No. 14-8101 FLW, 2015 WL 5032621, at *5 (D.N.J. Aug. 25, 2015) (cleaned up).

[3] Incredibly, it was not until the second amended schedules filed on March 30, 2026, more than six months after the Filing Date, that the Debtors *first* listed Labs' secured claim but stated that Labs was *not* an insider or related party. *See* Case No. 25-19834, at ECF Doc. No. 36.

does Labs' Form 10-Q for the period ending September 30, 2025, filed with the SEC on November

19, 2025, disclose *any* security interest granted to Labs or any financial support provided to the

Debtors in exchange for those security interest(s).

What the Form 10-Q does disclose, however, and what requires investigation by a neutral

third party, is the following statement:

**Voluntary Bankruptcy Filing and Deconsolidation**

On September 22, 2025 (the "Petition Date"), the Company's wholly-owned subsidiary, ProPhase Diagnostics, Inc., and two indirectly wholly-owned subsidiaries, ProPhase Diagnostics NY, Inc. and ProPhase Diagnostics NJ, Inc. (collectively the "PDX") filed for a Chapter 11 reorganization in United States Bankruptcy Court for the District of New Jersey (the "Chapter 11 case"). On September 30, 2025, the Court granted the motion for joint administration. During the Chapter 11 Case, the Company is deemed to no longer control PDX as its activities are subject to review and oversight by the Bankruptcy Court. Therefore, PDX was deconsolidated from the Company's condensed consolidated financial statements prospectively as of September 22, 2025.

*Deconsolidation of Bankrupt Subsidiaries*

In order to deconsolidate PDX, the carrying values of the assets and liabilities of PDX were removed from the Company's condensed consolidated balance sheet as of September 22, 2025, in accordance with ASC 810, Consolidation. ***The net impact with removing the assets and liabilities held at PDX resulted in the recognition of the investment in unconsolidated affiliates of $43.7 million, and a payable to unconsolidated affiliates of $27.7 million on the Company's condensed consolidated balance sheet as of September 30, 2025. Subsequent to the deconsolidation, the Company will account for the equity interest in PDX under the equity method of accounting as the Company is deemed to still have significant influence over PDX.***

All post-deconsolidation activities between the Company and PDX are reported as third-party transactions recorded within the Company's Unaudited Condensed Consolidated Statement of Operations. Since the Petition Date, there were no material transactions between the Company and PDX.

*Treatment of Intercompany Balances*

***The Company had total payables to PDX of approximately $27.7 million. As a result of the deconsolidation of PDX, the Company recognized $27.7 million payable to the unconsolidated affiliates on the condensed consolidated balance sheet as of September 30, 2025.***

*See* ECF Doc. No. 150, at p. 85 of 156, *Note 15 – Voluntary Bankruptcy Filing and Deconsolidation* (emphasis added in text).

6

Once again, this SEC disclosure is significant. It **does not** say that Labs has a nearly $10 million secured position; rather, it says that Labs has a $43.7 million **equity position** in the Debtors and a $27.7 million **payable** due the Debtors. The question is: who will collect that $27.7 million from Labs? Drexel highly doubts it will be the Debtors' management because they are the very same people who own and manage Labs. Only a disinterested trustee would pursue that claim.

And a trustee can also review the insider self-dealing surrounding the purported "security interest(s)," which appear to be transfers made to an insider entity just months before the Filing Date. Those transfers are subject to avoidance under Bankruptcy Code §§ 547 and/or 548 and may also present a basis for a motion to equitably subordinate the full amount of any purported debt due Labs based on its pre-petition conduct. *See, e.g., In re Rocco Corp.*, 37 B.R. 770, 772 (Bankr. D.R.I. 1984) (equitably subordinating claim of sole shareholder and president of company who arranged for his then insolvent entity to grant him a security interest in all assets, and holding: "[h]ad he prevailed in this strategy, [the insider] would have effectively wiped out all possibility of any recovery by Roco's suppliers, without their ever having known what hit them. In our opinion, this is precisely the type of insider misconduct that the principle of equitable subordination is designed to protect against."). *See also In re Brooks*, 619 B.R. 669, 679 (Bankr. C.D. Ill. 2020) ("The remedy [of equitable subordination] is most frequently used against corporate insiders who have attempted to convert an equity interest into secured debt in anticipation of bankruptcy.").

The conduct of Debtor's management further highlights the need for a chapter 7 trustee to review the insiders' conduct. Those insiders effectively breached their fiduciary obligations to creditors in favor of Labs' equity holders while the Debtors were in the zone of insolvency. *See In re Immune Pharms. Inc.*, 635 B.R. 118, 123 (Bankr. D.N.J. 2021) ("The fiduciary duties of a

corporate director or officer extend to creditors when the debtor is in the 'zone of insolvency.'").

Those breaches of fiduciary duty, waste, and mismanagement also implicate another potential source of recovery for the Debtors' estates that current management will not likely pursue: the Debtors' or Labs' Director and Officer Liability Policies and, absent insurance coverage, the personal assets of the respective officers and directors.

The total disregard for creditors is palpable. Although the Debtors have not filed a DIP financing motion, they did submit a DIP Receivables Trust Account Motion (ECF Doc. Nos. 107, 109) that proposed to allocate $4.5 million *to Labs* (a non-debtor) and only $1.5 million to the Debtors. That paints a clear picture of Labs still exerting "significant influence over" the Debtors, as stated in the Labs' Form 10-Q. It also raises an obvious question: *why*, if a plan is supposed to be funded through the collection of $50 million in alleged receivables, which effort the Debtors assert will be negatively affected by the appointment of a trustee,[4] do the Debtors need any DIP financing at all? The answer is obvious.

---

[4] The Court should view Crown's statements at the hearing for what they are – the concern of a retained professional who has allegedly been working for months on a large contingency case, and who is now left with the potential for a small administrative claim if the case is converted and the appointed trustee opts to work with another collection agency. Of course, the possibility remains that the trustee could decide to continue working with Crown and could even retain certain of the Debtors' employees to continue to assist with the collection efforts. However, Drexel's investigation into Crown and Mr. Richard Hersperger has yielded the following results:

- There is no evidence that Mr. Hersperger is the CEO, or an officer, owner, or employee of Crown Medical Collections;
- No state business registry shows any entity named "Crown Medical Collections," or any entity where Mr. Hersperger is listed as a principal under that business name;
- There are no litigation, regulatory filings, or corporate documents linking Mr. Hersperger to Crown Medical Collections;
- Mr. Hersperger's confirmed roles are/were: (i) CEO of Peachstate Health Management LLC; (ii) former CEO and Director of AEON Global Health Corp.; and (iii) Owner/CEO of Only One Hub, Inc. (Primus Healthcare) (and each are defendants in a federal action where misconduct, mismanagement and fraud have been alleged – *see Value Drug Co. v. Only One Hub, Inc. et al.,* Case No. 23-cv-00263 (U.S. Dist. Ct., W.D. Pa.);
- There is no indication that Mr. Hersperger is an attorney. Searches of attorney licensing databases show no bar admission under his name; and
- "Crown Medical Collections" itself does not appear to be a registered company in any U.S. jurisdiction, which raises questions about its legal structure and authority to collect medical receivables.

Zormati Decl., ¶ 6.

But Labs' attempt to control the Debtors does not end there. During argument it was also revealed that Labs has been funding post-petition payroll for certain of the Debtors' "employees" who are allegedly working with Crown to collect unreimbursed insurance receivables, *without first obtaining Court approval to fund the Debtors*. This is another example of management acting in their own self-interest without notice to the Court or the estates' creditors.

The payroll burn rate is $60,000 per month and has totaled approximately $550,000 over the last nine months, eclipsing the purported returns thus far on any receivable collections. Although the Debtors have asserted that they are employing personnel to assist in collection efforts, those persons remain unidentified, and there is no indication *who* is being paid $60,000 *per month* – including whether any of those funds are being paid to management.[5]

Finally, Drexel has learned that in March 2025, Ted Karkus was trying to raise $10 million for Labs. To entice investors, Mr. Karkus circulated a spreadsheet showing the amount of unreimbursed receivables owed to the Debtors and the amount collected through February 6, 2025. *See* accompanying Declaration of Bedis Zormati, dated June 26, 2026, at ¶¶ 3-5, and **Exhibit "A"** attached thereto. That spreadsheet reflected 993,492 in total claims, with $341,984,277 billed (and an "adjusted amount billed" of $319,002,058), and $75,578,171 collected. This raises another obvious question: what did Labs (or the Debtors) do with the $75,578,171 that was collected?[6] A trustee must be appointed to investigate where that money went.

---

[5] After the Debtors unwittingly disclosed this unauthorized post-petition arrangement at the hearing, two days later Labs filed a "stipulation" (ECF Doc. No. 174) that provided only a partial explanation about the "arrangement" between Labs and the Debtors, and further indicated that Labs did not intend to file a claim for the past payroll expenses. Drexel suspects that Labs believes it is better to ask this Court for forgiveness than permission.

[6] Through explanations of benefits ("EOB's") in Drexel's possession, Drexel is aware that the Debtors' pre-petition collections were performed by an affiliated entity known as Confucius Plaza Medical Laboratory, with a P.O. Box in Philadelphia, PA. Drexel is concerned that Confucius may still be collecting unreimbursed receivables outside of bankruptcy. The EOB's in Drexel's possession have not been docketed because they contain confidential patient information, but will be made available for an *in camera* inspection upon request.

Mr. Karkus' February 3, 2026 press release further shows that Labs is treating the unreimbursed insurance receivables as its own assets. In that release, Mr. Karkus stated:

> "While no assurances can be given, *recovery-based financing associated with the Crown Medical initiative could represent a significant liquidity event for ProPhase Labs*.... Independently, a transaction involving BE-Smart could also generate substantial liquidity. Either outcome has the potential to materially improve our balance sheet, strengthen our financial position, and fundamentally change the outlook for the Company. In parallel, our Nebula Genomics/DNA Complete business continues to perform ahead of internal expectations with minimal marketing spend. Our streamlined overhead and restructured subscription renewal approach are expected to further enhance profitability as we move through 2026."

*See* Zormati Decl., **Exhibit "B."** (Emphasis added).[7]

The intent to use the Debtors' unreimbursed receivables to leverage Labs' financial position and business operations is reinforced by yet another press release issued a month later, on March 17, 2026, in which the following was reported:

> "We are encouraged by the level of engagement across a broad group of insurance payors and by how these discussions continue to advance," said Ted Karkus, Chief Executive Officer of ProPhase Labs. "The progression we are seeing, together with Crown Medical's demonstrated experience in resolving similar claims, *has supported extensive diligence from potential financing sources and reinforces our view that these receivables represent a compelling asset*. While there can be no assurance as to timing or outcomes, we believe the current trajectory reflects tangible progress *and positions the Company to pursue financing alternatives that can support execution and enhance liquidity*.
>
> The Company reported that its Crown Medical Collections effort continues to advance, with engagement now underway with more than 250 insurance payors. Of these matters, approximately 100 are currently in active settlement discussions, with a number of cases progressing into more advanced stages of negotiation.

---

[7] This is not the first press release where Labs has purported to assert domain over the Debtors' unreimbursed insurance receivables. When Drexel raised concern about a proposed reverse merger between Labs and Advanced Biological Laboratories, Drexel attached as Exhibit "I" to the January 20, 2026 Declaration of Bedis Zormati a December 19, 2025 press release about the proposed merger. In that press release, Labs reported: "Additionally, all Crown Medical Collections receivables are expected to be carved *out for the exclusive benefit of current ProPhase shareholders*, with anticipated collections of approximately $50 million net." *See* ECF Doc. Nos. 69, at ¶ 26, and 69-1, at p. 142 of 144 (emphasis added).

10

Based on the level of engagement and progression of discussions, the Company believes current activity is trending in line with its previously communicated recovery framework and internal estimates, and is encouraged by the ongoing development of these discussions.

***In parallel, the Company is engaged in discussions with institutional capital providers regarding potential financing alternatives, <u>including structures that are expected to be secured by the Company's receivables platform, without recourse to the parent company</u>. These discussions follow extensive third-party diligence conducted on the receivables and related recovery processes.*** While no assurances can be given that any transaction will be completed, the Company believes the level of diligence completed and the nature of these discussions reflect growing external validation of the underlying asset and may enhance its financial flexibility.

Management continues to focus on stabilizing near term liquidity, managing liabilities and vendor relationships, and preserving and advancing key assets, including Nebula Genomics/DNA Complete and the BE-Smart esophageal cancer diagnostic."

*See* Zormati Decl., **Exhibit "C."** (Emphasis added).

And finally, another press release from just two months ago, on April 15, 2026, shows how

Mr. Karkus and Labs continue to leverage the unreimbursed insurance receivables that belong to

the Debtors:

"We are very encouraged by the scale and progression of activity across our receivables platform," said Ted Karkus, Chief Executive Officer of ProPhase Labs. "The level of engagement, the volume of claims in active negotiation, and the early settlement activity we are seeing reinforce our belief that this represents a highly valuable asset. Over the past several weeks, we have seen increasing engagement from insurance companies, and we expect both the pace of negotiations and the conversion of those discussions into agreed settlements to accelerate in the near term. Importantly, these early indications are generally consistent with the assumptions underlying our broader recovery estimates.

Based on current activity and Crown Medical's analysis, ***we believe this platform has the potential to generate meaningful cash flow beginning in Q3, <u>which could significantly enhance our liquidity position</u>. In addition, we believe the continued advancement of settlement activity is making the receivables platform increasingly financeable, <u>which could enable us to access capital in advance of collections and enhance liquidity in the near term</u>, including prior to the commencement of expected cash flow in Q3.***"

\*       \*       \*

> *In parallel, the Company continues to engage with institutional capital providers regarding potential financing alternatives, <u>including structures expected to be secured by the Company's receivables platform.</u>* These discussions follow extensive third-party diligence conducted on the underlying claims and recovery processes. As settlement activity continues to progress, including advancement of negotiations across multiple payors, the Company believes the receivables are increasingly demonstrable and financeable, which has meaningfully increased engagement and inbound interest from potential capital providers. While there can be no assurance that any financing will be completed, the Company believes the level of diligence and engagement reflects growing external validation of the asset.

*See* Zormati Decl., **Exhibit "D**." (Emphasis added).

Importantly, the press releases do *not* state that the unreimbursed insurance receivables are assets of the Debtors' estates. Nor do they mention the bankruptcy cases, except perhaps to allude to a potential financing arrangements secured by the Debtors' receivables platform and structured to avoid recourse against *Labs*.

## II.

### In The Alternative, A Chapter 11 Operating Trustee Should Be Appointed

Drexel recognizes that the appointment of a trustee "should be the exception, rather than the rule," but "the decision to appoint a trustee must be made on a case-by-case basis." *In re Sharon Steel Corporation,* 871 F.2d 1217, 1225-26 (3d Cir.1989). Further, Drexel recognizes that "[t]he movant … must prove the need for a trustee by clear and convincing evidence. *Id.*, at 1226.[8] Drexel respectfully submits that, based on the facts set forth in its Motion and in this supplement, Drexel has more than satisfied its burden for the appointment of a chapter 11 operating trustee.

---

[8] "Evidence is 'clear and convincing' when it produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Jobes*, 108 N.J. 394, 407, 529 A.2d 434, 441 (1987).

Section 1104(a) of the Bankruptcy Code provides:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

"While appointment of a trustee is mandatory upon a finding of cause under subsection (1) or upon a finding that a trustee would serve the interests outlined in subsection (2), the decision to appoint a trustee still falls within the court's discretion." *In re G-I Holdings, Inc.*, 295 B.R. 502, 507–08 (D.N.J. 2003), *aff'd*, 385 F.3d 313 (3d Cir. 2004). Indeed, "…it is within the … court's sound discretion to make a determination of cause, and this requires fact-finding and application of the facts to relevant precepts." *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 473 (3d Cir. 1998).

### A.   <u>Bankruptcy Code § 1104(a)(1)</u>

"Subsection (a)(1) requires the bankruptcy court … to appoint a trustee when the movant has proved "cause," which the statute defines to include incompetence and gross mismanagement." *Sharon, supra*, at 1226. "Pursuant to 11 U.S.C. § 1104(a)(1), a party in interest may request the appointment of a trustee for cause, including fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the Chapter 11 case." *In re U.S. Commc'ns of Westchester, Inc.*, 123 B.R. 491,

495 (Bankr. S.D.N.Y. 1991). "However, judicial considerations in determining the issue of whether to appoint a trustee are not limited to such cause as enumerated specifically in § 1104(a)(1). Thus, the Court has discretionary power pursuant to § 1104(a)(1) and (2) to appoint a trustee when necessary to protect rights of creditors of the estate." *In re Ford*, 36 B.R. 501, 504 (Bankr. W.D. Ky. 1983).

"The inquiry into whether 'cause' exists for such an appointment is not limited to the enumerated list of fraud, dishonesty, incompetency or gross mismanagement, but extends to 'similar cause.' Factors on which the decision whether to appoint a trustee have turned include:

1) Materiality of the misconduct;
2) Evenhandedness or lack of same in dealings with insiders or affiliated entities vis-a-vis other creditors or customers;
3) The existence of pre-petition voidable preferences or fraudulent transfers;
4) Unwillingness or inability of management to pursue estate causes of action;
5) Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor;
6) Self-dealing by management or waste or squandering of corporate assets."

*In re Intercat, Inc.*, 247 B.R. 911, 920–21 (Bankr. S.D. Ga. 2000).

Without rehashing all of management's misconduct in these Debtors' cases, it is clear that taking a $10 million security interest from insolvent Debtors based on antecedent debts (all of which is unreported in the SEC filings): (i) is material; (ii) represents a lack of evenhandedness in dealings with creditors; (iii) is a pre-petition voidable preference or fraudulent conveyance; and (iv) and represents self-dealing by management.

Further, it is clear that Labs' treatment of the unreimbursed insurance receivables as its own reflects a serious conflict of interest on the part of management.

Finally, the existence of certain claims, including the avoidance/equitable subordination claims against Labs, the **reported** $27.7 million payable due from Labs, and the potential claims against management for breach of fiduciary duty, waste, and mismanagement, are all claims that

14

management will be unwilling or unable to pursue on behalf of the Debtors' estates. In fact, here, as in *Intercat* and *Sharon*, the Debtors' management has "… not suggested that [they are] or will be capable of pursuing the aggressive, independent investigation of all the transactions in issue, or that [they] will prosecute litigation to recover assets, or sue for the damages sustained by the [Debtors]. Indeed, since [they or their family or their] closely-held corporations are all potential targets of any such litigation, it is impossible to believe that [they] would do so in the manner that a disinterested person would." *In re Intercat, Inc.*, 247 B.R. 911, 923 (Bankr. S.D. Ga. 2000).

Under these circumstances, cause exists for the appointment of a chapter 11 operating trustee. But even if cause did not exist (it does), then appointment of a chapter 11 trustee is appropriate under Bankruptcy Code § 1104(a)(2).

**B.     Bankruptcy Code § 1104(a)(2)**

Subsection (2) allows a court "to appoint a trustee when to do so would serve the parties' and estate's interests." *In re G-I Holdings, Inc.*, *supra*, at 507 (cleaned up). That is,

> [i]n determining whether a trustee should be appointed under section 1104(a)(2), 'in the interests of creditors,' courts 'look to the practical realities and necessities.' Although decisions have articulated certain factors to guide the court, ('Among the factors considered are (i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence - or lack thereof - of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment') the standard is a flexible one.

*In re Ridgemour Meyer Props., LLC*, 413 B.R. 101, 112 (Bankr. S.D.N.Y. 2008) (cleaned up). Other considerations include the level of acrimony between the debtor-in-possession and creditors. *See, e.g., Marvel, supra.*

For all the reasons set forth in Drexel's Motion and this Supplement, the Debtors' management must be replaced. They engaged in pre-petition transactions that will cause harm to

15

creditors, have incurable conflicts of interest that will prevent them from pursing claims, and have

failed to disclose to the Court and creditors post-petition financial dealings between and among

Labs and the Debtors.  The holding in *In re Microwave Prods. of Am., Inc.*, 102 B.R. 666, 676

(Bankr. W.D. Tenn. 1989) is instructive:

> The court is asked to weigh the cost of appointment of a trustee versus the benefit of leaving the debtor in possession … Because of the erosion of confidence in the debtor, there is likely to be increased litigation which will result in escalating legal costs to the estate. Finally, because the debtor is not in a strong posture to pursue possible claims that may have resulted from conflicts of interest and fraudulent transfers, a trustee would likely be able to investigate claims that could result in additional sums of money coming into the estate. The court in *In re Sharon Steel,* 871 F.2d at 1228, *citing In re L.S. Good & Co.,* 8 B.R. 312, 315 (Bankr.N.D.W.Va.1980) where the judge held:
>
>> "that although no clear proof of fraud, dishonesty, or gross mismanagement had been presented, intercompany transactions exceeding $1 Million Dollars justified appointment of a trustee under section 1104(a)(2) because the size and number of transactions "places current ... management ... in a position of having grave conflict of interest, and the presumption arises that the current management ... will be unable to make the important investigation and decisions demanded."
>
> Further, the court must concern itself with the question of current management's fitness to see the debtor through a successful reorganization.
>
> The failure of the debtor to investigate potential avoidable or preferential transfers weigh heavily in favor of appointing a trustee. Further, the failure of the debtor to attempt to collect substantial dormant receivables on the debtor's books from the parent company militates in favor of the appointment of a trustee. The protection and potential recovery of vast sums for the estate, should a trustee be appointed, far outweigh the costs of services to be rendered. The potential amount to be recovered from Holding's receivables alone could exceed $1.4 million dollars.
>
> For the foregoing reasons and based on the case record as a whole, the court finds that it is in the best interest of creditors, the estate, and other parties in interest to appoint a trustee.

In the present case, like *In re Microwave Prods. of Am., Inc.*, in the unlikely event the Court

does not simply convert the Debtors' chapter 11 cases to ones under chapter 7, then Drexel

respectfully submits that the Court should appoint a chapter 11 operating trustee under Bankruptcy Code § 1104(a)(2) because doing so is clearly in the best interest of creditors.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in Drexel's initial papers on its Motion, Drexel respectfully requests that the Court enter an Order converting these jointly administered chapter 11 cases to cases under chapter 7 of the Bankruptcy Code. Alternatively, if the cases are not converted, the Court should issue an Order appointing a chapter 11 operating trustee.

Respectfully submitted,

**STARK & STARK, P.C.**
A Professional Corporation

_____
Joseph H. Lemkin, Esq.
100 American Metro Boulevard
Hamilton, N.J. 08619-2319
(609) 791-7022
jlemkin@stark-stark.com
*Attorneys for Drexel Distribution, Inc. d/b/a*
*EZ Test NY*

-and-

**WESTERMAN BALL EDERER MILLER
ZUCKER & SHARFSTEIN, LLP**

By:  */s/ Jay S. Hellman*
        Jay S. Hellman, Esq., Admitted *Pro Hac Vice*
1201 RXR Plaza
Uniondale, New York 11556
(516) 622-9200
*Attorneys for Drexel Distribution, Inc. d/b/a*
*EZ Test NY*

17