WALLACE NEEL PLLC
Wallace B. Neel, Esq. (Admitted Pro Hac Vice)
1 Blue Hill Plaza, LL Suite 1509
Pearl River, New York 10965
Tel: (646) 524-6502
*Special Litigation Counsel to the Debtors*

MACIAG LAW, LLC
Thaddeus R. Maciag, Esq.
475 Wall Street
Princeton, New Jersey 08540
Tel: (908) 704-8800
*Counsel for the Debtors*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: Chapter 11 | |
| PROPHASE DIAGNOSTICS NJ, INC., et al., | Case No. 25-19833 (CMG) |
| Debtors. | (Jointly Administered) |
| | Hon. Chief Judge Christine M. Gravelle |
| | Hearing Date: July 14, 2026, 10:00 a.m. |

**DEBTORS' SUPPLEMENTAL RESPONSE IN OPPOSITION TO DREXEL
DISTRIBUTION, INC.'S SUPPLEMENTAL SUBMISSION IN FURTHER
SUPPORT OF ITS MOTION TO CONVERT THE CHAPTER 11 CASES, OR
ALTERNATIVELY TO APPOINT A TRUSTEE**

ProPhase Diagnostics NJ, Inc., ProPhase Diagnostics, Inc., and ProPhase Diagnostics NY, Inc., the debtors and debtors-in-possession in the above-captioned jointly administered cases (collectively, the "Debtors"), by and through their undersigned counsel, respectfully submit this Response in Opposition (the "Response") to the Supplemental Submission in Further Support of Motion to Convert the Debtors' Chapter 11 Cases to Chapter 7 or, in the Alternative, to Appoint a Chapter 11 Trustee (the "Supplemental Submission," ECF Doc. No. 175) filed by Drexel Distribution, Inc. d/b/a EZ Test NY ("Drexel").

## PRELIMINARY STATEMENT

The Motion to Convert should be denied in this case. This month alone, approximately $286,000 has been paid into the estates' trust accounts. Another $1.2 million is imminent, per Crown. These are not projections — they are actual and near-term recoveries being generated by the Court-approved collection program that conversion or the appointment of a trustee would destroy.

Thus, not only is money beginning to flow at a level that promises to redeem all stakeholders, but the surrounding circumstances are such that the Court's should exercise its discretion in unusual circumstances to "let the trend be everybody's friend" and not do anything to halt the real and hard-dollar progress that is beginning to accrue to the benefit of creditors and all other stakeholders.

Drexel's demand for a trustee would bring that burgeoning trend or recoveries to a halt that it may never recover from. As a practical matter, the Debtors have no employees of their own. The collections program that is generating these recoveries is operated in

1

significant part by individuals whose compensation is funded post-petition by the parent company, ProPhase Labs, Inc. ("Labs").   A trustee — whether under Chapter 7 or Chapter 11 — would have no authority over Labs or its personnel. Those individuals have jobs at a solvent, operating company. A trustee cannot compel them to continue performing work for the Debtors, and displacing current management would put the Debtors into an openly adversarial posture with the very parent whose cooperation the collections operation requires. The likely result would be a collapse of the settlement pipeline at the precise moment it is generating meaningful recoveries — directly benefiting the insurance carriers that are resisting payment and harming every creditor, including Drexel.

Drexel's Supplemental Submission does not grapple with this reality. Instead, it offers (1) a demonstrably false declaration asserting that Crown Medical Collections LLC does not exist — it is a Wyoming corporation in good standing, as the Secretary of State records attached hereto confirm; (2)  a mischaracterized $75.5 million figure representing three years of ordinary-course pre-petition insurance payments received during the COVID public health emergency, and (3) an accounting entry that, on the parent's own SEC disclosure, reflects Labs' financial support of these estates rather than extraction from them. None of this constitutes the clear and convincing evidence that Drexel's burden requires.

Drexel's proposed conversion would kill the golden goose just as it is laying eggs into the estates' accounts. The Motion should be denied.

I.      **REHABILITATION REMAINS REASONABLY LIKELY THROUGH THE COURT-APPROVED COLLECTION PROGRAM — BUT WOULD BE NEAR-IMPOSSIBLE UNDER AN 11 OR 7 TRUSTEE**

Section 1112(b)(4)(A) requires more than a continuing operating loss; it requires the absence of a reasonable likelihood of rehabilitation. Both elements must be present. Here, the second is not, because the Debtors have a concrete, Court-approved path to rehabilitation that does not depend on the matters Drexel emphasizes.

Drexel argues that, because the New Jersey laboratory lease expired by its terms and the New York premises were surrendered pre-petition, there is "no laboratory operating platform left to repurpose." That argument attacks a premise the Debtors do not rely upon. The estates' rehabilitation is asset-based: it depends on monetizing and collecting the Receivables Portfolio, the estates' primary asset, through the collection program this Court approved at ECF Doc. No. 41. The surrender of leased premises does not impair the value or collectability of insurance receivables, and Drexel cites nothing suggesting otherwise.

The collection program is functioning and producing concrete results. As set forth in the accompanying certification of Richard Hersperger of Crown, and consistent with the record already before the Court, the estate has executed a global settlement with a major commercial payor producing a substantial recovery, subject to a forthcoming motion for approval under Bankruptcy Rule 9019, and Crown has approximately $1.2 million in additional commercial-payor settlements in active process. The existence of a viable, Court-approved monetization path for the estates' principal asset, which is already generating actual recoveries, defeats any contention that rehabilitation is not reasonably likely within the meaning of Section 1112(b)(4)(A).

## II.     THE REORGANIZED DEBTORS ARE A GOING CONCERN WITH AN OPERATING BUSINESS

The reasonable likelihood of rehabilitation is reinforced by a second fact Drexel ignores: the reorganized Debtors will continue an operating business with independent going-concern value. Alongside the collection of the Receivables Portfolio, the Debtors are continuing and developing a diagnostic and genomic testing business, including a direct-to-consumer whole genome sequencing line that is presently generating revenue. The Plan provides a roadmap for that business, including bringing sequencing operations in-house to improve margins and developing the Debtors' diagnostic platform, so that the reorganized Debtors emerge not as a shell but as an operating enterprise.

To be clear about what carries what: the Debtors' ability to pay creditors under the Plan rests on the collection of the Receivables Portfolio, not on the future performance of the operating business. The operating business is not offered as the source of creditor recoveries, and the Plan's feasibility does not depend on it. It is offered for a different and proper purpose — to demonstrate that the reorganized Debtors are a viable, ongoing concern rather than a liquidating estate.

Drexel's argument that a lapsed lease leaves nothing to operate is wrong on the facts. The surrender of leased premises did not eliminate the Debtors' operating capacity, and the Debtors have current, concrete plans to restore laboratory operations. The equipment required to do so already exists. The enterprise holds production-grade sequencing instruments, including the Illumina NovaSeq X Plus and the Illumina NovaSeq 6000, the instruments on which a functioning genomics laboratory is built. A laboratory is ot its lease. It is its equipment, its personnel, and its book of business, and those exist here.

The genomics business is not a future hope. It is operating now and generating revenue. At present, that business pays an outside laboratory to perform the sequencing,

which is expensive and consumes much of its margin. Bringing that sequencing in-house on equipment that the parent owns and that Debtors can operate — precisely what the Debtors' filed Plan contemplates — is expected to reduce that cost substantially and potentially up to 50%. Once the laboratory is scaled up and running, the genomics business is expected to generate enough to cover the cost of operating the laboratory itself. That is the opposite of a dead platform. It is a revenue-generating business with a defined path to improved margins using equipment the enterprise already owns.

This is not aspiration untethered from a plan. The Debtors have filed a Plan of Reorganization and Disclosure Statement that provides for the collection of the Receivables Portfolio and for the continuation and development of this operating business, including bringing sequencing in-house on the existing equipment. Drexel's premise — that there is no laboratory operating platform left to repurpose — ignores the equipment in place, the revenue-generating genomics business already running, and the Debtors' filed Plan to restore in-house laboratory operations. The surrender of a lease is a solvable commercial matter, not the end of the Debtors' operating capacity, and it is no basis for the extraordinary remedies of conversion or a trustee.

### III.   A TRUSTEE CANNOT CONTROL THE PARENT, YET THE COLLECTIONS OPERATION DEPENDS ON PARENT-FUNDED PERSONNEL

The fundamental flaw in Drexel's request for a trustee is practical, not merely legal. The Debtors have no employees. The collections program that is currently generating recoveries and that is supposed to fund a plan paying creditors in full is being operated, in

significant part, by individuals whose compensation has been funded post-petition by the parent company, ProPhase Labs, Inc.

A Chapter 11 (or Chapter 7) trustee would have no authority over Labs or its personnel. The trustee could not compel those individuals to continue performing work for the Debtors, nor could the trustee prevent Labs from reassigning them or terminating their funding. Even if the trustee were inclined to retain Crown Medical Collections (which it could theoretically do), Crown would still require the claim-level history, payer relationships, and institutional knowledge that currently reside with the parent-funded personnel. Those individuals have jobs at a solvent, operating company. A trustee cannot force them to leave those positions to take uncertain, temporary work at a bankrupt estate that has no present ability to reliably pay them.

The result of displacing current management would therefore be a material degradation of the collections effort for months to years, if not permanently. New personnel, even if eventually retained, would require extensive time to develop the same level of familiarity with approximately 950,000 specific claims, the history of billing and denials, and the payer-specific dynamics that are currently being leveraged to drive settlements. During that period, active settlement negotiations would stall or collapse.

This is not a theoretical concern. The insurance carriers against which the estates are asserting claims are sophisticated parties that monitor these proceedings and that have every incentive to delay, reduce, or avoid payment. Every month that collections

momentum is lost while a new trustee learns the portfolio is another month those carriers can use to their advantage. The harm is concrete and falls directly on creditors.

Drexel's suggestion that a trustee can simply bring in operational people and run collections independently of the parent ignores this reality. The operational capacity is not a clean, standalone function that can be easily severed from the parent-employed and parent-funded personnel who currently perform it. A trustee has no power to maintain the status quo on the collections front while simultaneously pursuing aggressive claims against the very parent upon which that status quo depends.

For this reason alone, appointment of a trustee would harm — rather than protect — the interests of creditors. The same is true, only more so, with respect to conversion to Chapter 7. A Chapter 7 trustee would have even less incentive and even fewer resources to maintain a complex, long-term, relationship-driven collections operation on nearly one million claims. It would destroy value to halt the collections effort at this stage to implement a new plan under a new overseeing trustee. The Court should let the status quo prevail while monies that are arriving today and more on the horizon are settled into the estates' accounts.

## IV.   DREXEL'S $75,578,171 FIGURE IS ORDINARY-COURSE PRE-PETITION INSURANCE PAYMENTS, NOT ESTATE MONEY

Drexel's most prominent number — $75,578,171 described as having been "collected" — is presented as though it were missing or misappropriated estate funds. It is not.

This figure represents the cumulative total of insurance payments received on the diagnostic group's testing claims over a three-year period from 2020 through 2023, during

7

the public health emergency, and two years prior to the filings in these cases. These were ordinary-course receipts received while the testing business was operating during COVID. The payments came in across multiple years and were applied to the ordinary costs of running that business, including payroll, laboratory expenses, and vendors. This activity occurred years before these bankruptcy cases existed.

The figure is not a post-petition transfer. It is not a fund sitting somewhere today. It is not evidence of wrongdoing by current management. To characterize three years of ordinary-course pandemic-era insurance payments as "missing estate money" is simply false.

Moreover, the document from which Drexel draws this figure is an internal analytical worksheet prepared by Crown in the course of its work. It is not an estate financial statement. By the declarant Zormati's own sworn account, it was obtained from unidentified third parties via text message, and its metadata does not identify its author. A party seeking the extraordinary remedy of a trustee or conversion cannot meet its burden by relying on an unauthenticated internal document of unknown provenance that it then mischaracterizes.

### V.     THE $27.7 MILLION FIGURE REFLECTS THE PARENT FUNDING THE ESTATES, NOT THE REVERSE

Drexel's second major number — the $27.7 million payable disclosed in Labs' Form 10-Q — is presented as though it were evidence that the parent drained the estates. The

8

direction of the underlying facts is the opposite, and the schedules and the parent's own subsequent conduct confirm it.

The $27.7 million is not a debt Labs incurred on the Petition Date, and it is not a discrete transaction. It is an accounting entry — the intercompany balance between Labs and the PDX entities that was previously eliminated on Labs' consolidated balance sheet and that became visible on Labs' standalone balance sheet only because ASC 810 required Labs to recognize it upon deconsolidation of the PDX entities at the Petition Date. When a parent loses control of a subsidiary under ASC 810 — as occurs upon a bankruptcy filing, because the Court's oversight displaces the parent's control — the parent must remove the subsidiary from its consolidated statements and recognize intercompany balances that were previously eliminated in consolidation. The $27.7 million is that recognition event, not a new transaction or a newly discovered obligation.

That is why no intercompany receivable from Labs of anywhere near $27.7 million appears on the Debtors' Schedule A/B, filed and amended twice, on November 30, 2025 and again on March 30, 2026. The Debtors' books have never carried a demand, invoice, note, or claim against Labs in that amount, because no such obligation exists on the Debtors' side of the ledger in any amount approaching that figure. It is an accounting entry on Labs' standalone balance sheet arising from the ASC 810 deconsolidation requirement, not a transaction reflected on the Debtors' own books.

What the record does show, and what defeats Drexel's narrative, is the direction of the money as the COVID testing business wound down. As testing revenue collapsed, Labs did not extract further value from the Debtors — it funded them. That funding is reflected in the Security Agreement dated January 7, 2025 and accompanying UCC-1 filings, under

9

which Labs holds a perfected senior security interest of $9,998,503.80 in the Receivables Portfolio, disclosed on the Debtors' schedules. The record reflects that Labs was providing financial support to the Debtors during the wind-down period, not extracting value from them — a fact that is inconsistent with Drexel's narrative of extraction regardless of how the security interest is ultimately characterized.

To be clear about what this shows and what it does not: the Debtors do not contend that the $27.7 million figure represents a presently collectible receivable, and no such asset in that amount has been or needs to be scheduled, because the figure does not correspond to any actual claim, demand, or transaction on the Debtors' books in that amount. What it does show is that Drexel's central premise — that Labs has been extracting value from these estates — is contradicted by Labs' own public filings and by the sequence of its dealings with the Debtors. Any residual dispute over the historical intercompany balances underlying that accounting entry is, at most, a matter for reconciliation and, if warranted, the claims-allowance process, where all parties in interest have full visibility. It is not evidence of present wrongdoing, and it is not a basis for the extraordinary remedies of conversion or trustee appointment.

Nor does this figure support Drexel's fallback suggestion that only a disinterested trustee could be trusted to pursue it. The premise assumes a live, collectible claim of that magnitude that the Debtors' own books and schedules do not reflect and that the Debtors do not assert. To the extent any reconciled intercompany claim were ultimately determined to exist, the Debtors-in-possession, subject to this Court's oversight and any objection by parties in interest, are fully capable of evaluating and pursuing it — a trustee is not required

10

to preserve that possibility, and installing one now would jeopardize the functioning collections program for a contingency that the current record does not establish.

## VI.   LABS' SECURED POSITION WAS DISCLOSED AND IS NOT EVIDENCE OF PRESENT MISMANAGEMENT

Drexel attacks Labs' perfected security interest in the Receivables Portfolio as though it were concealed or improper. It was neither.

Labs holds a perfected senior security interest in the amount of $9,998,503.80, evidenced by a Security Agreement dated January 7, 2025 and UCC-1 financing statements filed in New York and New Jersey. This interest is reflected on the Debtors' schedules. Drexel's suggestion that the security interest was hidden until the Opposition papers is contradicted by the Debtors' own schedules, which disclosed it months earlier.

This secured funding is properly understood as part of the same story addressed in Section V above: as the Debtors' COVID-era testing revenue ended, Labs did not withdraw value from the estates — it advanced new, separately secured capital to sustain them as their revenue disappeared as the COVID Pandemic waned. The timing of that secured funding, following the wind-down of operations, is consistent with the Debtors' position that Labs has been a source of support to these estates, not the extractive actor Drexel describes.

Whether that secured position is subject to avoidance or subordination on any theory presents, at most, an estate cause of action that can be evaluated and pursued within these cases through the ordinary claims-allowance process. It is not clear-and-convincing

11

evidence of present wrongdoing by management requiring the appointment of a trustee or conversion of the cases.

### VII.   THE ZORMATI DECLARATION CANNOT BEAR THE EVIDENTIARY WEIGHT DREXEL'S BURDEN REQUIRES

#### A.   Crown Medical Collections Is a Corporation in Good Standing, Contrary to the Declaration's Sworn Assertion

The Zormati Declaration states, under penalty of perjury, that "Crown Medical Collections itself does not appear to be a registered company in any U.S. jurisdiction." That statement is incorrect. As reflected in the records of the Wyoming Secretary of State, attached hereto as Exhibit A, Crown Medical Collections is a corporation organized under the laws of the State of Wyoming, formed April 27, 2023, and in good standing. It is a duly organized entity with full authority to conduct its business.

The point is not merely that one assertion is wrong. The Supplemental Submission asks the Court to draw serious inferences of fraud, concealment, and mismanagement, largely on the strength of the Zormati Declaration. When a declaration offered to satisfy a clear-and-convincing standard is demonstrably false on the very subject its author chose to investigate and represent to the Court — and on a fact as straightforwardly verifiable as a Secretary of State registration — the Court is entitled to weigh the balance of that declaration accordingly.

It bears noting that this is not the first time Drexel has made a sworn assertion of non-existence that had to be withdrawn. In the underlying New York state court action, Drexel filed a motion before Justice Bannon asserting that ProPhase Diagnostics, Inc. did not exist as a legal entity. Drexel was compelled to withdraw that motion when Secretary

12

of State records confirmed ProPhase Diagnostics, Inc. to be in good standing. The pattern is relevant to the weight the Court should afford the Zormati Declaration here.

### B.  The Absence of a Bar Admission Is Irrelevant

The Zormati Declaration reports that searches of attorney-licensing databases reflect no bar admission for Mr. Hersperger, and offers that as though it were a deficiency. It is not. As reflected of record, this Court approved Crown's retention under 11 U.S.C. §§ 327(a) and 328(a) by Order entered November 13, 2025 (ECF Doc. No. 41). Crown functions as the Debtors' Court-approved collection professional; the relevant qualification is competence to collect the Receivables Portfolio, not the bar membership of any individual principal. Section 327(a) expressly contemplates the employment of professional persons, which includes non-attorney professionals such as collection agents.

### C.  Zormati's Innuendo Concerning Unrelated Litigation Is Without Probative Value

The Supplemental Submission references litigation involving entities other than Crown, including matters concerning separate companies with which Mr. Hersperger has at some time been associated. None of the cited matters involves Crown, the Receivables Portfolio, or any conduct in these cases. Assembling references to unrelated companies in order to suggest, without evidence, that something is amiss with Crown is guilt by association. It has no probative value toward the clear-and-convincing showing Drexel must make.

## VIII.    DREXEL HAS NOT ESTABLISHED CAUSE TO CONVERT UNDER SECTION 1112(b), AND CONVERSION IS INDEPENDENTLY PROHIBITED BY SECTION 1112(b)(2)

### A.    Drexel Has Not Established Cause Under Section 1112(b)(4)

Section 1112(b)(4)(A) requires a showing that there is both a continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation. Drexel has not made this showing; the Supplemental Submission has laid bare the opposite reality: conversion would cause loss or diminution to the estate by destroying the functioning collections program described above.

The Debtors have a concrete, Court-approved path to rehabilitation: the monetization of the Receivables Portfolio through the collection program this Court already approved. That program is functioning. A global settlement with a major commercial payor has been executed (subject to forthcoming Rule 9019 approval), and additional settlements are in active process. The Debtors have also filed a Plan of Reorganization that provides for payment in full of Drexel's allowed claim from collection proceeds.

### B.    Even If Cause Were Found, Conversion Is Prohibited by Section 1112(b)(2)

Even if any ground of cause were established under Section 1112(b)(4) — and none is — conversion is independently prohibited by 11 U.S.C. § 1112(b)(2). That provision mandates that the Court "shall not" convert or dismiss if: (A) unusual circumstances exist establishing that conversion or dismissal is not in the best interests of creditors and the estate; and (B) the debtor establishes both (i) a reasonable likelihood that a plan will be confirmed within a reasonable time, and (ii) that the grounds for cause include an act or

14

omission for which there is a reasonable justification that will be cured within a reasonable time. All requirements are satisfied here.

**Unusual circumstances.** The identity of the sole conversion movant as the subject of a pending $2.57 million adversary proceeding and a pending claim objection seeking to reduce its proof of claim to zero constitutes an unusual circumstance establishing that conversion does not serve the interests of the creditor body. The existence of a committed institutional lender prepared to provide § 364 debtor-in-possession financing that would be extinguished by conversion — and that is unavailable in any other procedural posture — is an additional unusual circumstance. And the pending § 9019 settlement with a major commercial payor, which commercial counterparties would reprice upon a Chapter 7 conversion, is a third. No single one of these circumstances would be present in the typical Section 1112(b)(4) case; all three are present here.

**Reasonable likelihood of plan confirmation.** The Debtors have a Court-ordered exclusivity deadline of July 20, 2026, a filed Plan of Reorganization, executed and in-process settlements totaling approximately $1.2 million in active process, an operating Court-approved collection program generating actual recoveries, and financing in final documentation. The profile is that of a debtor on a concrete path to confirmation.

**Reasonable justification, curable within a reasonable time.** To the extent administrative expenses constitute continuing loss under Section 1112(b)(4)(A), the justification is that those expenses are the necessary cost of administering the collection program and prosecuting the estate's most valuable affirmative claim — expenses that are bounded by the settlement pipeline and the financing facility and that will be resolved by plan confirmation. To the extent any delay in filing a plan constitutes grounds under

15

Section 1112(b)(4)(J), the justification is that the Court's own exclusivity order has not yet expired and the Debtors have filed a Plan within it. Each asserted ground therefore carries a reasonable justification that has been or will be cured within the Court's own established timeframe.

Because all requirements of Section 1112(b)(2) are satisfied, conversion is statutorily prohibited even if cause were found.

### IX. DREXEL CANNOT MEET THE CLEAR-AND-CONVINCING STANDARD FOR APPOINTMENT OF A TRUSTEE

Appointment of a trustee is an extraordinary remedy. The Third Circuit has held that the movant must prove the need for a trustee by clear and convincing evidence. In re Sharon Steel Corp., 871 F.2d 1217, 1226 (3d Cir. 1989). Drexel has not come close to meeting that standard.

Drexel's submission rests on a demonstrably false declaration — one whose central factual assertion, that Crown Medical Collections does not exist as a registered entity, is refuted by Secretary of State records attached hereto — a mischaracterized $75.5 million figure that represents three years of ordinary-course pre-petition insurance payments received during the COVID public health emergency, and a $27.7 million accounting entry that, on the parent's own SEC disclosure, reflects an ASC 810 deconsolidation recognition event rather than any actual transaction on the Debtors' books. None of this constitutes clear and convincing evidence of fraud, dishonesty, incompetence, or gross mismanagement within the meaning of Section 1104(a)(1), or evidence that trustee

16

appointment would serve the interests of creditors within the meaning of Section 1104(a)(2).

More fundamentally, Drexel's proposed remedy is affirmatively harmful to the very creditors it claims to protect. As set forth in Section III above, the collections operation that is generating recoveries for creditors depends in significant part on personnel whose compensation is controlled by the parent. A trustee — whether under Chapter 11 or Chapter 7 — has no authority over that parent or its personnel. Displacing current management therefore creates a near-certain risk that the personnel driving settlement activity will be lost, with no realistic mechanism to replace their institutional knowledge of approximately 950,000 specific claims quickly, seamlessly, or at all. The resulting degradation in collections performance would directly benefit the insurance carriers resisting payment and would directly harm the creditors Drexel claims to protect.

Drexel's deliberate choice to seek conversion rather than dismissal — the other option expressly contemplated by Section 1112(b)(1) — reveals that its true objective is not to protect the creditor body but to install a Chapter 7 trustee it hopes will be a more favorable litigation opponent in the pending adversary proceeding. That is not a legitimate purpose of a motion under Section 1112(b).

The cost and disruption of appointing a trustee far outweigh any speculative investigative benefit. Drexel has not met its burden under either Section 1104(a)(1) or Section 1104(a)(2).

## **CONCLUSION**

17

For the foregoing reasons, the Debtors respectfully request that the Court deny Drexel's Supplemental Submission in its entirety, deny conversion of these cases under 11 U.S.C. § 1112(b), deny the appointment of a trustee under 11 U.S.C. § 1104(a), and grant such other and further relief as the Court deems just and proper.

*Respectfully submitted,*

**WALLACE NEEL PLLC**

By: /s/ Wallace B. Neel
Wallace B. Neel, Esq.
(Admitted Pro Hac Vice)
1 Blue Hill Plaza, LL Suite 1509
Pearl River, New York 10965
*Special Litigation Counsel to the Debtors*

*– and –*

**MACIAG LAW, LLC**

*By: /s/ Thaddeus R. Maciag*
Thaddeus R. Maciag, Esq.
475 Wall Street
Princeton, New Jersey 08540
*Counsel for the Debtors*

18