| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY** | |
| **STARK & STARK, PC** <br> Joseph H. Lemkin, Esq. <br> 100 American Metro Blvd. <br> Hamilton, NJ 08619 <br> Telephone (609) 791-7022 <br><br> -and- <br><br> **WESTERMAN BALL EDERER MILLER ZUCKER & SHARFSTEIN, LLP** <br> Jay S. Hellman, Esq., Admitted *Pro Hac Vice* <br> 1201 RXR Plaza <br> Uniondale, New York 11556 <br> Telephone (516) 622-9200 <br><br> *Attorneys for Drexel Distribution, Inc.* | **Hearing Date: July 14, 2026** <br> **Time:            10:00 a.m.** |
| In re: <br><br> PROPHASE DIAGNOSTICS NJ, INC., et al., <br><br>     Debtors. | Chapter 11 <br><br> Case Nos. 25-19833 (CMG) <br><br> Jointly Administered <br><br> Hon. Chief Judge <br> Christine M. Gravelle |

**DREXEL DISTRIBUTION, INC.'S D/B/A EZ TEST NY'S**
**REPLY IN FURTHER SUPPORT OF ITS SUPPLEMENTAL SUBMISSION ON**
**DREXEL'S MOTION TO CONVERT THE DEBTORS' CHAPTER 11 CASES TO**
**CHAPTER 7 OR, IN THE ALTERNATIVE, TO APPOINT A CHAPTER 11 TRUSTEE**

Drexel[1] respectfully submits this Reply in Further Support of its Supplemental Submission

on its Motion and in response to the Debtors' Supplemental Response in Opposition (ECF Doc.

No. 188) (the "Response").

---

[1] Capitalized terms not defined herein have the same meaning ascribed to them in Drexel's original Motion and/or the Supplement.

4920-6405-2924, v. 1

## PRELIMINARY STATEMENT

The Debtors' Response fails to rebut the need for conversion or the appointment of a trustee but, rather, confirms it.  The Response highlights that: (i) the Debtors are beholden to Labs – a non-debtor parent with adverse interests; (ii) the collection of the insurance receivables is allegedly assisted by individuals the Debtors purportedly do not employ;[2] (iii) any recoveries against the insurance receivables are contingent, undocumented, and remain subject to an approval process the Debtors have not yet sought; and (iv) the Debtors' explanations for $75.5 million in pre-petition collections and a $27.7 million in intercompany payable(s) suggest that *no one* with fiduciary obligations to creditors has ever asked where the money went, whether the money should come back to the Debtors, and/or whether any of the pre-petition collections or payables should be pursued.

Instead, at every turn the Debtors urge this Court to simply "trust management" - the same management that: (i) belatedly disclosed a $10 million insider transaction in the form of a security interest that was arranged just months prior to the bankruptcy filings (and, when finally disclosed, the Debtors claimed that Labs was *not* affiliated);[3] (ii) funded post-petition payroll to the Debtors'

---

[2] As with every new filing the Debtors submit in this case, this is another new twist.  The Debtors *never* previously disclosed that employees of Labs assisted the collection program.  Rather, the Debtors only recently disclosed that the salaries of the Debtors' employees (as reflected in the MORs) were ultimately being funded by *Labs* (again, without Court Order), and even filed a "stipulation" two days after the June 23, 2026 hearing on conversion that purported to waive any claims Labs may have against the Debtors for having provided that funding.  *See* ECF Doc. No. 174.  The Debtors' new argument, *i.e.*, that Labs' employees are the ones doing the collection work, makes no sense when examined under the light of the foregoing facts.  That is if, in fact, *Labs* employees were performing the collection work, why would the MORs reflect payroll for the *Debtors'* employees?  Why would Labs file a "stipulation" saying that it did not intend to file a claim against the Debtors for payroll if, as Labs claims, it was paying its *own* employees to perform the collection work?

[3] The Debtors misunderstand Drexel's point in connection with this disclosure.  Although the Debtors' belatedly disclosed the secured claim in their Amended Schedules, which itself was dilatory, Drexel's point here is that it was not until the Debtors submitted the Declaration of Ted Karkus in connection with this Motion (ECF Doc. No. 164-1) that they (mistakenly) disclosed the transaction took place *only months* before the filing date and is, therefore, avoidable.  Not surprisingly, nowhere in the Debtors' Response do they contend that the secured claim is supported by a contemporaneous exchange or new value (under Bankruptcy Code § 547) or reasonably equivalent value or good faith (under Bankruptcy Code § 548); instead they incredibly contend that nobody has objected to the Labs' claim.

2

employees to "work on collections" without disclosing whether those employees consist of management and/or without first obtaining Court approval for Labs to fund; (iii) treats the insurance receivables platform as an asset of Labs, and not the Debtors; and (iv) has not produced even the most basic of documentation to support the purported collectability of nearly one million insurance receivable claims. That is not a record justifying continued deference to a debtor-in-possession; rather, it is precisely the record that warrants the relief Drexel seeks.

## ARGUMENT

## I.

### REHABILITATION IS NOT REASONABLY LIKELY  UNDER § 1112(b)(4)(A), NOTWITHSTANDING THE COLLECTION PROGRAM

The Debtors boast that $286,000 has been paid into the estates' trust accounts this month and that another $1.2 million is "imminent."  But that only underscores the problem with these cases: the $286,000 is far outstripped by the costs to collect those funds and the $1.2 million is *not* a recovery in hand, it is only a projection contingent on a "global settlement" with a "major commercial payor" that has not yet been the subject of a Rule 9019 motion or approved by this Court.  The Debtors cannot point to hoped-for recoveries that may never materialize to defeat a motion under § 1112(b)(4)(A).

But even taking the Debtors' overly-optimistic projections at face value (which the Court should not do), the amounts allegedly recovered or to be recovered are eclipsed by serious, unresolved questions. That is, the record now reflects $75,578,171 in pre-petition collections that have never been accounted for to this Court or creditors, a $27.7 million intercompany payable that no one with fiduciary duties to the Debtors' estates or their creditors has ever attempted to collect (and from the tone and content of the Debtors' papers, they will never do it), and a $10 million insider transaction in the form of a secured claim taken just months before the filing date

3

(which, again, from the tone and content of the Debtors' papers, the Debtors will never seek to avoid) that now encumbers the very receivables portfolio the Debtors tout as their vehicle toward rehabilitation.  Against that backdrop, $286,000 in collections thus far with an alleged $1.2 million on the way does not demonstrate a "reasonable likelihood" of rehabilitation - it demonstrates an approximate 3% potential recovery on the Debtors' projected, $50 million insurance receivables portfolio.

The Debtors also point to their "genomics" business and "sequencing instruments" as evidence of going-concern viability.  But that representation is fraught with multiple, objective contradictions.

First, the equipment that the Debtors claim as their own is *not* listed in any of the Petitions or Schedules.  In fact, the only real assets listed are the insurance receivables portfolios.  Critically, and in response to the question on Schedule A/B, Part 8, whether the Debtors own or lease any machinery, equipment, or vehicles, the Debtors each answered "no." [4]  *See* ECF Doc. Nos. 1, 46, and 98 in the main case; ECF Doc. Nos. 1, 26, and 36 in Case No. 25-19834 (same); and ECF Doc. Nos. 1, 26, and 36 in Case No. 25-19836 (same).  Therefore, not only do the Debtors lack space from which to operate a laboratory because the leases have either expired by their terms or have been surrendered, but by their prior admissions they also do not own any equipment despite their representations to this Court to the contrary. [5]  These infirmities suggest that the Debtors are hoping

---

[4] The only other potential response with respect to "equipment" is in Schedule A/B, Part 7, where the Debtors listed office furniture at a liquidation value of $500.00.

[5] The Debtors' about-face regarding rehabilitation is noteworthy.  Despite their newest claim in their Response that they are not relying on future laboratory operations as part of the rehabilitation process (see Response, p. 4 of 19), they previously stated that "… use the value generated by the liquidated Receivables portfolio to restructure the estates and return the Debtors to operation as going concerns, including by repurposing their laboratory operating platform …" (ECF Doc. No. 164, at p. 13 of 24, emphasis in original).  In fact, one page later in their Response, the Debtors acknowledge that "[t]he reasonable likelihood of rehabilitation is reinforced by a second fact Drexel ignores: the reorganized Debtors will continue operating business with independent going-concern value."

4920-6405-2924, v. 1

to start a new business, not simply "repurpose" a laboratory, which is ***not*** rehabilitation.  *See In re Costa Bonita Beach Resort, Inc.*, 513 B.R. 184, 198 (Bankr. D.P.R. 2014) ("The Forest Preserve District argues that the Debtor is not reorganizing a business, but starting a new business when chapter 11 is designed to reorganize existing businesses. It is correct. While the Debtor has not set up a new corporate entity, it is attempting to organize a new line of business, totally different from its past operations. The purpose of bankruptcy is to preserve going concerns and to maximize value for creditors, not to leverage a secured creditor's collateral for a new venture.").

Second, and as with their other arguments, the Debtors' stated viability of the "genomics" program conflicts with the filings that Labs made with the SEC.  *See* ECF Doc. No. 150-2.  Specifically, in its filings, Labs reported that it purchased the genomics sequencing platforms in August 2021 and September 2024, respectively.  *Id*., at p. 68 of 135.  For the three months ended September 30, 2025, however, Labs reported that net revenue was $0.9 million, ***down*** from $1.4 million for the three months ended September 2024.  *Id*., at p. 71 of 135.  Profit margins were also reported as trending downward: $.01 million for the three-month period ended September 30, 2025, down from $.02 million for the three month period ended September 30, 2024. *Id*. As Labs further reported in its filing: "We anticipate that we will continue to incur losses for the foreseeable future."  *Id*., at p. 74 of 135.  Based on all the foregoing, it is difficult to imagine ***how*** the Debtors can represent to this Court and creditors that they will have a successful rehabilitation by virtue of the genomics sequencing platform when Labs appears to be operating those platforms at a loss or, at best, at a break-even point.

Third, and on that note, the Debtors ***concede*** that the genomics sequencing business "is NOT the source of funds for creditor recoveries under the Plan."[6]  That concession is fatal: the

---

[6] Without getting into the multiple infirmities with the Debtors' plan and disclosure statement, which will be addressed in due course, the Debtors statement that they do not need the income from the genomics sequencing operations to

4920-6405-2924, v. 1

Debtors' plan rests entirely on the insurance receivables portfolio, which remains subject to a pending False Claims Act investigation, unresolved reimbursement disputes, and an insider's purported security interest of nearly $10 million.

## **II.**

### **THE DEBTORS' EXPLANATION FOR THE $75,578,171 IN COLLECTIONS ACTUALLY UNDERSCORES THE NEED FOR INDEPENDENT INVESTIGATION**

The Debtors characterize the $75,578,171 as "ordinary-course" pre-petition insurance payments received from 2020 through 2023 and applied to payroll, laboratory expenses, and vendors. Drexel does not dispute that these were pre-petition receipts. What Drexel has consistently asked - and what the Debtors conspicuously fail to answer over and over again is: *where is the documentation to support your claims?*

If $75.5 million was collected and applied in the ordinary course, that should be easy to prove. The Debtors should be able to show through accounts-payable records and reconciliations where the money went. But rather than show where money went, the Debtors attack the source of the spreadsheet that disclosed the figure – stating that Drexel acknowledges the author of the spreadsheet is unknown.   But the Debtors know who prepared that spreadsheet but, like all of the other issues with respect to the insurance receivables, they have not disclosed that information in their Response or otherwise by, for example, showing the Court the document with the metadata. Notably, the Debtors do not dispute the accuracy of the $75.5 million number – their only quarrel is with the messenger, not the message.

---

fund the plan is flatly contradicted by the cash flow *pro-forma* attached as Exhibit "E" to the Disclosure Statement (ECF Doc. No. 177).  Specifically, the *pro-forma* reflects that the Debtors intend to use the cash from the genomics business to pay creditors – but the numbers in the pro-forma reflecting payments to creditors do not account for any reserve to pay Drexel if (and when) the Debtors lose on their misguided "chargeback" claim.  Moreover, in some instances, even using the genomic business income, the Debtors' monthly projections are *still* in the negative.

6

In any event, the critical point here is this: the Debtors' own explanation confirms that $75.5 million flowed through these entities during the very period when their parent, Labs, was consolidating them on its balance sheet. The Debtors claim the money was spent on ordinary operations. Creditors are entitled to verify that - and current management, which oversaw the spending and operates the same parent that controlled the spending, is incapable of credibly conducting that investigation. These are precisely the types of intercompany transactions that justify the appointment of a trustee, because here management is "in a position of having grave potential conflicts of interest and the presumption arises that the current management of [the debtor] will be unable to make the impartial investigations and decisions demanded in evaluating and pursuing inter-company claims on behalf of [the debtor]." *In re L. S. Good & Co.*, 8 B.R. 312, 315 (Bankr. N.D.W. Va. 1980).

**III.**

**THE UNSUPPORTED "ASC 810" EXPLANATION DOES NOT EXTINGUISH LABS' $27.7 MILLION PAYABLE OR EXCUSE MANAGEMENT'S FAILURE TO PURSUE IT**

The Debtors contend that the $27.7 million payable to "unconsolidated affiliates" on Labs' 10-Q is merely an "accounting recognition" event under ASC 810, triggered by deconsolidation, and that "no corresponding receivable of anywhere near that amount appears on the Debtors' own Schedule A/B." Those arguments are unsupported, incorrect and, most of all, ludicrous.

The statements regarding the ASC 810 accounting requirements are unsupported because they are unaccompanied by any declaration of an accountant or other expert regarding the import of ASC 810 and the obligations of parents and affiliates in connection with bankruptcy filings. Accordingly, the Debtors' (or, more aptly Labs') self-serving narrative should be disregarded. *See* Fed. R. Evid. 702.

7

More importantly, the statements concerning the mere "accounting recognition" is incorrect. At least one accounting firm has published what happens with intercompany balances in bankruptcy. More specifically, in a publication dated March 12, 2025, PwC reported:

### 3.18.5 Intercompany balances during bankruptcy

Intercompany balances may exist between affiliated entities in which only certain of the entities are included in a Chapter 11 filing. When outstanding balances of a parent or subsidiary represent a claim in bankruptcy against a debtor, they should be accounted for the same as claims with an unaffiliated third party.

In instances when a parent has lost control of a bankrupt subsidiary and the subsidiary has an intercompany payable to the former parent or another parent-controlled entity, the entity in bankruptcy should no longer recognize an intercompany payable on its books. Such amounts should be recorded as liabilities subject to compromise at the expected amount of the allowed claim in the same manner as amounts due to unaffiliated third party creditors.

***In situations when a parent has lost control of a bankrupt subsidiary and that subsidiary has an intercompany receivable from its former parent*** or another parent-controlled entity, ***the entity in bankruptcy should no longer recognize an intercompany receivable on its books.*** ***<u>Such amounts should be recorded as a receivable in accordance with ASC 326 as if they were owed from a third party.</u>***

(emphasis added).[7]

Labs' SEC filings properly recognize a $27.7 million payable due the Debtors as a result of the deconsolidation. It is not merely an "accounting event" but, rather, recognition that a debt is owed as if it were owed to a third party.

In that regard, the Debtors' statement that seems to imply money is not owed because the Debtors' schedules do not reflect a $27.7 million receivable, is an absurdity. The omission means one of three things: (i) either that the Schedules are incorrect; or (ii) that the Debtors intentionally omitted the receivable due from Labs because they are all operated by the same management; or (iii) that the Debtors never even bothered to investigate the receivable claim.

---

[7]*See*https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/bankruptcies_and_liq/bankruptcies_and_liq_US/chapter_3_accounting_US/318_consolidation_during.html#pwc-topic.dita_1832292411039303

8

The Debtors' arguments are nothing less than an acknowledgement that they would never pursue the $27.7 million receivable due from Labs because they share the same management. This is a textbook conflict of interest that requires the appointment of a trustee. *See In re Intercat, Inc.*, 247 B.R. 911, 920–21 (Bankr. S.D. Ga. 2000) (factor 4: "unwillingness or inability of management to pursue estate causes of action"); *In re Microwave Prods. of Am., Inc.*, 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989) ("the failure of the debtor to attempt to collect substantial dormant receivables on the debtor's books from the parent company militates in favor of the appointment of a trustee").

The Debtors assert that the SEC filings show Labs has been funding, not extracting money from, the Debtors. But that argument reveals what Drexel has been saying all along: that the security interest that was taken in exchange for the funding was based upon antecedent debts and, as a result, the security interest is avoidable under Bankruptcy Code §§ 547 and/or 548. By their own admission, Labs funded the Debtors

- "as the COVID testing business wound down" (Response at p. 10 of 19);

- "*that* funding is reflected in the Security Agreement dated January 7, 2025 and accompanying UCC-1 filings [in May and June 2025, *see* Karkus Decl. ECF No. 164-1, at ¶ 19]…" (*Id.*; emphasis added); and

- "as the Debtors' COVID-era testing revenue ended, Labs … advanced new, separately secured capital to sustain them as their revenue disappeared as the COVID Pandemic waned." (Response, at p. 12 of 19).

Once again, reverting to Labs' SEC filings (ECF Doc. No. 150-2), Labs reported: "***The company did not generate any revenues from diagnostic services for the three months ended September 30, 2025 and 2024, respectively***." This means that the security interests, which were given in exchange for contributions from Labs in or about 2024 and 2025, are subject to avoidance.

In that regard, any "funding" under the foregoing scenario would be deemed a capital contribution, and ***not*** a loan for which Labs could elevate itself to secured creditor (or even

9

unsecured creditor) status.  It can and should be recharacterized. *See*, *e.g.*, *In re Mallett, Inc.*, No. 21-11619 (JLG), 2024 WL 150628, at *13 (Bankr. S.D.N.Y. Jan. 12, 2024) ( "Recharacterization of a claim from debt to equity 'is appropriate where the circumstances show that a debt transaction was actually an equity contribution *ab initio*.'") (cleaned up).

Accordingly, placing a lien on the Debtors' only valuable asset and treating their receivables as a "liquidity opportunity" for Labs' shareholders (as Labs' own press releases describe) is not selflessness - it is improper influence and control by management.  A disinterested trustee can evaluate these transactions without the incurable conflict that prevents current management from doing so.

### IV.

### THE DEBTORS' ARGUMENT THAT A TRUSTEE CANNOT CONTROL LABS' EMPLOYEES FURTHER PROVES DREXEL'S POINT

The crux of the Debtors' opposition is their warning that a trustee would have no authority over Labs or its personnel, and that displacing management would collapse the settlement pipeline. Those arguments are remarkable for what they acknowledge: the Debtors' entire rehabilitation strategy depends on the voluntary cooperation of a non-debtor insider that has interests adverse to these estates.

The Debtors' argument does not serve as any basis to deny the appointment of a trustee. Rather, it represents the exact incurable conflicts that require one.  More specifically, the Debtors argue that an independent fiduciary cannot be appointed because Labs will essentially retaliate by withdrawing cooperation.  If that is the case, it means that Labs - which holds an alleged $10 million secured claim that "no one objected to" yet - controls personnel working on collections, funds post-petition payroll, and treats the insurance receivables as its own asset (as noted in its public filings).  This establishes two things:  first, that Labs is exercising control over the estates

10

while management ignores its fiduciary duties to the Debtors' creditors;[8] second, if Labs would truly withdraw cooperation upon the appointment of a trustee, it reveals the fragility of the Debtors' plan, which undermines the Debtors' reasonable likelihood of rehabilitation.  Indeed, a plan that entirely depends on the goodwill of an adverse party is not a plan that is likely to succeed. As the Third Circuit has made clear, the appointment of a trustee is appropriate when, as here, management "will be unable to make the important investigation and decisions demanded" by virtue of conflicts with insiders.  *In re Sharon Steel Corp.*, 871 F.2d 1217, 1228 (3d Cir. 1989) (quoting *In re L.S. Good & Co.*, 8 B.R. at 315).

## V.

### CROWN'S WYOMING REGISTRATION DOES NOT CURE
### THE CONCERNS REGARDING CROWN AND MR. HERSPERGER

The Debtors provide evidence that Crown Medical Collections is a Wyoming corporation formed on April 27, 2023.[9]  The Debtors' attack on the Zormati Declaration's characterization of Crown's registration status does not discredit the remainder of that Declaration, because Crown's registration addresses only one aspect of the concerns Drexel raised.

The Debtors dismiss Mr. Hersperger's history with entities facing fraud and mismanagement allegations in *Value Drug Co. v. Only One Hub, Inc.*, Case No. 23-cv-00263 (W.D. Pa.) as irrelevant "guilt by association."  It is not.  Mr. Hersperger was specifically named as a defendant in that lawsuit, as well, and accused of tortious conduct, mismanagement, and contractual breaches associated with a collaborative Covid-19 testing project.  In particular, it was alleged that Only One Hub and Mr. Hersperger's misfeasance and unlawful conduct included:

---

[8] This is the very paradigm of "conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties" under *Intercat* (factor 5).

[9] It appears that Crown was issued a certificate of dissolution by the state of Wyoming, effective June 9, 2026, but the certificate was cancelled on June 30, 2026.  *See* **Exhibit "A"** attached hereto.

11

(a) failing to properly submit project claims;

(b) failing to obtain reimbursements for Covid-19 tests performed as part of the project;

(c) using improper billing codes to submit claims for the project;

(d) failing to properly segregate and place in escrow project payments received;

(e) failing to properly distribute project funds;

(f) failing to provide adequate reports, updates and information to Value Drug and other project participants;

(g) making numerous misrepresentations and material omissions to both Value Drug and Value Drug's member pharmacies related to the project; and

(h) failing to pay both Value Drug and Value Drug's member pharmacies for Covid-19 tests performed as part of the project.

When a Court is asked to entrust an estate's primary asset to a collection professional, the competence and trustworthiness of that professional is directly relevant - not as a basis for disqualification, but as a factor in assessing whether an independent trustee should oversee the relationship. The point is not that Mr. Hersperger is guilty of anything; it is that the Debtors' management selected, retained, and continues to rely upon a professional with an undisclosed litigation history, without the oversight of any fiduciary other than management itself.

## **VI.**

### **THE § 1112(b)(2) SAFE HARBOR DOES NOT APPLY**

The Debtors invoke 11 U.S.C. § 1112(b)(2) to argue that conversion is prohibited because unusual circumstances exist, rehabilitation is reasonably likely, and any continuing losses are curable. That argument fails on each prong.

**Unusual circumstances.** The Debtors argue that Drexel's status as a defendant in the adversary proceeding and a pending claim objection constitute "unusual circumstances." But the

4920-6405-2924, v. 1

existence of litigation between a debtor and a creditor is entirely routine in bankruptcy – litigation created by the Debtors themselves, is not an "unusual circumstance" justifying denial of conversion. If it were, any debtor could immunize itself from § 1112(b) by simply suing the creditor-movant.   Nor does the existence of a theoretical DIP lender "ready to provide § 364 financing" constitute an unusual circumstance when the Debtors have not presented any term sheet, the Court has not approved financing, and no motion is pending. The Court should not rely on unverified representations of future financing to defeat conversion.

**Reasonable likelihood of plan confirmation.** The Debtors cannot show a reasonable likelihood of confirming a plan within a reasonable time when: (a) the "global settlement" and "$1.2 million in active settlements" remain unquantified and unapproved; (b) the Plan's sole funding source (the insurance receivables portfolio) is subject to a pending federal False Claims Act investigation whose outcome could dramatically reduce their value; (c) the receivables portfolio is subject to dispute and the Debtors have produced no documentation supporting the collectability of the remaining portfolio; and (d) the receivables portfolio is encumbered by a recently disclosed $10 million insider secured claim.[10] A plan premised on contingencies is not a plan with a "reasonable likelihood" of confirmation.

**Reasonable justification.** The Debtors argue that their administrative expenses are "bounded" by the settlement pipeline and will be resolved by plan confirmation. But that is circular logic: the Debtors claim losses are justified because the plan will succeed, while also arguing the plan will succeed because collections are happening. Neither premise has been established with

---

[10] Whether distributions could be made to unsecured creditors is entirely speculative.  If Crown takes a 30% fee and Labs stands to collect nearly $10 million on its secured claim before any funds are available to unsecureds, then it is unlikely that unsecured creditors will see any distribution.

13

documentation, and both are contingent on the cooperation of Labs, an adverse parent whose cooperation the Debtors themselves warn will evaporate if a trustee is appointed.

## VII.

### THE PATTERN OF INCREMENTAL DISCLOSURE INDEPENDENTLY WARRANTS A TRUSTEE UNDER §§ 1104(a)(1) AND (a)(2)

Throughout the Response, the Debtors characterize each newly revealed and challenged disclosure as isolated and innocent. But the pattern, viewed in its totality, tells a different story:

- The Debtors' schedules were amended twice—on November 30, 2025, and March 30, 2026 - before Labs' $9,998,503.80 security interest was disclosed, and even then without designating Labs as an insider;

- Labs' post-petition funding of payroll for personnel working on collections was not disclosed to the Court or creditors until it was inadvertently revealed at the first hearing on conversion, prompting a belated "stipulation" (ECF Doc. No. 174) filed two days later;
- The DIP Receivables Trust Account Motion proposed allocating $4.5 million to Labs (the non-debtor parent) and only $1.5 million to the Debtors - a ratio that speaks volumes about who actually controls these estates;

- Labs' public statements consistently treat the insurance receivables portfolio as a Labs asset, and a "liquidity opportunity" for "current ProPhase shareholders," not as property of the Debtors' estates.

This is not the conduct of a debtor-in-possession fulfilling its fiduciary obligations of "[o]pen, honest, and straightforward disclosure." *Martelli v. Colts Neck Golf & Country Club*, No. 14-8101 FLW, 2015 WL 5032621, at *5 (D.N.J. Aug. 25, 2015). Rather, it reflects management that discloses only when compelled, omits what is inconvenient, and structures transactions for the benefit of Labs rather than creditors. Under either or both § 1104(a)(1) (cause, including dishonesty and gross mismanagement) and § 1104(a)(2) (interests of creditors), this record warrants a trustee. *See In re Sharon Steel Corp.*, 871 F.2d at 1226–28; *In re Ridgemour Meyer Props., LLC*, 413 B.R. 101, 112 (Bankr. S.D.N.Y. 2008).

14

Finally, the Debtors suggest that Drexel's "true motive" in seeking conversion is to obtain a more favorable litigation opponent.  This *ad hominem* attack ignores that Drexel is one of the Debtors' largest creditors and has a direct interest in maximizing estate recoveries - recoveries that are being jeopardized by management's incurable conflicts of interest and lack of transparency. Certainly, a trustee is no weaker an adversary than a debtor-in-possession and, in many cases, an aggressive trustee is far superior. But Drexel's motivation is irrelevant here – the objective record independently establishes cause for a trustee under both § 1104(a)(1) and § 1104(a)(2).

15

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in Drexel's Motion papers and Supplemental Submission, Drexel respectfully requests that the Court enter an Order converting these jointly administered Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code. In the alternative, if the cases are not converted, the Court should issue an Order appointing a Chapter 11 operating trustee.

Dated: July 10, 2026

*Respectfully submitted,*

**STARK & STARK, P.C.**
A Professional Corporation

__*/s/ Joseph Lemkin*_____
Joseph H. Lemkin, Esq.
100 American Metro Boulevard
Hamilton, N.J. 08619-2319
(609) 791-7022
jlemkin@stark-stark.com
*Attorneys for Drexel Distribution, Inc. d/b/a EZ Test NY*

-and-

**WESTERMAN BALL EDERER MILLER ZUCKER & SHARFSTEIN, LLP**

By: *__/s/ Jay S. Hellman__*
Jay S. Hellman, Esq., Admitted *Pro Hac Vice*
1201 RXR Plaza
Uniondale, New York 11556
(516) 622-9200
*Attorneys for Drexel Distribution, Inc. d/b/a EZ Test NY*

16

4920-6405-2924, v. 1