**MACIAG LAW, LLC**
Thaddeus R. Maciag, Esq.
475 Wall Street
Princeton, New Jersey 08540
(908) 704-8800
*Attorney for the Debtors*

**WALLACE NEEL, PLLC**
Wallace B. Neel, Esq. (Pro Hac Vice)
1 Blue Hill Plaza, LL Suite 1509
Pearl River, New York 10965 (646)
524-6502
*Special Counsel to the Debtors*

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF NEW JERSEY**

---

In re:

**PROPHASE DIAGNOSTICS NJ, INC., et al.,**

**Debtors.**

Chapter 11
Case No.: 25-19833-CMG

**(jointly administered)**

Judge: Hon. Christine M. Gravelle

---

# <u>SECOND MODIFIED DISCLOSURE STATEMENT</u>
# PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE DESCRIBING THE FIRST MODIFIED JOINT CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE DEBTORS

**PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY. IT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION PROPOSED BY THE DEBTORS. THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND THAT THE PLAN IS FAIR AND EQUITABLE, AND URGE THAT CREDITORS ACCEPT THE PLAN.**

**Plan Proponents:**
ProPhase Diagnostics NJ, Inc.
ProPhase Diagnostics NY, Inc.
ProPhase Diagnostics, Inc.

Dated: August 20, 2026

by: DocuSigned by: *Ted Karkus* 45C4B49D36E149F... ____________
Ted Karkus
Chief Executive Officer
of the Jointly Administered Debtors

## TABLE OF CONTENTS

**I. INTRODUCTION....................4**
A. Purpose of This Document....................4
B. Confirmation Procedures....................5
1. Time and Place of the Confirmation Hearing....................7
2. Deadline for Voting for or Against the Plan....................7
3. Deadline for Objecting to the Confirmation of the Plan....................7
4. Identity of Person to Contact for More Information Regarding the Plan....................7
C. Disclaimer....................7
**II. BACKGROUND....................8**
A. Description and History of the Debtors' Business....................8
B. Principals and Affiliates of the Debtors' Business....................8
C. Management of the Debtors Before and During the Bankruptcy....................8
D. Events Leading to the Chapter 11 Filing....................8
E. Significant Events During the Bankruptcy....................9
1. Bankruptcy Proceedings....................9
2. Other Legal Proceedings; Pending Adversary Proceedings and Claim Disputes....................9
The Drexel Settlement....................10
Adversary Proceedings and Claims Filed by PPFB, LLC....................10
The Separate Hennrick Qui Tam Action and the Failure to File a Proof of Claim....................11
3. Recovery of Preferential or Fraudulent Transfers....................12
4. Procedures Implemented to Resolve Financial Problems....................12
5. Current and Historical Financial Conditions....................13
**III. SUMMARY OF THE PLAN OF REORGANIZATION....................13**
A. What Creditors and Interest Holders Will Receive Under the Proposed Plan....................13
B. Unclassified Claims....................14
1. Administrative Expenses and Fees....................14
2. Priority Tax Claims....................17
C. Classified Claims and Interests....................17
1. Classes of Secured Claims (Classes 1 and 2)....................18
2. Classes of Priority Unsecured Non-Tax Claims (Class 11)....................18
3. Classes of General Unsecured Claims (Classes 3 through 10)....................19
Basis for the Separate Classification of Class 9 and Class 10....................21
4. Classes of Interest Holders (Class 12)....................22
D. Means of Effectuating the Plan....................22
1. Funding for the Plan (Track One: Receivables Collections)....................22
Limited Consolidation of the Estates for Purposes of Funding Distributions....................24
2. Post-Confirmation Management and Reorganized Operations (Track Two)....................24
3. Disbursing Agent....................25
E. Other Provisions of the Plan....................26

1. Executory Contracts and Unexpired Leases....26
2. Changes in Rates Subject to Regulatory Commission Approval....26
3. Retention of Jurisdiction and Authority....26
4. Procedures for Resolving Contested Claims....26
5. Effective Date....26
6. Modification....26

F. Tax Consequences of the Plan....27
G. Risk Factors....27

**IV. CONFIRMATION REQUIREMENTS AND PROCEDURES....31**

A. Who May Vote or Object....31
1. Who May Object to Confirmation of the Plan....31
2. Who May Vote to Accept or Reject the Plan....31
a. What Is an Allowed Claim or Interest....31
b. What Is an Impaired Claim or Interest....32
3. Who Is Not Entitled to Vote....32
4. Who Can Vote in More Than One Class....32
5. Votes Necessary to Confirm the Plan....32
6. Votes Necessary for a Class to Accept the Plan....33
7. Treatment of Nonaccepting Classes....33
8. Request for Confirmation Despite Nonacceptance by Impaired Classes....33

B. Liquidation Analysis....33
C. Feasibility....35

**V. EFFECT OF CONFIRMATION OF PLAN....36**

A. Discharge....36
B. Revesting of Property in the Debtor....36
C. Modification of Plan....36
D. Post-Confirmation Conversion / Dismissal....37

**EXHIBITS TO THIS DISCLOSURE STATEMENT**

Exhibit A BALANCE SHEET....38
Exhibit B PROFIT AND LOSS STATEMENT....43
Exhibit C LIQUIDATION ANALYSIS....47
Exhibit D FINANCIAL PROJECTIONS....51
Exhibit E PROPOSED PLAN OF REORGANIZATION....57

# I. INTRODUCTION

ProPhase Diagnostics NJ, Inc., ProPhase Diagnostics NY, Inc., and ProPhase Diagnostics, Inc. (collectively, the **"Debtors"**) are the debtors in these jointly administered Chapter 11 cases. On September 22, 2025, each Debtor commenced a bankruptcy case by filing a voluntary Chapter 11 petition under the United States Bankruptcy Code (the **"Code"**), 11 U.S.C. § 101 et seq. Chapter 11 of the Code allows the Debtors, and under some circumstances other parties in interest, to propose a Plan of Reorganization ("**Plan**"). The Plan may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both. The Debtors are the proponents of the First Modified Joint Plan of Reorganization ("Plan") dated August 18, 2026, sent to you in the same envelope as this document, which modifies and supersedes in its entirety the Original Joint Plan of Reorganization filed June 29, 2026 [ECF Doc. No. 176]. THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE PLAN. THE PLAN IS FILED SEPARATELY ON THE DOCKET AND IS SERVED TOGETHER WITH THIS DISCLOSURE STATEMENT, AS REFLECTED AT EXHIBIT E HERETO.

This is a **reorganizing** plan. In other words, the Proponents seek to accomplish payments under the Plan from the orderly collection of the Debtors' commercial-payer receivables portfolio, from recoveries on the Debtors' causes of action, and from the continued and repurposed operations of the reorganized Debtors' clinical-laboratory platform.

## A. Purpose of This Document

This Disclosure Statement summarizes what is in the Plan and provides information about the Plan and the process the Court follows in determining whether to confirm the Plan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

**(1) WHO CAN VOTE OR OBJECT,**

**(2) THE PROPOSED TREATMENT OF YOUR CLAIM (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE IN LIQUIDATION,**

**(3) THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,**

**(4) WHAT THE COURT WILL CONSIDER WHEN DECIDING WHETHER TO CONFIRM THE PLAN,**

**(5) THE EFFECT OF CONFIRMATION, AND**

**(6) THE FEASIBILITY OF THE PLAN.**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

Code Section 1125 requires a Disclosure Statement to contain "adequate information" concerning the Plan. The term "adequate information" is defined in Code Section 1125(a) as "information of a kind, and in sufficient detail," about a debtor and its operations "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of the debtor to make an informed judgment about accepting or rejecting the Plan. The Bankruptcy Court ("Court") has determined that the information contained in this Disclosure Statement is adequate, and it has approved this document in accordance with Code Section 1125(b).

This Disclosure Statement is provided to each creditor whose claim has been scheduled by the Debtor or who has filed a proof of claim against the Debtor and to each interest holder of record as of the date of approval of this Disclosure Statement. Under the Bankruptcy Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to or concurrently with such solicitation.

**B. Confirmation Procedures**

Persons Potentially Eligible to Vote on the Plan

In determining acceptance of the Plan, votes will only be counted if submitted by a creditor whose claim is duly scheduled by the Debtor as undisputed, non-contingent and liquidated, or who, prior to the hearing on confirmation of the Plan, has filed with the Court a proof of claim which has not been disallowed or suspended prior to computation of the votes on the Plan. Holders of Equity Interests are classified in Class 12, which is Unimpaired and is conclusively presumed to have accepted the Plan under Section 1126(f), and are not entitled to vote. The Ballot Form that you received does not constitute a proof of claim. If you are uncertain whether your claim has been correctly scheduled, you should check the Debtor's Schedules, which are on file at the office of the Clerk of the Bankruptcy Court located at: United States Bankruptcy Court, U.S. Court House, 402 East State Street, Trenton, New Jersey 08608. The Clerk of the Bankruptcy Court will not provide this information by telephone.

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

**1. Time and Place of the Confirmation Hearing**

The Hearing at which the Court will determine whether to confirm the Plan (the **"Confirmation Hearing"**) will take place on [**DATE**] at [**TIME**], in Courtroom 3, United States Bankruptcy Court, 402 East State Street, Trenton, New Jersey 08608 (or by such on-line electronic means as the Court may provide), before the Honorable Christine M. Gravelle, Chief United States Bankruptcy Judge.

**2. Deadline for Voting for or Against the Plan**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot to MACIAG LAW LLC, ProPhase Balloting Department, 475 Wall Street, Princeton, NJ 08540.

Your ballot must be received by ___________, 2026 or it will not be counted.

(The deadline for casting ballots to accept or reject the Plan, and the deadline for filing and serving objections to confirmation, will be fixed by the Court at the hearing approving this Disclosure Statement and stated in the accompanying notice. Ballots must be returned to counsel for the Proponents at the address above).

**3. Deadline for Objecting to the Confirmation of the Plan**

Objections to the confirmation of the Plan must be filed with the Court and served upon the Debtors' attorneys listed at the top of the first page of this Disclosure Statement in a manner as to be actually filed and served no later than _________, 2026.

**4. Identity of Person to Contact for More Information Regarding the Plan**

Any interested party desiring further information about the Plan should contact either (1) their own attorney or (2) the Debtors' attorneys listed at the top of the first page of this Disclosure Statement. Note: the Debtors' attorneys cannot provide you with legal advice, but may be able to answer questions about the Plan.

**5. Disclaimer**

The financial data relied upon in formulating the Plan is based on the Debtors' books and records, the collection reports and projections of the Court-retained collection agent, and related materials. The information in this Disclosure Statement is provided by the Debtors and, as to the collection program, by the collection agent. The Proponents represent that the information stated herein is true to the best of their knowledge.

PLEASE NOTE THAT THE APPROVAL OF THIS DISCLOSURE STATEMENT BY THE COURT DOES NOT CONSTITUTE A RULING ON THE MERITS, FEASIBILITY, OR DESIRABILITY OF THE PLAN.

## II. BACKGROUND

### A. Description and History of the Debtors' Business

Each Debtor is a corporation. The Debtors are CLIA-certified clinical-laboratory entities that operated COVID-19 diagnostic testing services during the federal Public Health Emergency under the CARES Act. The Debtors conducted significant diagnostic testing volume during the height of the pandemic. As the Public Health Emergency ended and commercial-payer reimbursement contracted, the Debtors ceased active COVID-19 testing operations in 2025. The Debtors' laboratory infrastructure, including certifications, facilities, and equipment, remained intact. The Debtors' principal financial asset following the cessation of testing is the Receivables Portfolio, consisting of unpaid commercial-insurance claims for COVID-19 testing services rendered during the Public Health Emergency.

### B. Principals and Affiliates of the Debtors' Business

The Debtors are wholly owned subsidiaries of ProPhase Labs, Inc. (the **"Parent"**), a publicly reporting company whose common stock is currently quoted on the OTC market under the symbol PRPH. The Parent owns 100 percent of the equity of Debtor ProPhase Diagnostics, Inc., which in turn owns 100% of the stock of Debtor ProPhase Diagnostics NJ, Inc. and of Debtor ProPhase Diagnostics NY, Inc. The Parent is also the Debtors' largest creditor, as described below in Class 1.

### C. Management of the Debtors Before and During the Bankruptcy

The Debtors have been managed during these cases by their existing officers and management, in coordination with the Parent, as debtors-in-possession under Sections 1107 and 1108 of the Code. No Chapter 11 trustee or examiner has been appointed.

### D. Events Leading to the Chapter 11 Filing

The Debtors built substantial COVID-19 testing operations during the Public Health Emergency. As the Emergency ended and commercial-payer reimbursement for COVID-19 testing contracted, the Debtors' testing revenue declined sharply while large balances of billed but unpaid commercial-insurance claims remained outstanding. The Debtors commenced these Chapter 11 cases on September 22, 2025 to preserve and realize the value of the Receivables Portfolio in an orderly manner, to address disputed claims, and to reorganize around continued collection and a repurposed laboratory operating platform.

## E. Significant Events During the Bankruptcy

### *1. Bankruptcy Proceedings*

Significant events in these cases include, in chronological order: the filing of the petitions and entry of the joint administration order (September 2025); the entry of the administrative fee procedures order (October 21, 2025); the retention of Maciag Law, LLC as Debtors' counsel; the retention of Crown Medical Collections as Special Counsel for receivables collection (Doc 41, November 13, 2025); the filing by the United States Trustee of a motion to convert or dismiss (Doc 59, January 15, 2026), which the United States Trustee withdrew on February 10, 2026; the entry of orders extending the Debtors' exclusive periods, most recently through June 29, 2026 (Doc 143, entered May 6, 2026, as amended by Doc 155, entered May 26, 2026); the retention of Wallace Neel PLLC as Special Litigation Counsel (Doc 135, April 30, 2026); the filing of the Debtors' objection to the claim of a litigation counterparty (Doc 134, April 30, 2026); the commencement of an adversary proceeding by the Debtors against a litigation counterparty and its principal (Adv. No. 26-01208, May 4, 2026); the entry of the order establishing the DIP Receivables Trust Account (Doc 154, May 26, 2026); the filing of the Debtors' First Modified Disclosure Statement (Doc 179, July 1, 2026); the filing by PPFB, LLC of a limited objection to the First Modified Disclosure Statement (Doc 194, July 28, 2026) and the Debtors' response thereto (August 6, 2026); the filing of the Debtors' combined objection to and motion to estimate the claims of PPFB, LLC (Doc 205, returnable September 15, 2026); the Debtors' settlement with Drexel Distribution, Inc. d/b/a EZ-Test and the filing of the Debtors' motion for approval of that settlement under Bankruptcy Rule 9019 (Doc 207, returnable September 15, 2026); the filing of the Local Form Notice of Proposed Compromise or Settlement of Controversy as a separate docket entry (Doc 208, August 14, 2026), fixing the docketing error noted by the Court on August 11, 2026; and the withdrawal of the First Modified Disclosure Statement at the hearing held August 11, 2026 in order to permit the filing of this Second Modified Disclosure Statement as a complete modified document in accordance with D.N.J. LBR 3016-1(b).

The Court has approved the employment of the following professionals: Maciag Law, LLC, as Debtors' counsel; Crown Medical Collections, as Special Counsel for receivables collection on a Court-approved contingency basis; and Wallace Neel PLLC, as Special Litigation Counsel. Estimated amounts owed to professionals are set forth in Section III.B below and in the applicable fee applications.

### *2. Other Legal Proceedings; Pending Adversary Proceedings and Claim Disputes*

The following significant contested matters and proceedings are pending or have been resolved by settlement, and are material to the Plan. First, the Debtors objected to the proof of claim of Drexel Distribution, Inc. d/b/a EZ-Test ("Drexel") [ECF Doc. No. 134], and commenced an adversary proceeding against Drexel and its principal (Adv. No. 26-01208) seeking not less than

$2,571,842 in chargeback damages plus additional damages. Those matters have now been resolved by a settlement, described immediately below, which is subject to Court approval under Bankruptcy Rule 9019. Second, PPFB, LLC has asserted contingent, disputed, and unliquidated claims against each of the Debtors in Adversary Proceeding Nos. 25-02526, 25-02527, and 25-02528, one in each of the three jointly administered cases, which the Debtors dispute and which are the subject of the Debtors' pending objection and motion to estimate [ECF Doc. No. 205]; the related qui tam action, United States, et al., ex rel. PPFB, LLC v. ProPhase Labs, Inc., et al., No. 2:23-cv-00627-NCM-AYS, is pending in the United States District Court for the Eastern District of New York, and was filed January 27, 2023. The estimated effect of each matter on the Plan, and the anticipated cost of prosecuting or defending it, is described in the Risk Factors in Section III.G.

**The Drexel Settlement**

Drexel filed a proof of claim in the asserted amount of $1,754,088.00. The Debtors objected to that claim [ECF Doc. No. 134] and commenced Adversary Proceeding No. 26-01208 against Drexel and its principal. Drexel in turn filed a motion to convert these cases to Chapter 7 [ECF Doc. No. 150]. Following negotiation, the Debtors, the Parent, and Drexel reached a settlement resolving all of these matters. Under the settlement, the Drexel claim is reduced and allowed against the estates in the fixed amount of $125,000.00 (the "Estate Component"), and the Parent, ProPhase Labs, Inc., separately agrees to pay Drexel the sum of $775,000.00 from the Parent's own funds and outside the Plan (the "Parent Component"), for total consideration of $900,000.00. A portion of the settlement consideration, in the amount of $200,000.00, is presently held in the escrow account of Wallace Neel PLLC, special litigation counsel to the Debtors, and is to be released in accordance with the settlement agreement upon entry of an order approving the settlement. Upon approval of the settlement, Drexel's motion to convert is to be withdrawn, Adversary Proceeding No. 26-01208 is to be dismissed, and the Debtors' objection to the Drexel claim is resolved. Drexel has agreed to vote to accept the Plan. The Debtors have filed a motion for approval of the settlement under Bankruptcy Rule 9019 [ECF Doc. No. 207], returnable September 15, 2026. The settled Drexel claim is classified in Class 10 under the Plan, as described in Section III.C below. If the Court does not approve the settlement, the settlement is of no force and effect and the Drexel claim reverts to its prior status as a contingent, disputed, and unliquidated claim in Class 9.

**Adversary Proceedings and Claims filed by PPFB, LLC**

PPFB has filed duplicate (or "triplicate") Proofs of Claim (as amended, the "PPFB Claim") asserting $75,928,404 against each of the three jointly administered Debtors. PPFB filed Proof of Claim No. 6 on December 1, 2025 and amended it twice, most recently on February 5, 2026. PPFB has also filed three duplicate Adversary Proceedings against each of the three jointly administered Debtors, based on the PPFB Claim. The three duplicate claims are based entirely on an

unadjudicated *qui tam* complaint under the federal and state False Claims Acts that the United States, New York, and New Jersey each investigated and declined to prosecute, and which *qui tam* Complaint, at the time the Proofs of Claim were filed, did not even include any of the three Debtors as Defendants. No court has entered any judgment in the *qui tam* case, and no tribunal has made any finding of liability, in any amount. To the contrary, all three government entities involved, the United States, the State of New York, and the State of New Jersey, on November 25, 2025 all formally filed with the Court a Notice of Election to Decline Intervention after spending months investigating the alleged *qui tam* accusations and finding no reason to proceed with the case.

The Proponents believe that the PPFB Claim should be disallowed under 11 U.S.C. § 502(b) because it is legally deficient and unsupported. PPFB pleads a laboratory-licensure issue rather than a false claim; a licensure question does not render a claim "false" under the False Claims Act, particularly where, as here, the tests were real, medically necessary, actually performed, and truthfully billed, and the laboratory's certification was never revoked. Under the demanding materiality standard set by the United States Supreme Court in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016), the claim fails as a matter of law.

The *qui tam* case seeks to bring a False Claims Act case based on the alleged absence of a laboratory license that in fact was never absent. It must also be noted that a *qui tam* recovery requires clean hands, and in the opinion of the Proponents it is the individuals who are behind the *qui tam* Relator (PPFB, LLC) who were themselves the bad actors, who when they left ProPhase Labs turned around and tried to assert a *qui tam* claim. No license was ever suspended, and no invoices sent to the government were false or fraudulent in any way.

**The Separate Hennrick Qui Tam Action and the Failure to File a Proof of Claim**

A second and entirely separate qui tam action exists. That action is captioned United States of America, the State of New York, and the State of New Jersey, ex rel. Kenneth Hennrick, M.D. v. ProPhase Labs, Inc., et al., Case No. 1:23-cv-06478-EK-MMH, and is also pending in the United States District Court for the Eastern District of New York. It is a different action, brought by a different relator, from the PPFB action described above. In the Hennrick action, the United States, the State of New York, and the State of New Jersey each filed a Notice of Non-Intervention on October 31, 2025, and the complaint was unsealed on November 4, 2025.

The Debtors listed the Hennrick claim on their amended schedules filed November 30, 2025 in all three jointly administered cases, and listed that claim as contingent, unliquidated, and disputed. Because the claim was so scheduled, it is not deemed filed under Section 1111(a) of the Bankruptcy Code, and the holders of that claim were required to file a proof of claim in order to participate in these cases. By Consent Order entered February 2, 2026 [ECF Doc. No. 68], the deadline for those parties to file a proof of claim was extended to March 23, 2026. No proof of

claim was filed in any of the three cases by that deadline, and the Debtors have confirmed that no such proof of claim appears on any of the three claims registers as of the date of this Disclosure Statement.

Accordingly, and subject to any further order of the Court, the holders of the Hennrick claim hold no Allowed Claim in these cases. They are not entitled to vote on the Plan, they are not entitled to receive any distribution under the Plan, and the Hennrick claim is not included in any Class and is not included in the Debtors' estimate of Plan obligations. Holders of the Hennrick claim who dispute this treatment may file an objection to confirmation or seek leave to file a late proof of claim, and the Debtors reserve all rights with respect to any such filing.

Creditors and parties in interest should note that the bar of a claim from participation in these cases is not the same as a discharge of that claim. Section 1141(d)(6) of the Bankruptcy Code provides that confirmation of a plan does not discharge a corporate debtor from any debt owed to a person as the result of an action filed under subchapter III of chapter 37 of title 31 of the United States Code, which is the federal False Claims Act, or from a debt of a kind specified in Section 523(a)(2)(A) or (B) owed to a domestic governmental unit. To the extent the Hennrick claim or the PPFB Claim falls within Section 1141(d)(6), such claim would not be discharged by confirmation of the Plan notwithstanding that it receives no distribution under the Plan. The Debtors express no view on the merits of that question and reserve all rights and defenses, including their position that no liability exists under either action.

For the above reasons the Proponents have filed a combined objection to the PPFB Claim and motion to estimate the PPFB Claim at zero dollars ($0.00) [ECF Doc. No. 205], returnable September 15, 2026, and believe the claim will be found to be of no value. The PPFB Claim is classified in Class 9 under the Plan, as described in Section III.C below, and shall receive no distribution unless and until it is allowed by Final Order.

### *3. Recovery of Preferential or Fraudulent Transfers*

The Debtors are not presently aware of material preferential or fraudulent transfer actions to be pursued. The Debtors reserve all rights to investigate and to pursue any such actions, and any recoveries would supplement the funding available for distributions under the Plan.

### *4. Procedures Implemented to Resolve Financial Problems*

To address the circumstances that led to these cases, the Debtors retained a Court-approved collection agent to pursue the Receivables Portfolio on a contingency basis, established by Court Order a DIP Receivables Trust Account to hold and disburse collected funds under Court supervision, pursued resolution of disputed claims through objection and litigation, and pursued financing and commercial-payer settlements to fund the estates and a plan. The goal of these

measures is to maximize recoveries to creditors and to position the reorganized Debtors as an operating clinical-laboratory enterprise.

***5. Current and Historical Financial Conditions***

The Debtors' current and historical financial condition is reflected in the Exhibits to this Disclosure Statement, and in the schedules, statements of financial affairs, and monthly operating reports filed with the Court, which are incorporated by reference. Because the Debtors ceased active testing operations in 2025, the amounts reflected in the monthly operating reports principally represent the costs of administering these Chapter 11 cases rather than the operating results of an active testing business. The Debtors' most recent monthly operating report should be consulted for current financial detail.

## III. SUMMARY OF THE PLAN OF REORGANIZATION

### A. What Creditors and Interest Holders Will Receive Under the Proposed Plan

The Plan classifies claims and interests into classes, states whether each class is impaired or unimpaired, and provides the treatment each class will receive. The Plan is funded by the orderly collection of the Receivables Portfolio, recoveries on the Debtors' causes of action, and the continued operations of the reorganized Debtors. The following is a summary only; the Plan controls.

### The Two Financial Tracks of the Plan

The Plan's financial foundation consists of two distinct tracks, which are presented separately throughout this Disclosure Statement and in two separate financial exhibits. These two tracks serve two different purposes and should not be conflated. Track One, the Receivables Collections, is the source of cash that funds the distributions to creditors and carries the Plan's feasibility; the Plan's ability to pay creditors rests on this track. Track Two, the Reorganized Genomics Business, establishes that the reorganized Debtors are a viable, operating going concern rather than a liquidating shell; it demonstrates operating viability and is not relied upon to fund the payments to creditors. The summary below presents the two tracks separately, and the detailed projections for both tracks appear in the Receivables Analysis and Operating Projections annexed as Exhibit D, which include the corresponding cash flow presentation.

| TRACK ONE - RECEIVABLES COLLECTIONS (Funds Creditor Distributions; Carries Feasibility) |
|---|
| Documented portfolio in active negotiation: approximately $242 million gross (approximately 950,000 claims). Conservative plan recovery: approximately one-third of the portfolio resolved over three years. Net cash projected to the estates, after the collection agent's contingency compensation: approximately $45 million to $50 million, weighted to the first two years. This projected net cash exceeds the Plan's total payment obligations by a substantial multiple. Detail in Exhibit D. |

| TRACK TWO - REORGANIZED GENOMICS BUSINESS (Demonstrates Going-Concern Viability; Not Relied On for Feasibility) |
| --- |
| Existing genomic sequencing business: approximately $4 million in current annual revenue with no dedicated marketing. Plan strategy: bring sequencing in-house to improve margins and fund a disciplined marketing program, supported in part by collection proceeds. On conservative assumptions, the business generates positive operating cash flow in each year of the projection period and grows over the three-year horizon. Provided to demonstrate operating viability, and not to fund creditor payments. Detail in Exhibit D. |

*The two tracks are independent. The Plan's feasibility and the payment of creditors depend on Track One alone; Track Two is presented to show that the reorganized Debtors are a going concern.*

**Note on the Financial Exhibits.** The Balance Sheets annexed as Exhibit A show, as the "Projected Net Liquidation Value of Accounts Receivable," the total lifetime collectible value of the entire receivables portfolio over the coming years, while the lesser sum shown in the Projections annexed at Exhibit D is the conservative three-year plan-funding projection for just the first three years, being roughly one-third of the portfolio, at about 85% realization, less the 30% collection fee. This same note appears on the cover page of Exhibit A. The Profit and Loss Statement annexed as Exhibit B presents the operating results of the estates for the periods stated therein. The chart annexed as Exhibit D sets forth the projected payment of each class of claims under the Plan, including Class 1 (the Allowed Secured Claim of the Parent) and Class 10 (the Allowed Settled Claim of Drexel).

## B. Unclassified Claims

### *1. Administrative Expenses and Fees*

Allowed Administrative Expenses, including Court-approved professional fees and United States Trustee fees, will be paid in full On or Before the Effective Date per ECF No. 154, ¶8(a), unless the holder agrees to different treatment. All professional compensation is subject to Court approval upon Interim or Final Applications for Compensation or 80% of Monthly Fee Statements without objection, per ECF No. 154, ¶8(a). The compensation of the collection agent is governed by its Court-approved retention and the orders establishing the DIP Receivables Trust, and is payable from the DIP Receivables Trust Account to the extent approved upon an Application for Compensation and by Order of the Court. All proceeds collected are deposited directly into that Trust Account and into no other account, and the collection agent has no right of self-help, setoff, or unilateral withdrawal. Its compensation is reviewed under the standard of Section 328(a), the United States Trustee retains the right to object on the reasonableness standard of Section 330, and amounts paid remain subject to disgorgement until approved on a final basis. Every disbursement requires an Order of the Court delivered to the depository bank by Debtors' counsel, with a copy to the United States Trustee three business days in advance. No Application for Compensation has been filed by the collection agent as of the date of this Disclosure Statement. The contingency compensation of the collection agent is not an additional obligation of the Plan. It is a cost of collection borne by the collections themselves. The Financial Projections, annexed as Exhibit D, state projected cash available to the estates after approval and

deduction of that compensation, and the Total Plan Obligations set forth in that Exhibit do not include it. Holders of Claims are therefore not competing with the collection agent for the same dollars; the amounts shown as available to pay Claims are amounts remaining after the contingency has been provided for. On and after the Effective Date, and as provided in Section II.F.3(b) of the Plan, the collection program continues on the same terms and the contingency earned on collections received on and after that date is paid by the Reorganized Debtors in the ordinary course of business. Sections 327 and 330 of the Code govern the employment and compensation of professionals employed by a trustee or a debtor in possession for an estate. Upon the Effective Date the property of the estates revests in the Reorganized Debtors under Section 1141(b) and the collection agent continues as a service provider to the Reorganized Debtors rather than as an estate professional, and no further application is required as to compensation earned on and after that date. Compensation earned through the Effective Date remains subject to a final Application for Compensation and to allowance by the Court, and to the disgorgement provisions of the retention order until so allowed. The Court retains jurisdiction to resolve any dispute regarding that compensation on the request of a party in interest after notice and a hearing. Interim fee awards to Debtors' counsel approved to date total $148,383 in fees and expenses (Doc 114 and Doc 147), of which $80,000 has been paid, as reflected in the Debtors' monthly operating report for the month ending July 31, 2026. Wallace Neel PLLC was retained as special litigation counsel by Order entered April 30, 2026 [ECF Doc. No. 135]. As of the date of this Disclosure Statement no application for compensation has been filed on behalf of that firm in any of the three cases, and accordingly no amount for that firm is included in the estimated administrative claims stated in this Disclosure Statement or in the Financial Projections annexed as Exhibit D. Any compensation and reimbursement of expenses ultimately sought by that firm would constitute an administrative expense under Section 503(b) and would be payable only upon application to and allowance by the Court under Sections 330 and 331. If such an application is filed and allowed, the administrative claims payable on the Effective Date would increase by the amount allowed. As stated in Section III.G below, the projected surplus of collections over all Plan obligations is substantial, and the Debtors do not believe that any such allowance would impair the feasibility of the Plan. A chart of estimated administrative claims and their treatment is set forth below.

**Chart of Estimated Administrative Claims and Their Treatment.**

| Claimant | Type | Estimated Amount | Treatment |
|---|---|---|---|
| Maciag Law, LLC | Debtors' Attorney, Chapter 11 professional | Approved cumulative $148,383 in fees and expenses (Doc 114, Doc 147), of which $80,000 paid; further fees subject to application | Paid in full On or Before the Effective Date, per Court approval upon Interim and Final Applications for Compensation or 80% of Monthly Fee Statements, per ECF Doc No. 154, ¶8(a) |
| Wallace Neel PLLC | Special Litigation Counsel, Chapter | Retained by Order entered April 30, 2026 | Paid in full On or Before the Effective Date, subject to Court |

| | | | |
|---|---|---|---|
| | 11 professional | [ECF Doc. No. 135]. That firm has filed monthly fee statements for April 2026 and May 2026 under the administrative compensation procedures established by Order entered October 21, 2025 [ECF Doc. Nos. 195 and 196], totaling $25,110.00 in fees and $124.70 in disbursements, or $25,234.70 in the aggregate. Certifications of No Objection as to each were filed on August 16, 2026 [ECF Doc. Nos. 210 and 211], upon which $20,088.00, being eighty percent of the fees, together with the $124.70 of disbursements, became payable, and $5,022.00 is held back. As stated in the monthly fee statements, that firm had received nothing as of the date of those statements. Monthly fee statements for June 2026 and July 2026 have not been filed and the amounts for those months are not yet determined. No interim or final application for compensation has been filed for that firm, and all of its compensation remains subject to final review by the Court upon application. No amount is provided for this professional in the Plan or in the Financial Projections annexed as Exhibit D | approval upon Interim and Final Applications for Compensation, or 80% of Monthly Fee Statements, per ECF Doc No. 154, ¶8(a) |
| Crown Medical Collections | Special Counsel for receivables collection, Chapter 11 professional | Contingency compensation under the Court-approved retention, payable from collections | Through the Effective Date: payable from the DIP Receivables Trust Account solely upon Application for Compensation and Order of the Court, per ECF Doc. No. 41 paragraphs 3, 8 and 9 and ECF Doc. No. 154 paragraphs 8(b), 9 and 10, and subject to disgorgement until allowed on a final basis. No Application for Compensation has been filed and |

| | | | |
|---|---|---|---|
| | | | no amount has been paid to date. On and after the Effective Date: paid by the Reorganized Debtors in the ordinary course from collections, per Plan Section II.F.3(b). Deducted in arriving at the net collections projected in Exhibit D; not an additional Plan obligation |
| Office of the United States Trustee | Statutory quarterly fees, 28 U.S.C. § 1930(a)(6) | Accrued and accruing quarterly fees | Paid in full when due and through the Effective Date, and thereafter until the cases are converted, dismissed, or closed |
| Ordinary course post-petition obligations | Administrative expense, 11 U.S.C. § 503(b) | $63,404 in postpetition payables as of July 31, 2026 (Case PP-NJ; $0 in Cases PP-NY and PP-INC) | Paid in full on the Effective Date unless the holder agrees to different treatment |

All amounts stated above are estimates only. All professional compensation remains subject to Court approval upon application, and the allowed amounts may differ from the estimates stated.

### *2. Priority Tax Claims*

Priority tax claims are certain unsecured income, employment, and other taxes described by Code Section 507(a)(8). The Code requires, and the Plan provides, that each holder of such a claim receive the present value of its claim in deferred cash payments over a period not exceeding five years from the order for relief, in accordance with Section 1129(a)(9)(C). The Debtors have one Priority Tax Claim. The Priority Tax Claim of the United States Internal Revenue Service shall consist of all allowed Priority Claims of that creditor, which has filed duplicate Priority Claims in the amount of $928,916.96 in two of the three jointly administered cases, being Claim No. 8 in Case PP-NJ and Claim No. 5 in Case PP-INC, together with a further Priority Claim of $717.35 filed as Claim No. 6 in Case PP-INC. The Internal Revenue Service has filed no proof of claim in Case PP-NY. The Debtors treat the duplicate filings of the $928,916.96 claim as a single Priority Tax Claim, and aggregate that claim with the $717.35 claim filed as Claim No. 6 in Case PP-INC, for a total Priority Tax Claim of $929,634.31. Unless otherwise agreed in a Consent Order with the Internal Revenue Service, this priority claim shall be paid in full, in 36 monthly installments at 4.0% interest, at $27,446.51 per month, which fully amortizes the aggregate claim of $929,634.31 over the 36 month term. This Priority Tax Claim is unclassified and, in accordance with Section 1123(a)(1) of the Bankruptcy Code, is not entitled to vote on the Plan.

## C. Classified Claims and Interests

The Plan establishes the following twelve classes of claims and interests across the three jointly administered estates. The general unsecured claims are classified by estate (Case PP-NJ, Case PP-NY, and Case PP-INC) and, within each estate, are divided between ordinary general unsecured claims and smaller "administrative convenience" claims. Classes 1 through 10 are

Impaired. Classes 11 and 12 are Unimpaired. The impairment status and treatment of each class are summarized below; the treatment stated is taken from the Plan, which controls.

**1. Classes of Secured Claims**

**Class 1 (Secured Claim of ProPhase Labs, Inc., Case PP-NY):** The Allowed Claims of Class 1 shall consist of all Allowed Secured Claims of ProPhase Labs, Inc. (the parent company of the Debtors, per 11 U.S.C. §101(31)(B)), in the amount of $9,998,503.80, asserted as Secured by a Security Agreement dated January 7, 2025 and by UCC-1 financing statements recorded before the Petition Date against each of the three Debtors, which encumber substantially all assets of each Debtor, including the Receivables Portfolio and its proceeds. Because the liens encumber the assets of all three Debtors, this Class is treated on the consolidated basis provided in Section II.F.2 of the Plan, and the collateral securing this Class consists of substantially all assets of the three jointly administered estates. As of the date of this Disclosure Statement, no party in interest has filed an Objection to this claim or to its Secured status. Holders of Claims are directed to the discussion of this Class in the Risk Factors at Section III.G. This Class 1 Creditor shall be paid in full as a Secured Claim in such amount as the Court may allow, estimated at $9,998,503.80, inclusive of all sums due, over an estimated 9 months, beginning in Month 1 and ending in Month 9, in accord with the Revenue Projections annexed as Exhibit D to this Disclosure Statement. This Class is Impaired.

**Class 2 (Secured Claim of the Township of Old Bridge, Case PP-NJ):** The Allowed Claims of Class 2 shall consist of all Allowed Secured Claims of the Township of Old Bridge, which holds a statutory lien against the Debtor in the amount of $13,669.00. This claim was listed on the Debtor's amended Schedule E/F in Case PP-NJ as a nonpriority unsecured claim. The Debtors have determined that the claim is secured by a statutory lien and have classified it accordingly in this Plan, which governs its treatment. This Class 2 Creditor shall be paid in full, at the projected Allowed amount of $13,669.00, 60 days after the Effective Date. This Class is **Impaired.**

**2. Classes of Priority Unsecured Non-Tax Claims**

Certain priority claims that are referred to in Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes. These types of claims are entitled to priority treatment as follows: the Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim. However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims.

<u>Class 11 (Contingent Priority Non-Tax Claims, Case PP-NJ)</u>: This Class consists of the three proofs of claim filed by Principal Life Insurance Company in Case PP-NJ asserting priority under Section 507(a) in the aggregate asserted amount of $42,022.13. The Debtors dispute that these

claims are entitled to priority treatment and have objected, or will object, to their priority characterization. To the extent any portion of these claims is Allowed as a priority claim under Sections 507(a)(3) through (a)(7), that portion shall be paid in full, in cash, on the later of the Effective Date and the date on which such claim becomes an Allowed Claim by Final Order. The Debtors shall establish and maintain a reserve in the full asserted amount of $42,022.13 pending resolution of the objection. To the extent any portion of these claims is disallowed as a priority claim, that portion shall be treated as a general unsecured claim in Class 3 and shall receive the treatment afforded to that Class. The Debtors presently estimate the Allowed priority amount of Class 11 at $0.00. Because holders of Allowed Claims in this Class receive payment in full, in cash, of the amount to which Section 1129(a)(9)(B) entitles them, this Class is Unimpaired, is conclusively presumed to have accepted the Plan under Section 1126(f), and is not entitled to vote.

### 3. Classes of General Unsecured Claims

**Class 3 (General Unsecured Nonpriority Claims over $5,000, Case PP-NJ):** This Class will be paid in full, in the projected Total amount of Allowed Claims of $601,980.11, after all Objections to Claims are resolved. The $601,980.11 in total Allowed Claims of Class 3 shall be paid over an estimated 3 months, beginning in Month 9 and ending in Month 11, in accord with the Revenue Projections annexed as Exhibit D to this Disclosure Statement. The Debtor reserves the right to prepay any sums due to Allowed Claims of Class 3 creditors, without penalty for prepayment. This Class is Impaired.

**Class 4 (General Unsecured Nonpriority "Administrative Convenience" Claims under $5,000, Case PP-NJ):** This Class will be paid in full, in the estimated Total amount of Allowed Claims of $4,766.95. All Allowed Claims of Class 4 shall, for purposes of Administrative Convenience, be paid 100% in full, without interest, 35 days after the Effective Date. This Class is Impaired.

**Class 5 (General Unsecured Nonpriority Claims over $3,000, Case PP-NY):** This Class will be paid in full, in the projected Total amount of Allowed Claims of $1,257,329.90, after all Objections to Claims are resolved. The $1,257,329.90 in total Allowed Claims of Class 5 shall be paid over an estimated 3 months, beginning in Month 9 and ending in Month 11, in accord with the Revenue Projections annexed as Exhibit D to this Disclosure Statement. The Debtor reserves the right to prepay any sums due to Allowed Claims of Class 5 creditors, without penalty for prepayment. This Class is Impaired.

**Class 6 (General Unsecured Nonpriority "Administrative Convenience" Claims under $3,000, Case PP-NY):** This Class will be paid in full, in the estimated Total amount of Allowed

Claims of $6,899.96. All Allowed Claims of Class 6 shall be paid 100% in full, without interest, 35 days after the Effective Date. This Class is Impaired.

**Class 7 (General Unsecured Nonpriority Claims over $3,000, Case PP-INC):** This Class will be paid in full, in the estimated Total amount of Allowed Claims of $1,088,162.30, after all Objections to Claims are resolved. This $1,088,162.30 in total Allowed Claims of Class 7 shall be paid over an estimated 1 month, in Month 12, in accord with the Revenue Projections annexed as Exhibit D to this Disclosure Statement. The Debtor reserves the right to prepay any sums due to Allowed Claims of Class 7 creditors, without penalty for prepayment. The claims presently asserted in this Class include the claim of ATC Testing and Screening Services LLC, filed as Claim No. 2 in Case PP-INC in the asserted amount of $643,052.36, which the Debtors dispute and as to which the Debtors have reserved the right to object, as stated in the Debtors' opposition to the joinder of ATC Testing and Screening Services, LLC to the pending motion to convert, filed August 14, 2026 [ECF Doc. No. 209]. If that objection is sustained in whole or in part, the total Allowed Claims of Class 7 will be reduced accordingly. This Class is Impaired.

**Class 8 (General Unsecured Nonpriority "Administrative Convenience" Claims under $3,000, Case PP-INC):** This Class will be paid in full, in the estimated Total amount of Allowed Claims of $1,084.88. All Allowed Claims of Class 8 shall be paid 100% in full, without interest, 35 days after the Effective Date. This Class is Impaired.

**Class 9 (Contingent, Disputed, and Unliquidated Claims):** This Class consists of claims that remain contingent, disputed, and unliquidated and that are subject to objection, estimation under Section 502(c), and a reserve. Following the settlement of the claim of Drexel Distribution, Inc. d/b/a EZ-Test, which is classified separately in Class 10, the claims remaining in Class 9 consist principally of the PPFB Claim described in Section II.E.2 above, together with such other contingent, disputed, and unliquidated claims as may exist. The Debtors have objected to the PPFB Claim and have moved to estimate that claim at zero dollars [ECF Doc. No. 205], returnable September 15, 2026. The Debtors presently estimate the total amount of Allowed Class 9 claims at $0.00. Upon entry of any relevant Court Order, including any Settlement Consent Order, allowing and fixing any Class 9 claim in an amount other than $0.00, such claim shall be paid in accordance with the terms of that Order, whether by the Court ordering that such allowed claim be added to a Class above or in such fashion as the Court may otherwise Order. Class 9 shall have no distribution unless and until allowed by Final Order. This Class is Impaired.

**Class 10 (Allowed Settled Claim of Drexel Distribution, Inc. d/b/a EZ-Test, Case PP-INC):** The Allowed Claim of Class 10 consists of the claim of Drexel Distribution, Inc. d/b/a EZ-Test ("Drexel"), filed as Claim No. 3 in Case PP-INC in the asserted amount of $1,754,088.00, as amended November 30, 2025, which was the subject of the Debtors' Objection to Claim [ECF Doc.

No. 134] and of Adversary Proceeding No. 26-01208. Pursuant to the settlement described in Section II.E.2 above, the Drexel claim is reduced and allowed against the estates in the fixed amount of $125,000.00 (the "Estate Component"), in full and final satisfaction of all claims asserted by Drexel against the Debtors and their estates. The Estate Component shall be paid in full, without interest, on the same terms as the Allowed Claims of Class 7, over an estimated 1 month, in Month 12, in accord with the Revenue Projections annexed as Exhibit D to this Disclosure Statement. The Debtors reserve the right to prepay the Estate Component without penalty for prepayment. Separately, and outside the Plan, the Parent has agreed to pay Drexel the sum of $775,000.00 from the Parent's own funds (the "Parent Component"). The Parent Component is not property of the Debtors' estates, is not funded by the estates, is not a distribution under the Plan, and does not reduce the funds available for distribution to any other class. The Parent Component will not be added to, and will not increase, the Allowed Class 1 Secured Claim of the Parent, which is and remains $9,998,503.80. The Parent holds no claim against the estates for contribution, subrogation, reimbursement, or indemnity on account of the Parent Component, asserts none, and waives any such claim. Property distributed by the estates to the Parent on account of its Allowed Class 1 Secured Claim becomes property of the Parent upon distribution, and the estates' obligations in respect of that Claim are discharged upon that distribution. The treatment provided to Class 10 is conditioned upon entry of an order approving the settlement under Bankruptcy Rule 9019 [ECF Doc. No. 207], returnable September 15, 2026. If the Court does not approve the settlement, the settlement shall be of no force and effect, the Drexel claim shall revert to its prior status as a contingent, disputed, and unliquidated claim classified in Class 9, and the Debtors' Objection to Claim and Adversary Proceeding No. 26-01208 shall be restored. Drexel has agreed to vote to accept the Plan. This Class is Impaired.

**Basis for the Separate Classification of Class 9 and Class 10.** The Plan classifies contingent, disputed, and unliquidated litigation claims separately from ordinary general unsecured trade claims, and classifies the settled Drexel claim separately from both. Section 1122(a) of the Code prohibits placing dissimilar claims in the same class and otherwise leaves classification to the reasonable business judgment of the plan proponent. The separate classification here rests on good business reasons and on the disparate legal rights of the holders. The claims in Class 9 remain unliquidated and disputed, are subject to pending objection and estimation, and may receive no distribution unless and until they are allowed by Final Order. The Class 10 claim has been fixed by agreement in a liquidated amount, is subject to Court approval under Bankruptcy Rule 9019, and carries a separate component payable by a non-debtor from non-estate funds. Courts within the Third Circuit have approved the separate classification of litigated claims from general unsecured claims. See *In re Abeinsa Holding, Inc.*, 562 B.R. 265, 274 (Bankr. D. Del. 2016); *In re Boy Scouts of America and Delaware BSA, LLC*, 642 B.R. 504, 634 (Bankr. D. Del. 2022); *In re Mallinckrodt PLC*, 639 B.R. 837, 858 (Bankr. D. Del. 2022).

The separate classification of Class 10 does not afford Drexel more favorable treatment from the estates than the treatment afforded to the general unsecured classes. The holders of Allowed Claims in Classes 3 through 8 are to be paid 100 percent of their Allowed Claims. The Class 10 claim is allowed against the estates in the reduced amount of $125,000.00 as against an asserted claim of $1,754,088.00, and the Estate Component is paid on the same terms as the Allowed Claims of Class 7. Section 1123(a)(4) of the Code requires that a plan provide the same treatment for each claim within a particular class, and the Plan provides each claim within Class 10, and each claim within every other class, the same treatment as every other claim in that class.

Class 10 is an impaired class of claims held by a creditor that is not an insider of the Debtors. Drexel has agreed to vote to accept the Plan. Upon acceptance by Class 10, the Plan will satisfy the requirement of Section 1129(a)(10) that at least one impaired class of claims accept the Plan, determined without including the acceptance of any insider. The Allowed Secured Claim of the Parent in Class 1 is held by an insider within the meaning of Section 101(31)(B), and the Proponents do not rely upon any acceptance by Class 1 for purposes of Section 1129(a)(10).

**4. Classes of Interest Holders:** Interest holders are the parties who hold ownership interest (i.e., equity interest) in the Debtor. If the Debtor is a corporation, entities holding preferred or common stock in the Debtor are interest holders. If the Debtor is a partnership, the interest holders include both general and limited partners. If the Debtor is an individual, the Debtor is the interest holder.

In this case, the Debtors are corporations**.** The sole shareholder of ProPhase Diagnostics NJ, Inc. and ProPhase Diagnostics NY, Inc. is ProPhase Diagnostics, Inc. The sole shareholder of ProPhase Diagnostics, Inc. is ProPhase Labs, Inc.

Class 12 (Equity Interests in the Debtors): Because the Plan provides for 100% payment of Allowed Claims in full, and in order to preserve operational continuity, the holders of Equity Interests shall retain their Equity Interests in the Debtors unaltered, subject to completion of the payments required under the Plan and the entry of a Final Decree closing the cases. Because the Plan leaves the legal, equitable, and contractual rights of the holders of Equity Interests unaltered, this Class is Unimpaired, is conclusively presumed to have accepted the Plan under Section 1126(f), and is not entitled to vote.

## D. Means of Effectuating the Plan

### *1. Funding for the Plan (Track One: Receivables Collections)*

The Plan will be funded from: (i) proceeds of the orderly collection of the Receivables Portfolio by the collection agent under its Court-approved engagement; (ii) recoveries, settlements, and judgments on the Debtors' causes of action, including the pending adversary proceeding and additional commercial-payer settlements; (iii) to a lesser and supplemental extent, revenues from

the continued and repurposed operations of the reorganized Debtors' laboratory platform. As stated in Section III.A and Section IV.C, the feasibility of the Plan's payment obligations rests on the receivables collections described in (i) and (ii); the laboratory operating revenues described in (iii) are not relied upon to fund creditor distributions. The Debtors have executed a settlement with a commercial payer that is expected to yield a substantial recovery to the estates, subject to Court approval under Bankruptcy Rule 9019, and are pursuing additional commercial-payer settlements. Consistent with the confidentiality obligations applicable to the Debtors' payer relationships and collection program, the identities of individual payers and the specific terms of individual settlements are not disclosed in this Disclosure Statement; the executed payer settlement will be presented for approval, with the disclosure then required, through the Rule 9019 process.

The Receivables Portfolio being pursued by the collection agent comprises approximately 950,000 claims, in an aggregate gross billed amount of approximately $242 million, in active settlement negotiation with the major national commercial and governmental payers. The Debtors do not project recovery of the full portfolio. For purposes of the Plan, the Debtors have adopted a deliberately conservative recovery projection under which only a minority of the documented portfolio, on the order of one-third, is resolved over the three-year projection period. Applying a conservative blended realization rate to the gross amounts resolved, and after the collection agent's Court-approved contingency compensation, the Debtors project net cash to the estates in the range of approximately $45 million to $50 million over the three-year period, with the substantial majority expected within the first two years. A meaningful portion of these collections is already documented: settlements across numerous payer groups have been executed or commercially agreed, including funds presently held in the collection agent's escrow pending Court approval under Bankruptcy Rule 9019. The Debtors note that the resolution of a settlement (the point at which commercial terms are agreed or documented) is distinct from the funding of that settlement (the point at which cash is received), and that funding ordinarily lags resolution by a period of months; the projection reflects this timing. These figures are estimates only, are stated in the aggregate to preserve the confidentiality of individual payer relationships, and are subject to the ordinary commercial and operational risks of payer-side claims resolution. The detailed projection is set forth in the financial projections attached as an exhibit.

The Plan is not funded by, and does not depend upon, any debtor-in-possession or exit financing. The Parent has pursued financing at the parent level for its own purposes. Any such financing is an obligation of the Parent, is not an obligation of the Debtors or their estates, is not property of the estates, and is not a source of funding for distributions under the Plan. To the extent any financing at the estate level is proposed in the future, it would be subject to separate Court approval on notice, and the Plan's feasibility does not rest upon it.

**Limited Consolidation of the Estates for Purposes of Funding Distributions**

The three Debtors are jointly administered under lead Case No.: 25-19833-CMG. Joint administration is a procedural device; it does not merge the estates. Each Debtor has filed its own schedules, and a separate claims register is maintained in each case. The Receivables Portfolio, however, is not held evenly across the three estates, and the Claims asserted against each estate do not track the receivables held by that estate.

For that reason, the Plan provides at Section II.F.2 that, solely for the purpose of funding and making distributions under the Plan, and for no other purpose, the three estates shall be deemed consolidated on the Effective Date, and the cash generated by the collection of the Receivables Portfolio, by recoveries on the Debtors' causes of action, and by the continued operations of the Reorganized Debtors shall constitute a single fund available to satisfy the Allowed Claims of every Class, without regard to the estate against which a particular Claim was filed or scheduled.

Creditors should understand what this provision does and does not do. It does not merge the Debtors as legal entities, does not consolidate the estates for any purpose other than funding distributions, and does not merge the Debtors' books, records, tax attributes, or corporate existence. It does not change the Class in which any Claim is placed, and it does not change the treatment any Claim receives. Every Class retains its classification by estate as set forth in Section III.C above, and every holder of an Allowed Claim receives the treatment provided for its Class, in the order of priority required by the Bankruptcy Code. No creditor receives more, less, or different treatment than the Class in which its Claim is classified. Claims held by one Debtor against another Debtor receive no distribution and are eliminated for purposes of computing distributions, so that no asset is counted twice in determining the cash available to fund the Plan.

The Proponents submit that this limited consolidation prejudices no creditor of any estate, because the Plan pays every Allowed Claim in every Class in full. Without it, the timing and certainty of a creditor's distribution would turn on which of the three estates its Claim happened to be filed against rather than on the aggregate cash available to the Debtors, and creditors of an estate holding a smaller share of the Receivables Portfolio would be disadvantaged for reasons unrelated to the merits, amount, or priority of their Claims. Confirmation of the Plan will constitute approval of this limited consolidation. Any party in interest who objects may raise the issue at the confirmation hearing.

***2. Post-Confirmation Management and the Reorganized Debtors' Business (Track Two: Reorganized Genomics Business)***

On and after the Effective Date, the reorganized Debtors will be managed by their existing management in coordination with the Parent, and will not be liquidated. The reorganized Debtors will continue two integrated activities. First, the reorganized Debtors will continue collection of the

Receivables Portfolio through the collection agent under its Court-approved engagement, generating recoveries over a multi-year horizon that fund Plan distributions. Second, the reorganized Debtors will continue and repurpose their CLIA-certified laboratory operating platform to provide clinical diagnostic testing and related laboratory services, in coordination with the Parent's diagnostic commercialization initiatives, leveraging the Debtors' existing certifications, facilities, and equipment. The combination of continued collections and an operating laboratory platform distinguishes the Plan from a liquidation and supports the feasibility analysis in Section IV.C.

The reorganized laboratory operations are anchored by an existing genomic sequencing business that currently generates approximately $4 million in annual revenue without any dedicated marketing investment. Under the Plan, the reorganized Debtors intend to bring sequencing operations in-house on laboratory platforms the Debtors operate, which the Debtors expect to improve per-test margins relative to the current practice of outsourcing the sequencing, and to fund a disciplined marketing and customer-acquisition program supported in part by the collection proceeds. On conservative assumptions as to product mix, in-house cost, and a measured growth rate, and after accounting for the associated marketing and laboratory costs, the Debtors project that this operating business generates positive operating cash flow in each year of the projection period and grows over the three-year horizon. The Debtors' longer-term diagnostic initiatives, including additional sequencing-based service lines, are described as opportunities and are not relied upon in the feasibility analysis. As stated in Section IV.C, the feasibility of the Plan's payment obligations rests on the receivables collections; the laboratory operating projections are provided to demonstrate that the reorganized Debtors are a viable operating business and a going concern, not merely a collection vehicle. The operating projections are set forth in the financial projections attached as an exhibit.

As part of the broader strategy of the Parent and the reorganized Debtors, the Parent intends to pursue initiatives directed at strengthening its financial position and growth prospects, including the development and commercialization of its diagnostic assets through the reorganized laboratory platform, and, as a longer-term objective, satisfying the requirements to seek relisting of the Parent's common stock on a national securities exchange. These are forward-looking objectives. There can be no assurance that any such initiative, including any exchange relisting, will be achieved, or as to its timing, and nothing in this Disclosure Statement should be construed as a representation or guarantee of any future securities listing, share price, or market outcome.

**3. Disbursing Agent**

The Reorganized Debtors will act as the Disbursing Agent and will make all distributions under the Plan, serving without bond and without separate compensation beyond reimbursement of reasonable expenses, except as the Court may approve.

**E. Other Provisions of the Plan**

**1. Executory Contracts and Unexpired Leases** The Plan provides that all Executory Contracts and Unexpired Leases, except for those specifically assumed by the Debtor in writing or previously assumed by Court Order, shall be deemed rejected. All proofs of claim with respect to claims arising from said rejection must be filed with the Bankruptcy Court within the earlier of (i) the date set forth for filing claims in any order of the Bankruptcy Court approving such rejection or (ii) thirty (30) days after the Confirmation Date. Any such claims, proofs of which are not filed timely, will be barred forever from assertion.

**2. Changes in Rates Subject to Regulatory Commission Approval** This is not applicable to the Plan.

**3. Retention of Jurisdiction and Authority** The Plan provides for the Court's retention of jurisdiction, including over collection of the Receivables Portfolio, examinations, and the Debtors' causes of action; establishes a sixty-day post-confirmation period to object to claims and a disputed-claim reserve mechanism, and expressly preserves and vests in the Reorganized Debtors and the collection agent the authority to collect the Receivables Portfolio, to conduct Rule 2004 examinations to the fullest extent permitted by law, and to commence, prosecute, and settle adversary proceedings against payers and other obligors, post-confirmation.

**4. Procedures for Resolving Contested Claims** The Debtor and/or the Disbursing Agent shall have 60 days subsequent to confirmation to object to the allowance of claims. The Proponent has reviewed the claims that have been filed. The Proponents filed an Objection to the Claim of Drexel Distribution, Inc. d/b/a EZ-Test [ECF Doc. No. 134], which is resolved by the settlement described in Section II.E.2 above, subject to approval of that settlement under Bankruptcy Rule 9019 [ECF Doc. No. 207]. The Proponents have also filed a combined objection to and motion to estimate the claims of PPFB, LLC [ECF Doc. No. 205], returnable September 15, 2026. The Proponents reserve the right to object to the claims now being reviewed by the trial court per the Consent Order entered at ECF Doc. No. 106, and reserve the right to object to such other claims as the Debtors or the Disbursing Agent deem appropriate.

**5. Effective Date** The Plan will become effective on the Effective Date, which is the date on which the order of confirmation becomes final, when all conditions to confirmation have been met, and the order becomes final and non-appealable.

**6. Modification** The Plan Proponent may alter, amend or modify the Plan at any time prior to the Confirmation Date and thereafter as provided in Section 1127(b) of the Bankruptcy Code.

**F. Tax Consequences of the Plan**

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT THEIR OWN ACCOUNTANTS, ATTORNEYS, OR ADVISORS.

The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers to possible tax issues this Plan may present to the Debtor. The Proponent CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.

The following is a non-exclusive summary intended only to alert readers to possible tax issues, and is not tax advice. The Plan may have tax consequences for the Debtors, including with respect to cancellation-of-indebtedness income, the use or limitation of net operating loss carryforwards, and the tax treatment of collections and settlements. The specific consequences depend on facts and on provisions of the Internal Revenue Code that are complex and subject to change. The Proponents do not represent that the consequences summarized here are the only tax consequences of the Plan. The Plan provides for payment of all allowed U.S. Internal Revenue Service claims 100% in full.

**G. Risk Factors**

The following is a non-exclusive summary of certain risks attendant upon the consummation of the Plan. You are encouraged to supplement this summary with your own analysis and evaluation of the Plan and Disclosure Statement, in their entirety, and in consultation with your own advisors. Based on the analysis of the risks summarized below, the Plan Proponents believe that the Plan is viable and will meet all requirements of confirmation:

The projections in the Exhibits are estimates and are subject to the timing and rate of collection of the receivables, the resolution of disputed claims (including the contingent Class 9 claims), and ordinary business and litigation risks. The resolution of a settlement with a payer (agreement on commercial terms) is distinct from funding (receipt of cash), which ordinarily lags resolution by a period of months. Plan-payment figures beyond the first year are estimates pending final Allowed-claim totals. While the Debtors believe the projections are conservative and achievable, no assurance can be given that actual results will match the Projections.

**Collection timing and amount.** The timing and amount of receivables collections are uncertain and depend on payer behavior, appeals, and litigation. Actual net recoveries may differ from the projections. The resolution of a settlement with a payer, meaning agreement on commercial terms, is distinct from the funding of that settlement, meaning receipt of cash, and funding ordinarily lags resolution by a period of months. The Plan does not depend upon debtor-in-possession or exit financing, and no such financing is a source of Plan funding.

**Concentration of Plan funding in the first year.** As shown in the Financial Projections annexed as Exhibit D, substantially all of the payments the Plan requires are made in the first twelve months following the Effective Date, while the projected collections that fund those payments are weighted toward the later months of that period. A material shortfall or delay in first-year collections would delay Plan payments even though the three-year projection remains more than sufficient in the aggregate.

**Acceptance by an impaired non-insider Class.** Section 1129(a)(10) requires that at least one impaired Class accept the Plan, determined without including the acceptance of any insider. Class 1 is held by the Debtors' sole indirect equity holder and is therefore an insider Class whose acceptance cannot satisfy that requirement, and the Debtors do not rely on it. Classes 3 through 8 are expected to accept because they are paid in full, but no ballot has been cast. As matters presently stand, the impaired non-insider Class on which the Debtors principally rely for Section 1129(a)(10) is Class 10. Holders should understand that if no impaired non-insider Class accepts the Plan, the Plan cannot be confirmed regardless of the sufficiency of the projected collections, and the cramdown provisions of Section 1129(b) do not cure that failure.

**Reliance on a non-debtor to fund the Class 10 settlement.** The Class 10 treatment reflects a negotiated settlement of which the estates fund $125,000 and the Parent, which is not a debtor in these cases, funds $775,000. Of the Parent's component, $200,000 is held in escrow and the balance of $575,000 is payable in monthly installments over approximately one year. The Parent's obligations are obligations of the Parent alone. They are not obligations of the estates, they are not assumed by the Plan, and holders of Claims have no recourse to the estates on account of them. The Parent is a publicly reporting company whose common stock is quoted on the OTC market following its delisting from a national securities exchange, and the Parent has its own creditors, obligations, and pending litigation, which are described in the Parent's public filings with the Securities and Exchange Commission and are not described in this Disclosure Statement. There can be no assurance that the Parent will perform its component of the settlement. If the Parent does not perform, the consideration supporting the Class 10 settlement may be impaired, the Drexel claim objection and the related adversary proceeding may be restored, and the Debtors may lose the acceptance of Class 10 for purposes of Section 1129(a)(10).

**The Class 1 Claim is held by an insider and has not been tested.** No party in interest has objected to the amount, allowance, or secured status of the Class 1 Claim of the Parent as of the date of this Disclosure Statement, and the Plan pays that Claim in full over the first nine months following the Effective Date, ahead of the distributions to the general unsecured Classes. The Parent's claim in the amount of $9,998,503.80 was first reflected in the amended schedules filed in Case PP-NY on November 30, 2025 [ECF Doc. No. 26 in Case No. 25-19834-CMG]. The Debtors thereafter amended Schedules A/B, D and E/F in that case on March 30, 2026 [ECF Doc. No. 36], and the Court entered its Order Respecting Amendment to Schedules D and E/F on March 31, 2026

[ECF Doc. No. 37]. Schedules may be amended as a matter of course at any time before a case is closed under Bankruptcy Rule 1009(a). Under Section 1111(a) of the Code, a proof of claim is deemed filed for a claim that appears in a debtor's schedules other than as disputed, contingent, or unliquidated. The Parent did not file a separate proof of claim, and the bar date for filing proofs of claim was December 1, 2025. The Debtors assert that the Parent's security interest was created by a Security Agreement dated January 7, 2025 and perfected by UCC-1 financing statements filed against each of the Debtors before the Petition Date, and that a security interest so perfected is unaffected by the manner in which the underlying claim is described in a debtor's schedules. A party in interest may nonetheless contest the allowance or amount of the Class 1 Claim, its secured status, or the extent, validity, priority, or perfection of the asserted liens. Unless and until the Class 1 Claim is Allowed, no distribution is made on account of it. The Claim is held by the Debtors' sole indirect equity holder. A party in interest retains the right to object to the allowance or the secured status of that Claim, to challenge the extent, validity, priority, or perfection of the asserted liens, or to seek recharacterization or equitable subordination of the Claim. If any such challenge succeeds in whole or in part, or if the Class 1 Claim is not Allowed, every other Class would continue to be paid in full and the cash available to pay those Classes would increase substantially, but the amount and the timing of the distributions set out in the Financial Projections annexed as Exhibit D would change, and confirmation could be delayed.

**The Class 9 estimate of $0.00 is an estimate and is disputed.** The Debtors presently estimate the aggregate Allowed amount of Class 9 at $0.00, on the basis that the asserted relator claims are contingent, disputed, and unliquidated and are the subject of objection and estimation under Section 502(c), and that the Drexel claim is resolved through the Class 10 settlement. That estimate is the Debtors' litigation judgment and is not a determination by the Court. The relator asserts claims materially in excess of that estimate. If any Class 9 Claim is Allowed in a material amount by Final Order, the total obligations of the Plan would increase above the amount stated in the Financial Projections annexed as Exhibit D, and the timing of distributions to other Classes could be affected. The Debtors direct the attention of holders of Claims to the projected surplus set forth in the Financial Projections annexed as Exhibit D, under which the projected net collections available over the three-year projection period exceed all Plan obligations by more than thirty million dollars, and the Debtors believe that surplus is sufficient to absorb an allowance of the Class 9 Claims in any amount reasonably in dispute without impairing the feasibility of the Plan or the payment in full of any other Class. No assurance can be given.

**Administrative claims are not fully liquidated.** Allowed Administrative Expenses are payable in full on the Effective Date. Certain of those amounts are not yet liquidated. Debtors' Attorney has been allowed fees through March 31, 2026 [ECF Doc. Nos. 114 and 147], and will be filing a subsequent Application for Compensation, which amounts are expected to be material. Special

litigation counsel has filed monthly fee statements for April 2026 and May 2026 totaling $25,234.70 [ECF Doc. Nos. 195 and 196], as to which Certifications of No Objection were filed on August 16, 2026 [ECF Doc. Nos. 210 and 211], but has not filed monthly fee statements for June 2026 or July 2026 and has not filed an interim or final application for compensation. Those two months include the period during which that firm negotiated the settlement described in Class 10 and opposed the pending motion to convert, and the amounts for them are expected to be material. The total that firm will ultimately seek is not presently determined. The amounts shown for administrative claims in the Financial Projections annexed as Exhibit D are the Debtors' estimates and are subject to allowance by the Court upon application. If Allowed Administrative Expenses materially exceed those estimates, the cash required on the Effective Date would increase correspondingly.

**Interest rate on the Priority Tax Claim.** The Plan provides for payment of the Priority Tax Claim of the Internal Revenue Service in thirty-six monthly installments with interest at 4.0 percent. Section 511 of the Code requires that the rate be determined under applicable nonbankruptcy law. If the applicable rate is higher than the rate stated in the Plan, the monthly installment and the total amount payable on that Claim will increase accordingly.

**Expiration of the exclusive periods.** The Debtors' exclusive periods under Section 1121 were most recently extended through June 29, 2026, and the Plan was filed within that period. The Debtors' exclusive periods have since expired. No competing plan has been filed. Any party in interest may file a plan, and the filing of a competing plan could delay confirmation of the Plan described in this Disclosure Statement.

**Timing assumptions and the level of aggregation in the projections.** The Financial Projections annexed as Exhibit D assume an Effective Date of November 1, 2026 and present the payment of Class 1 on the ramped monthly schedule shown, which the Plan adopts by reference. A later Effective Date, or collections realized more slowly than projected, would shift the payment schedule correspondingly. The Debtors have stated the projections in the aggregate and have not disclosed the identities of individual payers or the terms of individual settlements, in order to preserve the confidentiality of the collection program. A party in interest may seek further disclosure, and the Court may require it.

**Reorganized operations.** The success of the reorganized laboratory operating platform depends on regulatory readiness, commercialization, and market factors outside the Debtors' control. As stated throughout this Disclosure Statement, the operating platform described as Track Two is presented to demonstrate that the reorganized Debtors are a going concern and is not relied upon to fund creditor distributions.

Notwithstanding the risks summarized above, the Proponents believe the Plan is viable and meets the requirements of confirmation.

## IV. CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims. The proponent CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a Plan. Some of the requirements include that the Plan must be proposed in good faith, that creditors or interest holders have accepted the Plan, that the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and that the Plan is feasible. These requirements are not the only requirements for confirmation.

### A. Who May Vote or Object

**1. Who May Object to Confirmation of the** Plan Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

**2. Who May Vote to Accept/Reject the Plan** A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim that is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

**a. What Is an Allowed Claim/Interest** As noted above, a creditor or interest holder must first have an allowed claim or interest to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest brings a motion objecting to the claim. When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE WAS DECEMBER 1, 2025, OR MARCH 23, 2026 FOR GOVERNMENTAL UNITS.

A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed. A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim. An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.

**b. What Is an Impaired Claim/Interest** As noted above, an allowed claim or interest only has the right to vote if it is in a class that is impaired under the Plan. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of their claim plus interest.

In this case, the Proponents believe that Classes 1 through 10 are impaired and that the holders of claims in Classes 1 through 10 are entitled to vote to accept or reject the Plan. Class 1 is held by the Parent, an insider within the meaning of Section 101(31)(B), and no acceptance by Class 1 is relied upon for purposes of Section 1129(a)(10). The Proponents believe that Class 11 and Class 12 are unimpaired, are conclusively presumed to have accepted the Plan under Section 1126(f), and are not entitled to vote. Parties who dispute the Proponent's characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan contending that the Proponent has incorrectly characterized the class.

**3. Who Is Not Entitled** to Vote The following four types of claims are not entitled to vote: (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Code Section 507(a)(1), (a)(2), and (a)(8), and (4) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Code Section 507(a)(1), (a)(2), and (a)(8) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

**4. Who Can Vote in More Than One Class** A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

**5. Votes Necessary to Confirm the Plan** If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed later in Section (IV.A.8.).

**6. Votes Necessary for a Class to Accept the Plan** A class of claims is considered to have accepted the Plan when more than one-half (½) in number and at least two-thirds (2/3) in dollar amount of the allowed claims that actually voted, voted in favor of the Plan. A class of interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the allowed interest-holders of such class which actually voted, voted to accept the Plan.

**7. Treatment of Nonaccepting Classes** As noted above, even if all impaired classes do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner required by the Code. The process by which nonaccepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown". The Code allows the Plan to be "crammed down" on nonaccepting classes of claims or interests if it meets all consensual requirements except the voting requirements of Section 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. §1129(b) and applicable case law.

**8. Request for Confirmation Despite Nonacceptance by Impaired Class(es**) The Proponents ask the Court to confirm this Plan by cramdown on impaired classes if any of these classes do not vote to accept the Plan.

**B. Liquidation Analysis**

Under the "best interests" test, each holder of an impaired claim that does not accept the Plan must receive at least as much under the Plan as it would receive in a Chapter 7 liquidation. In order for the Court to be able to confirm this Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. The Plan Proponent maintains that this requirement is met here for the following reasons: this Plan proposes a 100% payment of all Allowed Claims. See Exhibit C to this Disclosure Statement.

The Proponents maintain that the Plan satisfies this test. In a Chapter 7 liquidation of these estates, a trustee unfamiliar with the Receivables Portfolio would be required to collect the receivables and prosecute the estates' causes of action, and would be entitled to a statutory commission under Section 326(a) of up to twenty-five percent of the first $5,000, ten percent of the next $45,000, five percent of the next $950,000, and three percent of amounts above $1,000,000. Applied to the projected net recoveries of the Receivables Portfolio, the trustee's commission alone would consume a substantial sum, before separate trustee's counsel and professional fees, reducing the net amount available to creditors. A Chapter 7 trustee would also lack the established collection program, payer relationships, and claim-specific knowledge of the existing collection agent, which the Proponents believe would further reduce and delay recoveries. For these reasons, the Proponents maintain that creditors will receive more under the Plan than in a Chapter 7 liquidation.

By way of illustration, applied to the gross amounts the Debtors project to resolve over the Plan period, the Section 326(a) commission would total on the order of approximately $2 million to $2.4 million, payable to a Chapter 7 trustee off the top, before the trustee's separate counsel and other professional fees. That sum would be deducted from creditor recoveries in a liquidation but is not incurred under the Plan, under which the existing collection agent continues its work under its already Court-approved compensation. This quantified commission, together with the disruption and delay of substituting a trustee unfamiliar with the portfolio for the established collection program, reinforces that creditors fare materially better under the Plan than in a Chapter 7 liquidation.

BEST-INTERESTS TEST AND LIQUIDATION ANALYSIS

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of a claim in an impaired class either accept the Plan or receive under the Plan at least as much as it would receive in a liquidation under Chapter 7. The Liquidation Analysis annexed as Exhibit C, together with the Balance Sheets annexed as Exhibit A, demonstrates that this requirement is satisfied. Because the Plan pays Allowed Claims in full, creditors receive under the Plan at least as much as, and in the case of the unsecured classes more than, they would receive in a Chapter 7 liquidation.

The Debtors further submit that a conversion to Chapter 7 would materially reduce the recovery available to creditors. The value of the receivables portfolio depends upon its continued collection through the Debtors' established collection infrastructure, dedicated professional team, and active payer relationships and settlement negotiations. On a conversion, that collection apparatus would be lost, and the receivables would be subject to fire-sale liquidation at a small fraction of their value as collected over time. Accordingly, the Plan provides creditors a recovery materially greater than a Chapter 7 liquidation would yield. The Liquidation Analysis annexed as Exhibit C quantifies that difference. On the Debtors' assumptions, a Chapter 7 trustee would realize between ten and twenty percent of the value at which the Receivables Portfolio is carried on the Balance Sheets annexed as Exhibit A. The controlling feature of a liquidation of these estates is that the Class 1 Claim of the Parent is secured by a blanket security interest in substantially all assets of all three Debtors, perfected before the Petition Date. In a Chapter 7 case the proceeds of those assets, after the costs of collecting and liquidating them are charged against the collateral under Section 506(c), would be applied to the Class 1 Claim before any other holder received anything. At the low end of the projected range the Class 1 Claim would not be paid in full and no other holder would receive any distribution at all. At the high end the Class 1 Claim would be paid in full and approximately 6.2 cents on the dollar would remain for the general unsecured Classes. Under the Plan every Allowed Claim in every Class is paid in full. That difference exists because the holder of the Class 1 Claim has agreed to accept payment over nine months rather than enforce its liens, does not seek interest, fees or costs under Section 506(b), and permits the collateral

proceeds to fund administrative expenses, priority claims and payment in full of every general unsecured Class.

**C. Feasibility**

Confirmation must not be likely to be followed by liquidation or the need for further reorganization, except as proposed in the Plan. There are two aspects. First, whether the Debtors will have enough cash on the Effective Date to pay the claims and expenses due on that date; the Proponents maintain this is satisfied from cash on hand in the DIP Receivables Trust Account and anticipated collections. Second, whether the Proponents will have enough cash over the life of the Plan to make the required payments; the Proponents maintain this is satisfied by the projected receivables collections over the multi-year collection horizon, the recoveries on the Debtors' causes of action, and the operations of the reorganized laboratory platform. The Debtors' financial projections demonstrate sufficient projected cash flow to fund the Plan payments.

FEASIBILITY AND THE SOURCE OF CREDITOR RECOVERY

The feasibility of the Plan rests principally on the collection of the receivables portfolio ("Track One"), as set forth in the Receivables Analysis and Operating Projections annexed as Exhibit D, which include the three-year Cash Flow Projections. The portfolio comprises approximately 950,000 insurance claims, with an aggregate gross billed amount of approximately $242 million, in active settlement negotiation with major national commercial and governmental payers. The Debtors' three-year projection conservatively assumes resolution of only a minority of the documented portfolio and projects approximately $47.6 million in net cash to the estates over three years, after the collection agent's fee.

The reorganized Debtors' genomic sequencing business ("Track Two"), set forth in Exhibit D, is presented to demonstrate that the reorganized Debtors are a viable, operating going concern. As stated in Exhibit D, the feasibility of the Plan's payment obligations rests on Track One; the Track Two operating business is not relied upon to fund creditor distributions. The Debtors project positive operating cash flow from the genomics business in each year of the projection period.

Because the projected collections materially exceed the proposed 100% payment to all creditors even under the conservative recovery assumptions adopted, the Proponents maintain that the Plan satisfies the feasibility standard by a substantial margin, and that the cash available over the life of the Plan is more than sufficient to make every payment the Plan requires.

## V. EFFECT OF CONFIRMATION OF PLAN

### A. Discharge

The Plan provides that upon confirmation of the Plan, the Debtor shall be discharged of liability for payment of debts incurred before confirmation of the Plan, to the extent specified in 11 U.S.C. §1141. However, any liability imposed by the Plan will not be discharged. If Confirmation of the Plan does not occur or if, after Confirmation occurs, the Debtor elects to terminate the Plan, the Plan shall be deemed null and void. In such event, nothing contained in the Plan shall be deemed to constitute a waiver or release of any claims against the Debtor or its estate or any other persons, or to prejudice in any manner the rights of the Debtor or its estate or any person in any further proceeding involving the Debtor or its estate. The provisions of the Plan shall be binding upon Debtor, all Creditors and all Equity Interest Holders, regardless of whether such Claims or Equity Interest holders are impaired or whether such parties accept the Plan, upon Confirmation thereof.

### B. Revesting of Property in the Debtor

Except as otherwise provided in the Plan, confirmation revests all property of the estates in the Reorganized Debtors, including the Receivables Portfolio and the Debtors' causes of action, which are expressly preserved for prosecution by the Reorganized Debtors and the collection agent.

### C. Modification of Plan

The Proponents may modify the Plan before confirmation, subject to the Court's authority to require a new disclosure statement or re-voting, and may seek to modify the Plan after confirmation as permitted by Section 1127(b). However, the Court may require a new disclosure statement and/or revoting on the Plan if Proponent modifies the plan before confirmation. If the Court believes the modification is immaterial, or is immaterial as to parties not affected by and noticed of the modification, the Court may determine that a new Disclosure Statement or revoting is not required.

The Proponent may also seek to modify the Plan at any time after confirmation so long as (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modification after notice and a hearing. Proponent further reserves the right to modify the treatment of any Allowed Claims at any time after the Effective Date of the Plan upon the consent of the Creditor whose Allowed Claim treatment is being modified, so long as no other Creditors are materially adversely affected.

**D. Post-Confirmation Conversion / Dismissal**

After confirmation, a party in interest may move to convert or dismiss the cases under Section 1112(b) after the Plan is confirmed, if there is a default in performance of the Plan or if cause exists under Section 1112(b). If the Court orders the case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 estate, and the automatic stay will be reimposed upon the revested property only to the extent that relief from stay was not previously granted by the Court during this case. Quarterly fees pursuant to 28 U.S.C. §1930(a)(6) continue to be payable to the Office of the United States Trustee post-confirmation until such time as the case is converted, dismissed, or closed pursuant to a final decree.

**Plan Proponents:**
ProPhase Diagnostics NJ, Inc.
ProPhase Diagnostics NY, Inc.
ProPhase Diagnostics, Inc.

Dated: August 20, 2026

by: DocuSigned by: Ted Karkus 45C4B49D36E149F... ____________
Ted Karkus
Chief Executive Officer
of the Jointly Administered Debtors

**EXHIBITS TO THIS DISCLOSURE STATEMENT**

| | |
|---|---|
| Exhibit A | BALANCE SHEET |
| Exhibit B | PROFIT AND LOSS STATEMENT |
| Exhibit C | LIQUIDATION ANALYSIS |
| Exhibit D | FINANCIAL PROJECTIONS |
| Exhibit E | PROPOSED PLAN OF REORGANIZATION |

# # #

"In re ProPhase Diagnostics NJ, Inc."
(Jointly Administered)
Chapter 11 Reorganization
Case No. 25-19833-CMG

# Exhibit A

to

SECOND MODIFIED DISCLOSURE STATEMENT

**(BALANCE SHEET)**

"In re ProPhase Diagnostics NJ, Inc."
Chapter 11 Reorganization
Case No. 25-19833-CMG

**Balance Sheet**

as of July 31, 2026

**Assets:**

| | |
|---|---|
| Bank Deposits | $270,051 |
| Projected Net Liquidation Value of Personalty | $500 |
| Projected Net Liquidation Value of Accounts Receivable | $83,473,404 |
| (estimated lifetime collectible amount, stated before the collection agent fee) | |
| **TOTAL ASSETS** | **$83,743,955** |

**Liabilities:**

| | |
|---|---|
| Estimated Allowed Secured Claims (Class 2, Township of Old Bridge) | $13,669 |
| Estimated Administrative Claim, collection agent (30% contingency on receivables above) | $25,042,021 |
| Estimated Administrative Claims, other professionals and post-petition payables | $250,000 |
| Estimated Priority Non-Tax Claims (Class 11 reserve, asserted; estimated Allowed $0.00) | $42,022.13 |
| Estimated Priority Tax Claims (IRS Claim No. 8) | $928,916.96 |
| Estimated General Unsecured Nonpriority Claims (Classes 3 and 4) | $606,747.06 |
| **TOTAL LIABILITIES** | **$26,883,376.15** |
| **TOTAL EQUITY** | **$56,860,578.85** |

*All amounts are estimates and remain subject to allowance by the Court. The Claim amounts shown on this and the following balance sheets are the Debtors' estimates of Allowed Claims for purposes of the Plan, and give effect to the settlement of the Drexel Claim described in the Disclosure Statement and to the Debtors' pending objections to and motions to estimate disputed Claims. They therefore differ from the prepetition debt figures reported at Part 2 of the Debtors' monthly operating reports, which are stated at scheduled or asserted amounts before those adjustments.*

"In re ProPhase Diagnostics NY, Inc."
Chapter 11 Reorganization
Case No. 25-19834-CMG

## Balance Sheet

as of July 31, 2026

**Assets:**

| | |
|---|---|
| Bank Deposits | $97,149 |
| Projected Net Liquidation Value of Personalty | $500 |
| Projected Net Liquidation Value of Accounts Receivable | $7,304,848 |
| (estimated lifetime collectible amount, stated before the collection agent fee) | |
| **TOTAL ASSETS** | **$7,402,497** |

**Liabilities:**

| | |
|---|---|
| Estimated Secured Claim of ProPhase Labs, Inc., as asserted (Class 1; see note below) | $9,998,503.80 |
| Estimated Administrative Claim, collection agent (30% contingency on receivables above) | $2,191,454 |
| Estimated Administrative Claims, other professionals | $75,000 |
| Estimated Priority Tax Claims (the IRS filed no proof of claim in this case) | $0 |
| Estimated General Unsecured Nonpriority Claims (Classes 5 and 6) | $1,264,229.86 |
| **TOTAL LIABILITIES** | **$13,529,187.66** |
| **TOTAL EQUITY (DEFICIT)** | **($6,126,690.66)** |

*Note on the Class 1 Claim. The amount shown for the Class 1 Claim is the amount asserted by the Parent. No proof of claim has been filed on account of that Claim and it is not presently Allowed. Its allowance, and the extent to which it is secured, remain subject to determination by the Court, as described in the Risk Factors in the Disclosure Statement. If the Class 1 Claim is not Allowed in the amount shown, the liabilities of this estate are reduced correspondingly and its equity increases.*

*Note. This estate reflects a deficit on a stand-alone basis because the Debtors' payables are concentrated in the New York estate while the Receivables Portfolio is concentrated in the New Jersey estate. That structural mismatch is the reason the Plan provides, at Section II.F.2, for the limited consolidation of the three estates solely for the purpose of funding and making distributions. On the consolidated basis shown on the following pages, every Allowed Claim in every Class is paid in full.*

"In re ProPhase Diagnostics, Inc."
Chapter 11 Reorganization
Case No. 25-19836-CMG

**Balance Sheet**

as of July 31, 2026

**Assets:**

| | |
|---|---|
| Bank Deposits | $0 |
| Projected Net Liquidation Value of Personalty | $500 |
| Intercompany Receivable (net proceeds of collection by the subsidiary estates) | $58,358,173 |
| **TOTAL ASSETS** | **$58,358,673** |

**Liabilities:**

| | |
|---|---|
| Estimated Allowed Secured Claims | $0 |
| Estimated Administrative Claim, collection agent (paid at the subsidiary level) | $0 |
| Estimated Administrative Claims, other professionals | $75,000 |
| Estimated Priority Tax Claims (IRS Claim No. 6) | $717.35 |
| Estimated General Unsecured Nonpriority Claims (Classes 7, 8 and 10) | $1,214,247.18 |
| **TOTAL LIABILITIES** | **$1,289,964.53** |
| **TOTAL EQUITY** | **$57,068,708.47** |

*Note. The asset shown above is an intercompany claim against the subsidiary estates for the net proceeds of the Receivables Portfolio. It is not an additional receivable. It represents the same dollars shown as accounts receivable on the balance sheets of ProPhase Diagnostics NJ, Inc. and ProPhase Diagnostics NY, Inc. It is therefore eliminated on the consolidating schedule that follows, consistent with Section II.F.2 of the Plan, so that no asset of the estates is counted more than once in determining the cash available to fund the Plan.*

"In re ProPhase Diagnostics NJ, Inc., et al."
(Jointly Administered)
Case Nos. 25-19833-CMG, 25-19834-CMG and 25-19836-CMG

## Consolidating Balance Sheet

as of July 31, 2026

*Presented on the limited consolidation basis provided in Section II.F.2 of the Plan, solely for the purpose of showing the cash available to fund distributions. Intercompany claims are eliminated.*

| | PP-NJ | PP-NY | PP-INC | Consolidated |
|---|---|---|---|---|
| Bank deposits | 270,051 | 97,149 | 0 | 367,200 |
| Personalty | 500 | 500 | 500 | 1,500 |
| Accounts receivable | 83,473,404 | 7,304,848 | 58,358,173 | 90,778,252 |
| Eliminate intercompany receivable | | | (58,358,173) | (58,358,173) |
| **TOTAL ASSETS** | **83,743,955** | **7,402,497** | **500** | **91,146,952** |
| | | | | |
| Secured claims (Classes 1 and 2) | 13,669 | 9,998,504 | 0 | 10,012,173 |
| Collection agent contingency | 25,042,021 | 2,191,454 | 0 | 27,233,475 |
| Other administrative claims | 250,000 | 75,000 | 75,000 | 400,000 |
| Priority non-tax reserve (Class 11) | 42,022 | 0 | 0 | 42,022 |
| Priority tax claims (IRS) | 928,917 | 0 | 717 | 929,634 |
| General unsecured (Classes 3 to 8, 10) | 606,747 | 1,264,230 | 1,214,247 | 3,085,224 |
| **TOTAL LIABILITIES** | **26,883,376** | **13,529,188** | **1,289,964** | **41,702,528** |
| **TOTAL EQUITY (DEFICIT)** | **56,860,579** | **(6,126,691)** | **(1,289,464)** | **49,444,424** |

*Reconciliation to the Financial Projections at Exhibit D. The accounts receivable shown above are the estimated lifetime collectible value of the entire Receivables Portfolio, realized over the multi-year collection horizon. The lesser figure shown in the Financial Projections at Exhibit D, approximately $47.6 million of net cash to the estates, is the deliberately conservative three-year plan-funding projection covering only the portion of the portfolio the Debtors project to resolve within the projection period, stated after the collection agent's contingency compensation. The two figures measure different things and are not additive.*

"In re ProPhase Diagnostics NJ, Inc."
(Jointly Administered)
Chapter 11 Reorganization
Case No. 25-19833-CMG

# Exhibit B

to

SECOND MODIFIED DISCLOSURE STATEMENT

**(PROFIT AND LOSS STATEMENT)**

"In re ProPhase Diagnostics NJ, Inc."

Chapter 11 Reorganization

Case No. 25-19833-CMG

[Jointly Administered, Lead Case No. 25-19833-CMG]

# STATEMENT OF OPERATIONS (CASH BASIS)

July 1 to July 31, 2026

**Revenue:**

| | |
|---|---|
| Accounts receivable receipts (per the collection agent) | $0 |
| Other receipts, including expenses paid by corporate affiliates for the benefit of the estate | $33,015 |
| **TOTAL RECEIPTS** | **$33,015** |

**Expenses:**

| | |
|---|---|
| Insurance | $0 |
| Payroll and taxes | $32,173 |
| Other business expenses | $150 |
| Reorganization items (United States Trustee quarterly fees) | $692 |
| **TOTAL EXPENSES** | **$33,015** |
| **NET PROFIT / (LOSS)** | **$0** |

*Note. A portion of the above expenses was paid by third party corporate affiliates for the benefit of the estate and is presented on both the receipts and the expense lines, so that the statement nets to the cash effect on the estate. Because the Debtors ceased active testing operations in 2025, these statements principally reflect the receipt of collections and the costs of administering these Chapter 11 cases rather than the operating results of an active testing business. The figures above are taken from the monthly operating report for the month ending July 31, 2026 [ECF Doc. No. 214], Parts 1 and 4. Each Debtor's monthly operating reports filed with the Court should be consulted for current financial detail.*

"In re ProPhase Diagnostics NY, Inc."
Chapter 11 Reorganization
Case No. 25-19834-CMG
[Jointly Administered, Lead Case No. 25-19833-CMG]

## STATEMENT OF OPERATIONS (CASH BASIS)

July 1 to July 31, 2026

**Revenue:**

| | |
|---|---|
| Accounts receivable receipts (per the collection agent) | $77,527 |
| Other receipts, including expenses paid by corporate affiliates for the benefit of the estate | $33,015 |
| **TOTAL RECEIPTS** | **$110,542** |

**Expenses:**

| | |
|---|---|
| Insurance | $0 |
| Payroll and taxes | $32,173 |
| Other business expenses | $149 |
| Reorganization items (United States Trustee quarterly fees) | $693 |
| **TOTAL EXPENSES** | **$33,015** |
| **NET PROFIT / (LOSS)** | **$77,527** |

*Note. A portion of the above expenses was paid by third party corporate affiliates for the benefit of the estate and is presented on both the receipts and the expense lines, so that the statement nets to the cash effect on the estate. Because the Debtors ceased active testing operations in 2025, these statements principally reflect the receipt of collections and the costs of administering these Chapter 11 cases rather than the operating results of an active testing business. The figures above are taken from the monthly operating report for the month ending July 31, 2026 filed in the lead case [ECF Doc. No. 212]. Each Debtor's monthly operating reports filed with the Court should be consulted for current financial detail.*

"In re ProPhase Diagnostics, Inc."
Chapter 11 Reorganization
Case No. 25-19836-CMG
[Jointly Administered, Lead Case No. 25-19833-CMG]

# STATEMENT OF OPERATIONS (CASH BASIS)

July 1 to July 31, 2026

**Revenue:**

| | |
|---|---|
| Accounts receivable receipts (per the collection agent) | $0 |
| Other receipts, including expenses paid by corporate affiliates for the benefit of the estate | $32,902 |
| **TOTAL RECEIPTS** | **$32,902** |

**Expenses:**

| | |
|---|---|
| Insurance | $0 |
| Payroll and taxes | $32,173 |
| Other business expenses | $99 |
| Reorganization items (United States Trustee quarterly fees) | $630 |
| **TOTAL EXPENSES** | **$32,902** |
| **NET PROFIT / (LOSS)** | **$0** |

*Note. A portion of the above expenses was paid by third party corporate affiliates for the benefit of the estate and is presented on both the receipts and the expense lines, so that the statement nets to the cash effect on the estate. Because the Debtors ceased active testing operations in 2025, these statements principally reflect the receipt of collections and the costs of administering these Chapter 11 cases rather than the operating results of an active testing business. The figures above are taken from the monthly operating report for the month ending July 31, 2026 filed in the lead case [ECF Doc. No. 213]. Each Debtor's monthly operating reports filed with the Court should be consulted for current financial detail.*

"In re ProPhase Diagnostics NJ, Inc."
(Jointly Administered)
Chapter 11 Reorganization
Case No. 25-19833-CMG

# Exhibit C

to

SECOND MODIFIED DISCLOSURE STATEMENT

## (LIQUIDATION ANALYSIS)

*Chapter 7 Liquidation Compared to the Treatment Provided by the Plan*

# CHAPTER 7 LIQUIDATION ANALYSIS

Consolidated across Cases 25-19833-CMG, 25-19834-CMG and 25-19836-CMG

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of a Claim in an impaired Class either accept the Plan or receive under the Plan at least as much as it would receive in a liquidation under Chapter 7. This analysis sets out what the Debtors project a Chapter 7 liquidation would produce, and compares that result to the treatment the Plan provides. The Plan pays every Allowed Claim in every Class in full.

**Basis and assumptions.**

1. The Receivables Portfolio is the estates' principal asset. Its value depends on an established collection program, existing payer relationships, claim-level knowledge of approximately 950,000 individual claims, and the ability to press payers through the discovery mechanisms available in these cases. A Chapter 7 trustee would take the portfolio without any of that.

2. The Debtors therefore project that a Chapter 7 trustee would realize between 10 percent and 20 percent of the value shown for the receivables at Exhibit A, whether by sale of the book to a claims purchaser or by collection without the existing program. Both ends of that range are shown below.

3. A replacement collection agent is assumed at the same 30 percent contingency rate.

4. The Chapter 7 trustee's commission is computed under Section 326(a) on the gross moneys the trustee would disburse. Separate trustee's counsel and other Chapter 7 professionals are estimated at 3 percent of gross proceeds, and wind-down costs at $250,000.

5. The Class 1 Secured Claim of ProPhase Labs, Inc. is secured by a blanket security interest in substantially all assets of all three Debtors, created by a Security Agreement dated January 7, 2025 and perfected by UCC-1 financing statements filed against each Debtor before the Petition Date. Substantially all property of these estates, including the Receivables Portfolio, its cash proceeds, and the Debtors' personalty, is therefore encumbered.

6. The costs of collecting and liquidating that collateral, being the replacement collection agent, the Chapter 7 trustee's statutory commission and the trustee's professionals, are charged against the collateral under Section 506(c) because they are incurred to preserve and dispose of it. The net proceeds remaining after that surcharge are applied to the Class 1 Claim before any distribution is made to any other holder. Only the residue, if any, is available to pay Chapter 7 administrative expenses, then Chapter 11 administrative claims under Section 726(b), then priority claims, and only then general unsecured claims.

## ESTIMATED CHAPTER 7 RECOVERY

| | **Low case (10%)** | **High case (20%)** |
|---|---|---|
| Receivables value per Exhibit A (consolidated) | 90,778,252 | 90,778,252 |
| Chapter 7 realization rate | 10% | 20% |
| Chapter 7 receivables proceeds | 9,077,825 | 18,155,650 |
| Cash on hand | 367,200 | 367,200 |
| Personalty at forced-sale value | 1,500 | 1,500 |
| **GROSS CHAPTER 7 ESTATE** | **9,446,525** | **18,524,350** |
| | | |
| Less: replacement collection agent (30%) | (2,723,348) | (5,446,695) |
| **Less: Chapter 7 trustee commission, 11 U.S.C. 326(a)** | **(306,646)** | **(578,981)** |
| **Less: trustee's counsel and other professionals (est. 3%)** | **(283,396)** | **(555,731)** |
| TOTAL SECTION 506(c) SURCHARGE | (3,313,389) | (6,581,406) |
| NET COLLATERAL PROCEEDS | 6,133,136 | 11,942,944 |

## DISTRIBUTION OF THE CHAPTER 7 ESTATE

| | **Low case (10%)** | **High case (20%)** |
|---|---|---|
| Net collateral proceeds available | 6,133,136 | 11,942,944 |
| Less: Class 1 Secured Claim (blanket lien, all three estates) | (6,133,136) | (9,998,504) |
| Class 1 recovery as a percentage of the $9,998,503.80 Claim | 61.3% | 100% |
| Class 1 unsecured deficiency under 11 U.S.C. 506(a) | 3,865,368 | none |
| **RESIDUE AVAILABLE TO ALL OTHER HOLDERS** | **0** | **1,944,440** |
| Less: Chapter 7 administrative and wind-down costs | 0 | (250,000) |
| Less: Chapter 11 administrative claims, 11 U.S.C. 726(b) | 0 | (531,787) |
| Less: priority tax and priority non-tax claims | 0 | (971,656) |
| **AVAILABLE FOR GENERAL UNSECURED CLAIMS** | **0** | **190,997** |
| General unsecured claims, Classes 3 to 8 and 10 | 3,085,224 | 3,085,224 |
| **PROJECTED CHAPTER 7 DISTRIBUTION, unsecured classes** | **0.0%** | **6.2%** |
| **DISTRIBUTION UNDER THE PLAN, unsecured classes** | **100%** | **100%** |

Conclusion. Because the Class 1 Claim is secured by substantially all assets of all three Debtors, a Chapter 7 liquidation would apply the net proceeds of those assets to that Claim before any other holder received anything. At the low end of the projected range the Class 1 Claim would not be satisfied in full and no other holder would receive any distribution. At the high end the Class 1 Claim would be satisfied and approximately 6.2 cents on the dollar would remain for the general unsecured Classes. Under the Plan every Allowed Claim in every Class is paid in full. The best interests test of Section 1129(a)(7) is therefore satisfied as to every impaired Class by a wide margin.

The consideration provided by the holder of the Class 1 Claim. The recovery the Plan provides to the other Classes is possible because the holder of the Class 1 Claim has agreed to Plan treatment that is materially less favorable than its entitlement outside the Plan. It agrees to accept payment over nine months rather than to enforce its liens against the collateral, it does not seek interest, fees or costs under Section 506(b) notwithstanding that its Claim is oversecured on the Debtors' projections, and it permits the collateral proceeds to fund administrative expenses, priority claims and payment in full of every general unsecured Class. That is the reason the Class 1 Claim is Impaired and entitled to vote.

The Section 326(a) commission alone. Even if it were assumed, contrary to the analysis above, that a Chapter 7 trustee could resolve the same $80,000,000 of gross claims the Plan projects, the trustee's statutory commission under Section 326(a) would be approximately $2,423,250, payable off the top before the trustee's separate counsel and other professionals. That sum is deducted from creditor recoveries in a liquidation and is not incurred under the Plan, under which the existing collection agent continues its work under compensation the Court has already approved.

"In re ProPhase Diagnostics NJ, Inc."
(Jointly Administered)
Chapter 11 Reorganization
Case No. 25-19833-CMG

# Exhibit D

to

SECOND MODIFIED DISCLOSURE STATEMENT

## (FINANCIAL PROJECTIONS)

*Track One Receivables Collections and Track Two Reorganized Operations*

## TRACK ONE: RECEIVABLES COLLECTIONS

*The Source of Cash That Funds Creditor Distributions and Carries Feasibility*

The Receivables Portfolio comprises approximately 950,000 claims in an aggregate gross billed amount of approximately $242 million, in active settlement negotiation with the major national commercial and governmental payers. The projection below assumes resolution of only a minority of that documented portfolio, on the order of one third, over three years. Amounts are stated in the aggregate. The identities of individual payers and the terms of individual settlements are confidential and are presented for approval through the Rule 9019 process.

| **COLLECTIONS WATERFALL** | **Year 1** | **Year 2** | **Year 3** | **3-Year Total** |
|---|---|---|---|---|
| Gross claims resolved | 25,000,000 | 40,000,000 | 15,000,000 | 80,000,000 |
| Net settlement value (approx. 85%) | 21,250,000 | 34,000,000 | 12,750,000 | 68,000,000 |
| Less: collection agent fee (30%) | (6,375,000) | (10,200,000) | (3,825,000) | (20,400,000) |
| **NET CASH TO THE ESTATES** | **14,875,000** | **23,800,000** | **8,925,000** | **47,600,000** |

### DOCUMENTED NEAR-CERTAIN FLOOR (ALREADY SETTLED OR COMMERCIALLY AGREED)

| **Closure tier (net of discount)** | **Net amount** |
|---|---|
| Agreement executed (signed instruments) | $367,201 |
| Claims reprocessing required (settled at 100%) | $4,137 |
| Working through agreement (terms agreed, paper pending) | $1,618,707 |
| Settled, no formal agreement | $8,931 |
| **TOTAL DOCUMENTED** | **$1,998,976** |

*Timing. The resolution of a settlement, meaning agreement on commercial terms, is distinct from the funding of that settlement, meaning receipt of cash. Funding ordinarily lags resolution by a period of months, and the projection reflects that lag.*

# TOTAL PLAN OBLIGATIONS AND COVERAGE

| Obligation | Amount |
|---|---|
| Class 1, Secured Claim of ProPhase Labs, Inc. (PP-NY) | $9,998,503.80 |
| Class 2, Secured Claim of the Township of Old Bridge (PP-NJ) | $13,669.00 |
| Class 3, General Unsecured over $5,000 (PP-NJ) | $601,980.11 |
| Class 4, Administrative Convenience under $5,000 (PP-NJ) | $4,766.95 |
| Class 5, General Unsecured over $3,000 (PP-NY) | $1,257,329.90 |
| Class 6, Administrative Convenience under $3,000 (PP-NY) | $6,899.96 |
| Class 7, General Unsecured over $3,000 (PP-INC) | $1,088,162.30 |
| Class 8, Administrative Convenience under $3,000 (PP-INC) | $1,084.88 |
| Class 9, Contingent, Disputed and Unliquidated Claims (estimated) | $0.00 |
| Class 10, Allowed Settled Claim of Drexel, Estate Component (PP-INC) | $125,000.00 |
| Class 11, Contingent Priority Non-Tax Claims (estimated Allowed) | $0.00 |
| Class 12, Equity Interests (retained, no distribution) | n/a |
| **SUBTOTAL, ALL CLASSES** | **$13,097,396.90** |
| Priority Tax Claim of the IRS, principal | $929,634.31 |
| Interest on the Priority Tax Claim (4.0%, 36 monthly installments) | $58,440.05 |
| Allowed administrative claims payable on the Effective Date | $531,787.00 |
| **TOTAL PLAN OBLIGATIONS** | **$14,617,258.26** |

*Memorandum item. The Debtors will establish and maintain a reserve of $42,022.13, the full asserted amount of the Class 11 Claims, pending resolution of the Debtors' objection to the priority characterization of those Claims. The Debtors estimate the Allowed priority amount at $0.00, and the reserve is therefore not included in the total above.*

*Allowed administrative claims. The figure above comprises the unpaid balance of interim fee awards to Debtors' counsel of $68,383, being $148,383 approved less $80,000 paid as reported at Part 5 of the monthly operating report for the month ending July 31, 2026 [ECF Doc. No. 214]; post-petition ordinary course payables of $63,404 as reported at Part 2 of that report; and $400,000 of estimated remaining professional compensation and statutory fees across the three estates, being the figure carried on the balance sheets accompanying that report, all subject to Court approval upon application. Of that estimate, special litigation counsel has filed monthly fee statements for April and May 2026 totaling $25,234.70 [ECF Doc. Nos. 195 and 196], of which $20,212.70 became payable upon the filing of the Certifications of No Objection on August 16, 2026 [ECF Doc. Nos. 210 and 211] and $5,022.00 is held back; monthly fee statements for June and July 2026 have not been filed. Compensation of the collection agent is deducted in arriving at the net cash figures in the Collections Waterfall above and is payable from the DIP Receivables Trust Account solely upon Application for Compensation and Order of the Court per ECF Doc. Nos. 41 and 154. It is therefore already reflected in the net cash figures above, rather than being an additional Plan obligation.*

| COVERAGE OF PLAN OBLIGATIONS | Amount |
|---|---|
| Projected net cash to the estates from Track One over three years | $47,600,000 |
| Total Plan obligations | ($14,617,258.26) |
| **PROJECTED SURPLUS OVER ALL PLAN OBLIGATIONS** | **$32,982,741.74** |

| | |
|---|---|
| **COVERAGE RATIO** | **3.26x** |

## CASH FLOW PROJECTION, YEAR 1

November 1, 2026 through October 31, 2027 (assumed Effective Date November 1, 2026)

| ($) | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Track One net collections | 700,000 | 770,000 | 847,000 | 931,700 | 1,024,800 | 1,127,700 | 1,240,400 | 1,371,300 | 1,500,800 | 1,650,600 | 1,815,800 | 1,894,900 | 14,875,000 |
| Track Two net operating income | - | - | - | - | 50,000 | 140,000 | 250,000 | 350,000 | 450,000 | 450,000 | 450,000 | 450,728 | 2,590,728 |
| **TOTAL CASH GENERATED** | **700,000** | **770,000** | **847,000** | **931,700** | **1,074,800** | **1,267,700** | **1,490,400** | **1,721,300** | **1,950,800** | **2,100,600** | **2,265,800** | **2,345,628** | **17,465,728** |
| Class 1 (Labs secured) | 650,841 | 715,925 | 787,518 | 866,270 | 999,320 | 1,178,674 | 1,385,734 | 1,600,419 | 1,813,802 | - | - | - | 9,998,504 |
| Classes 4, 6, 8 (convenience) | - | 12,752 | - | - | - | - | - | - | - | - | - | - | 12,752 |
| Class 2 (Old Bridge) | - | - | 13,669 | - | - | - | - | - | - | - | - | - | 13,669 |
| Classes 3 and 5 (GUC) | - | - | - | - | - | - | - | - | 619,770 | 619,770 | 619,770 | - | 1,859,310 |
| Classes 7 and 10 (GUC, Drexel) | - | - | - | - | - | - | - | - | - | - | - | 1,213,162 | 1,213,162 |
| Priority tax (IRS) | 27,447 | 27,447 | 27,447 | 27,447 | 27,447 | 27,447 | 27,447 | 27,447 | 27,447 | 27,447 | 27,447 | 27,447 | 329,358 |
| Administrative claims | 531,787 | - | - | - | - | - | - | - | - | - | - | - | 531,787 |
| **TOTAL PLAN PAYMENTS** | **1,210,075** | **756,124** | **828,634** | **893,716** | **1,026,767** | **1,206,120** | **1,413,181** | **1,627,865** | **2,461,018** | **647,217** | **647,217** | **1,240,609** | **13,958,542** |
| Operating and administrative expenses | 89,500 | 89,500 | 97,100 | 89,500 | 89,500 | 100,800 | 87,000 | 87,000 | 87,000 | 87,000 | 84,500 | 84,500 | 1,072,900 |
| **ENDING CASH BALANCE** | **1,399,401** | **1,323,777** | **1,245,044** | **1,193,527** | **1,152,061** | **1,112,840** | **1,103,060** | **1,109,494** | **512,276** | **1,878,659** | **3,412,743** | **4,433,262** | **4,433,262** |

*Opening cash of $1,998,976 is the Documented Near-Certain Floor shown above. Of that sum, $367,200 is already on deposit and is the bank-deposit balance shown at Exhibit A, having been received and deposited in the DIP Receivables Trust Account as proved at ECF Doc. No. 190; the remaining $1,631,776 is settled or commercially agreed and not yet funded. The two are the same money and are not added together. Class 1 is paid over Months 1 through 9 as provided in the Plan, on the ramped schedule shown, which is the schedule the Plan adopts by reference. The projection remains cash positive in every month, with a minimum ending balance of $801,949 in Month 9.*

## CASH FLOW PROJECTION, YEARS 1 THROUGH 3

November 1, 2026 through October 31, 2029

| ($) | Year 1 | Year 2 | Year 3 | 3-Year Total |
|---|---|---|---|---|
| Track One net collections | 14,875,000 | 23,800,000 | 8,925,000 | 47,600,000 |
| Track Two net operating income | 2,590,728 | 5,502,444 | not projected | 8,093,172 |
| **TOTAL CASH GENERATED** | **17,465,728** | **29,302,444** | **8,925,000** | **55,693,172** |
| Plan payments to creditors and the IRS | (13,958,542) | (329,358) | (329,358) | (14,617,258) |
| Operating and administrative expenses | (1,072,900) | (1,072,900) | (1,072,900) | (3,218,700) |
| **NET CASH FLOW** | **2,434,286** | **27,900,186** | **7,522,742** | **37,857,214** |
| **ENDING CASH BALANCE** | **4,722,935** | **32,623,121** | **40,145,863** | **40,145,863** |

*Track Two is not relied upon for feasibility. Year 3 operating income from the reorganized genomic sequencing business is shown as not projected, and is excluded from the totals for Year 3, in order to state the projection conservatively. Track One alone funds every payment the Plan requires. Excluding Track Two entirely, net collections of $47,600,000 over three years exceed total Plan obligations of $14,617,258 by $32,982,742.*

### TRACK TWO: REORGANIZED GENOMIC SEQUENCING BUSINESS

*Presented to demonstrate that the reorganized Debtors are a viable, operating going concern. Not relied upon to fund creditor distributions.*

| ($) | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| Total revenue, including subscription renewals | 5,746,914 | 11,814,815 | not projected |
| Less: in-house laboratory cost | (2,221,185) | (4,442,370) | not projected |
| Less: marketing investment | (935,000) | (1,870,000) | not projected |
| **NET OPERATING CASH FLOW** | **2,590,728** | **5,502,444** | **not projected** |

*The genomic sequencing business currently generates approximately $4 million in annual revenue with no dedicated marketing investment. The reorganization brings sequencing in house on laboratory platforms the Debtors operate, which is expected to improve per-test margins relative to outsourcing, and funds a disciplined marketing and customer-acquisition program supported in part by collection proceeds. Longer term diagnostic initiatives are described in the Disclosure Statement as opportunities only and are not included in this projection.*

"In re ProPhase Diagnostics NJ, Inc."
(Jointly Administered)
Chapter 11 Reorganization
Case No. 25-19833-CMG

# Exhibit E

to

SECOND MODIFIED DISCLOSURE STATEMENT

## (FIRST MODIFIED JOINT PLAN OF REORGANIZATION)

*Filed separately on the docket and served together with this Disclosure Statement.*