**WEBBER MCGILL LLC**
Douglas J. McGill, Esq.
100 E. Hanover Avenue, Suite 401
Cedar Knolls, New Jersey 07927
Tel: (973) 739-9559
Fax: (973) 739-9575
*Attorneys for PPFB, LLC*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>ProPhase Diagnostics, NJ, *et al.*,[1]<br><br>Debtors-in -Possession. | Case No. 25-19833 (CMG)<br>Chapter 11<br><br>Hon. Christine M. Gravelle<br>(Jointly Administered) |

**RESPONSE IN OPPOSITION TO DEBTORS' OBJECTION TO PROOFS OF CLAIM FILED BY PPFB, LLC OR, IN THE ALTERNATIVE, TO ESTIMATE THE CLAIMS AT $0, PURSUANT TO 11 U.S.C. §§ 502(b) AND 502(c)**

PPFB, LLC, ("**PPFB**" or "**Relator**") hereby responds and objects to Debtors' Objection to Proofs of Claim Filed by PPFB, LLC or, in the Alternative, to Estimate the Claims at $0, Pursuant to 11 U.S.C. §§ 502(b) and 502(c), as follows:

## BACKGROUND

1. On January 27, 2023, Relator filed a *qui tam* lawsuit against the Debtors' parent ProPhase Labs, Inc. ("**ProPhase Labs**") and others in the District Court for the Eastern District of New York, Case No. CV 23-0627 (E.D.N.Y.). ("**EDNY Action**"). That case remains pending. A true and correct copy of the Second Amended Complaint (the "**EDNY Complaint**") in the EDNY Action is attached as Exhibit A to the Certification of Grace Y. Park, Esq. submitted herewith, and is incorporated herein by reference.

[1] ProPhase Diagnostics, NY, Inc., No. 25-19834 (CMG); ProPhase Diagnostics, Inc., No. 25-19836 (CMG)

2. Generally speaking, the EDNY Action involves a scheme carried out by ProPhase Labs and the Debtors to defraud the United States, New York, and New Jersey in connection with HRSA, Medicare, and Medicaid reimbursement payments in violation of the federal False Claims Act, 31 U.S.C. § 3729, *et seq.;* the New York False Claims Act, New York State Fin. Law § 189, *et seq.* and the New Jersey False Claims Act, N.J. Stat. § 2A:32C-3.

3. PPFB has filed proofs of claim (the "**Proofs of Claim**") against each of the Debtors, in an amount exceeding $75 million, based the factual allegations set forth in the EDNY Action, and the assertion that each of the Debtors is the alter ego of ProPhase Labs.

4. On December 19, 2025, PPFB commenced the adversary proceedings styled *United States of America, New York State and State of New Jersey, ex rel. PPFB, LLC*; Adv. Pro. Nos. 25- 02526; 25-02527; 25-02528 (the "**Adversary Proceedings**"), asserting that each of the Debtors is the alter ego of ProPhase Labs and liable for violation of the False Claims Acts, and seeking to have such liability declared non-dischargeable pursuant to 11 U.S.C. § 1141(d)(6).

5. On April 10, 2026, the Court entered a Consent Order [Docket No. 106] (the "**Consent Order**") modifying the automatic stay to permit Relator to commence and prosecute a lawsuit(s) against the Debtors in the United States District Court for the Eastern District of New York or other appropriate non-bankruptcy forum, in order to liquidate claims which are the subject of the above-captioned non-dischargeability proceedings. PPFB has since amended its complaint in the EDNY Action to assert claims against the Debtors, which are underlying claims which are the subject of the Adversary Proceedings.

6. On August 5, 2026, the Hon. Natasha C. Merle held a pre-motion conference concerning the Debtors' (and other defendants') impending motion to dismiss the EDNY Action.

At that conference, Judge Merle expressed skepticism that such motion to dismiss would succeed. *See Park Certification at ¶ 2*.

4. Three days later, on August 8, 2026, the Debtors' filed the instant Objection and Motion. PPFB's opposition to the motion to dismiss the EDNY Action is due October 23, 2026, and Debtors' Reply, if any, is due November 23, 2026. *See id*.

**OPPOSITION TO DEBTORS' OBJECTION TO PROOFS OF CLAIM**

5. The Debtors' instant Objection and Motion amounts to a re-hash of arguments viewed with skepticism by Judge Merle, and is a back-door attempt to short-circuit the pending EDNY Action. By way of the Consent Order, the Debtors have agreed to have the claims and causes of action upon which the Proofs of Claim are based (the "**Claims**") litigated and liquidated in the EDNY Action. Bankruptcy Courts appropriately abstain from hearing claim objections which are already the subject of pending litigation in another forum. *See, e.g., McIntyre v. Active Energies Solar, LLC*, BAP Appeal No. 22-4, Docket No. 44 at p. 19 (10th Cir. BAP. 2022) (affirming bankruptcy court's decision to abstain from hearing claim objection because "[a]lthough the [c]laim [o]bjection is a core proceeding, the Bankruptcy Court, focusing on substance rather than form, dismissed it because it was "simply a reassertion of the [State Law Claims] the Court [had] already abstained from hearing[.]") (citing *United States v. Bagley (In re Murdock Mach. & Eng'g Co. of Utah*), 990 F.2d 567, 572 (10th Cir. 1993) (in claim allowance process, where a specialized forum or administrative agency has been entrusted with authority to liquidate claims such as those before the bankruptcy court, the bankruptcy court usually should defer to that forum); *Hanson v. HSBC Bank, USA (In re Hanson)*, 525 B.R. 791, 796 (Bankr. M.D. Fla. 2015) (court abstained from hearing count in adversary proceeding that was an objection to a proof of claim as objection was based entirely on state law that could be resolved in foreclosure

action pending when bankruptcy case was filed); *In re BFW Liquidation, LLC*, 459 B.R. 757, 779–80 (Bankr. N.D. Ala. 2011) (court abstained from hearing debtor's objection to proof of claim to allow the extent of withdrawal liability to be resolved through arbitration).

6. Notwithstanding the foregoing, the Debtors raise a number of *non-sequiturs* in their attack on the merits of the Claims. First, the Debtors' effort to make an issue out of the fact that the governments have not intervened in the EDNY Action is of no moment. Courts have long recognized that a government's decision not to intervene in a case has no bearing on the merits of that action. *See, e.g., United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 n.17 (11th Cir. 2006) ("In any given case, the government may have a host of reasons for not pursuing a claim."); *United States ex rel. Chandler v. Cook Cty., Ill.*, 277 F.3d 969, 974 n.5 (7th Cir. 2002) ("The Justice Department may have myriad reasons for permitting the private suit to go forward including limited prosecutorial resources and confidence in the relator's attorney."); *United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1077 (N.D. Cal. 2020) ("The government's failure to intervene on any or all claims does not mean that the claims lack merit (or that the government thinks that they do)."); *United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 455 (5th Cir. 2005) ("[A] decision not to intervene may not necessarily be an admission by the United States that it has suffered no injury in fact, but rather the result of a cost-benefit analysis").

7. Moreover, the Debtors generally ignore the specifically pleaded allegations set forth in the EDNY Complaint, including that the EDNY Complaint alleges that Debtors are alter egos of the parent, Prophase Labs, Inc. Such allegations are not pleaded in a vacuum, nor mere licensure issues. As set forth in the EDNY Complaint:

> On March 31, 2021, the New Jersey Department of Health found that Debtor's Laboratory Director "failed to provide overall management and direction to the laboratory to ensure that laboratory testing is performed satisfactorily for molecular COVID tests." *See Exhibit 1 to EDNY Complaint*. NJ DOH noted seven deficiencies. These include: (1) failure to minimize contamination; and (2) failure to validate the COVID testing. See *id*. The ProPhase COO learned that the Parent's former lab director prepared the company's initial, deficient validation study, which he later sold to other labs. *See EDNY Complaint at* ¶ *84*. That plagiarism was easy to detect, since the former lab director inadvertently submitted a draft of the validation report to NJ DOH with telltale typos and other editing errors. *See id*. The former lab director also sold the same draft to the defrauding labs with the same typos and errors. *See id*.

8. In other words, NJ DOH determined that Debtors could not validate the accuracy of its COVID tests at the height of a global pandemic. NJ DOH could not determine how many other laboratories administered COVID tests using plagiarized and unvalidated testing.

9. The Debtors' contention that PPFB cannot prove scienter is, again, belied by the very specific allegations of conscious wrongdoing:

> On March 31, 2021, immediately after NJ DOH's onsite inspection concluded, the ProPhase COO immediately walked over to Karkus's (the CEO) office and told him about the NJ DOH order. Karkus' initial response was "Oh shit." When the ProPhase COO told Karkus that COVID testing had to cease immediately, Karkus responded: "We are not shutting down for anyone." Karkus explained that the company had to continue its COVID testing to "bring revenue up" and accordingly directed the ProPhase COO to "do what you have to do." *See id. at* ¶ *85*.

10. The EDNY Complaint further alleges:

> Once, the ProPhase COO and the ProPhase CFO, together, advised Karkus to cease testing and disclose the order to investors. In response, Karkus exploded and told the ProPhase COO and CFO that ProPhase would not disclose the order to investors, would continue COVID testing at its New Jersey and New York labs, and would "march on" and operate like "business as usual." *See id. at* ¶ *87.*

> . . .
>
> On one occasion, The Laboratory Supervisor showed a NJ DOH inspector a shut-down machine to demonstrate that COVID testing had in fact ceased—a move that Karkus later described as "brilliant." *Id. at ¶ 95*.
>
> . . .
>
> The ProPhase COO advised Karkus that he risked both civil and criminal liability under the False Claims Act for failing to cease COVID testing at ProPhase's New Jersey and New York labs and under the securities laws for failing to disclose the March 31, 2021 order to investors. Karkus responded that the "reward" of larger revenue and increasing stock prices outweighed the risk of False Claims Act or securities law liability. Karkus further told the ProPhase COO that he had apprised his personal attorney of the matter and "would resolve it" should governmental authorities become aware of his conduct. *Id. at ¶ 119*.

11. On April 9, 2021, New Jersey Department of Health issued its stop order. In that order, NJ DOH stated: "If deficiencies are cited, an approved plan of correction *is requisite to continued program participation*." The letter provided 14 pages of deficiencies. The letter also states: "Any deficiency statement ending with an asterisk (*) denotes a deficiency which the institution may be excused from correcting providing it is determined that other safeguards provide a sufficient protection to the patients." The stop order does not contain any asterisks, , meaning that NJ DOH did not excuse any deficiency that would allow "continued program participation." *See Exhibit 1 to EDNY Complaint*.

12. The April 9, 2021, letter summarized its findings: "the deficient practices of your laboratory pose immediate jeopardy to patient health and safety," in which "immediate corrective action is necessary because the laboratory's non-compliance with one or more Condition-level requirements has already caused, is causing, or is likely to cause, at any time, serious injury or harm, or death, to individuals served by the laboratory or to the health and safety of the general public." *See id*.

13. 42 CFR 493.1812 provides the enforcement procedures for situations where the lab poses "immediate jeopardy." Under 1812(a), if Prophase does not remove the immediate jeopardy, *i.e.* stop testing, then it faces sanctions. Under 1812(b), if NJ DOH makes an unannounced visit and finds that testing is taking place, Prophase faces suspension or revocation. Under 1812(c), if NJ DOH finds that Prophase is continuing to administer unvalidated/inaccurate COVID tests at the height of the pandemic, then it can seek an injunction or TRO.

14. ProPhase did not "remove the jeopardy" identified by NJ DOJ. Rather ProPhase continued COVID testing using unvalidated methods that posed harm to human health. Moreover, ProPhase created the impression that it has "eliminated the jeopardy," *i.e.*, ceased COVID testing using unvalidated methods. Rather, ProPhase concealed the fact that it continued COVID testing using unvalidated methods to avoid CMS suspension, enforcement, injunction, and/or revocation of its CLIA certificate.

15. Specifically, ProPhase continued its COVID testing at the New Jersey and New York labs at nighttime to avoid detection. *See EDNY Complaint at ¶ 94*. "The Laboratory Supervisor told the ProPhase COO that NJ DOH conducted two or three surprise inspections to confirm that the "immediate jeopardy," *i.e.* unvalidated COVID testing, ceased in accordance with the stop order." *Id.* at ¶ 95. At the New Jersey lab, COVID testing took place behind a wall to avoid detection from unannounced visits from NJ DOH. *See id. at ¶ 94*. "Multiple ProPhase employees told the ProPhase COO that Miralles scrubbed ProPhase's laboratory information system (LIS) to falsely show that COVID testing took place at another lab instead of ProPhase's New Jersey and New York labs. *See id. at ¶ 96*, and the ProPhase COO observed Karkus approve Miralles' proposal of purchasing device trackers on Amazon.com and directing a ProPhase employee to drive near the Alliance facility (which was near where she lived) with the tracker

enabled. The employee did not load or deliver any specimens when the tracker was enabled. Rather, Miralles kept the records of the tracker on his computer in the event that NJ DOH or other governmental agencies sought evidence that specimens were in fact being delivered to Alliance (when in fact they were not). Such activities were carried out to give the false impression of compliance with 42 C.F.R. § 493.1812.

16. None of the foregoing is a mere licensure issue as the Debtors would have this Court believe. Apart from issues of public safety, the foregoing alleged conduct necessarily involved fraudulent misrepresentations for which the Debtors are liable in many millions of dollars in damages.

17. The Debtors made many false express and implied certifications for which they are liable. With respect to "falsity," each claim is submitted on a Form CMS 1500.[2] For each claim, Debtors have to certify that the claim, whether submitted by [the provider] or on [the provider's] behalf by [the provider's] designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law). Debtors did not comply with this provision.

18. When "a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 187, 136 S. Ct. 1989, 1999, 195 L. Ed. 2d 348 (2016). Debtors representations were misleading because, among

[2] https://www.cms.gov/medicare/cms-forms/cms-forms/downloads/cms1500.pdf.

other reasons, they repeatedly omitted that its COVID tests were unvalidated and subject to cross-contamination.

**<u>OBJECTION TO DEBTORS' MOTION TO ESTIMATE CLAIMS</u>**

19. The Debtors' Motion to estimate PPFB's substantial Claims at $0 should be denied for several reasons. First, the Debtors' have not submitted any evidence that litigation of the Claims in the EDNY Action will cause undue delay in the administration of their estates. *See 502(c)*. In fact, the Magistrate Judge assigned to the EDNY Action, Hon. Anne Y. Shields, requires "Tier One" discovery to be completed within 60 days after the parties Rule 26(f) conference, following which "the parties should be in a position to enter into meaningful settlement discussions or be able to identify additional limited discovery necessary to put the matter into a meaningful settlement posture." *See Park Certification, Exhibit B*. The Tier One discovery to be produced should include claims data (de-indentified to comply with HIPAA) which will significantly bear on the merits of the Claims.

20. Secondly, "[b]anruptcy law favors liquidation over estimation," *In re VidAngel, Inc.*, 593 B.R. 340, 350 (Bankr. D.Utah 2018); the Debtors have not proposed a procedure to fairly determine and liquidate the Claims, and the evidentiary record is otherwise inadequate to do so. At the absolute minimum, PPFB, LLC must be afforded a reasonable period of discovery and afforded a trial, even if on an expedited timetable.

21. Lastly, for the reasons set forth above, PPFB's claims, if estimated, should not be estimated at $0. Rather, such claims must, at miminim, be estimated in the many millions of dollars based upon the very specifically pleaded and colorable claims set forth in the EDNY Complaint, and based on the current record before this Court.

## CONCLUSION

**WHEREFORE**, PPFB respectfully requests that the Court deny the Debtor's Objection and Motion, and grant such other and further relief as the Court deems just and proper.

**WEBBER MCGILL LLC**
*Attorneys for PPFB, LLC*

By: */s/ Douglas J. McGill*
Douglas J. McGill

Dated: September 8, 2026